Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrellcantrall.com
Diane Martinez, State Bar No. 276499
E-Mail: dmartinez@hurrellcantrall.com
Blessing O. Ekpezu, State Bar No. 332308
E-Mail: bekpezu@hurrellcantrall.com
HURRELL CANTRALL LLP
725 S. Figueroa Street, Suite 3800
Los Angeles, California 90017
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendants, CITY OF LOS ANGELES, OFFICER DUSTIN RICHMOND AND OFFICER JOSEPH HUNT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NICOLE JUAREZ ZELAYA, Individually and as Successor-In-Interest to Decedent, JACOB JUAREZ CEDILLO,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, OFFICER DUSTIN RICHMOND as Doe 1, OFFICER JOSEPH HUNT as Doe 2 and DOES 3 THROUGH 10, Inclusive,<br><br>Defendants. | Case No. 2:20-cv-08382-ODW (MAAx)<br><br>Judge:  Judge Otis D. Wright, II - Courtroom 5D<br><br>**DEFENDANTS CITY OF LOS ANGELES, OFFICER DUSTIN RICHMOND AND OFFICER JOSEPH HUNT'S NOTICE OF MOTION AND MOTION FOR NEW TRIAL AND/OR MOTION TO ALTER OR AMEND THE JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>(*Federal Rules of Evidence,* **Rule 59(a), Rule 59(e)**)<br><br>**[Concurrently Filed with:**<br>**1.  Supporting Declaration of Diane Martinez, Esq.;**<br>**2.  Index of Exhibits;**<br>**3.  Notice of Lodging; and**<br>**4.  [Proposed] Order]**<br><br>***Hearing***<br>**Date: January 8, 2024**<br>**Time: 1:30 p.m.**<br>**Courtroom: "5D"** |

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that on January 8, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard, Defendants CITY OF LOS ANGELES, OFFICER DUSTIN RICHMOND and OFFICER JOSEPH HUNT's Motion for New Trial and/or Motion to Alter or Amend the Judgment is to come on for hearing in Courtroom "5D" of the above-entitled Court.

Pursuant to *Federal Rules of Civil Procedure*, Rule 59(a), Defendants CITY OF LOS ANGELES ("the City"), OFFICER DUSTIN RICHMOND ("Officer Richmond") and OFFICER JOSEPH HUNT ("Officer Hunt") (collectively referred to as "Defendants") move for a new trial on the grounds of prejudicial judicial misconduct, which prevented Defendants from having a fair trial.  Accordingly, a new trial must be granted on behalf of the City, Officer Richmond and Officer Hunt, as to all issues, including liability and damages, on which Plaintiff prevailed at trial. Additionally, the damages were excessive, and influenced by the judicial misconduct.  Thus, a new trial should be granted.  At a minimum, a Remittitur should issue.

For the same reasons, and due to manifest error of law and facts upon which the judgment is based, this Court should alter/amend/vacate the judgment, entered in favor of Plaintiff Nicole Juarez Zelaya ("Plaintiff"), pursuant to *Federal Rules of Civil Procedure,* Rule 59(e).

This motion is made following the conference of counsel pursuant to *Local Rule* 7-3 which took place on December 1, 2023.

In compliance with this Court's rules, the Memorandum of Points and Authorities does not exceed 7,000 words.

/ / /

/ / /

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE   (213) 426-2000

1    This motion is based upon this notice and the attached Memorandum of

2  Points and Authorities, the Declaration of Diane Martinez, Esq., the concurrently

3  filed exhibits, and all exhibits, papers, pleadings, transcripts, and documents

4  contained on file, and upon all further oral and documentary evidence as may be

5  presented at the time of the hearing on this motion.

6

7  DATED:  December 8, 2023        HURRELL CANTRALL LLP

8

9

By:    _/s/ Thomas C. Hurrell_

10                                THOMAS C. HURRELL

11                                DIANE MARTINEZ

BLESSING O. EKPEZU

12                                Attorneys for Defendants, CITY OF LOS

13                                ANGELES, OFFICER DUSTIN

RICHMOND AND OFFICER JOSEPH

14                                HUNT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION....................................................................... 1

II.   STATEMENT OF THE FACTS .............................................. 2

III.   STATEMENT OF THE CASE ................................................ 5

IV.   A MOTION FOR NEW TRIAL IS PROPERLY GRANTED BASED UPON PREJUDICIAL JUDICIAL MISCONDUCT. ................................... 11

V.   A NEW TRIAL MUST BE ORDERED BASED UPON PREJUDICIAL JUDICIAL MISCONDUCT. ............................... 12

   A.   THE COURT IMPROPERLY AND REPEATEDLY ATTACKED THE CREDIBILITY OF THE DEFENSE WITNESSES........................................................................ 13

      a.   Court's Attack of Credibility of Defense Expert Flosi.............. 15

      b.   Court's Attack of the Credibility of Defendants ....................... 16

      c.   Court's Attack of Credibility of Witness LAPD Officer. .......... 17

   B.   THE COURT IMPROPERLY AND REPEATEDLY CONSTRUED THE EVIDENCE IN A MANNER FAVORABLE TO THE PLAINTIFF ON THE ULTIMATE ISSUE OF LIABILITY, *WHICH CONFLICTED WITH DEFENDANTS' EVIDENCE*, IN FRONT OF THE JURY. ................ 18

VI.   THE JUDICIAL MISCONDUCT WAS PREJUDICIAL. ............................ 21

VII.   THE DAMAGES ARE EXCESSIVE............................................................ 21

VIII.   THIS COURT SHOULD GRANT A MOTION UNDER RULE 59(E)........ 22

IX.   CONCLUSION…………………………………………………….......23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Champeau v. Fruehauf Corp.*, 814 F.2d 1271 (8th Cir. 1987)...................................12

*Closson v. Bank of Am., NA*, 600 F. App'x 575 (9th Cir. 2015)...............................12

*Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103 (9th Cir. 1991) .................21

*Estate of Casillas v. City of Fresno,* 2019 WL 2869079 (E.D. Cal. 2019)...............22

*Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999)……………………..22

*Maheu v. Hughes Tool Co.*, 569 F.2d 459 (9th Cir. 1977)....................................13, 19

*Mears v. City of Los Angeles,* 2018 WL 11305362 (C.D. Cal. 2018)........................22

