# EXHIBIT B

1           UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

4

5    NICOLE JUAREZ ZELAYA, individually and )
     as Successor-in-Interest to Decedent   )
6    JACOBO JUAREZ CEDILLO,                  )
                                             )
7                      Plaintiff,            )
                                             )
8        v.                                  )          Case No.
                                             )   CV 20-8382 ODW (MAAx)
9    CITY OF LOS ANGELES, DUSTIN RICHMOND,   )
     and JOSEPH HUNT,                        )        Volume 3
10                                           )   (Pages 177 - 375)
                       Defendants.           )
11   _____)

12

13          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                         TRIAL DAY TWO
14              WEDNESDAY, OCTOBER 11, 2023
                         8:03 A.M.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23        MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
             FEDERAL OFFICIAL COURT REPORTER
24           350 WEST 1ST STREET, ROOM 4455
             LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305

1      Q.    And what was your first assignment after that?

2      A.    I was assigned to Central Division, patrol.

3      Q.    Where is that?

4      A.    It's right where we're at.  We're in downtown.

08:05AM   5      Q.    All right.  And how long were you there?

6      A.    I was there approximately 18 months.

7      Q.    And after that, where were you assigned?

8      A.    I got assigned to Valley jail section for six

9    months.  And then following that, I was assigned to Van Nuys

08:05AM   10   patrol, which is where I'm currently at.

11     Q.    Very good.

12           And at the time that you encountered Mr. Cedillo, I

13   believe yesterday you said you had been with the department for

14   about five years?

08:06AM   15     A.    That's correct.

16     Q.    So during that time period, had you had occasion on

17   your patrol duties to come into contact with individuals who

18   were under the influence of some substance?

19     A.    Yes.  Absolutely.

08:06AM   20     Q.    Can you tell us what kind of substances that you

21   later determined these individuals were intoxicated with?

22     A.    Sure.  On an almost daily basis, we came in contact

23   with people that were under the influence of alcohol,

24   methamphetamine, heroin, or any other combination of drugs.

08:06AM   25   Those would be the most common, though.

1      Q.    In your experience as a police officer back there in
2  2019, did you come to understand what physical symptoms or
3  characteristics were consistent with somebody under the
4  influence of methamphetamine?

08:06AM   5      A.    Yes.

6      Q.    Can you tell us about that?

7      A.    Sure.  Um, somebody under the influence of
8  methamphetamine commonly grinds their teeth, has rapid
9  movements or jerky movements, a lot of muscle rigidity, profuse
08:07AM  10  sweating, among other things.

11      Q.    Now, going to your initial encounter with
12  Mr. Cedillo, we saw video yesterday of that.  I won't play it
13  now because we've seen it a couple of times.

14          But after engaging with him for about the first
08:07AM  15  minute, did you gain an impression as to whether he was
16  displaying abnormal behavior?

17      A.    Absolutely.  He appeared to be under the influence
18  of a stimulant, most likely methamphetamine at the time.

19      Q.    And can you describe what he was doing that led you
08:07AM  20  to that belief?

21      A.    All those things I described in regards to jerky
22  movements, muscle rigidity, rambling speech, licking of lips,
23  sweating, he was exhibiting all of them.

24      Q.    Now, this incident occurred in April of 2019;
08:07AM  25  correct?

| | |
|---|---|
| 1 | to try to evaluate him, see if he did need that kind of care. |
| 2 | The problem was we were unable to establish a dialogue to do |
| 3 | that evaluation effectively. |
| 4 | Q.   I want to take you to the moment in time where you |
| 08:10AM  5 | are engaging with Mr. Cedillo at the front of your patrol |
| 6 | vehicle.  Okay? |
| 7 | A.   Okay. |
| 8 | Q.   And I want to play a short portion, Exhibit -- |
| 9 | plaintiff's Exhibit 23, starting at time 4 minutes, 50 seconds. |
| 08:11AM  10 | (Videotape played, not reported.) |
| 11 | Q.   (BY MR. HURRELL:)   Sir, can you describe for us what |
| 12 | we're seeing here?  What are you doing? |
| 13 | A.   Sir, as I'm -- my partner and I are trying to |
| 14 | establish that dialogue with Mr. Cedillo, he's becoming more |
| 08:12AM  15 | agitated.  And that's when I applied a wrist lock in order to |
| 16 | try to gain compliance with a pain compliance technique.  He |
| 17 | then tries to -- he starts kicking at me, at my shins, like |
| 18 | donkey kicking.  I don't know if that's the best description, |
| 19 | but he starts kicking backwards at my shins and trying to spin |
| 08:12AM  20 | out of my grasp and, my impression, was to flee.  And so as he |
| 21 | does that, I then proceed to take him to the ground. |
| 22 | Q.   And you realize that he's handcuffed; correct? |
| 23 | A.   Absolutely. |
| 24 | Q.   And did you have a concern that he could hit his |
| 08:12AM  25 | head when he's taken to the ground? |

**UNITED STATES DISTRICT COURT**

1    on the ground?

2         A.   He was in a prone position.

3         Q.   Face up or facedown?

4         A.   Facedown.

08:14AM   5    Q.   As part of your training, what are you taught in

6    terms of how to gain control of a suspect or an individual who

7    becomes combative?

8         A.   That's the -- one of the best ways to gain control

9    of somebody that is trying to fight with you.  It limits their

08:15AM  10    movements to the greatest degree.

11        Q.   By placing them in that facedown position?

12        A.   That's correct.

13        Q.   Now, Officer Mena, for short, arrived at the scene

14    shortly after this?

08:15AM  15        A.   He does, after I broadcasted the backup.  I believe

16    they're the first unit to arrive.

17        Q.   And did you ask him to apply a hobble?

18        A.   Yes.

19        Q.   Why did you do that?

08:15AM  20        A.   In order to further limit the kicking, the movement

21    of his legs, of Mr. Cedillo, in order to prevent him from

22    kicking my partner and I.

