# EXHIBIT C

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

4

5    NICOLE JUAREZ ZELAYA, individually and )
     as Successor-in-Interest to Decedent   )
6    JACOBO JUAREZ CEDILLO,                  )
                                             )
7                          Plaintiff,        )
                                             )
8        v.                                  )            Case No.
                                             )   CV 20-8382 ODW (MAAx)
9    CITY OF LOS ANGELES, DUSTIN RICHMOND,   )
     and JOSEPH HUNT,                        )         Volume 4
10                                           )     (Pages 376 - 488)
                           Defendants.       )
11   _____)

12

13           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                          TRIAL DAY THREE
14                  THURSDAY, OCTOBER 12, 2023
                           9:07 A.M.
15                   LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23        MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
               FEDERAL OFFICIAL COURT REPORTER
24             350 WEST 1ST STREET, ROOM 4455
               LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305

urine, it's very vital.

Q.   Okay.  Is it -- are you saying, in part, that the blood would be a more accurate reflection of what was in his system at the time if a quantitative analysis had been done of the blood?

A.   Yes, sir.

Q.   And with urine, drugs could stay in your system longer.  So if someone hypothetically did some methamphetamine three or five days prior, it could still be potentially showing in their urine?

A.   The amphetamine will show in the urine but not the methamphetamine because the body breaks down methamphetamine to amphetamine just like the body breaks down cocaine within hours of consumption to metabolites, just like the body breaks down heroin to morphine.

So finding only amphetamine in his urine tells us that there was not a recent, meaning hours, consumption of methamphetamine.  There was no evidence that he was acting under the influence of methamphetamine.

Q.   Okay.  Let's talk about the heart for a moment.

Was there a description in the autopsy report about his heart or cardiovascular system?

A.   Yes, sir.  There was a description of the heart in the autopsy report.

Q.   And it references a couple different issues I want

```
 1    angina, pain, like when you're under stress.

 2            So an occlusion of 40 percent, you would find in a

 3    majority of human beings.  So what we say, it is of no

 4    significant forensic consequence.

 5            And having even said that, 51 percent of men in

 6    America above the age of 18 have enlarged ventricles, enlarged

 7    ventricles, 51 percent of men above the age of 18.

 8            So finding mildly enlarged left ventricle,

 9    epidemiologically speaking, is what you call unremarkable.

10        Q.   So in -- based on the heart, do you think that

11    Mr. Cedillo died because he had a bad heart?

12        A.   No, sir.  Um, looking at the heart as described in

13    the autopsy report, looking at the tissue slides, microscopy --

14    so we make histologist slides, we examine it under the

15    microscope.  Sometimes we can enlarge it 1,000 times.  Looking

16    at a heart, he did not have any significant heart disease and

17    the blood die from any disease of the heart.

18            There is no human being who's absolutely normal.  We

19    all suffer from some type of disease.  The question is:  Is the

20    disease significant?  And once it's not significant, even your

21    doctor will tell you don't worry about it, live your life,

22    enjoy your life.

23        Q.   Did Mr. Cedillo die, in your opinion, because of

24    drugs?

25        A.   No, sir.  Um, epidemiology-wise again, the rate of
```

09:33AM

09:33AM

09:34AM

09:34AM

09:34AM

**UNITED STATES DISTRICT COURT**

 1  death of people who consume methamphetamine in the

 2  United States every year, about 13 million people above the age

 3  of 12, agree to have used methamphetamine.  Less than 3,000 die

 4  from it, which is 0.02 percent.

09:35AM  5          And a paper recently published by Strommer,

 6  S-t-r-o-m-m-e-r, Strommer & Powell published in 2022, shows

 7  that people -- 1 out of 350,000 doses of methamphetamine may

 8  result in death.  1 out of 350,000 doses.

 9          So death from methamphetamine is not something very

09:35AM 10  prevalent.  The majority of people who consume methamphetamine

11  do not die from it.  So the presence of methamphetamine in your

12  blood does not mean it was what killed you.

13      Q.    And if you know, Dr. Omalu, are stimulants like

14  amphetamine also prescribed by doctors to some patients?

09:35AM 15      A.    Yes, sir.  Amphetamine is prescribed by doctors

16  sometimes to treat diseases like narcolepsy, like ADHD.  So

17  it's actually a prescription medicine, yes, sir.

