# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

NICOLE JUAREZ ZELAYA, individually and as Successor-in-Interest to Decedent JACOBO JUAREZ CEDILLO,

Plaintiff,

v.

CITY OF LOS ANGELES, DUSTIN RICHMOND, and JOSEPH HUNT,

Defendants.

Case No. CV 20-8382 ODW (MAAx)

Volume 5
(Pages 489 - 680)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY FOUR
FRIDAY, OCTOBER 13, 2023
8:00 A.M.
LOS ANGELES, CALIFORNIA

MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
(213) 894-2305

A. No.

Q. And what pattern did you see?

A. So what was initially seen was asystole, a-s-y-s-t-o-l-e, which is flatline.

08:27AM Q. What did that tell you with respect to the cause of his death?

A. Well, given the entire clinical situation -- and, of course, I had -- I had information from the videos, from the testimony, from all of those involved, including the paramedics, I also had the autopsy information.

08:27AM So what we're seeing here is a pattern that's entirely consistent with prone restraint asphyxia causing cardiac arrest, inability of the lungs to function because of the prone restraint with compression, leading to plummeting oxygen levels, rising acid levels, causing cardiac arrest.

08:28AM And then there are two classic patterns on the EKG that you would see in that situation. One is asystole, flatline. The other is something called PEA, pulseless electrical activity, which we'll discuss at the appropriate time.

08:28AM Q. Okay. So the initial reading by the paramedics was asystole?

A. Yes.

Q. And then later, when he was taken to the hospital at some point, did -- was there evidence of the PEA?

08:28AM

A. Yes.

Q. Have you had experience encountering individuals in your medical practice who were under the influence of methamphetamine?

08:54AM A. Yes.

Q. And they displayed symptomatology very similar to what we saw in the video in Mr. Cedillo; correct?

A. Well, they can. Not everybody that has methamphetamine in their system has altered mental status or

08:54AM mentation. There's a spectrum of how people behave. But I agree that that pattern is consistent with methamphetamine in the system.

Q. And did you read any interviews of Mr. Cedillo's brother that were conducted by the police department?

08:55AM A. Yes.

Q. And you -- you read there that Mr. Cedillo had likely ingested methamphetamine the same night that he was encountered by the police officers; correct?

A. Yes.

08:55AM Q. And you would also agree and I think you laid out for the jury that methamphetamine creates stressors on the heart; correct?

A. Yes.

Q. It creates a higher pulse rate, higher blood

08:55AM pressure; correct?

A. Yes.

Q. And creates a need for more oxygen; correct?

A. Yes.

Q. And you would also agree, I'm sure, that methamphetamine toxicity can cause cardiac arrest; correct?

A. Yes.

Q. Doctor, the autopsy report you reviewed in this case; correct?

A. Yes.

Q. And would you agree that the coroner found no signs of asphyxia in Mr. Cedillo?

A. Yes.

MR. HURRELL: Thank you.

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q. So just to cover a few of the points, Doctor, that were just covered by counsel.

The portion of the video where a sergeant asked Officer Richmond, who was the officer who was on his back, whether he was breathing and then Officer Richmond said something to the effect that he is or he thought he was, does that -- as you as a medical doctor conclusive in your mind that he must have been breathing?

A. No.

Q. And you're saying that you observed the video and

you're really forcing things down, you can get on somebody. So, you know, at most, I would guess 125 pounds, maybe a little more, a little less of being pushed or pressed down at the most.

09:12AM Q. Dr. Vilke, do you have an opinion as to whether or not the cause of death for Mr. Cedillo was due to asphyxiation?

A. I do have an opinion.

Q. What is that?

A. Yeah, that there's no evidence of asphyxiation.

09:12AM Again, the timing of it, you don't have additive effects. So what happened in the first process of proning, the second process of proning, they don't add up. You can't add them together.

Once you recover from something, you breathe, you 09:13AM blow off your carbon dioxide, if there was any retention of it, and you're back to normal.