*Rivas v. Brattesani*, 94 F.3d 802 (2d Cir. 1996)......................................14, 16, 18, 21

*Ross v. Black & Decker, Inc.*, 977 F.2d 1178 (7th Cir. 1992)..................................12

*Sandin v. Conner*, 515 U.S. 472 (1995).............................................................................2

*Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921 (4th Cir. 1984)...................18

*Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987)……………………..22

*Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058 (9th Cir. 2003) ...............22

*U.S. v. Harris*, 501 F.2d 1  (9th Cir. 1974).........................................................12, 20

*United States v. Allsup*, 566 F.2d 68 (9th Cir. 1977) ............................................13

*United States v. Blood*, 435 F.3d 612 (6th Cir. 2006) ...............................................12

*United States v. Hall*, 271 F. App'x 559 (9th Cir. 2008) .........................................14

*United States v. Laurins*, 857 F.2d 529 (9th Cir. 1988) ..........................................21

*United States v. Mazzilli*, 848 F.2d 384 (2d Cir. 1988)............................................13

*United States v. Nazzaro,* 472 F.2d 302 (2d Cir. 1973) ............................................14

*United States v. Pena-Garcia*, 505 F.2d 964 (9th Cir. 1974)....................................13

*United States v. Pritchard*, 485 F. App'x 199 (9th Cir. 2012) .................................14

*United States v. Tilghman*, 134 F.3d 414 (D.C. Cir. 1998)........................................13

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

*Walker v. Sumner*, 14 F.3d 1415 (9th Cir. 1994) ................................................2, 12

*Watec Co. v. Liu*, 403 F.3d 645 (9th Cir. 2005) .........................................................21

## **OTHER AUTHORITIES**

42 U.S.C. § 1983.................................................................................................. 1, 14

*Federal Rules of Civil Procedure,* Rule 59 ....................................................2, 12, 22

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION.

This is a 42 U.S.C. § 1983 action arising from allegations that on April 8, 2019, Los Angeles Police Department ("LAPD") Officers Richmond and Hunt used excessive force against Jacobo Cedillo ("Decedent") during a pedestrian stop, resulting in his death.  A jury trial took place before the Honorable Judge Otis Wright.  The jury found the Defendant Officers used excessive force in violation of the Decedent's Fourth Amendment rights, the City was liable on a failure to train claim, and Plaintiff was entitled to prevail on her Fourteenth Amendment familial relationship claim.  The jury awarded damages in the amount of $13,500,000, as follows: $6,000,000 for Decedent's pre-death pain and suffering, $6,000,000 for Decedent's loss of life, and $1,500,000 for wrongful death damages.  Dkt. 129.

Respectfully, Defendants the City, Officer Richmond and Officer Hunt submit a new trial is plainly warranted based upon judicial misconduct.  A number of Court's comments, made in front of the jury, constituted prejudicial judicial misconduct, both individually and cumulatively.  For example, during the examination of Defendants' key expert witness, Edward Flosi, the Court repeatedly challenged his credibility, showing partiality to the Plaintiff.  The Court attacked the expert's independent assessment of the case and stated he was "***in the bag***" with the police.  Moreover, during Officer's Hunt testimony, the Court ***accused him of making up a story for trial and repeatedly challenged his testimony***, clearly signaling to the jury that the Court did not believe Officer Hunt's testimony.  Furthermore, the Court stated the testimony of a different LAPD officer was "***pathetic.***"

Additionally, before the jury, the Court repeatedly contradicted Defendants' version of the incident, and improperly signaled to the jury that Defendants' evidence and testimony about the incident were not true.  At no time did the Court

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

1

1  similarly challenge the credibility of Plaintiff's witnesses or evidence.

2      As established in detail below, the Court's conduct clearly left an abiding

3  impression of an appearance of advocacy or partiality as perceived by the jury, and a

4  new trial must be granted.  See *Walker v. Sumner*, 14 F.3d 1415, 1423 (9th Cir.

5  1994), overruled on other grounds by *Sandin v. Conner*, 515 U.S. 472, 483–84

6  (1995).

7  **II.   STATEMENT OF THE FACTS**

8      **Plaintiff** (**Decedent's daughter**): She lived in Spokane, Washington, at the

9  time of the incident.  Ex. B, 349:2-22.  When she was 8-years-old, her father moved

10 to Los Angeles, and she never saw him again.  Ex. B, 349:23-350:12, 354:12-19,

11 363:16-364:4.  She spoke to the Decedent about once a week, and they wrote letters

12 to each other, but she does not know the address to where she mailed the letters.  Ex.

13 B, 364:7-21.  She did not know the Decedent was homeless.  Ex. B, 360:2-7.  She

14 did not attend the Decedent's funeral.  Ex. B, 365:15-366:1.

15     **Defendant Officer Richmond**: The Officers observed Mr. Cedillo at about

16 4:10 a.m., sitting in the driveway of a gas station.  Ex. A, 127:3-14.  Based on

17 experience, the Decedent may have been under the influence of a stimulant, most

18 likely methamphetamine.  Ex. A, 128:22-25; Ex. B, 184:16-185-23.  Mr. Cedillo

19 exhibited jerky movements, muscle rigidity, rambling speech, licking of lips, and

20 sweating.  Ex. B, 185:19-23.  Officers Richmond and Hunt approached Mr. Cedillo

21 and handcuffed him.  Ex. A, 128:13-15.  Officer Richmond applied a wrist lock to

22 gain compliance, as Mr. Cedillo started to kick backward, like "donkey kicking."

23 Ex. B, 188:4-19.  Mr. Cedillo tried to spin out of his grasp, as if trying to flee, and

24 Officer Richmond took the Decedent to the ground.  Ex. B, 188:19-21.  Placing a

25 suspect in a prone position is one of the best ways to gain control of somebody

26 trying to fight, as it limits their movements.  Ex. B, 190:5-12.  Officer Richmond

27 asked another officer to apply a hobble on Mr. Cedillo to further limit the kicking

28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

and movement of Mr. Cedillo's legs.  Ex. B, 190:13-22.  He applied body weight to Mr. Cedillo in a sprawl position, and rocked from his knees to his toes such as to apply and release weight as required.  Ex. B, 190:23-191:15.  Mr. Cedillo stopped actively kicking, jerking and trying to roll, and the officers rolled Mr. Cedillo into a right recovery position.  Ex. A, 143:18-144:20; Ex. B, 192:5-8.  Thereafter, a paramedic shook Mr. Cedillo's shoulder, and Mr. Cedillo started yelling and moving.  Ex. A, 148:16-149:5.  Officer Richmond then placed the Decedent on his chest, and he placed his knees on Mr. Cedillo's back to apply weight and downward pressure, as Mr. Cedillo tried to lift up and roll.  Ex. A, 149:5-152:2.  The paramedics did not administer any emergency medical care to Mr. Cedillo, who was breathing at the scene.  Ex. B, 195:14-196:6.