23        Q.   And after that point in time, did -- were you

24    applying body weight to Mr. Cedillo?

08:16AM  25        A.   I was.

1    Q.    And can you describe how you were doing that?

2    A.    I was in a sprawl position in the sense of I had my

3    chest on Mr. Cedillo's back with my legs kind of spread in a

4    triangle to his side.   And then I would -- I would rock from my

08:16AM   5   knees to my toes as weight was required.

6    Q.    Okay.   So you were applying weight and then

7    releasing the weight from time to time?

8    A.    Correct.

9         MR. GALIPO:   Objection.   Leading as phrased.

08:16AM   10        THE COURT:   Sustained.

11   Q.    (BY MR. HURRELL:)   Can you describe again what you

12   were doing?

13   A.    I was moving -- if more weight was required, I would

14   get up on my toes.   If -- and at the time less weight was

08:16AM   15  required, I would go back to my knees.

16   Q.    Now, eventually, Mr. Cedillo became compliant and

17   stopped resisting?

18   A.    That's correct.

19   Q.    And during that time frame from when you first took

08:16AM   20  him to the ground to the time that he became compliant, were

21   you able to determine whether or not he was breathing?

22   A.    He was breathing.   He was actively resisting the

23   whole time.

24   Q.    Well, what about that led you to the belief that he

08:17AM   25  was -- that he was breathing?

**UNITED STATES DISTRICT COURT**

1      A.    He would have been unable to actively resist us if

2   he was not breathing.

3      Q.    Was he enunciating anything?

4      A.    I couldn't understand any words he was saying.

08:17AM   5      Q.    Now, after he becomes compliant, what position do

6   you place him in?

7      A.    Rolled him into a right recovery position, right

8   lateral recovery position.

9      Q.    Was there a reason why you didn't do it before that

08:17AM   10   time?

11      A.    We were -- my opinion, we would have been unable to

12   control him on his side, yeah.

13      Q.    Why -- is it harder to control someone on their side

14   versus when they're prone facedown?

08:17AM   15      A.    When someone's on their side, they have quite a bit

16   more range of motion with their legs as well as their upper

17   body and can inflict a lot more damage on you.  Yes, it's very

18   difficult to control somebody on their side.

19      Q.    And now, yesterday we found out that there was an

08:18AM   20   ambulance that was called; correct?

21      A.    That's correct.

22      Q.    Do you know why that happened?

23      A.    Initially, when we rolled him onto his side, we

24   noticed he had a small abrasion or a small laceration to his

08:18AM   25   forehead.  So we requested one for that.

**UNITED STATES DISTRICT COURT**

1          A.     When somebody's under the influence of a narcotic.

2    Specifically methamphetamine, it makes them incredibly strong.

3          MR. GALIPO:  I apologize, Your Honor.  I'm going to

4    object and move to strike the comment about making them strong

08:21AM  5    as lacking foundation.

6          THE COURT:  Sustained.

7          Q.     (BY MR. HURRELL:)  Mr. -- Officer Richmond, have you

8    had occasion where you've had to encounter combative

9    individuals who were under the influence of methamphetamine?

08:21AM 10          A.     Numerous times.

11          Q.     And have you had -- have you found those -- those

12    encounters difficult from a physical standpoint?

13          A.     Yes.

14          Q.     Now, during the time that the paramedics or EMTs

08:22AM 15    were standing there by Mr. Cedillo before he was placed on the

16    gurney, did they administer any emergency medical care to him?

17          A.     No.

18          Q.     And Mr. Cedillo was eventually placed on the gurney;

19    correct?

08:22AM 20          A.     Correct.

21          Q.     And yesterday Mr. Galipo asked you about

22    Sergeant Briscoe being at the scene.  Do you recall that?

23          A.     Uh-huh.  I do.

24          Q.     And did Sergeant Briscoe ask you to see whether or

08:22AM 25    not Mr. Cedillo was breathing?

**UNITED STATES DISTRICT COURT**

1    A.   I believe he asked me if he was breathing.

2    Q.   And did you respond?

3    A.   I did.

4    Q.   What did you say?

08:22AM   5    A.   I said he is.  And then I placed my hand on his

6    chest and felt him breathing.

7              MR. HURRELL:  If I could play a clip from

8    Exhibit 158.  It's 158-1.

9              (Exhibit 158-1 for identification.)

08:23AM   10             (Videotape played, not reported.)

11   Q.   (BY MR. HURRELL:)  It's hard to hear, but did you

12   hear yourself in that?

13   A.   I did.

14   Q.   And what were you saying?

08:23AM   15   A.   I said, "He is," I believe is what I said.

16   Q.   In response to what?

17   A.   To Sergeant Briscoe's question.

18   Q.   And in that clip -- I'll play it again.  It's

19   relatively short.  I want you to -- I want to ask you about the

08:23AM   20   officer standing with his back towards us who has a flashlight.

21   Who is that?

22   A.   I believe that's Officer Mena.

23   Q.   And what is he doing with that flashlight?

24   A.   I believe he's looking at his face, Mr. Cedillo's

08:24AM   25   face.

```
 1      Q.    So you were aware, when he was taken down to the

 2   ground, that he might hit his head or face on the cement?

 3      A.    Yes.

 4      Q.    And you later, I think, saw a bleeding or a

 5   laceration to the forehead?

 6      A.    Correct.

 7      Q.    And in your mind, that probably happened when he was

 8   taken down to the ground.  Is that fair?

 9      A.    Yes.

10      Q.    Now, with the initial prone restraint -- and I think

11   you indicated this in your report -- your impression was that

12   Officer Richmond landed on his back, Mr. Cedillo's back;

13   correct?

14      A.    Yes.

15      Q.    And you went to the legs?

16      A.    Yes.

17      Q.    And you wrapped your arms around both of his legs

18   and pulled them into your chest?

19      A.    Yes.

20      Q.    And you and your partner were trying to hold

21   Mr. Cedillo down at that point?

22      A.    Yes.

23      Q.    And there were times when you felt he was trying to

24   lift up or roll?

25      A.    From -- I was holding his legs, like, from when he
```

08:54AM (line 5)
08:54AM (line 10)
08:55AM (line 15)
08:55AM (line 20)
08:55AM (line 25)

**UNITED STATES DISTRICT COURT**

was -- he was kicking upward and trying to kick me off of him.