18      Q.    Now I'd like to move on in the chronology of what

19  happened to Mr. Cedillo.

09:36AM 20          So after he was sitting in the driveway and

21  handcuffed in the driveway, he was walked over to the front of

22  the patrol vehicle.  And you saw this in reviewing the videos?

23      A.    Yes, sir.

24      Q.    Thank you.  I'll stay by the microphone.  Sorry.

09:36AM 25          And one of the things you were asked to opine on in

1    Q.    But you don't perform CPR on somebody that's

2    breathing, do you?

3    A.    Cardiopulmonary resuscitation does not always mean

4    compression.  Cardiopulmonary resuscitation means remove the

10:49AM   5    handcuff, remove anything from the patient that may compromise

6    the patient's life.  Cardiopulmonary resuscitation does not

7    always mean compression of the chest.  And that is why I add

8    first aid because many times the general public confuses it.

9    First aid and cardiopulmonary resuscitation.

10:49AM   10    Q.    Okay.  Now, I understand that you feel that the

11    cause of death in this case was asphyxia.   Correct?

12    A.    Yes, sir.

13    Q.    And you're aware that the coroner in this case found

14    there to be no evidence of asphyxia when she did her work?

10:50AM   15    A.    Yes, sir, she said that.   But if you read my report,

16    I explained she was wrong and how wrong she was.

17    Q.    She was what?

18    A.    Wrong.

19    Q.    And then you indicated that end-tidal CO2 levels are

10:50AM   20    meaningless?

21    A.    I said in terms of determining why people die, it is

22    of no utility because it simply indicates a patient is in

23    shock.  If he's a living patient, yes, it's totally different

24    because if the end-tidal CO2 is low, it tells you, the

10:50AM   25    physician, this patient is dying, be more aggressive.

**UNITED STATES DISTRICT COURT**

1    depositions?

2         A.    Yes, sir.

3         Q.    And the videos were of the body-worn camera and some

4    surveillance videos.  Did you see those?

11:09AM   5         A.    I did, yes.

6         Q.    Now, as part of your review of materials in this

7    case, did you gain an understanding of whether or not the

8    decedent, Mr. Cedillo, had ingested methamphetamine, say,

9    within the month period prior to this incident?

11:09AM   10        A.    Yes.  I mean, there's testimony from --

11              MR. GALIPO:  I apologize.  I believe this is going

12   to call for a hearsay response.

13              MR. HURRELL:  Well, Your Honor, it goes to the basis

14   for his opinion.

11:10AM   15              MR. GALIPO:  Well, if -- if it's a statement from

16   someone, particularly not taken under oath, I believe it's

17   hearsay.

18              THE COURT:  Well, pardon me, but the question was

19   whether or not he gained an understanding from the review of

11:10AM   20   some materials.  And that's either yes, he did, or, no, he did

21   not.

22              MR. GALIPO:  Yeah.  He said yes, and he was about to

23   say what --

24              THE COURT:  Well, I don't know what he was about to

11:10AM   25   say.

1          MR. GALIPO:  Well, that was what my concern was.

2          THE COURT:  Okay.  And given the fact that he is

3   here as an expert witness and they can -- your opinion can be

4   based on all manner of things.  So let's not waste time where

5   we needn't waste time.

6          Go ahead, sir.

7          THE WITNESS:  Yes.  There is evidence in the medical

8   record, the emergency room record at the hospital that the

9   patient had been ingesting methamphetamine for probably about

10  five days prior to this incident.  There was discussion with

11  the patient's brother that he had been with the patient for the

12  entire day of April 7th.  This incident occurred in the early

13  morning hours of April 8th.

14          And the brother testified that he had typical signs

15  and symptoms of when he was using methamphetamine.  He had

16  typical mouth movements and tongue protrusions and muscle

17  twitching and he was agitated and saying, you know, confused

18  sentences and, um, wasn't really himself.  And all these were,

19  according to the brother, very, very typical findings of when

20  he was using crystal meth.

21     Q.   (BY MR. HURRELL:)  Now, as part of your review and

22  analysis of this case, did you review the autopsy report?