So the second process was really where he went into cardiac arrest, at some point after that. There was maybe two, two-and-a-half minutes of time. The weight itself wasn't 09:13AM enough. We just talked about that studies looking at over 200 pounds on people's backs don't cause physiologic changes that would imply that asphyxia can happen.

You don't breathe as deeply when you have a lot of weight on your back, like 225 pounds, but you don't asphyxiate. 09:13AM You don't have significant changes.

We have a lot of extra lung volume in our chest. That's why people can have a lung removed and still function. So even if you restrict some of the volume with some weight on the back, that doesn't kill you. That doesn't cause that cascade of events of the CO2 levels rising, the oxygen dropping, and then eventually the heart going into arrythmia and dying.

This case here, for the two-and-a-half minutes that he was being held in that position the second time, he was yelling and moving air in and out. There was definitely air movement, as you can tell, by the audio.

Patients who can't breathe who come into the emergency department aren't yelling. People who have asthma attacks, people who have respiratory failure, they're not going doc, doc, doc, help, help. They are focused on one thing, that's breathing. That's because they're teetering on the edge.

Clinically, that's not the case here. He was yelling and moving. And, again, the time period wasn't long enough to asphyxiate somebody, even if he had complete compression and blockage of air.

So that's why my opinion is that there was not asphyxiation in this case.

Q. Dr. Vilke, I'm going to change topics to the concept of pain. Okay?

Now, in terms of your analysis of this case, have you reviewed the various reports, the depositions, and body-worn camera video pertaining to an incident that occurred on April 8th of 2019?

10:12AM A. Yes. Those were some of the materials that I reviewed.

Q. All right. Now, I want to take you to a point in time during the -- the encounter between Mr. Cedillo and the police officers involved in this case, Officers Richmond and

10:12AM Hunt. Okay?

A. Okay.

Q. And I want you to assume that at a point in time in that encounter, Mr. Cedillo is walked to the front of the patrol vehicle. Can you assume that?

10:12AM A. Yes. That he was walked to the front of the car?

Q. Yeah.

And after he was walked to the front of the car, was there a period of dialogue between the officers and Mr. Cedillo?

10:13AM A. As I recall, the officers were communicating with him to relax and to calm down while they were trying to control him and search him.

Q. Now, I want you to assume that when they were -- when the two officers were trying to search Mr. Cedillo, that

10:13AM he pulled away from their grasp. Can you assume that?

10:13AM 10:13AM 10:14AM 10:14AM 10:15AM

A. Yes.

Q. And I want you to assume that at approximately that -- in that time frame, that one of the officers placed Mr. Cedillo into what's called a wrist lock. Can you assume that?

A. Yes.

Q. Can you describe for us in police nomenclature, what's a wrist lock?

A. The wrist lock applied in this case, as I understand it, was a two-handed wrist lock rather than a one-handed wrist lock. So one hand of the officers would go to the back -- the palm of the officer's hand would go to the back of the subject's hand and bend the wrist inward while bracing the subject's elbow with the other hand. And then, if needed, they would apply pressure inward, the subject's palm toward the elbow to help to control the subject's movement.

Q. What is the law enforcement reason for utilizing this wrist lock?

A. First and foremost, it's to help to control the subject's movements. And if the subject starts resisting to a point where the officer cannot control the person very well, they can actually bend the wrist to a point where there's some pain involved and the officer would give some kind of verbal response to the person letting them know that -- what to do to relieve that pain.