**Defendant Officer Hunt**: Mr. Cedillo appeared to be under the influence of methamphetamine.  Ex. B, 231:6-16.  Mr. Cedillo eventually became combative, trying to kick Officer Richmond and pull away from the officers.  Ex. B, 231:17-232:15.  Officer Hunt applied a firm grip to Mr. Cedillo's arm, but the Decedent was tried to kick his partner and seemed like he was trying to pull away and run, and Officer Richmond took the Decedent to the ground; Officer Hunt positioned himself to grab Mr. Cedillo's legs while Officer Richmond was on his torso.  Ex. B, 232:12-23.  Officer Hunt tried to hold Mr. Cedillo down because he was kicking at him, until Officer Mena arrived to apply a hobble.  Ex. B, 219:10-220:22.  When Mr. Cedillo was on his right side, Officer Hunt monitored Mr. Cedillo and confirmed he was breathing.  Ex. B, 234:16-21.  Another officer called for an ambulance and reported Mr. Cedillo was "conscious."  Ex. B, 234:22-235:14.

When paramedics arrived, they tried shaking Mr. Cedillo's shoulder to talk to him, and Mr. Cedillo tried to resist again.  Ex. B, 235:15-236:5.  Officer Hunt could not control Mr. Cedillo's movements while on his side, and Officer Hunt placed his knees on the backs of Mr. Cedillo's legs.  Ex. B, 236:4-15.  During the second prone

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

3

1    restraint, he could tell that Mr. Cedillo was breathing.  Ex. B, 236:19-25.  Prior to
2    Mr. Cedillo being placed on the gurney, the EMT did not administer any emergency
3    medical measures.  Ex. B, 237:2-5.

4         **Plaintiff's Police Practices Expert Jeff Noble**: The takedown was not
5    appropriate given that Mr. Cedillo was handcuffed, with wrist locks applied, and
6    Mr. Cedillo had been compliant.  Ex. B, 305:2-9.  The force was not reasonable
7    during the initial prone restraint because Mr. Cedillo was handcuffed, on the ground,
8    and the two officers were physically much larger than him.  Ex. B, 314:25-315:15.
9    The officers violated the hobble policy.  Ex. B, 316:23-317:4.  The second
10   placement of Mr. Cedillo in prone position was also inappropriate.  Ex. B, 319:18-
11   23.

12        **Defendants' Police Practices Expert Edward Flosi**: He reviewed various
13   reports and depositions, in addition to the body worn camera videos.  Ex. D, 572:1-
14   6.  The officers told Mr. Cedillo to relax and calm down while they tried to control
15   and search him.  Ex. D, 572:15-22.  Officers apply a wrist lock to control a subject's
16   movement.  Ex. D, 572:23-574:12.  It was appropriate to take Mr. Cedillo to the
17   ground while handcuffed because a suspect can be taken to the ground in a
18   controlled manner to use the ground as an additional controlling agent.  Ex. D,
19   574:13-575:19.  It was appropriate for the officers to place Mr. Cedillo prone
20   facedown and apply body weight to his torso and legs according to applicable police
21   standards.  Ex. D, 576:4-18.  According to the videos and Officers' statements, Mr.
22   Cedillo tried to kick back at the Officers and was still moving his body back and
23   forth.  Ex. D, 577:18-578:1.  The Defendants were justified in placing Mr. Cedillo
24   into a second prone position, which is a de-escalating tactic, because the Decedent
25   started yelling and started to writhe his body again in a motion that the officers
26   perceived as potentially kicking at them or could precipitate an attack.  Ex. D,
27   578:2-15.

28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

**Plaintiff's Medical Expert Daniel Wohlgelernter**: Prone restraint asphyxia caused the Decedent's cardiac arrest.  Ex. D, 512:5-15.  However, the coroner found no signs of asphyxia.  Ex. D, 531:7-12.  Also, Mr. Cedillo displayed symptoms consistent with methamphetamine use, and his brother told police the Decedent likely ingested methamphetamine that evening.  Ex. D, 530:2-19.

**Defendants' Medical Expert Michael Chaikin, M.D.**: There was evidence Mr. Cedillo had been ingesting methamphetamine for about five days prior to the incident.  Ex. C, 441:6-442:20.  Based on the autopsy report, Mr. Cedillo's heart was abnormal, likely due to the effects of methamphetamine.  Ex. C, 443:18-25.  Mr. Cedillo's cause of death was cardiac arrest due to methamphetamine intoxication on top of an abnormal heart that was vulnerable to the excitability.  Ex. B, 444:7-448:13.  Absent the foregoing, Mr. Cedillo would not have died.  Ex. B, 471:15-21.  Mr. Cedillo did not die due to restraint asphyxia.  Ex. B, 449:8-20.

**Plaintiff's Pathologist Expert Bennet Omalu, M.D.**:  No evidence suggested that Mr. Cedillo was acting under the influence of methamphetamine.  Ex. C, 390:7-19.  He did not die due to drugs or because he had a bad heart.  Ex. C, 393:10-394:12.  He died from restraint asphyxiation; the coroner was wrong in finding that there was no evidence of asphyxia.  Ex. C, 428:10-18.

**Emergency Room Physician Gary Michael Vilke, M.D.**: The cause of death was not due to asphyxiation, for which there is no evidence.  Ex. D, 545:5-546:23.

## III.   STATEMENT OF THE CASE

During the jury trial, there were several instances of prejudicial judicial misconduct, where the Court demonstrated partiality to the Plaintiff, conveyed to the jury that Defendants and their witnesses were not credible, and contradicted the evidence submitted by Defendants.