As far as, like, rolling from what I was doing, I could -- I

was holding his legs, and it felt like he was trying to kick me

off of him.

08:55AM    Q.   Well, he never landed a kick on you; true?

A.   No.

Q.   Is that correct?

A.   Correct.

Q.   Okay.  In any event, you're controlling his legs

08:56AM  with -- you actually pulled his legs into your chest, so you

were applying the weight of your chest on his legs during the

initial prone restraint?

A.   Right.

Q.   And this went on up until the time where

08:56AM  Officer Mena came to apply a hobble?

A.   Correct.

Q.   And you slightly lifted or repositioned the legs to

allow the hobble to be applied?

A.   Correct.

08:56AM    Q.   And you were aware when the hobble was finally

applied?

A.   Yes.

Q.   And we saw this hobble policy.  Maybe we can put it

up again briefly, Exhibit 34, page 4.

08:56AM    I'm assuming you were familiar with the hobble

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | that were under the influence of methamphetamine, what types of |
| 2 | characteristics or symptoms did they display? |
| 3 | A.    Oftentimes they displayed erratic behavior, rigid |
| 4 | muscles, grinding of their teeth, dry mouth, profuse sweating, |
| 09:11AM  5 | things like that. |
| 6 | Q.    Now, we saw the video yesterday of your initial |
| 7 | encounter, say, for the first minute or two with Mr. Cedillo. |
| 8 | Can you describe after that period of time lapsed what was your |
| 9 | impression of his condition? |
| 09:11AM 10 | A.    He appeared to be under the influence of a |
| 11 | stimulant, most likely meth, and may have had a mental illness |
| 12 | as well.  But he definitely appeared under the influence to me. |
| 13 | Q.    What did you see that led you to that belief? |
| 14 | A.    His muscles were very rigid, his speech was rapid, |
| 09:12AM 15 | he was rapidly looking around, he was sweating and grinding his |
| 16 | teeth. |
| 17 | Q.    Now, going to the location in front of your patrol |
| 18 | vehicle where you took Mr. Cedillo, did he eventually become |
| 19 | combative? |
| 09:12AM 20 | A.    Yes. |
| 21 | Q.    Can you describe what was he doing? |
| 22 | A.    He was trying to -- appeared like he was trying to |
| 23 | kick Officer Richmond, my partner.  And he was trying to pull |
| 24 | away from us as well. |
| 09:12AM 25 | Q.    Before that time, were you and your partner trying |

**UNITED STATES DISTRICT COURT**

```
 1   to de-escalate the situation or calm Mr. Cedillo down?
 2       A.   Yes.
 3       Q.   What kinds of things were you doing?
 4       A.   I was trying to establish a dialogue with him,
 5   ask -- I was trying to reassure him that we were there to help
 6   him and explain what we were doing because he seemed to be
 7   getting more agitated and I wanted him to hopefully have an
 8   understanding of what we were trying to do.  Um, but it didn't
 9   seem to -- didn't seem to be working.
10       Q.   And then can you describe, after Mr. Cedillo became
11   resistant and combative, what happened?
12       A.   He -- I was applying a firm grip to his arm to try
13   to hold him in front of the car, but he had tried to pull
14   away -- he was trying to kick my partner and seemed like he was
15   trying to pull away to run.
16       Q.   What happened then?
17       A.   He was then taken to the ground to prevent him from
18   escaping.
19       Q.   So after he's taken to the ground, where do you
20   position yourself?
21       A.   I immediately go to grab his legs.
22       Q.   And Officer Richmond, he's on the torso?
23       A.   Yes.
24       Q.   Now, counsel talked to you about the hobble
25   directive.  Do you recall that testimony?
```

09:13AM (line 5)
09:13AM (line 10)
09:13AM (line 15)
09:14AM (line 20)
09:14AM (line 25)

| | | |
|---|---|---|
| | 1 | A.   Yes. |
| | 2 | Q.   And you had that knowledge back then? |
| | 3 | A.   Yes. |
| | 4 | Q.   And if we go down this page 4, on this exhibit, |
| 09:16AM | 5 | there's a subheading that's titled "Medical Treatment."  Do you |
| | 6 | see that? |
| | 7 | A.   Yes. |
| | 8 | Q.   And that it -- does it describe that officers should |
| | 9 | monitor the individual for signs of medical distress? |
| 09:16AM | 10 | A.   Yes. |
| | 11 | Q.   And the last sentence says that you should -- "shall |
| | 12 | request an ambulance if the individual shows signs of medical |
| | 13 | distress, such as unconsciousness or has difficulty breathing." |
| | 14 | Do you see that? |
| 09:16AM | 15 | A.   Yes. |
| | 16 | Q.   Now, while you were there with Mr. Cedillo and he |
| | 17 | was in that position on his right side, did you, in fact, |
| | 18 | monitor him to see whether or not he was breathing? |
| | 19 | A.   Yes. |
| 09:16AM | 20 | Q.   And was he? |
| | 21 | A.   Yes. |
| | 22 | Q.   Now, at one point during this encounter, an |
| | 23 | ambulance was called; correct? |
| | 24 | A.   Correct. |
| 09:17AM | 25 | Q.   And who did that? |