23     A.   Yes, sir.

24     Q.   And were there findings in that report that are

25  significant to you to your opinions in this case?

```
 1          A.    Sure.

 2          Q.    Can you describe them?

 3          A.    Well, there were findings in the autopsy that showed

 4     that his heart, Mr. Cedillo's heart was abnormal.  It was

11:12AM  5     abnormally thickened and enlarged, more than normal.  It

 6     weighed more than normal.  The normal weight of a heart for a

 7     man his size is probably about 300 to 325 grams.  Maybe upward

 8     to 350 if you push the envelope.  But his heart weight was 375,

 9     which is much higher than average for his height and weight,

11:13AM 10     which was 5'3", 143 pounds, which is a pretty small man.

11               And, also, his -- the thickness of his heart muscle

12     in the autopsy was increased.  It was thicker than normal.  The

13     walls of the heart muscle were thicker than normal.  The

14     autopsy measured them at 1.6 centimeters.  Normal thickness for

11:13AM 15     a small man like that would be up to 1.1, 1.2 at the most.  And

16     so 1.6 is pretty thickened compared to normal, which means the

17     heart was thickened and heavier than normal.

18               What that means is he likely had effects of

19     methamphetamine on the heart, scar tissue in the heart, the --

11:13AM 20     the heart was hypertrophied, meaning larger than normal.

21     Whenever the heart becomes hypertrophied and thickened and is

22     under the influence of chronic methamphetamine use, there's

23     scar tissue created in the heart which makes the heart more

24     vulnerable to electrical instability or abnormal heartbeats

11:14AM 25     that can be fatal.
```

**UNITED STATES DISTRICT COURT**

                    And so the heart was clearly abnormal.  There were

some mild to moderate blockages in the coronary arteries, which

are the arteries that supply blood to the heart muscle.  So

they were blocked up to 40 percent.  And so those are the main

11:14AM  highlights of the autopsy that are relevant to my opinions in

this case.

     Q.    Now, Dr. Chaikin, as part of your -- after having

reviewed the material in this case and reviewed some of the

deposition testimony, particularly of other experts in the

11:15AM  case, have you come to certain opinions as to the cause of

Mr. Cedillo's death?

     A.    Yes, sir.

     Q.    And can you tell us your first opinion -- what was

the cause of Mr. Cedillo's death, according to your review of

11:15AM  this matter?

     A.    The cause of his death was sudden fatal cardiac

arrythmia due to methamphetamine intoxication on top of an

abnormal heart that was vulnerable to the excitability of the

methamphetamine, the toxicity of the methamphetamine, the --

11:15AM  and all the adverse effects of that drug on an abnormal heart.

     Q.    Can you tell us about that?  What -- what adverse

effects on Mr. Cedillo's heart were created by use of

methamphetamine that led to his death?

     A.    Sure.  So I have a slide on the effects of

11:16AM  methamphetamine.  Do you want to show that now or wait?  Or do

1    you want me to just say it --

2        Q.    Go ahead and just describe it.

3        A.    Yeah.  So methamphetamine is a stimulant.  So it's

4    going to raise the heart rate very high, it's going to cause

11:16AM  5    your heart to beat fast.  It releases adrenaline into your

6    system above and beyond any adrenaline that's already there.

7            So it's -- one of the effects of it is to cause

8    nerve endings to spew out the adrenaline in them and

9    hyperstimulate the body, the brain, the heart.  So his heart

11:17AM  10   rate was much higher than it would have been otherwise.

11   Methamphetamine increases blood pressure by constriction of

12   arteries.  It's a direct effect on the body that

13   methamphetamine does, is squeeze the arteries, cause spasm of

14   the arteries to your muscles and to your heart and to the

11:17AM  15   brain, everywhere.  It just causes the arteries to constrict.

16           It causes microscopic arteries of the heart to

17   constrict.  Um, it causes overstimulation of the heart muscle,

18   which is trying to circulate blood.  It causes acidosis because

19   of the lack of oxygen.  It causes what we call a mismatch of

11:18AM  20   supply and demand, meaning -- let's say in this particular

21   case, Mr. Cedillo was having -- was in an altercation and

22   struggled with police officers.  And so his muscles in his body

23   was struggling, which increases the demand of oxygen to his

24   muscles, his brain, his heart.  But the methamphetamine is

11:18AM  25   causing constriction of blood flow and oxygen that's carried in

UNITED STATES DISTRICT COURT

1    the blood to those muscles.

2           So the demand is very high, but the supply of blood

3    is diminished because of the constriction of the

4    methamphetamine caused on the arteries of -- that bring oxygen

11:19AM   5    to the muscles.