10:15AM
10:15AM
10:16AM
10:16AM
10:16AM

Q. Now, I want you to assume that, during the application of this wrist lock, one of the officers told Mr. Cedillo to relax. Can you assume that?
A. Yes.
Q. That seems counterintuitive to me. Can you explain, why would a police officer holding an individual in a wrist lock like this tell them to relax?
A. That is how we train officers to do. It's a verbal response along with a control hold to put the person on notice, if you will, of what they need to do so if they are feeling pain, this is a direction for them to understand what they need to do to relieve that pain.
Q. Okay. And now I want you to assume for purposes of my next question that the -- Mr. Cedillo is taken to the ground by Officer Richmond. Can we assume that?
A. Yes.
Q. Okay. And I want you to assume that at this point in time Mr. Cedillo is handcuffed. Can you assume that?
A. Yes.
Q. Would it be appropriate -- was it appropriate in that instance, assuming those two factors are true, for the officers to take Mr. Cedillo to the ground while handcuffed?
A. Yes. If -- what officers are trained is if they can't reasonably control a person in a standing position and then to -- even up against the police car and if they still

can't reasonably control this person to finish their task, whether it be searching or handcuffing at that point, then they should take the person to the ground in a controlled manner to be able to use the ground as an additional controlling agent.

10:17AM Q. Now, in this particular instance, with Mr. Cedillo handcuffed, there was a likelihood -- in fact, he did hit his head on the ground. Is that your understanding?

A. That is my understanding.

Q. Wouldn't that deem this takedown inappropriate, 10:17AM according to police standards?

A. No, it would not. Again, it's a -- when we train officers takedown techniques on the mat -- and that's one of the things I did for over ten years -- is that we do it in a controlled manner to the best of our ability. We try to place 10:17AM them into a position on the ground where it can mitigate injury, but there's no way for us to prevent all injuries because sometimes a suspect or the subject just moves unexpectedly and we're not able to completely control the subject's descent to the ground.

10:17AM Q. And I'm going through the next progression on this scenario. Mr. Cedillo was placed in a prone facedown position on the ground; correct?

A. That's my understanding.

Q. And then the officers applied body weight, one on 10:18AM the upper torso area, the back area, and one on the legs. Is

that what happened?

A. That is my understanding. And by looking at the surveillance video, that's what appeared to happen.

Q. Was placing Mr. Cedillo prone facedown and applying body weight to his torso and legs appropriate, according to applicable police standards?

A. It would be appropriate if the subject is still resisting and trying to escape or trying to injure the officers in any way, trying to attack the officers, spit at the officers, bite at the officers, or kick at the officers.

In a prone position, officers are trained that that person is less likely to be able to deliver effective attacks against the officer.

So officers are trained to put the person in a prone position until they stop resisting and to place body weight to prevent the subject from being able to create some space between their chest and the ground because, once the subject is able to create some space between the chest --

THE COURT: Mr. Flosi, let me interrupt you a second. You've gotten way away from the question.

The question was really quite simple. The question was the appropriateness of this particular action. Was it appropriate? Was it necessary? Did it fulfill any legitimate law enforcement purpose?

THE WITNESS: It was appropriate according to law

enforcement training --

THE COURT: I'm talking about what you saw in the video. Was it appropriate under those circumstances?

THE WITNESS: What I saw appeared to be appropriate, yes, sir.

THE COURT: Okay. What did you see? Because what we saw was a gentleman who volunteered to be handcuffed, who walked voluntarily over to the police car, who wasn't combative. And what we also saw was we saw the officers push one of his hands, handcuffed hands up between his shoulder blades and we saw him crying out in pain. But you saw a different video.

What did you see?

THE WITNESS: I'm sorry. What's the question, sir?

THE COURT: You're so in the bag. Why am I bothering?

All right. I have nothing.

Q. (BY MR. HURRELL:) Mr. Flosi, what did you see in the video that deemed this placement of Mr. Cedillo's body appropriate, according to applicable police standards?

A. Well, according to the body-worn video that I saw and the surveillance video and the statements from the officers that Mr. Cedillo was trying to kick back at them and was still moving his body back and forth, then it would be appropriate -- and the video that I could see supports that -- to take the

person to the ground to be able to mitigate that attack.