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

5

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

### Court's Reaction to Video of Incident

During the testimony Officer Richmond, Plaintiff played a number of videos, including Exhibit 23, partially showing the incident and the Defendants' use of force against the Decedent.  Ex. A, 173:22-174:8.  While the video was playing, Judge Wright stated: "Stop this.  Stop."  Ex. A, 174:7-9.  The foregoing gave the impression that the Court believed Defendants' use of force was excessive because it conveyed to the jury that the Court found the video too upsetting to watch.

### Court's Questioning of Defendant Officer Hunt

After both Plaintiff's counsel and Defense counsel finished questioning Officer Hunt, the Court further questioned Officer Hunt and expressed skepticism regarding his testimony that the Decedent was not compliant.  Ex. B, 245:1-22.  The Court further stated:

> THE COURT: But why was it done to begin with? Where was the noncompliance?
>
> He walked with you voluntarily and peacefully over to your vehicle, yet you're employing these pain compliance techniques. For what reason?
>
> THE WITNESS: He's -- at that point, he was moving back toward us. He's no longer -- he's not calm anymore, and he's steadily becoming more and more agitated.
>
> THE COURT: *That's what you're saying, but that isn't what we saw.* We keep hearing you say "Relax, relax," and he is crying out in pain. *It's often difficult to watch. And I'm wondering, Why are you doing this to this man? So I haven't been able to wait to ask you* . . . .
>
> **You have nothing to fear from this man; correct?**
>
> THE WITNESS: I don't know if I have nothing –
>
> THE COURT*: This little guy***. You had nothing to fear from this man, did you*? Or you're in the wrong line of work.* **You feared this man who is handcuffed behind his back. Is that -- is that what you're saying? The two of you, over 6 feet tall, you were fearful of this man at that time?**
>
> THE WITNESS: I didn't know what he could – he

6

appeared to be under the influence to me of likely meth. I didn't know what he could –

THE COURT: **Let's say he was. Let's just say he was under the influence of meth. Handcuffed behind his back,** *two young, healthy police officers well over 6 feet tall. What were you worried about?*

THE WITNESS: Him beginning to resist or try –

THE COURT: *And then what? What were you worried about?*

THE WITNESS: That he would try to -- try to flee, he may try to kick us. He still had the ability to do those things.

THE COURT: **That's what you were worried about?** *We never saw any signs of either of those things happening, so I don't know why it was that you thought that they might happen. Or is that something that's convenient for the purpose of the trial?*

**That's fine. I understand that. Step down.**

Ex. B, 245:23-247:16 (emphasis added).

### Court's Comments During Questioning of Plaintiff's Expert

During Defense counsel's examination of Plaintiff's expert, Jeff Noble, the following exchange took place:

Q. Wouldn't you agree that the best way to gain control of somebody who's becoming combative is to get them into a prone position on the ground?

THE COURT: *Combative?*

THE WITNESS: So --

THE COURT: *Wait, wait, wait. Is there evidence of him being combative? I have a problem with your question, the hypothetical. Where is the combative part?*

Q. (BY MR. HURRELL:) Mr. Noble, do you -- in this video that we just saw, do you see any indication that Mr. Cedillo is resisting the efforts of the officers?

\*      \*      \*

THE COURT: Hang on. Hang on. His question was whether or not Mr. Cedillo is resisting the efforts of the

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

7

officers, *the efforts of the officers to break his freakin' arm.* Was he resisting that?

Ex. B, 337:12-22 (emphasis added), 338:7-10 (emphasis added). The Court then stated before the jury that it could not believe the video was being shown again, and that it should be excluded as inflammatory.  Ex. B, 338:13-19.

### Court's Questioning of Witness LAPD Officer Cuba

Judge Wright questioned Officer Cuba in an argumentative and accusatory manner, insinuating before the jury that Officer Cuba was not being honest.  The Court challenged why Officer Cuba was telling the Decedent "Relax," and wanted to know what Officer Cuba was "doing to him." Ex. C, 484:20-23.  The following exchange took place:

> THE COURT: Why was he not relaxed?  What was going on with him?
>
> THE WITNESS: I can't answer for him.
>
> THE COURT: **You can't answer because you weren't there or you weren't paying attention** *or you don't want to answer now in open court under oath*?

Ex. C, 485:4-9 (emphasis added).  The Court further questioned Officer Cuba, as follows:

> THE COURT: Why is he crying out?
>
> THE WITNESS: I couldn't understand him.
>
> THE COURT: You couldn't understand him. It sounds like he's in pain. I don't understand squat. I barely understand English. **But that man sounds like he's in pain. What was that about? What were you guys doing to him?**
>
> THE WITNESS: I wasn't doing anything. I was just verbalizing.
>
> THE COURT: **Of course, you didn't observe anything; right?**
>
> THE WITNESS: I was the cover officer. So, yes, I was observing pedestrians –
>
> THE COURT: **What were you doing to him? Why was**

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

8

**he crying out in pain?**

THE WITNESS: I wasn't doing anything to him. I didn't touch him.

THE COURT: **I said what were you guys doing?** *You don't have to give up any names.* **What are you guys doing to the man that's causing him to cry out in pain?**

THE WITNESS: Police officers were controlling him.

THE COURT: From what?

THE WITNESS: I can't explain that, sir.

THE COURT: ***Get out of here. Go.*** Thank you.

***Goodbye.***

Ex. C, 486:1-25 (emphasis added).

As Officer Cuba stepped down from the stand, the Court asked Defense counsel, in the presence of the jury, ***referring to the LAPD Officer***, "Got any more of these?" Ex. C, 487:1. Defense counsel indicated there were no other witnesses, and Judge Wright stated, "***Pathetic***" in the presence of the jury. Ex. C, 487:1-3 (emphasis added).) Clearly, at a minimum, there was an appearance of partiality, and a new trial is required.

## Court's Questioning of Defendants' Police Practices Expert

Defendants' police practices expert Edward Flosi testified the Defendants acted appropriately, at which point the Court responded, in front of the jury:

THE COURT: Okay. What did you see? Because what we saw was a gentleman who volunteered to be handcuffed, who walked voluntarily over to the police car, who wasn't combative. And what we also saw was we saw the officers push one of his hands, handcuffed hands up between his shoulder blades and we saw him crying out in pain. ***But you saw a different video. What did you see?***

THE WITNESS: I'm sorry. What's the question, sir?