|    |          |                                                          |
|----|----------|----------------------------------------------------------|
| 1  |          | A.    Officer Nuñez.                                      |
| 2  |          | Q.    And counsel referenced a statement that            |
| 3  | Officer Nuñez said that the patient -- or Mr. Cedillo was |
| 4  | unconscious.   Do you recall that statement?            |
| 5  |          | A.    Yes.                                               |
| 6  |          | Q.    I'd like to play for you a short clip of about a   |
| 7  | minute from 164.                                           |
| 8  |          | (Exhibit 164 for identification.)                        |
| 9  |          | MR. HURRELL:   This is starting at five minutes.         |
| 10 |          | (Videotape played, not reported.)                        |
| 11 |          | Q.    (BY MR. HURRELL:)   What did Officer Nuñez say there? |
| 12 |          | A.    "Conscious."                                       |
| 13 |          | Q.    And you were there and overhead that?             |
| 14 |          | A.    Yes.                                               |
| 15 |          | Q.    Now, after an approximate 11-minute period of time, |
| 16 | the paramedics were present; is that true?                |
| 17 |          | A.    Yes.                                               |
| 18 |          | Q.    And did you see what they -- their conduct for the |
| 19 | first couple of minutes they were there?                   |
| 20 |          | A.    Yes.                                               |
| 21 |          | Q.    Can you describe what you saw?                    |
| 22 |          | A.    They were trying to assess Mr. Cedillo.           |
| 23 |          | Q.    And how were they doing that?                     |
| 24 |          | A.    They were looking at him.   One of the -- one of them |
| 25 | tried shaking his shoulder and trying -- talking to him.  |

09:17AM — line 5
09:17AM — line 10
09:18AM — line 15
09:18AM — line 20
09:19AM — line 25

UNITED STATES DISTRICT COURT

1    Q.    And what happened after that?

2    A.    It aroused him, and he woke up and began to try to

3    resist again.

4    Q.    So when he was in that state of trying to resist,

09:19AM  5    couldn't you control him with him remaining on his side?

6    A.    I didn't think that that was feasible.

7    Q.    Why not?

8    A.    With the level of strength he deployed -- displayed

9    toward us when we were holding him, he was able to lift me with

09:19AM  10   his legs.  And I don't think, if he was on his side, I would

11   have been able to control those movements as well.

12   Q.    While you were -- well, describe -- how did you then

13   come into contact with Mr. Cedillo in an effort to restrain him

14   that second time?

09:20AM  15   A.    I placed my -- my knees on the backs of his legs.

16   Q.    And that occurred for about approximately three

17   minutes?

18   A.    Yes.

19   Q.    During that time period, could you tell whether

09:20AM  20   Mr. Cedillo was breathing or not?

21   A.    Yes.

22   Q.    Was he?

23   A.    Yes.

24   Q.    How did you know that?

09:20AM  25   A.    He was -- I could hear him and he was making noises

1    as well.

2        Q.    Now, before Mr. Cedillo was placed on the gurney,

3    did the firefighter EMT technicians administer any kind of

4    emergency medical care to Mr. Cedillo?

09:20AM  5        A.    No.

6        Q.    Did they tell you anything about his condition?

7        A.    No, they did not.

8        Q.    Did you see individuals, namely, members of the LAPD

9    and the -- and the EMT people, check periodically on

09:21AM  10   Mr. Cedillo's medical status or condition?

11       A.    Yes.

12            MR. HURRELL:  That's all I have.  Thank you.

13                    **REDIRECT EXAMINATION**

14   BY MR. GALIPO:

09:21AM  15       Q.    Officer Hunt, do you recall that I took your

16   deposition in this matter?

17       A.    Yes.

18       Q.    Have you had a chance to review your deposition

19   recently?

09:22AM  20       A.    Yes.

21       Q.    And do you recall that we listened to the portion of

22   the audio that was just played regarding Officer Nuñez

23   requesting medical at your deposition?

24       A.    Yes.

09:22AM  25       Q.    And do you recall telling me at your deposition you

1          We also saw the part where you and your partner were

2     inflicting pain on him, digging into his bicep and bending his

3     wrist back a direction it was not intended to go.  And he's

4     crying out in pain, and you're saying, "Relax, relax."  And I

09:33AM  5     would imagine he's trying to pull away from you.

6               Is that the part where he was being noncompliant?

7               THE WITNESS:  Yes, sir.

8               THE COURT:  So when he was recoiling from your

9     infliction of pain, that was being noncompliant; is that right?

09:33AM  10              THE WITNESS:  Yes.

11              THE COURT:  Because you were instructing him to

12    relax; correct?

13              THE WITNESS:  Correct.

14              THE COURT:  And he would not relax.

09:33AM  15              THE WITNESS:  No.

16              THE COURT:  Because you continued to inflict pain;

17    correct?

18              What was the purpose for the infliction of the pain?

19              THE WITNESS:  The purpose of a pain compliance

09:33AM  20    technique is the person does not want to have that pain

21    compliance done on them and for it -- to be relaxed and it will

22    stop.

23              THE COURT:  But why was it done to begin with?

24    Where was the noncompliance?

09:34AM  25              He walked with you voluntarily and peacefully over

1    to your vehicle, yet you're employing these pain compliance

2    techniques.  For what reason?

3              THE WITNESS:  He's -- at that point, he was moving

4    back toward us.  He's no longer -- he's not calm anymore, and

09:34AM  5   he's steadily becoming more and more agitated.

6              THE COURT:  That's what you're saying, but that

7    isn't what we saw.  We keep hearing you say "Relax, relax," and

8    he is crying out in pain.  It's often difficult to watch.  And

9    I'm wondering, Why are you doing this to this man?  So I

09:35AM 10   haven't been able to wait to ask you.  Why were you doing this

11   to this man who your partner's indicated, when you encountered

12   him, you had no reason to even arrest him, yet you put him in

13   cuffs, okay, and that should have given you some feeling of

14   security.  He is cuffed behind his back.

09:35AM 15             You have nothing to fear from this man; correct?