6           So the supply of blood and oxygen is low, the demand

7    is high, it causes a mismatch.  And that same process occurs in

8    the heart.  When there is a supply/demand mismatch, there's

9    acidosis that builds up, lactic acidosis that builds up in

11:19AM  10    muscles.

11           Let's take a very typical example of what lactic

12    acidosis is.  You're in the gym and you're working out,

13    weightlifting with your biceps and, you know, you're overdoing

14    it and you're trying to build up muscle.  And you get a little

11:19AM  15    charley horse in your muscle and you've got to slow down so

16    that -- and the charley horse is due to lactic acidosis

17    building up in your muscle because you're putting a high demand

18    on it, but the supply of oxygen is not as good as the demand

19    requires so you have to slow down and let it catch up.  And

11:20AM  20    then you -- you know, you let it wash out and you do another

21    set and you get a little more, you know, tightness in your

22    muscles, charley horse.

23           That's -- that's lactic acidosis in your muscles

24    from supply/demand mismatch.  Demand is high, you're working

11:20AM  25    out, the supply of blood and oxygen is level but the demand

**UNITED STATES DISTRICT COURT**

1    goes up.  So there's a mismatch.  Same thing occurs in the

2    body.

3              And when Mr. Cedillo is struggling, the demand in

4    his muscles are going up because he's tense.  The supply of

11:20AM   5    oxygen and blood is going down because of the constriction of

6    blood flow.  That causes what we call systemic lactic acidosis.

7    The acid builds up in your blood, and that also builds up in

8    your heart.

9              Acidosis releases potassium in the blood.  Potassium

11:21AM   10   is dangerous.  Acidosis -- all this struggling and so forth

11   increases the body temperature.  Your body temperature is going

12   up just like if you're exercising, you start sweating, you're

13   hot, I mean, your body temperature is going up, that also

14   increases vulnerability in someone with an abnormal heart.

11:21AM   15             And so methamphetamine accentuates all this kind of

16   overstimulation.  When you chronically take methamphetamine, it

17   damages the heart muscle fibers and causes scar tissue in the

18   heart.  Scar tissue in the heart creates electrical instability

19   because the heart is an electrical organ.  It has a pacemaker.

11:22AM   20   It beats 60, 80 times a minute normally.

21             Under circumstances of stress, it's going to go way

22   up.  I mean, you all experience a sudden stress of some kind

23   and you feel your heart pounding.  That's adrenaline.  This

24   kind of whole situation involved a lot of adrenaline,

11:22AM   25   stimulating the heart, methamphetamine stimulating the heart

**UNITED STATES DISTRICT COURT**

1    but decreasing oxygen to the heart.

2            All that potassium and acidosis creates a very

3    vulnerable milieu or environment that makes the heart very

4    vulnerable to a sudden fatal electrical arrythmia or abnormal

11:23AM   5    beat.  And I have pictures of that if you want to show it in a

6    little bit.

7            But it creates a very rapid beat or a slow beat.  It

8    can do either one that will stop the heart.  And I think that's

9    exactly what happened in this case.  He was overstimulated,

11:23AM   10    intoxicated, struggling, and had an abnormal heart, proven at

11    autopsy, that caused him to have a sudden cardiac arrest.

12    Because of all of the -- because of the cardiac arrest, it --

13    he was not able to be saved ultimately and died.