Q. And then there was a second time that Mr. Cedillo was placed in the facedown prone position; correct?

A. Yes. There was a second occasion later on during the encounter.

10:21AM

Q. And the paramedic, I believe, was trying to arouse Mr. Cedillo. And according to what you saw in the video, what justified placing him into a second prone position?

A. Mr. Cedillo suddenly started to writhe his body again, started yelling and -- in a motion that would be perceived as a potential kicking at the officers or could be precipitous to an attack, they saw him spitting at the officer.

10:22AM

So, again, laying him into a prone position is a de-escalating tactic to be able to take any kind of advantage of him laying out on his side away while they're prone.

10:22AM

Q. And as part of your review of materials in this case, did you review a hobble directive publicized in approximately November of 2018?

A. Yes.

Q. And did that directive express an awareness that it's not a good idea to keep someone in a prone down position for an unreasonable length of time?

10:22AM

A. In essence, it did.

MR. HURRELL: That's all I have. Thank you.

///

is common spelling. Thomas has an "h." And Flosi is spelled F, as in Frank, l-o-s-i.

THE COURTROOM DEPUTY: Thank you so much.

10:47AM THE COURT: All right. Mr. Flosi, you consider yourself an independent -- basically an independent observer as -- as you function as an expert in this case. Right?

THE WITNESS: I do.

10:47AM THE COURT: All right. You do an investigation and you come to a conclusion. And you pretty much let the facts speak for themselves. You don't consider yourself a party to these cases, do you?

THE WITNESS: No. The -- reviewing the evidence and letting the evidence lead you to your opinions.

10:47AM THE COURT: All right. Because I was wondering, Mr. Galipo had asked you about de-escalation being part of the training of police officers. But I guess once you see a case beginning to spiral out of control, that one of the things they teach policemen is to settle things down, to de-escalate. Is that right?

10:48AM Do you remember -- do you even remember that question and the fact that you actually did provide an answer to that? If you don't, let me read it to you.

THE WITNESS: I don't remember.

THE COURT: All right.

10:48AM "QUESTION: And also part of the training is to

de-escalate the situation rather than escalate it?"

Your answer: "We try to de-escalate when we can. It takes both sides of the equation for a proper de-escalation to occur."

So do you put yourself in that equation? "We try to de-escalate when we can."

THE WITNESS: Meaning the training that I provide for law enforcement and when I was still on the job, that we try to de-escalate to the best of our ability.

THE COURT: Well, that's -- that's a long time ago. That was when you were a young man.

He was asking about -- about training. In an answer to the question about de-escalation, you didn't talk about you teaching or what is being taught or what other people know or try or do. You said "we" try to de-escalate. And I'm wondering, How did you get into this situation? Or do you consider yourself -- do you really consider yourself that closely aligned with law enforcement now that you can no longer be objective?

THE WITNESS: I do not.

THE COURT: Okay. Thank you.

THE WITNESS: I -- I testify against police officers in criminal cases.

THE COURT: Pardon me?

THE WITNESS: I've taken cases -- I've been retained

by district attorney offices in the prosecution of officers in cases where, if they were convicted, they would maybe go to prison or jail.

THE COURT: Okay. I -- I understand that. You said that. But then listening to other parts of your testimony, I began to -- to wonder just how independent you are.

You saw things that I didn't see. I didn't see fights, I didn't see spitting, I didn't see any kind of a confrontation or combativeness. I certainly did not see any kicking.

And even so, one of the things that we all saw was the gentleman's shoes are still sitting out in the street. He's barefoot, he's in his stockings. And I couldn't understand the constant references to kicking.

But in any event, I was beginning to wonder whether or not -- or just -- I was asking: How independent are you? Because you -- you found nothing inappropriate about the takedown, you found nothing inappropriate about the -- using these pain methods to control this individual.

And I don't understand -- would you tell me what it was that you were trying to control? Because he seemed to be compliant up until -- certainly he was compliant at the time they walked him over to the police car, which they tried to wrench his arm back halfway up his back. And I'm wondering, What is the purpose for this that you found to be appropriate?