THE COURT: ***You're so in the bag. Why am I bothering?***

9

1  Ex. D, 577:6-16 (emphasis added).

2      Subsequently, the Court asked whether Mr. Flosi considered himself "a party"

3  to the case, and Mr. Flosi stated that, as an expert, he was an independent observer,

4  letting the evidence lead him to his opinions.  Ex. D, 595:8-13.  The Court stated it

5  believed Mr. Flosi was seeing "*a case beginning to spiral out of control*," and

6  asked if he was trying to de-escalate the situation.  Ex. D, 595:14-596:6 (emphasis

7  added).

8      Thereafter, the Court continued to attack Mr. Flosi's credibility and plant

9  doubt to the jury regarding his testimony, stating, in front of the jury:

10

11      THE COURT: . . . *And I'm wondering, How did you get*
        *into this situation? Or do you consider yourself -- do you*

12      *really consider yourself that closely aligned with law*
        *enforcement now that you can no longer be objective?*

13      THE WITNESS: I do not.

14              *        *        *

15      THE COURT: Okay. I -- I understand that. You said that.
        *But then listening to other parts of your testimony, I*

16      *began to -- to wonder just how independent you are*.

17      You saw things that I didn't see. I didn't see fights, I didn't
        see spitting, *I didn't see any kind of a confrontation or*

18      *combativeness. I certainly did not see any kicking.*

19      *And even so, one of the things that we all saw was the*
        *gentleman's shoes are still sitting out in the street. He's*

20      *barefoot, he's in his stockings. And I couldn't*
        *understand the constant references to kicking.*

21

22      *But in any event, I was beginning to wonder whether or*
        *not -- or just -- I was asking: How independent are you?*

23      *Because you -- you found nothing inappropriate about*
        *the takedown, you found nothing inappropriate about the*

24      *-- using these pain methods to control this individual.*
        *And I don't understand* -- would you tell me what it was

25      that you were trying to control? . . .

26  Ex. D, 596:15-20 (emphasis added), 597:4-21 (emphasis added).  The Court

27  continued to question Mr. Flosi at length (see Ex. D, 595:4-601:22), including the

28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

following exchange:

> THE COURT: . . . are officers taught anywhere, even when they first get to patrol, do their training officers teach them how to now navigate this new world where they're wearing body cams? *Are you taught to say certain things while you're wearing a body cam?*
>
> For example, they kept telling him to relax. I just found that curious. Why were they telling him to relax when they were inflicting pain on him and he's understandably moving but they're saying "Relax"? *Is that for the benefit of the camera*?
>
> THE WITNESS: No. It's for the benefit of the subject so that the subject understands what they need to do –
>
> THE COURT: **Oh. The subject understands that if you stop hurting me, I'll stop moving. And we all understood that. But what we didn't understand is why they kept saying "Relax."**

Ex. D, 600:21-601:10 (emphasis added).  The Court also conveyed its belief to the jury that there was "an awful lot of pain inflicted just to pat him down quickly." Ex. D, 601:17-19.

The defense counsel moved for a mistrial, noting the comments made by the Court regarding what was depicted in the videos and the facts of the incident and indicated the Court made overly prejudicial comments, which the Court denied.  Ex. D, 603:17-604:13.

During closing arguments, Plaintiff's counsel reiterated the statements the Court made in front of the jury by stating that Mr. Flosi "was not very credible because he seemed extremely biased in favor of the LAPD." Ex. D, 632:3-12.

The jury found in favor of Plaintiff, and the Court entered Judgment on November 13, 2023.  Dkt. 129.

## IV. <u>A MOTION FOR NEW TRIAL IS PROPERLY GRANTED BASED UPON PREJUDICIAL JUDICIAL MISCONDUCT.</u>

A court may grant a new trial based upon judicial misconduct, pursuant to

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

11

*Federal Rules of Civil Procedure,* Rule 59(a).  Specifically, where the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality, a new trial is warranted.  *Walker,* 14 F.3d at 1423; *Closson v. Bank of Am., NA*, 600 F. App'x 575, 576 (9th Cir. 2015).  While a federal trial court may properly participate in the examination of witnesses to clarify and control the presentation of the evidence and to prevent the undue repetition of testimony, the "trial court must be ever mindful of the sensitive role it plays in a jury trial and avoid even the appearance of advocacy or partiality."  *U.S. v. Harris*, 501 F.2d 1, 10 (9th Cir. 1974).  It is critical that a court avoids the impression that it was not performing an impartial role.  *Id.*  Indeed, a trial court must show "scrupulous impartiality," and a trial judge may not advocate on behalf of a plaintiff or a defendant, nor may he betray even a hint of favoritism toward either side.  *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1187 (7th Cir. 1992).  Judicial misconduct is found where the judge's remarks clearly indicate a hostility to one of the parties, an unwarranted prejudgment of the merits of the case, or an alignment with one of the parties.  *See United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006).  A prejudicial comment by the court will warrant a new trial.  *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1275 (8th Cir. 1987).

## V.    A NEW TRIAL MUST BE ORDERED BASED UPON PREJUDICIAL JUDICIAL MISCONDUCT.

Defendants respectfully submit the comments the Court made in front of the jury warrant a new trial, individually and cumulatively.  The Court repeatedly attacked the credibility of the Defendants and defense witnesses, clearly giving the impression of partiality.  In addition, the Court signaled to the jury that the evidence as testified to by the Defendants was not credible.  The prejudice could not be cured, for the reasons set forth below.

**A.      THE COURT IMPROPERLY AND REPEATEDLY ATTACKED THE CREDIBILITY OF THE DEFENSE WITNESSES.**

A court may not give the impression that it doubted the credibility of a party. "Because juries, not judges, decide whether witnesses are telling the truth, and because judges wield enormous influence over juries, judges may not ask questions that signal their belief or disbelief of witnesses." *United States v. Tilghman*, 134 F.3d 414, 416 (D.C. Cir. 1998). Judges must strive to preserve the appearance of impartiality that should pervade the courtroom, and should not question the defendant's credibility on the stand. *Id.* at 421. The court must be mindful of its position before the jury, and it must avoid the appearance of giving aid to one party or the other. *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977); *United States v. Mazzilli*, 848 F.2d 384, 388 (2d Cir. 1988) (the jury cannot reach its own conclusions about the defendant's credibility when the court indicated, directly or indirectly, that it disbelieves his testimony); see also *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 472 (9th Cir. 1977) (the court's "commenting on the evidence is a perilous endeavor, to be undertaken with caution lest the slightest suggestion of favor for one side"; the trial judge overreached by adding evidence on the credibility of a key witness).