16             THE WITNESS:  I don't know if I have nothing --

17             THE COURT:  This little guy.  You had nothing to

18   fear from this man, did you?  Or you're in the wrong line of

19   work.  You feared this man who is handcuffed behind his back.

09:35AM 20   Is that -- is that what you're saying?  The two of you, over

21   6 feet tall, you were fearful of this man at that time?

22             THE WITNESS:  I didn't know what he could -- he

23   appeared to be under the influence to me of likely meth.  I

24   didn't know what he could --

09:35AM 25             THE COURT:  Let's say he was.  Let's just say he was

|      |    |                                                                    |
|------|----|--------------------------------------------------------------------|
|      | 1  | under the influence of meth.  Handcuffed behind his back, two       |
|      | 2  | young, healthy police officers well over 6 feet tall.  What         |
|      | 3  | were you worried about?                                             |
|      | 4  | THE WITNESS:  Him beginning to resist or try --                     |
| 09:36AM | 5 | THE COURT:  And then what?  What were you worried             |
|      | 6  | about?                                                              |
|      | 7  | THE WITNESS:  That he would try to -- try to flee,                  |
|      | 8  | he may try to kick us.  He still had the ability to do those        |
|      | 9  | things.                                                             |
| 09:36AM | 10 | THE COURT:  That's what you were worried about?             |
|      | 11 | We never saw any signs of either of those things                   |
|      | 12 | happening, so I don't know why it was that you thought that         |
|      | 13 | they might happen.  Or is that something that's convenient for      |
|      | 14 | the purpose of the trial?                                           |
| 09:36AM | 15 | That's fine.  I understand that.                            |
|      | 16 | Step down.                                                          |
|      | 17 | Your next witness.                                                  |
|      | 18 | Oh, never mind.  No, no, no.  Thank you.  I'm sorry.                |
|      | 19 | Let's take a break.                                                 |
| 09:36AM | 20 | THE COURTROOM DEPUTY:  All rise.                            |
|      | 21 | (Break taken.)                                                      |
|      | 22 | (In the presence of the jury:)                                      |
|      | 23 | THE COURT:  We are rejoined by the jury, all                       |
|      | 24 | counsel, and the parties are present.                               |
| 09:50AM | 25 | Mr. Galipo, your next witness.                              |

```
 1        A.    Yes.
 2        Q.    Do you have an opinion, given that he was handcuffed
 3   behind his back, given that they had been applying wrist locks,
 4   and given that he had generally been compliant and cooperative
11:10AM  5   up to that point and hadn't committed any crime or serious
 6   crime, whether the takedown was appropriate or not?
 7        A.    I do.
 8        Q.    What is your opinion?
 9        A.    It was not appropriate.
11:10AM 10        Q.    Can you tell the jury why, in your opinion, the
11   takedown was not appropriate?
12        A.    So we train police officers to use force based on a
13   threat and that they can only use force that's proportional to
14   the threat.
11:10AM 15            So in this case, you have two officers who are
16   physically much larger than Mr. Cedillo.  Mr. Cedillo has been
17   handcuffed, his hands are behind his back.  He's been
18   compliant.  While the officers claim that Mr. Cedillo began
19   kicking at them and that they feared that he may attempt to
11:11AM 20   flee, again, it had two much -- physically much larger officers
21   holding him in a wrist lock, he's handcuffed.  A reasonable
22   officer would not believe he's going to flee.
23            I didn't see any evidence on the video consistent
24   with him fleeing or kicking.  Even if he did kick, he would be
11:11AM 25   kicking backwards where an officer would understand that you
```

increased level of control.  Their ankles are hobbled together.

So now you have control of their legs so they can't kick,

they're handcuffed, they can't fight, they can't run away.  It

just makes it easier to hold somebody in a recovery position.

11:22AM       Q.    And you said you reviewed their hobble policy?

              A.    I did.

              Q.    And did that talk about how to maintain control of

an individual in a seated or on their side position?

              A.    Yes, it did.

11:22AM       Q.    Okay.  Now, I'd like to talk to you about this case

after the takedown, the initial prone restraint.  Is it your

understanding that the officers were using weight and downward

pressure on Mr. Cedillo during that time frame?

              A.    Yes.

11:22AM       Q.    And where did you get that understanding from?

              A.    Well, from watching videos because you can see the

officers laying across his back and over his legs and from the

officers' statements in their depositions.

              Q.    And at some point during that prone restraint, is it

11:23AM  your understanding that Mr. Cedillo was hobbled?

              A.    Yes.

              Q.    But as you already stated, he was handcuffed even

before it started?

              A.    Yes.

11:23AM       Q.    So let's take the time frame of the prone restraint,

1    the initial prone restraint before he was hobbled.  Are you

2    with me --

3         A.    Yes.

4         Q.    -- in that time frame?

11:23AM  5         Do you have an opinion as to whether or not that

6    time frame, that restraint, that weight, that force was

7    reasonable or not?

8         A.    Yes.

9         Q.    What's your opinion?

11:23AM 10        A.    It was not reasonable.

11        Q.    Why not?

12        A.    Because he had already been handcuffed, he was on

13   the ground.  You had two officers who were physically much

14   larger than him.  And they could have simply rolled him on his

11:23AM 15   side and maintained control of him.

16        Q.    What if the officers say, well, we felt him trying

17   to lift up or roll so we felt we had to put more weight on him

18   and more downward pressure?  What would be your response to

19   that?

11:23AM 20        A.    So police officers are trained that, you know, it's

21   certainly possible that somebody could be trying to resist

22   while they're handcuffed with their hands behind their back,

23   but they also may be trying to breathe.

24             And it's a fairly simple process, particularly when

11:24AM 25   you have multiple officers, to put somebody on their side, put

1    them in a wrist lock, have the other officer take his upper leg

2    and pull his leg behind so he can't kick and you can hold it by

3    the ankle.  And you just -- you know, it's very difficult to

4    move in that position.