14        Q.    Dr. Chaikin, there is a -- there is a period of time

11:24AM   15    that Mr. Cedillo was on his side, his right side for about

16    11 minutes.  Do you recall that --

17        A.    Sure.

18        Q.    -- that period of time?

19        A.    Yes.

11:24AM   20        Q.    Do you have an opinion as to whether or not

21    Mr. Cedillo was unconscious during that period of time?

22        A.    Well, he, uh, was noted to be sleeping or -- or

23    unconscious for some time.  And then, once he was turned on his

24    side into a -- what we call recovery position, he then became

11:24AM   25    more agitated and regained consciousness and became more

```
  1    combative and required another -- the officers to restrain him

  2    so he wouldn't run out in the street, for example, and hurt

  3    himself.  He was agitated again.

  4            So he wasn't unconscious at the end of those

  5    11 minutes.  He -- he had -- he was in a recovery position and

  6    he recovered to some degree, whatever was causing him to be

  7    unconscious and sleepy before that 11-minute time period.

  8        Q.    Now, there's been an opinion expressed in this case

  9    that Mr. Cedillo died due to restraint asphyxia.  You're aware

 10    of that; correct?

 11        A.    Yes, I am.

 12        Q.    Do you agree with that opinion?

 13        A.    I do not.

 14        Q.    Can you tell us why not?

 15        A.    Well, there are multiple reasons.  Um, the coroner

 16    did not find any signs of asphyxia.  That's No. 1.

 17            Number 2, when the paramedics hooked him up to their

 18    monitors, they found his CO2 levels to be 44.  If he was

 19    asphyxiated by the officers, his CO2 levels would have been

 20    much, much higher than 44, and they were not.

 21        Q.    Can you explain that process?  Why would the CO2

 22    level go high if someone's asphyxiated?

 23        A.    Well, because when you're asphyxiated, you're not

 24    clearing CO2 breathing out of your body.  Normally -- you

 25    breathe in oxygen and you breathe out CO2 to maintain a
```

The time stamps in the left margin read: 11:25AM (line 5), 11:25AM (line 10), 11:25AM (line 15), 11:26AM (line 20), 11:26AM (line 25).

|     |     |
|-----|-----|
| 1   | Q.    Fair enough. |
| 2   | A.    -- really -- |
| 3   | Q.    You would defer to the pathologist? |
| 4   | A.    Of course.  I'd defer to the pathologist. |

11:56AM 5     Q.    Okay.  And you understand that Dr. Bennet Omalu is a

6     forensic pathologist?

7         A.    Well, I'm not familiar with him and what he does,

8     actually.  But he -- he is a pathologist, according to his

9     report.

11:56AM 10    Q.    Okay.

11         MR. GALIPO:  Thank you so much.  That's all I have,

12    Your Honor.

13                        **REDIRECT EXAMINATION**

14    BY MR. HURRELL:

11:57AM 15    Q.    Dr. Chaikin, if we take away the abnormalities you

16    discussed in Mr. Cedillo's heart and we also take away the

17    methamphetamine intoxication, do you have an opinion as to

18    whether he would have died that night?

19        A.    Yeah.  I think that, absent the heart abnormalities

11:57AM 20    and the methamphetamine intoxication, he wouldn't have died

21    that night.

22         MR. HURRELL:  Thank you very much.

23                        **RECROSS-EXAMINATION**

24    BY MR. GALIPO:

11:57AM 25    Q.    Well, he certainly -- to a reasonable medical

|     |     |                                                                          |
| --- | --- | ------------------------------------------------------------------------ |
|     | 1   | THE WITNESS:  Yes.                                                        |
|     | 2   | THE COURT:  So this other stuff about a man acting                        |
|     | 3   | erratically, et cetera, that's something that you supplied.               |
|     | 4   | THE WITNESS:  Well, because it's a backup.  If                            |
| 01:52PM | 5 | someone thinks there's a basic disturbance, you usually ask for          |
|     | 6   | an additional unit, means you just need extra resources.  A               |
|     | 7   | backup elevates it.  That's why we respond Code 3, lights and             |
|     | 8   | sirens.                                                                   |
|     | 9   | THE COURT:  Did you respond to this?                                      |
| 01:53PM | 10 | THE WITNESS:  Yes.                                                      |
|     | 11  | THE COURT:  415, Code 3.                                                  |
|     | 12  | THE WITNESS:  Yes, it was a backup.                                       |
|     | 13  | THE COURT:  It wasn't an officer needs assistance.                        |
|     | 14  | It was just a man acting erratically.                                     |
| 01:53PM | 15 | THE WITNESS:  No.  It came out as a backup, not a                      |
|     | 16  | radio call.                                                               |
|     | 17  | THE COURT:  Backup on a call that went out                                |
|     | 18  | originally as a 415.                                                      |
|     | 19  | THE WITNESS:  Yes.                                                        |
| 01:53PM | 20 | THE COURT:  So why is he apparently -- it sounds                       |
|     | 21  | like he's in pain, crying out in pain.  And you're going,                 |
|     | 22  | "Relax."                                                                  |
|     | 23  | What are you doing to him?                                                |
|     | 24  | THE WITNESS:  I'm just verbalizing, de-escalating                         |
| 01:53PM | 25 | it.                                                                     |

|   |   | THE COURT:  You're verbalizing it and doing what? |
| 1 |  |  |
| 2 |  | THE WITNESS:  Trying to de-escalate by verbalizing |
| 3 |  | him to relax. |

1     THE COURT:  You're verbalizing it and doing what?

2     THE WITNESS:  Trying to de-escalate by verbalizing

3  him to relax.