Why inflict pain on someone who's not fighting you?

       THE WITNESS:  Well, that was a good long question, sir.  I'll try to answer to the best of my ability.

       THE COURT:  All right.  Let me just ask you this. What was the purpose of that application of pain when they first walked him over to the -- the car?

       THE WITNESS:  The -- the two-handed wrist lock was applied when the officers -- and this is on the body worn as well -- when Mr. Cedillo was moving his body back and forth and was in a jerking kind of movement.

       So the control hold -- and that's what they're called, control holds -- is applied to help control the subject's movements so that the officer can do whatever task it is that they need to do next.

       THE COURT:  Number one -- I've forgotten which officer it was, it may have been Richmond, indicated when he first put the cuffs on, he just did it because the guy basically volunteered his wrist.  He put his hands behind his back.  So he said, what the hell, I may as well put the cuffs on.  But the officer admits, he had no probable cause at that time to arrest the man.  All right?

       So here we are now, seconds later, you walk him over to the car.  And what we see on the video is his arm being wrenched up between his shoulder blades and he's crying out in pain.  And it's your -- your position now is that, by him

moving back and forth, apparently in response to pain, that invites the infliction of more pain and that's justified?

THE WITNESS: Well, if I can address certain things. The handcuffing was done to maintain the status quo of the detention. There was no probable cause --

THE COURT: What detention? There was no probable cause for a detention.

THE WITNESS: Well, sir, respectfully, the standard is not probable cause for detention. It is reasonable suspicion.

THE COURT: Of what?

THE WITNESS: They had reason to -- that he was under the influence of a stimulant --

THE COURT: Or?

THE WITNESS: -- methamphetamine.

THE COURT: Or?

THE WITNESS: Or what?

THE COURT: Is that the only -- the only conclusion, that he could not have been having a psychotic episode of some kind?

THE WITNESS: Could have, but no officer is trying to jump to any conclusions until they can do an evaluation.

THE COURT: But they're trained to do an evaluation?

THE WITNESS: When they can. Mr. Cedillo had not been searched yet. And the officers believed, based on their

        10:54AM

observations, that he may have been armed or at least in possession of --

THE COURT: All right. They thought he may have been armed. And they walked him over to the patrol car to -- what? -- conduct the search?

THE WITNESS: Pat for a search, yes, sir.

THE COURT: All right. And he's handcuffed? Why was it necessary to inflict any pain on him to pat him down?

THE WITNESS: Well, he -- it started, the movements, before he -- the wrist lock. He started the movement. And he tried to use the vehicle -- my understanding, he tried to use the vehicle --

10:55AM

THE COURT: Where are you getting this understanding from? Where are you getting this information from?

THE WITNESS: From the material I reviewed.

10:55AM

THE COURT: It's not on the video.

THE WITNESS: Unless the officers are narrating the video, um, they wouldn't have -- it would have to be in a statement.

THE COURT: By the way, you just said something that's -- are officers taught anywhere, even when they first get to patrol, do their training officers teach them how to now navigate this new world where they're wearing body cams? Are you taught to say certain things while you're wearing a body cam?

10:55AM

10:56AM

For example, they kept telling him to relax. I just found that curious. Why were they telling him to relax when they were inflicting pain on him and he's understandably moving but they're saying "Relax"? Is that for the benefit of the camera?

10:56AM

THE WITNESS: No. It's for the benefit of the subject so that the subject understands what they need to do --

THE COURT: Oh. The subject understands that if you stop hurting me, I'll stop moving. And we all understood that. But what we didn't understand is why they kept saying "Relax."

10:56AM

THE WITNESS: The first command of "relax" was well before any kind of pain compliance. It's something that officers are trained to do when they feel that the subject may start to resist, to let the subject know that, hey, I'm feeling some resistance, you need to relax so that I can continue doing my job.