In *United States v. Pena-Garcia*, 505 F.2d 964, 965 (9th Cir. 1974), the trial judge stated during the testimony of a defense witness that he did not care for any attempted perjury, which was "telling the untruth under oath." *Id.* at 966-67. The Ninth Circuit found the trial judge went too far. "[T]he judge cannot conduct his questioning in such manner as to convey to the jury the impression that he has formed an opinion as to the truth of the witness' statement or the verdict that should be returned." *Id.* The trial judge must limit his comments and rulings to "what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues." *Id,* at 967, n.5; see also *United*

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE (213) 426-2000

*States v. Nazzaro,* 472 F.2d 302, 310 (2d Cir. 1973) (questioning by a judge which signals to the jury that the judge does not believe the defense witnesses is improper, warranting a new trial); *United States v. Pritchard*, 485 F. App'x 199, 201 (9th Cir. 2012) (new trial warranted as court created an atmosphere in which an objectively fair trial could not be conducted); *United States v. Hall*, 271 F. App'x 559, 560 (9th Cir. 2008) (new trial warranted by judge's conduct, including court's aggressive questioning of two witnesses in a manner that crossed the line).

In *Rivas v. Brattesani*, 94 F.3d 802, 803 (2d Cir. 1996), the plaintiff sued two police officers for excessive force in a 42 U.S.C. § 1983 action. The Court of Appeals found that the district court denied the officers a fair trial. "[C]omments made by the court in the presence of the jury may have given the jury the impression that the court had formed a distinctly negative opinion of defendants, their counsel, and their evidence, impairing the fairness of the trial in a way that no jury instruction could cure." *Id.* For example, during the cross-examination of plaintiff's damages expert, the court stated to defense counsel, "Come off it, will you counsel," and then advised the jury that this is "pretty silly." *Id.* at 805. Later, during the cross-examination of defendants' medical expert, the expert testified that his practice did not involve treating living people, and the court asked whether the expert had ever done an autopsy without seeing the body. *Id.* at 806. Subsequently, a defendant officer testified that he could have initially used a napkin or any paper available to write down information that was contained in his reports, rather than in his memo book. The court stated, "So that your memo book becomes a fraud that you make up at the end of the day?" *Id.*

On appeal, the Court ordered a new trial because the court's questions and statements made in front of the jury and resulting prejudice could not have been cured. *Rivas,* 94 F.3d at 807-808. The Court stated that a trial court must strive for impartiality and, although it may ask questions, those questions may not convey the

Hurrell Cantrall LLP
725 S. Figueroa Street, Suite 3800
Los Angeles, California 90017
Telephone (213) 426-2000

14

court's view about the merits of a party's claim.  *Id.* at 807.  The judge cannot create an impression in the juror's minds that he is hostile to one party's position.  *Id.*  The district's comments conveyed to the jury the impression that it held an unfavorable opinion of defendants and their position.  *Id.*  The judge's questions to the officer's expert may have created the impression that the court was skeptical of the expert.  *Id.*  Moreover, the court's questioning of the defendant officer was likely to have conveyed to the jury that the court doubted the defendant's credibility.  *Id.*

Similarly, here, the Court's repeated comments attacking the credibility of the Defendants, their expert and witnesses, were prejudicial misconduct.  Notably, the Court's comments in this case are far more egregious than the statements which constituted prejudicial judicial misconduct in the cases set forth above.

### a.    Court's Attack of Credibility of Defense Expert Flosi

Respectfully, it was undoubtedly prejudicial error for the Court to repeatedly convey to the jury that the Court did not believe Mr. Flosi conducted an independent review of the case, and that Mr. Flosi's opinions were based on his bias in favor of police officers rather than his independent assessment as a very experienced former police officer.  Indeed, when the expert did not agree with the Court's opinions, the Court stated in front of the jury: "***You're so in the bag. Why am I bothering?***"  Ex. D, 577:6-16 (emphasis added).  It is unequivocally judicial misconduct to tell the jury that the defense expert is "so in the bag," with the LAPD, conveying to the jury that the expert is biased and that the jury should disregard his testimony.   This statement is so prejudicial that the statement alone warrants a new trial.  Plainly, the Court's comments created the impression that the Court was skeptical of the expert, and this type of misconduct could not be cured.

Moreover, the Court asked Mr. Flosi if he considered himself a "party" to the case, and implied that he would say anything to save the case that was "spiraling" out of control.  Ex. D, 595:14-596:6.  The Court further stated: "***And I'm***

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

1   *wondering, How did you get into this situation? Or do you consider yourself – do*
2   *you really consider yourself that closely aligned with law enforcement now that*
3   *you can no longer be objective?"*  Ex. D, 596:15-19 (emphasis added).  Again,
4   respectfully, these statements are serious prejudicial judicial misconduct, conveying
5   to the jury that Mr. Flosi was not objective because he reached the opinion that the
6   Defendants' use of force was reasonable.

7         In addition, as indicated above, the Court repeatedly interrupted Mr. Flosi's
8   testimony, challenging Mr. Flosi's belief that the Defendants acted appropriately
9   during the incident.  Ex. D, 596:15-601:20.  *The Court made it quite clear to the*
10  *jury that it did not believe Mr. Flosi should have found that the Officers' use of*
11  *force was reasonable.  Id.*  The Court repeatedly said, before the jury, *that it*
12  *wondered "just how independent" Mr. Flosi was.  Id.*  The Court's repeated
13  questioning of Mr. Flosi was unequivocally prejudicial judicial misconduct.

14        Moreover, during the examination of Mr. Flosi, the Court asked if the
15  officers, who wore body cameras, made statements "*for the benefit of the camera.*"
16  Ex. D, 600:21-601:10 (emphasis added).  Again, the Court clearly conveyed to the
17  jury that the Defendants were not credible and made false statements for the benefit
18  of the camera, to cover up their alleged use of excessive force.  Respectfully, the
19  statement was very prejudicial to the defense and exceeded the bounds of reason.

20              **b.     Court's Attack of the Credibility of Defendants**

21        Again, respectfully, the Court's comments and questions during the testimony
22  of Officer Hunt warrant a new trial.  The Court asked Officer Hunt why he was
23  worried about the Decedent's conduct during the incident, and Officer Hunt
24  responded that the Decedent tried to kick and pull away from the officers.  Ex. B,
25  231:17-232:15.  Before the jury, the Court then criticized Officer's Hunt's response
26  and accused him of making up a story for trial, stating:  "That's what you were
27  worried about? *We never saw any signs of either of those things happening, so I*
28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

16

*don't know why it was that you thought that they might happen. Or is that something that's convenient for the purpose of the trial*? That's fine. I understand that. Step down." Ex. B, 247:10-16 (emphasis added).  Clearly, the Court contradicted the defense evidence and improperly accused Officer Hunt of testifying untruthfully, which is plainly judicial misconduct. *Rivas,* 94 F.3d at 807.  The Court then abruptly dismissed Officer Hunt, leaving the foregoing as the jury's last impression of Officer Hunt on the stand.

Additionally, in front of the jury, the Court repeatedly demeaned Officer Hunt's apprehension during his interaction in the field with the Decedent, who appeared to be on methamphetamines, and who was becoming increasingly agitated while interacting with the police.  The Court repeatedly said that because of the height of the Defendants as compared to the height of the Decedent, the Defendants could not have feared the decedent. Ex. B, 245:23-247:16.  *The Court told Officer Hunt, in front of the jury, that he had nothing to fear from the Decedent, contradicting Officer Hunt's testimony.  Id.* (emphasis added).  Again, this improper interjection by the Court into the proceedings clearly constitutes prejudicial judicial misconduct.  The Court then went further to advise the jury that Officer Hunt's fears were unreasonable, by stating that if Officer Hunt feared for his safety, he was "*in the wrong line of work.*"  Ex. B, 246:17-19 (emphasis added).  The Court repeatedly challenged Officer Hunt's responses, further giving the clear impression to the jury that the Court did not believe Officer Hunt was a credible witness.  Ex. B, 245:23-247:16.

    c. **Court's Attack of Credibility of Witness LAPD Officer.**

Again, there was plain judicial misconduct during the Court's improper comments and questioning of LAPD Officer Cuba.  The Court challenged Officer Cuba as to "what was going on with" the Decedent, and Officer Cuba properly responded that he could not answer for the Decedent. Ex. C, 485:4-6.  The Court

1    then stated, "You can't answer because you weren't there or you weren't paying

2    attention *or you don't want to answer now in open court under oath*?"  Ex. C, at

3    485:7-9 (emphasis added).)  Again, where a Court insinuates a police officer is lying

4    under oath, in front of the jury, the trial is tainted by judicial misconduct, and the

5    judgment cannot stand.  See *Rivas,* 94 F.3d at 807.

6        The Court further discredited Officer Cuba by sarcastically stating "Of

7    course, you didn't observe anything; right?"  Ex. C, 486:10-11.  When the Court

8    asked Officer Cuba "What were you doing to him?," and Officer Cuba responded he

9    was not doing anything to the Decedent, the Court stated: "I said what were you

10   guys doing? *You don't have to give up any names.* **What are you guys doing to

11   the man that's causing him to cry out in pain?**"  Ex. C, 486:14-20.  Respectfully,

12   this line of questioning was highly improper.  Surprisingly, the Court, which is not

13   supposed to give off a hint of impartiality before the jury, then stated to Officer

14   Hunt:  "*Get out of here.*"  Ex. C, 486:24.  As he left the witness stand, in the

15   presence of the jury, the Court stated: "*Pathetic.*"  Ex. C, 487:3.  This statement

16   alone clearly constitutes prejudicial judicial misconduct.

17       Certainly, the individual and cumulative effects of the statements above

18   warrant a new trial.

19   **B.    THE COURT IMPROPERLY AND REPEATEDLY

20           CONSTRUED THE EVIDENCE IN A MANNER FAVORABLE

21           TO THE PLAINTIFF ON THE ULTIMATE ISSUE OF

22           LIABILITY, *WHICH CONFLICTED WITH DEFENDANTS'

23           EVIDENCE*, IN FRONT OF THE JURY.**

24       A court is not permitted to convey factual determinations to the jury.  *Sit-Set,

25   A.G. v. Universal Jet Exch., Inc*., 747 F.2d 921, 925 (4th Cir. 1984) (the verdict

26   cannot be allowed to stand because of impermissibly extensive and intrusive

27   interventions by the trial judge in the jury's fact-finding function).  A court may not

28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

either distort or add to the evidence.  *Maheu,* 569 F.2d at 471.  The Ninth Circuit has emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence should not be misleading or one-sided, and that deductions not warranted by the evidence should be "studiously avoided."  *Id.*

Here, however, the trial court repeatedly commented upon the evidence with regard to the ultimate issue of whether Defendants' use of force was excessive, in a manner favorable to the Plaintiff and unfavorable to the Defendants.  As indicated above, Officer Richmond testified that prior to being taken to the ground, the Decedent was kicking at the officers and trying to spin away.  Ex. B, 188:8-21.  During his testimony, Plaintiff's counsel played a video showing the officer's takedown of the decedent.  Ex. B, 188:8-21.  However, the decedent's bottom half and his legs cannot be seen in the video.  Ex. E (trial exhibit 23).  Moreover, Officer Hunt testified the Decedent was combative and was kicking.  Ex. B, 231:17-232:15.

Nevertheless, the Court repeatedly stated before the jury that the Decedent *was not combative and was not kicking*, because the Court could not see that in the partial video.  Ex. B, 337:12-22; 246:3-8; Ex. D, 577:6-16, 597:4-21.  These statements to the jury were clearly improper and prejudiced the Defendants.  The Court virtually instructed the jury that the Defendants' version of the incident was not true.  Moreover, during the testimony of Mr. Flosi, the Court challenged Mr. Flosi's opinion that the Defendants acted appropriately, for which he relied upon the statements of the officers.  The Court stated: "*I didn't see any kind of a confrontation or combativeness. I certainly did not see any kicking. And even so, one of the things that we all saw was the gentleman's shoes are still sitting out in the street. He's barefoot, he's in his stockings. And I couldn't understand the constant references to kicking.*"  Ex. D, 597:7-10 (emphasis added).  The Court sarcastically stated to Mr. Flosi that he must have seen a "different video" of the incident, because what "we" (i.e., the Court and jury) saw, was a witness who

19

"*wasn't combative.*"  Ex. D, 577:6-16, 597:8-9 (emphasis added).  The Court was not present during the incident and had no foundation to contradict Officers' testimony that the Decedent kicked at them off-camera.  Such statements are clearly prejudicial judicial misconduct, requiring a new trial.

In addition, during the testimony of Officer Hunt, Officer Hunt explained that the Decedent was moving back toward the officers and was no longer calm, and was steadily becoming more agitated.  Ex. B, 246:3-5.  However, again, the Court challenged the evidence and testimony submitted by Defendants by contradicting Officer Hunt and stating, before the jury, "*That's what you're saying, but that isn't what we saw.*"  Ex. B, 245:23-247:16 (emphasis added).  The Court is plainly contradicting Officer Hunt's testimony before the jury, which is completely improper.  Again, the Decedent's lower half is not even reflected in the video.  Nevertheless, the Court stated Officer Hunt's testimony was not true.

Furthermore, during the questioning of Plaintiff's police practices expert, Jeff Noble, despite the fact that the Officers testified the Decedent was combative and kicking at them, the Court would not allow defense counsel to question Plaintiff's expert on the best way to gain control of a combative individual.  "*Wait, wait, wait. Is there evidence of him being combative? I have a problem with your question, the hypothetical. Where is the combative part?*"  Ex. B, 337:17-19 (emphasis added).  Once again, the Court advised the jury that the Decedent was not combative, despite Defendant Officers' testimony to the contrary.  The Court's interference prevented Defense counsel from properly questioning Plaintiff's expert. *Harris,* 501 F.2d at 11.  The Court improperly asserted itself into the proceedings in a prejudicial, one-sided manner.

Moreover, the Court advised the jury that the Defendants tried to "*break his freakin' arm,*" which was another plainly inappropriate and prejudicial comment.  Ex. B, 338:7-10 (emphasis added).

1    In addition, the Court repeatedly made statements questioning the

2    Defendants' conduct and commenting that the incident was "difficult to watch.  And

3    I'm wondering, '***Why are you doing this to this man***?'"  Ex. B, 246:8-9, Ex. C,

4    486:1-25 (emphasis added).  The Court improperly signaled to the jury its belief that

5    the Defendants' use of force was excessive.  The judgment in favor of Plaintiff was

6    the result of unfair proceedings, and a new trial must be ordered.

7    **VI.   THE JUDICIAL MISCONDUCT WAS PREJUDICIAL.**

8    Again, judicial misconduct is prejudicial where a judge's conduct "leaves an

9    abiding impression that the jury perceived an appearance of advocacy or partiality."

10   *Supra*; *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1988) (citations

11   omitted).  Certainly, the Court's conduct, individually and cumulatively, plainly left

12   the jury with the impression that the Court believed the jury should find in favor of

13   Plaintiff, despite the evidence set forth by the Defendants and their experts that the

14   use of force was reasonable and that the Decedent did not die from asphyxiation.

15   The Court did not similarly disparage the Plaintiff's case before the jury.  The Court

16   failed to offer curative instructions following each of the improper comments.

17   Regardless, based on the nature and extent of each of the Court's comments,

18   curative instructions could not undo the prejudice to Defendants.  *Rivas,* 94 F.3d at

19   808.

20   **VII.   THE DAMAGES ARE EXCESSIVE.**

21   Where a jury's verdict is the product of passion or prejudice which affected

22   the jury's liability finding, the Court should grant a motion for new trial.  *Watec Co.*

23   *v. Liu*, 403 F.3d 645, 655 (9th Cir. 2005); *Cooper v. Firestone Tire & Rubber Co.*,

24   945 F.2d 1103, 1107–08 (9th Cir. 1991) (the question is whether the misconduct so

25   permeated the trial as to lead to the conclusion the jury was necessarily influenced

26   by passion and prejudice in reaching its verdict).  Here, the $12,000,000 award on

27   behalf of the decedent, and $1,500,000 award to the Plaintiff, were excessive, and

28

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

21

influenced by the judicial misconduct as set forth above.  The Court repeatedly stated before the jury that the Decedent was crying out in pain and Defendants inflicted "an awful lot of pain," inflating the damages.  *Supra*; *compare to Mears v. City of Los Angeles,* 2018 WL 11305362, *1 (C.D. Cal. 2018) (decedent awarded $2,500,000 combined for pain and suffering and loss of life after encounter with police and struggle); and *Estate of Casillas v. City of Fresno,* 2019 WL 2869079, *1 (E.D. Cal. 2019) ($2,000,000 award for decedent's loss of life).  Indeed, the damages award appears to be an attempt to punish the Defendants for alleged wrongdoing, even though punitive damages were not an issue at trial.  Moreover, the Plaintiff did not have a substantial relationship with the Decedent that would warrant a $1,500,000 award.  *See Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987), overruled on other grounds by *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (claim based on relationship with a parent only implicates a companionship interest).  Thus, a new trial is required.  At a minimum, a Remittitur should issue, significantly reducing the damages.

## VIII.  **THIS COURT SHOULD GRANT A MOTION UNDER RULE 59(E).**

For the same reasons, this Court should grant a motion to vacate/amend/alter the judgment, pursuant to *Federal Rules of Civil Procedure,* Rule 59(e).  *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (Rule 59(e) motion proper to correct manifest errors upon which the judgment is based).

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

## IX.   <u>CONCLUSION.</u>

For the foregoing reasons, a new trial should be granted.

DATED:  December 8, 2023          HURRELL CANTRALL LLP


By:   _____*/s/ Thomas C. Hurrell*_____
        THOMAS C. HURRELL
        DIANE MARTINEZ
        BLESSING O. EKPEZU
        Attorneys for Defendants, CITY OF LOS
        ANGELES, OFFICER DUSTIN
        RICHMOND AND OFFICER JOSEPH
        HUNT

HURRELL CANTRALL LLP
725 S. FIGUEROA STREET, SUITE 3800
LOS ANGELES, CALIFORNIA 90017
TELEPHONE  (213) 426-2000

23