11:24AM    5        Q.    Okay.  Now, he's hobbled at some point.  And is it

6    your understanding that, after he's hobbled, he's immediately

7    sat up?

8        A.    Yes -- or he's not sat up.  He's rolled on his side.

9        Q.    Okay.  But how much -- do you know if there was a

11:24AM    10   period of time that passed between him being hobbled and being

11   rolled on his side?

12       A.    Yeah.  I don't recall exactly how long it was, but

13   there was a period of time.

14       Q.    Okay.  Do you have any criticism of the officers if

11:24AM    15   they continued to apply weight and hold Mr. Cedillo down while

16   he was chest down after he was hobbled?

17       A.    So once you -- once he's hobbled, that gives them an

18   additional level of restraint.  And they have additional

19   officers there at that point.  So it's very simple to hold on

11:25AM    20   to the end of the hobble to control his legs.  And, again, they

21   had multiple officers who could have rolled him on his side and

22   held him in a safe position.

23       Q.    Now, in your opinion, in reviewing their hobble

24   policy in effect at the time of this incident, do you have an

11:25AM    25   opinion as to whether they violated that policy?

1        A.     Yes.

2        Q.     What's your opinion?

3        A.     That they did violate it.   The policy requires that,

4    once he's hobbled, to put him on his side or sit him up.

11:25AM  5        Q.     Okay.  Now, moving forward, is it your understanding

6    that, after this first prone restraint, eventually Mr. --

7    according to the officers, Mr. Cedillo stopped resisting?

8        A.     Yes.

9        Q.     And was put on his right side?

11:25AM  10       A.     Yes.

11       Q.     And remained on his right side for a period of

12   almost 11-and-a-half minutes?

13       A.     Yes.

14       Q.     And several of the officers describe him as sleeping

11:26AM  15   during that time.  Did you see that reference?

16       A.     Yes.

17       Q.     Okay.  Now, for someone to go into a sleeping phase

18   following a prone restraint, the first prone restraint with the

19   weight applied, the handcuff, the hobbles, based on what you

11:26AM  20   would expect officers to be trained on, should that cause a

21   reasonable officer some concern?

22            MR. HURRELL:  Objection.  No foundation.  Calls for

23   medical testimony.

24            THE COURT:  Given all the variables in that

11:26AM  25   hypothetical, I'm going to go ahead and sustain that objection.

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | Q.    Whether they're hobbled?                               |
|        | 2  | A.    Yes.                                                   |
|        | 3  | Q.    And whether they're in medical distress?              |
|        | 4  | A.    Yes.                                                   |
| 11:27AM | 5 | Q.    Now, your understanding is the paramedics got there,  |

6    at some point shook his shoulder, Mr. Cedillo came to, and

7    within a matter of a couple seconds -- I'm estimating -- he was

8    put back down in a prone position?

9        A.    Yes.

11:28AM  10       Q.    And Officer Richmond had both of his knees on

11   Mr. Cedillo's back?

12       A.    Yes.

13       Q.    And Officer Hunt was -- had both knees and hands on

14   the back of his legs?

11:28AM  15       A.    Yeah, he was on his legs.

16       Q.    For a little under three minutes?

17       A.    Yes.

18       Q.    Okay.  What is your opinion, given the totality of

19   the circumstances in this case, as to whether that was

11:28AM  20   appropriate or not, to put him back down when he was awoken by

21   the paramedics, chest down, handcuffed, hobbled, with all that

22   weight and pressure on him?

23       A.    It was inappropriate.

24       Q.    And why?

11:28AM  25       A.    Well -- so you look at it -- you look at the

1   justify a takedown in that position.

2       Q.    (BY MR. HURRELL:)  Well, in the video, you can't see

3   his legs, can you?

4       A.    No.

12:48PM  5       Q.    So you don't know one way or the other whether he's

6   actually kicking the officers; correct?

7       A.    Well, the officers said that he never made contact.

8   I even -- even if you can't see his legs, you'll see some

9   movement in their upper body that would be moving back and

12:48PM 10  forth, consistent with a kick.  I don't see that.  So I -- I

11  don't see it.

12       Q.    Wouldn't you agree that the best way to gain control

13  of somebody who's becoming combative is to get them into a

14  prone position on the ground?

12:48PM 15           THE COURT:  Combative?

16           THE WITNESS:  So --

17           THE COURT:  Wait, wait, wait.  Is there evidence of

18  him being combative?  I have a problem with your question, the

19  hypothetical.  Where is the combative part?

12:48PM 20       Q.    (BY MR. HURRELL:)  Mr. Noble, do you -- in this

21  video that we just saw, do you see any indication that

22  Mr. Cedillo is resisting the efforts of the officers?

23       A.    No.  What I see is that they moved him over to the

24  car, they applied a wrist lock that -- you know, and he's

12:49PM 25  trying to communicate.  He's looking back and forth.  And he's,

|      |    | you know, being held in a wrist lock, which can be very |
|------|----|
|      | 1  | you know, being held in a wrist lock, which can be very |
|      | 2  | painful.  There's some movement there but not the movement that |
|      | 3  | the officers described.  I don't see him attempting to spit at |
|      | 4  | anybody, I don't see him trying to kick at anybody.  He can't |
| 12:49PM | 5 | punch anybody, he's handcuffed.  You know, I don't see any |
|      | 6  | combative -- I don't see -- |

                    THE COURT:  Hang on.  Hang on.  His question was
whether or not Mr. Cedillo is resisting the efforts of the
officers, the efforts of the officers to break his freakin'
arm.  Was he resisting that?

                    THE WITNESS:  Yeah.  I think -- I think he's in
pain, so he's trying to move out of that position of pain.

                    THE COURT:  I can't believe we're on this.

                    MR. HURRELL:  Excuse me, Your Honor?

                    THE COURT:  I can't believe we're on this video
again.

                    MR. HURRELL:  Well, I'll move on.

                    THE COURT:  I should exclude this video as being
inflammatory.  I can't believe we're still showing it.

        Q.    (BY MR. HURRELL:)  So after he's on the ground,
that's when weight is applied to his back and leg area;
correct?

        A.    Yes.

        Q.    And at that point in time, based upon the video,
you're just critical of engaging in that maneuver; correct?

```
 1        A.    A little over a year.

 2        Q.    Before living in Durham, were you living in

 3   Washington?

 4        A.    Yes.

 5        Q.    What were you doing when you lived in Washington?

 6        A.    Most currently, I was living in Spokane, Washington,

 7   and I was getting my bachelor's in psychology there.

 8        Q.    Did you end up getting your bachelor's?

 9        A.    Yes.

10        Q.    What was your purpose upon graduating from college?

11   What were you trying to do after college?

12        A.    My hope was that I would find a job that -- one that

13   would be life-giving and that would be able to help support me

14   and the people that I loved and people closest to me.  And so I

15   was hoping to, um -- yeah, just be in a spot where I could have

16   a career and support my family.

17        Q.    Okay.  Do you have any kids?

18        A.    No.

19        Q.    Do you have any siblings from your dad, Mr. Cedillo?

20        A.    No.

21        Q.    So you're his only child?

22        A.    Yes.

23        Q.    Now, I want to go back a little bit in time to when

24   you grew up with your father and your mother.

25              Now, what part of the country did you grow up in?
```

Timestamps (left margin): 01:04PM (line 5), 01:04PM (line 10), 01:05PM (line 15), 01:05PM (line 20), 01:05PM (line 25)

**UNITED STATES DISTRICT COURT**

1       A.      Washington state.

2       Q.      Okay.  Any particular city or region that L.A.

3   people here might know about?

4       A.      Tonasket, Washington, so north-central Washington.

01:05PM   5       Q.      Okay.  And when you were growing up, did you live

6   with your mother and father?

7       A.      Um, I lived not with both of them together.  Um, I

8   lived with my mom or my dad, um, and kind of go back and forth.

9       Q.      At some point did your father move to the L.A. area?

01:06PM  10       A.      Yes.

11       Q.      And how old, approximately, were you then?

12       A.      I believe I was about 8 years old.

13       Q.      Okay.  So this would be about first, second grade?

14       A.      I believe so.

01:06PM  15       Q.      What I'd like to do is publish -- well, let me ask

16   you, first, about these photos.  This would be Exhibit 29.

17               MR. CARRILLO:  By agreement, Your Honor, to the

18   admittance of Exhibit 29.  If I may publish?

19               THE COURT:  Sure.

01:06PM  20               (Exhibit 29 for identification

21                and received into evidence.)

22               MR. CARRILLO:  Thank you.

23       Q.      (BY MR. CARRILLO:)  Now, is this a photo,

24   Exhibit 29, of you and your father?

01:06PM  25       A.      Yes.

 1   loved by your father?

 2       A.    Yeah.  I just was, first of all, always super

 3   encouraged by my father.  Um, he was always very proud of me,

 4   and he always let me know that he was proud of me.

01:11PM  5       Um, I'd tell him about all these things that I had

 6   going on, and they were just opportunities he didn't have and

 7   people in our family didn't really have.  And so he was always

 8   excited to know about them and would always verbalize how much

 9   he cared for me, how much he encouraged me.  Um, yeah, how much

01:12PM 10   he loved me and how much he was praying for me, even if he

11   wasn't praying for me on the phone.

12       Q.    Were you able to see him from the time that you --

13   he moved from Washington, were you able to see him in person

14   very often?

01:12PM 15       A.    No.  From when he moved, I wasn't able to.  Um, the

16   hope was when I had graduated high school, I would be able to,

17   but that just wasn't an option, like, financially.  And so we

18   had talked about too that, when I graduated college, that I'd

19   get to see him then.  But, no, it wasn't able to happen.

01:13PM 20       Q.    Besides these phone calls with the updates, are

21   there other ways that you and your father communicated?

22       A.    Yeah.  We would often send letters to each other.  I

23   would, yeah, write him letters and tell him what I was up to

24   and he would write back.

01:13PM 25       Q.    These are handwritten letters?

**UNITED STATES DISTRICT COURT**

```
 1    basic needs met.
 2        Q.   Did you ever know or come to learn before your
 3    father's passing at all that he was homeless?
 4        A.   No.
 5        Q.   Did you ever have any suspicions that he may have
 6    been homeless at any time?
 7        A.   No.
 8        Q.   What was your understanding as to where he lived
 9    before he passed?
10        A.   With my uncle, is what I -- is my understanding.
11        Q.   Was there ever times when he missed phone calls that
12    he had set up times to speak to you?
13        A.   Not that I recall, no.
14        Q.   Would your -- would you call your father someone
15    that you considered dependable?
16        A.   Yes.
17        Q.   Did you depend on your father for -- for guidance
18    and support?
19        A.   Definitely.
20        Q.   And nowadays, now that he's not with us, are there
21    other ways that you look to somebody else instead or -- or are
22    there other ways that you don't have his guidance and support
23    that may be affecting you now today?
24        A.   I don't have that father figure anymore.  Um, like,
25    my dad was the person that I was quick to call and tell him
```

01:22PM (line 5)
01:23PM (line 10)
01:23PM (line 15)
01:23PM (line 20)
01:23PM (line 25)

|   | | |
|---|---|---|
| 1 | | **CROSS-EXAMINATION** |
| 2 | BY MR. HURRELL: | |
| 3 | | Q.    Good afternoon. |
| 4 | | A.    Good afternoon. |
| 5 | 01:28PM | Q.    So at the time your father passed away, you were |
| 6 | | 19 years old? |
| 7 | | A.    Yes. |
| 8 | | Q.    And the last time you had saw him, as I understand, |
| 9 | | you were about 7 or 8 years old? |
| 10 | 01:28PM | A.    Yes. |
| 11 | | Q.    Can you tell me -- at that time you were living in |
| 12 | | Washington state? |
| 13 | | A.    Yes. |
| 14 | | Q.    And your dad was in L.A.; correct? |
| 15 | 01:29PM | A.    Yes. |
| 16 | | Q.    Did you take any trips to L.A. to -- to see him at |
| 17 | | all? |
| 18 | | A.    I can never afford that, no. |
| 19 | | Q.    Couldn't afford to take a train? |
| 20 | 01:29PM | A.    From where I live, there wasn't trains that go to |
| 21 | | L.A., no. |
| 22 | | Q.    How about your dad?  Did your dad ever take trips to |
| 23 | | see you in Washington? |
| 24 | | A.    No. |
| 25 | 01:29PM | Q.    Did you ever have any vacations together? |

**UNITED STATES DISTRICT COURT**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | A.    Not after I was about 8 years old.                     |
|       | 2  | Q.    Did you spend any holidays with your dad after you     |
|       | 3  | were 8 years old?                                            |
|       | 4  | A.    After that, no, not -- not in person.                  |
| 01:29PM | 5 | Q.    And where did your dad live when he lived in L.A.?     |
|       | 6  | A.    I don't recall his exact address, but in L.A.          |
|       | 7  | Q.    You mentioned you had a letter writing campaign        |
|       | 8  | going back and forth.  Where did you send the letters?       |
|       | 9  | A.    I don't have that -- I don't have that memorized,      |
| 01:30PM | 10 | but I, yeah, could get that.                                 |
|       | 11 | Q.    When you talked to him, though, would you know that    |
|       | 12 | he received a letter?                                         |
|       | 13 | A.    Yes.  Yeah.                                             |
|       | 14 | Q.    You just don't know where you actually sent it?        |
| 01:30PM | 15 | A.    Yeah, I don't have the address memorized.  It's been   |
|       | 16 | four years.                                                  |
|       | 17 | Q.    Do you know the city?                                   |
|       | 18 | A.    In L.A.                                                 |
|       | 19 | Q.    Was there a community within L.A. that was on the      |
| 01:30PM | 20 | address?                                                     |
|       | 21 | A.    I don't remember it.                                   |
|       | 22 | Q.    The phone calls you had, they were about once a        |
|       | 23 | week?                                                         |
|       | 24 | A.    Yes.                                                   |
| 01:30PM | 25 | Q.    And did your dad always have the same phone number?    |

**UNITED STATES DISTRICT COURT**

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | A.    I don't -- not since I was -- not from when I was 8   |
|       | 2  | to 19.  I -- I think it changed maybe once or twice.       |
|       | 3  | Q.    And your -- you mentioned your dad was sending you    |
|       | 4  | money from time to time?                                   |
| 01:31PM | 5 | A.    Yes.                                                  |
|       | 6  | Q.    Where did he work?                                    |
|       | 7  | A.    Where did he work?  At a car wash.                    |
|       | 8  | Q.    Where was that located?                               |
|       | 9  | A.    I don't know the exact address.                       |
| 01:31PM | 10 | Q.    And he worked there for the whole time he was here   |
|       | 11 | in L.A.?                                                    |
|       | 12 | A.    From my knowledge, yes.                               |
|       | 13 | Q.    The letters that he sent you, did you save them?      |
|       | 14 | A.    I don't think I -- I'm not sure if I still have any.  |
| 01:31PM | 15 | Q.    And did your dad have funeral services?              |
|       | 16 | A.    He did.                                               |
|       | 17 | Q.    And where were they?                                  |
|       | 18 | A.    He had one here and in Mexico.                        |
|       | 19 | Q.    Did -- did you attend?                                |
| 01:31PM | 20 | A.    No.  I was not emotionally in a state of being able  |
|       | 21 | to attend and accept that.                                 |
|       | 22 | Q.    And where is your dad resting right now?              |
|       | 23 | A.    Mexico.                                               |
|       | 24 | Q.    When your deposition was taken a couple of years      |
| 01:32PM | 25 | ago, you didn't know where he was buried?                  |

**UNITED STATES DISTRICT COURT**

1    A.    I was -- yeah, I was confused.

2         MR. HURRELL:   Thank you very much.

3         THE WITNESS:   Thank you.

4                    **REDIRECT EXAMINATION**

01:32PM  5   BY MR. CARRILLO:

6    Q.    Ms. Zelaya, do you know why it is that your father

7    didn't come visit you in Washington when he was living in L.A.?

8    A.    Um, yeah, just financially it was very difficult.

9    Q.    For him?

01:32PM  10  A.    Yes.  And me too.  I was -- yeah.  I was under 19 at

11   least.

12   Q.    And counsel was just asking you about the funeral

13   services.  Can you tell us a little bit more about why you

14   didn't attend those funeral services?

01:33PM  15  A.    Yeah.  Well, apart from the financial aspect, I was

16   19, was in college full-time, so I didn't have a full-time job.

17   Um, that I just wasn't in that state of wanting to attend a

18   funeral service.  I don't think any 19-year-old wants to attend

19   someone's -- like, their dad's funeral service.

01:33PM  20       So I -- I thought that that's not the way that I

21   want to remember my dad.  I felt like that was really just a

22   triggering memory to give myself a really tragic, horrifying

23   memory.  And I just thought that I would rather remember my dad

24   from just the memories that I already had of my dad that were

01:33PM  25  good and special to me.  And I didn't want my last memory of my

1      **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES   )
                            )
4   STATE OF CALIFORNIA     )

5

6           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17          DATED THIS 29TH DAY OF NOVEMBER, 2023.

18

19

20              /S/ MYRA L. PONCE
    _____
21      MYRA L. PONCE, CSR NO. 11544, CRR, RDR
            FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**