4     THE COURT:  Why was he not relaxed?  What was going

01:53PM   5  on with him?

6     THE WITNESS:  I can't answer for him.

7     THE COURT:  You can't answer because you weren't

8  there or you weren't paying attention or you don't want to

9  answer now in open court under oath?

01:53PM  10     THE WITNESS:  No, he was erratic by moving.  They

11  were trying to de-escalate, keep him in control --

12     THE COURT:  De-escalate what?

13     THE WITNESS:  From him getting up, trying to resist,

14  trying to fight.

01:54PM  15     THE COURT:  Trying to fight?

16     THE WITNESS:  They were just controlling him.

17     THE COURT:  Wait a minute.  He was trying to fight?

18  He's handcuffed.  He's hobbled.  He's trying to fight?

19     How many of you were there?

01:54PM  20     THE WITNESS:  Approximately six.

21     THE COURT:  And he's what?  5 foot nothing or what?

22  143 pounds?  He was trying to fight?

23     THE WITNESS:  I never said he was trying to fight.

24  I said they're de-escalating it.  That's why I'm verbalizing to

01:54PM  25  him to just relax, the ambulance is here.

**UNITED STATES DISTRICT COURT**

|    |    |
|----|----|
| 1  | THE COURT:  Why is he crying out? |
| 2  | THE WITNESS:  I couldn't understand him. |
| 3  | THE COURT:  You couldn't understand him.  It sounds |
| 4  | like he's in pain.  I don't understand squat.  I barely |
| 5  | understand English.  But that man sounds like he's in pain. |
| 6  | What was that about? |
| 7  | What were you guys doing to him? |
| 8  | THE WITNESS:  I wasn't doing anything.  I was just |
| 9  | verbalizing. |
| 10 | THE COURT:  Of course, you didn't observe anything; |
| 11 | right? |
| 12 | THE WITNESS:  I was the cover officer.  So, yes, I |
| 13 | was observing pedestrians -- |
| 14 | THE COURT:  What were you doing to him?  Why was he |
| 15 | crying out in pain? |
| 16 | THE WITNESS:  I wasn't doing anything to him.  I |
| 17 | didn't touch him. |
| 18 | THE COURT:  I said what were you guys doing?  You |
| 19 | don't have to give up any names.  What are you guys doing to |
| 20 | the man that's causing him to cry out in pain? |
| 21 | THE WITNESS:  Police officers were controlling him. |
| 22 | THE COURT:  From what? |
| 23 | THE WITNESS:  I can't explain that, sir. |
| 24 | THE COURT:  Get out of here.  Go.  Thank you. |
| 25 | Goodbye. |

01:54PM (line 5)
01:54PM (line 10)
01:54PM (line 15)
01:55PM (line 20)
01:55PM (line 25)

1          Got any more of these?

2          MS. MARTINEZ:   No, Your Honor.   All done.

3          THE COURT:   Pathetic.

4          Are these the witnesses for the day?

01:55PM    5          MS. MARTINEZ:  Yes.

6          THE COURT:  All right.  Ladies and gentlemen, we've

7  got things to do, not the least of which is try to finalize our

8  jury instructions, et cetera.  Okay?

9          So we're going to shut it down early and -- what

01:55PM    10 time tomorrow?  9:00 o'clock?  8:00 o'clock?  Let's get the day

11 going; right?  8:00 o'clock?  8:00 o'clock.

12          Okay.  Remember the admonition.

13          THE COURTROOM DEPUTY:  All rise.

14          (Proceedings adjourned at 1:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                 **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                          )

4    STATE OF CALIFORNIA    )

5

6         I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17           DATED THIS 29TH DAY OF NOVEMBER, 2023.

18

19

20                    /S/ MYRA L. PONCE

21            MYRA L. PONCE, CSR NO. 11544, CRR, RDR

22              FEDERAL OFFICIAL COURT REPORTER

23

24

25

**UNITED STATES DISTRICT COURT**