10:57AM

THE COURT: All right. I'm just thinking that's an awful lot of pain inflicted just to pat him down quickly and get on with whatever the job was, but all right.

Thank you. You've answered my questions.

10:57AM

THE WITNESS: Thank you.

THE COURT: Next witness.

MR. GALIPO: Your Honor, I -- I'm not sure there are any more witnesses but Mr. Hurrell --

THE COURT: Oh, excellent.

10:57AM

We'll tell you -- I'll give you example. We want to say "use of force"; they want to say "use of force or restraint." So, like, there's some minor differences on the language. So we should be able to knock this out.

10:58AM THE COURT: Can we use both?

MS. MARTINEZ: Well, we don't think so. We don't believe so.

MR. GALIPO: So why don't we have that to you by 11:30?

10:59AM THE COURT: That would be great.

MR. GALIPO: And then maybe have the jury come back at, like, 1:00. Whatever time you think is good for you. 1:30? 1:00?

(Off-the-record discussion between

10:59AM the Court and the courtroom deputy.)

THE COURT: Yes. That will work. That will work.

MR. HURRELL: Yes. And I have just one thing to put on the record out of the presence.

THE COURT: Sure. Let them go.

10:59AM THE COURTROOM DEPUTY: All rise.

(Out of the presence of the jury:)

MR. HURRELL: Your Honor, based upon the Court's questioning of Mr. Flosi, I'd like to make a motion for mistrial. And specifically, I'm referencing comments the Court made about what was depicted in the videos. And I think

11:00AM

 it's -- the comments were overly prejudicial.

MR. GALIPO: Plaintiff's response is that I don't think a mistrial is warranted. I think the Court asked questions of the witness that the Court wanted to follow up on.

11:00AM There's a jury instruction, I think, that includes the jury to decide the case based on their interpretation of the evidence and the law and not to take any cues at all from the judge and to decide this case themselves and independently. And I believe that's what this jury will do.

11:01AM So we don't believe a mistrial is appropriate.

THE COURT: It certainly won't be granted, but thank you.

MR. HURRELL: Thank you, Your Honor.

THE COURT: Anything else? Or you can go to lunch

11:01AM because we have some things I'm going to need you to do by -- one of them by 11:30.

MR. GALIPO: Yes. So --

THE COURT: So you know, I'm going to instruct before the argument.

11:01AM MR. GALIPO: Okay. That's helpful.

And then what we'll do is we'll meet back at 11:30 to see if we can finalize the verdict form and jury instructions. If we're in agreement, we're good. If there's some small area of disagreement, like was mentioned, "force" or

11:01AM "force or restraint," the Court will make the call. And then

police practice expert the plaintiffs called does 50 percent of his work for plaintiffs, 50 percent of his work for law enforcement. One could argue he's more objective and unbiased, perhaps, than Mr. Flosi who's done a hundred cases for the LAPD. And every single case he does with the LAPD, including shooting cases and death cases and unarmed people shot in the back, he comes into court and says everything that the officers did is -- is okay, it's fine. Even when the Board of Police Commission says that was out of policy, Mr. Flosi disagrees.

02:25PM 02:25PM

So I would submit you can find that Mr. Flosi was not very credible because he seemed extremely biased in favor of the LAPD. Mr. Noble, on the other hand, does half his work for the plaintiffs, half his work for the defense.

What did he have to say? He educated all of us about the risk of prone restraint. And in the law enforcement community, it's been around since the '80s and '90s. This is nothing new.

02:26PM

He talked about the Department of Justice, he talked about the International Association of Chiefs of Police, he talked about all the agencies having written policies and training to prevent positional and restraint asphyxia; LAPD didn't have it. Policies about risk factors; LAPD didn't have it. That's not good. It's not good for the LAPD, it's not good obviously for Mr. Cedillo and his family, it's not good for these officers either not to have the right training. I

02:26PM 02:26PM

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 29TH DAY OF NOVEMBER, 2023.

/S/ MYRA L. PONCE

MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER