# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

NICOLE JUAREZ ZELAYA, individually and )
as Successor-in-Interest to Decedent )
JACOBO JUAREZ CEDILLO, )
                                      )
              Plaintiff, )
                                      )
     v. )                             Case No.
                                      ) CV 20-8382 ODW (MAAx)
CITY OF LOS ANGELES, DUSTIN RICHMOND, )
and JOSEPH HUNT, )                    Volume 5
                                      ) (Pages 489 - 680)
              Defendants. )
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY FOUR
FRIDAY, OCTOBER 13, 2023
8:00 A.M.
LOS ANGELES, CALIFORNIA

MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

1          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          LAW OFFICES OF DALE K. GALIPO
           BY:   DALE K. GALIPO
5          BY:   RENEE V. MASONGSONG
                 Attorneys at Law
6          21800 Burbank Boulevard, Suite 310
           Woodland Hills, California  91367
7          (818) 347-3333

8          CARRILLO LAW FIRM, LLP
           BY:   MICHAEL S. CARRILLO
9                Attorney at Law
           1499 Huntington Drive, Suite 402
10         South Pasadena, California  91030
           (626) 799-9375
11

12    **FOR THE DEFENDANTS:**

13
           HURRELL CANTRALL, LLP
14         BY:   THOMAS C. HURRELL
           BY:   DIANE MARTINEZ
15               Attorneys at Law
           725 South Figueroa Street, Suite 3800
16         Los Angeles, California  90017
           (213) 426-2000
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                        **INDEX OF WITNESSES**

2

3    **PLAINTIFF'S WITNESSES**                           **PAGE**

4    WOHLGELERNTER, M.D., Daniel

5        Direct Examination by Mr. Galipo                498
         Cross-examination by Mr. Hurrell               526
6        Redirect Examination by Mr. Galipo             531
         Recross-examination by Mr. Hurrell             533

7

8    **DEFENDANTS' WITNESSES**                          **PAGE**

9    VILKE, M.D., Gary

10
         Direct Examination by Mr. Hurrell              535
11       Cross-examination by Mr. Galipo                549

12

13   FLOSI, Edward (via videoconference)

14       Direct Examination by Ms. Martinez             568
         Cross-examination by Mr. Galipo                579

15

16

17

18

19

20

21

22

23

24

25

                    **UNITED STATES DISTRICT COURT**

492

1

## INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 22A - Demonstrative | | 521 | |
| 22B - Demonstrative | | 521 | |

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | THE COURT:  Anyone who cannot see an image on the |
| 2 | monitor in front of you, raise your hand. |
| 3 | I see no hands.  Okay. |
| 4 | Go ahead. |
| 10:05AM 5 | THE COURTROOM DEPUTY:  Please raise your right hand. |
| 6 | Do you solemnly swear that the testimony you shall |
| 7 | give in the cause now before this Court shall be the truth, the |
| 8 | whole truth, and nothing but the truth, so help you God? |
| 9 | THE WITNESS:  Yes, I do. |
| 10:06AM 10 | THE COURTROOM DEPUTY:  Thank you.  You may be |
| 11 | seated. |
| 12 | THE COURT:  Go ahead, sir. |
| 13 | MR. HURRELL:  Thank you. |
| 14 | **EDWARD FLOSI,** |
| 10:06AM 15 | **DEFENSE WITNESS, WAS SWORN AND TESTIFIED** |
| 16 | **AS FOLLOWS VIA VIDEOCONFERENCE:** |
| 17 | **DIRECT EXAMINATION** |
| 18 | BY MR. HURRELL: |
| 19 | Q.    Mr. Flosi, what is your current occupation? |
| 10:06AM 20 | A.    As it pertains to this, I am the president of |
| 21 | Justitia Consulting, Incorporated. |
| 22 | Q.    And what kind of consulting do you do? |
| 23 | A.    Law enforcement consulting and training. |
| 24 | Q.    Do you have background as a law enforcement officer? |
| 10:06AM 25 | A.    Yes, I do. |

can't reasonably control this person to finish their task, whether it be searching or handcuffing at that point, then they should take the person to the ground in a controlled manner to be able to use the ground as an additional controlling agent.

10:17AM

Q.    Now, in this particular instance, with Mr. Cedillo handcuffed, there was a likelihood -- in fact, he did hit his head on the ground.  Is that your understanding?

A.    That is my understanding.

Q.    Wouldn't that deem this takedown inappropriate,

10:17AM according to police standards?

A.    No, it would not.  Again, it's a -- when we train officers takedown techniques on the mat -- and that's one of the things I did for over ten years -- is that we do it in a controlled manner to the best of our ability.  We try to place

10:17AM them into a position on the ground where it can mitigate injury, but there's no way for us to prevent all injuries because sometimes a suspect or the subject just moves unexpectedly and we're not able to completely control the subject's descent to the ground.

10:17AM

Q.    And I'm going through the next progression on this scenario.  Mr. Cedillo was placed in a prone facedown position on the ground; correct?

A.    That's my understanding.

Q.    And then the officers applied body weight, one on

10:18AM the upper torso area, the back area, and one on the legs.  Is

1    that what happened?

2         A.     That is my understanding.  And by looking at the

3    surveillance video, that's what appeared to happen.

4         Q.     Was placing Mr. Cedillo prone facedown and applying

10:18AM  5    body weight to his torso and legs appropriate, according to

6    applicable police standards?

7         A.     It would be appropriate if the subject is still

8    resisting and trying to escape or trying to injure the officers

9    in any way, trying to attack the officers, spit at the

10:19AM 10    officers, bite at the officers, or kick at the officers.

11              In a prone position, officers are trained that that

12    person is less likely to be able to deliver effective attacks

13    against the officer.

14              So officers are trained to put the person in a prone

10:19AM 15    position until they stop resisting and to place body weight to

16    prevent the subject from being able to create some space

17    between their chest and the ground because, once the subject is

18    able to create some space between the chest --

19              THE COURT:  Mr. Flosi, let me interrupt you a

10:19AM 20    second.  You've gotten way away from the question.

21              The question was really quite simple.  The question

22    was the appropriateness of this particular action.  Was it

23    appropriate?  Was it necessary?  Did it fulfill any legitimate

24    law enforcement purpose?

10:19AM 25              THE WITNESS:  It was appropriate according to law

```
 1   enforcement training --
 2               THE COURT:  I'm talking about what you saw in the
 3   video.  Was it appropriate under those circumstances?
 4               THE WITNESS:  What I saw appeared to be appropriate,
 5   yes, sir.
 6               THE COURT:  Okay.  What did you see?  Because what
 7   we saw was a gentleman who volunteered to be handcuffed, who
 8   walked voluntarily over to the police car, who wasn't
 9   combative.  And what we also saw was we saw the officers push
10   one of his hands, handcuffed hands up between his shoulder
11   blades and we saw him crying out in pain.  But you saw a
12   different video.
13               What did you see?
14               THE WITNESS:  I'm sorry.  What's the question, sir?
15               THE COURT:  You're so in the bag.  Why am I
16   bothering?
17               All right.  I have nothing.
18        Q.    (BY MR. HURRELL:)  Mr. Flosi, what did you see in
19   the video that deemed this placement of Mr. Cedillo's body
20   appropriate, according to applicable police standards?
21        A.    Well, according to the body-worn video that I saw
22   and the surveillance video and the statements from the officers
23   that Mr. Cedillo was trying to kick back at them and was still
24   moving his body back and forth, then it would be appropriate --
25   and the video that I could see supports that -- to take the
```

**UNITED STATES DISTRICT COURT**

1   person to the ground to be able to mitigate that attack.

2        Q.    And then there was a second time that Mr. Cedillo

3   was placed in the facedown prone position; correct?

4        A.    Yes.  There was a second occasion later on during

10:21AM 5   the encounter.

6        Q.    And the paramedic, I believe, was trying to arouse

7   Mr. Cedillo.  And according to what you saw in the video, what

8   justified placing him into a second prone position?

9        A.    Mr. Cedillo suddenly started to writhe his body

10:22AM 10  again, started yelling and -- in a motion that would be

11  perceived as a potential kicking at the officers or could be

12  precipitous to an attack, they saw him spitting at the officer.

13        So, again, laying him into a prone position is a

14  de-escalating tactic to be able to take any kind of advantage

10:22AM 15  of him laying out on his side away while they're prone.

16        Q.    And as part of your review of materials in this

17  case, did you review a hobble directive publicized in

18  approximately November of 2018?

19        A.    Yes.

10:22AM 20        Q.    And did that directive express an awareness that

21  it's not a good idea to keep someone in a prone down position

22  for an unreasonable length of time?

23        A.    In essence, it did.

24        MR. HURRELL:  That's all I have.  Thank you.

25  ///

**CROSS-EXAMINATION**

1

2  BY MR. GALIPO:

3      Q.    Good morning, Mr. Flosi.

4      A.    Good morning, sir.

5      Q.    You have actually been retained by the City of

6  Los Angeles in LAPD cases going back to 2012.  Is that true?

7      A.    That is true.

8      Q.    And at one point, you kept a list of all the times

9  that you had been retained by them and actually wrote down the

10  name of the case and the type of case it was.  Is that also a

11  fair statement?

12      A.    A very long time ago, yes.

13      Q.    And when did you stop keeping that list,

14  approximately?

15      A.    To that degree of specificity, it was probably two

16  or three years into doing this.  So sometime around 2015, I

17  would imagine.

18      Q.    Do you -- do you still currently keep a list naming

19  the cases that you've been retained on?

20      A.    No.  Currently, I only keep a list of the cases

21  where I've testified on.

22      Q.    And in the past, do you recall that you and I have

23  at times gone through one of -- some of those older lists?

24      A.    We have.

25      Q.    And would you agree just on the older list you had

**UNITED STATES DISTRICT COURT**

1    been retained by the LAPD in cases over 50 times?

2         A.    Well, I have been retained by an attorney

3    representing the LAPD in excess of 50 times, yes.

4         Q.    Okay.  Now, how about more recently?  How many

10:25AM  5    active cases do you currently have where you've been retained

6    by attorneys representing the LAPD?

7         A.    I don't have a good number on that.  I don't -- I

8    would have to do some researching of my current active cases.

9         Q.    Would it be fair to say it's probably in excess of

10:25AM  10   10?

11        A.    It might be.  Probably a better conservative number

12   would be between five and ten.

13        Q.    Okay.  Would it be fair to say, Mr. Flosi, that over

14   the years you have been retained by attorneys representing the

10:26AM  15   LAPD approximately 100 times?

16        A.    I don't know about 100.  It wouldn't surprise me if

17   I were to go back that it would be somewhere near 100 by this

18   time.

19        Q.    And would you agree that in many of those cases, you

10:26AM  20   gave deposition testimony?

21        A.    In many of them, yeah.  Many of them went to that

22   phase of deposition.

23        Q.    And would you agree that some of the cases went to

24   trial?

10:26AM  25        A.    Some of them ended up in trial, yes.

**UNITED STATES DISTRICT COURT**



 1    Q.    And would you agree in the majority of those cases,
 2   there was somebody alleging that the LAPD had used excessive
 3   force?
 4    A.    Probably that would be correct.  As far as majority,
 5   most of my cases do involve some level of force response.
 6    Q.    And would you agree that in every case where you
 7   were retained by attorneys for the LAPD where you gave
 8   deposition or trial testimony, your opinion was that the force
 9   was not excessive?
10    A.    If the case -- if I was retained, if it wasn't one
11   of the ones I turned down, the retention went through, then,
12   yes, by the time it got to retention -- or deposition or trial,
13   it would have been supporting the officers' actions.
14    Q.    And would you agree that in most of the cases there
15   was a police practice expert on the other side that had a
16   differing opinion than you did?
17    A.    That is generally true, yes.
18    Q.    And numerous of those cases were death cases.  Is
19   that fair?
20    A.    There were -- there were a lot.  I'm not sure the
21   number, but many of them dealt with subjects who were killed by
22   the response.
23    Q.    Right.
24          And some of them, like this one, were cases where
25   someone was held down prone by LAPD officers and died.  Is that

10:26AM (line 5)
10:27AM (line 10)
10:27AM (line 15)
10:27AM (line 20)
10:28AM (line 25)

**UNITED STATES DISTRICT COURT**

1    also a fair statement?

2        A.    There was at least one other one that I can think of

3    where there was a prone restraint and then the person died

4    proximate to the prone restraint, not saying that it was a

10:28AM    5    causal issue, it's that they were both aligned in time and

6    space.

7        Q.    Okay.  Like this case?

8        A.    Yes.  There was a prone restraint and later -- and

9    during that or just shortly after that, that person died.

10:28AM    10        Q.    And many of the cases where you testified on behalf

11    of the defense when LAPD was involved were shooting cases;

12    correct?

13        A.    Yes.  Again, most of my retentions have been

14    involving some level of force response, and shooting was one of

10:29AM    15    them.

16        Q.    And in multiple cases, you gave testimony in

17    deposition or court that your opinion was the shooting was not

18    excessive even though the individuals shot were unarmed.  Isn't

19    that true?

10:29AM    20        A.    Well, in all those cases, they were discovered

21    unarmed in hindsight.  So, yeah, it wasn't known to the

22    officers at the time.

23        Q.    And in some of those cases, the individuals were

24    running away and shot in the back.  Is that also true?

10:29AM    25        A.    In one or two cases that I can think of, shots were

1    to the back because that's where the target area was at the

2    time.

3         Q.    And in a few of the cases, the LAPD cases that you

4    were involved in, even when the Board of Police Commissioners

10:29AM  5    found the use of force to be out of policy, you disagreed with

6    them and said you thought it was in policy.  Is that true?

7         A.    In some, we had disagreed.  In others, we had

8    agreed.

9         Q.    Okay.  And I'm assuming all these cases,

10:30AM  10    approximately a hundred cases or so where you were retained by

11    attorneys representing the LAPD, you got compensated.  Is that

12    right?

13        A.    Of course.  Most people get compensated for their

14    work.

10:30AM  15        Q.    Right.

16              You're getting compensated for your work in this

17    case; is that true?

18        A.    I am.

19        Q.    Now, with respect to the video and reasonable

10:30AM  20    interpretations of the video, you understand from being an

21    expert witness that the jury is going to decide what the video

22    shows; correct?

23        A.    The jury makes up their own mind, yes.

24        Q.    And you also understand that the jury decides

10:30AM  25    whether the use of force was appropriate or not.  Do you

 1   generally understand that?

 2        A.    I understand that the jury makes up -- makes their

 3   own decision.

 4        Q.    Now, you referenced a hobble policy in response to

10:31AM   5   counsel's question.  Was that one of the documents you

 6   reviewed?

 7        A.    I believe it was either in the initial review or it

 8   could have been after the Rule 26 report was submitted.

 9        Q.    Where are you -- are you out of state right now or

10:31AM  10   in state?

11        A.    No.  I'm -- I'm out of state.  I'm in Texas right

12   now.

13        Q.    I see.

14              In any event, are you familiar with the language of

10:31AM  15   that hobble policy?

16        A.    Somewhat, yes.

17        Q.    And are you aware that the policy says that, when a

18   hobble is secured, the person shall be immediately searched and

19   then immediately placed in an upright or seated position or on

10:31AM  20   his or her side?

21        A.    My understanding is the training is when it's safe

22   and feasible to do that, yes.

23        Q.    Right now I'm talking about what the policy says.

24   Are you aware that's what the policy says?

10:32AM  25        A.    I don't have the policy in front of me, so I don't

```
 1    know what it is word for word.
 2         Q.   I see.
 3              And in this case, just so I'm clear on your
 4    understanding of the facts, you did see the part of the video
 5    where the officers raised Mr. Cedillo's arm up high on his
 6    back?  You did see that part?
 7         A.   I saw the part where it looks like they're using the
 8    two-handed wrist control.  And, yes, you have to raise the arm
 9    up in order to get that pressure that you need.
10         Q.   And the pressure is -- causes pain, as you
11    understand it; correct?
12         A.   It can depending on how much pressure is placed on
13    the back of the subject's hand to move the palm toward the
14    elbow.
15         Q.   And you were aware, based on your review of the
16    materials, that, when Mr. Cedillo was taken to the ground, he
17    was handcuffed behind his back?
18         A.   Yes, he was handcuffed.
19         Q.   And you were aware the officers were controlling his
20    arms at that time?
21         A.   They were on his arms trying to do the search, yes.
22         Q.   And you were aware that he would be unable to brace
23    his fall?
24         A.   He was handcuffed, so he couldn't post out and brace
25    his fall, that's correct.
```

1    Q.    And based on your review, you saw where

2  Officer Richmond was aware that he could hit his head from the

3  takedown?

4    A.    Yes.  I believe he made some commentary about that

10:33AM  5  understanding and tried to guide Mr. Cedillo to avoid injury.

6    Q.    Well, he did hit his head on the ground.  Is that

7  your understanding?

8    A.    Yes.  That's the outcome.

9    Q.    And isn't part of the training that officers have to

10:34AM  10  keep in mind the safety of the subject?

11    A.    To the best of their ability, they would try to make

12  sure that the subject was safely taken to the ground and

13  controlled.

14    Q.    And try to prevent unnecessary injury to the

10:34AM  15  subject.  That's part of the training?

16    A.    To try to mitigate any injury, yes.

17    Q.    And also part of the training is to de-escalate the

18  situation rather than escalate it?

19    A.    We try to de-escalate when we can.  It takes both

10:34AM  20  sides of the equation for a proper de-escalation to occur.

21    Q.    Okay.  So now, during this initial prone restraint,

22  you timed it in your report to be four minutes and 13 seconds?

23    A.    I believe that is correct, yes.

24    Q.    And during that time, you obviously saw and read in

10:35AM  25  the materials Officer Richmond's chest against the back of

1    Mr. Cedillo; correct?

2         A.    Yes.  His chest was in contact with Mr. Cedillo's

3    back.

4         Q.    Right.

10:35AM  5         And he indicated in his report and deposition and

6    statement that he was applying body weight and downward

7    pressure on Mr. Cedillo's back; true?

8         A.    Yes.  That it was modulated.  Sometimes he would go

9    up to his toes or the balls of his feet.  Sometimes he would go

10:35AM 10   down to his knees.  He would modulate the amount of weight

11   depending on the resistance level of the individual.

12        Q.    And then Hunt was on the legs; correct?

13        A.    That's my understanding.

14        Q.    And then you noted in your timeline when the hobble

10:35AM 15   was placed; correct?

16        A.    I did.

17        Q.    And how much time after the hobble was placed was it

18   before they turned him over, put him on his side?  Was it

19   immediate like the policy says?

10:36AM 20        A.    I don't remember if I made that timing, but it was

21   after the -- Mr. Cedillo was searched and then he was rolled to

22   his side.

23        Q.    Do you know if it was about a minute or two after

24   the hobble was placed before he was put on his side?

10:36AM 25        A.    I don't remember making that exact time measurement.

UNITED STATES DISTRICT COURT

1      Q.     And he was on his side for some period of time?

2      A.     After the first prone restraint, sir?

3      Q.     Yes.

4      A.     Yes, he was moved to his side, and they were waiting

10:36AM  5   for the rescue ambulance to show up.  And I believe that was

6   right around 11 minutes when the rescue ambulance showed up.

7      Q.     Was he resisting at all when he was on his side?

8      A.     It didn't appear so.  But, again, looking at the

9   video, it's hard to tell if there were small movements that the

10:37AM  10   officers were able to effectively counter.

11      Q.     Now, you were asked by counsel about the time frame

12   from him being awoken to putting him back chest down for the

13   second prone restraint.  Remember that?

14      A.     Um, I remember talking about the sequence of events.

10:37AM  15   I don't remember anything about a specific time.

16      Q.     Okay.  But you recall the sequence of events, being

17   asked about that?

18      A.     Yes.  When the firefighter paramedic touched

19   Mr. Cedillo and what Mr. Cedillo's actions were and then the

10:37AM  20   officers' response.

21      Q.     Yeah.  That's what I wanted to ask you about, what

22   you -- how you characterized his actions.  I was trying to keep

23   up.  He was trying to fight with the officers, attack the

24   officers, bite the officers, trying to escape.  Those were some

10:37AM  25   of the words that you used that I was trying to write down.

1          Remember that?
2     A.   I don't say -- I didn't say he was trying to.  I
3  said he was writhing his body and kicking his legs in what
4  could be reasonably perceived as a potential attack, which
10:38AM  5  would include those potential attacks.
6     Q.   Well, first of all, let's just look at the
7  chronology of the events.
8          Would you agree that Mr. Cedillo, before being
9  handcuffed, never tried to punch the officers, attack the
10:38AM  10  officers, or take a fighting stance?  Would you agree with
11  that?
12     A.   He was handcuffed -- I'm sorry.  I thought you were
13  done.  I spoke over you.  Can you repeat?
14     Q.   Sure.
10:38AM  15          Would you agree in the short time before he was
16  handcuffed, he never tried to fight or attack the officers?
17     A.   No.  He was handcuffed very early on in this
18  situation or the contact.
19     Q.   And would you agree that the officers weren't
10:38AM  20  responding to some serious call, like he had threatened to harm
21  someone or attacked someone or anything like that?  Would you
22  agree with that?
23     A.   I would agree that there was no call for service.
24  This was an on-view event by the officers.
10:39AM  25     Q.   And so after he was awoken, he was still handcuffed

```
 1   and he was hobbled, wasn't he?

 2       A.   When he was awoken by the firefighters, he was

 3   handcuffed and the hobble went around his ankles, yes.

 4       Q.   And then within -- I think you said in your report,

 5   almost immediately he was put chest down again for a little

 6   under three minutes; correct?

 7       A.   Well, yeah.  He started moving his body is what I

 8   remember from looking at the video and the officers' testimony,

 9   that they -- they felt that it was better to put him back in a

10   prone position to mitigate any kind of attack that might

11   happen.

12       Q.   Where in the hobble policy does it say to, after

13   someone's handcuffed and hobbled and you put him in a recovery

14   position, put him back down chest down?  Where does it say that

15   in the hobble policy?

16       A.   Yeah, I don't have the policy with me, but I doubt

17   any policy would go down to that specificity.

18       Q.   While we're talking about training and policies, you

19   realized in this case one of the contentions was that the LAPD

20   at the time of this incident did not have adequate training on

21   the issues of positional asphyxia, restraint asphyxia, and the

22   risk of prone restraint.  You understood that; correct?

23       A.   I believe the -- it was -- there was a failure to

24   train claim.  I don't remember specifically what the categories

25   of training were.
```

Timestamps: 10:39AM (5), 10:39AM (10), 10:40AM (15), 10:40AM (20), 10:41AM (25)

1    Q.    Okay.  Well, in your work on this case -- and it

2  sounds like you worked on a lot of other LAPD cases, including

3  restraint cases -- are you aware of any written policy the LAPD

4  had at the time of this incident, April 8th, 2019, that talked

10:41AM  5  about restraint asphyxia?

6    A.    Not specifically restraint asphyxia that I'm aware

7  of.

8    Q.    How about positional asphyxia?

9    A.    No.  That wouldn't surprise me.  By that time, the

10:41AM  10  term "positional asphyxia" had pretty much been removed from

11  police language.

12    Q.    How about the risk of prone restraint?  Is that

13  included in any of the written policies or training materials

14  that were in effect at this time?

10:41AM  15    A.    I don't recall any specific training that I saw on

16  that.

17    Q.    Well, in fact, you read the officers' depositions,

18  didn't you?

19    A.    I did.

10:42AM  20    Q.    Did you read where the officers said they had no

21  training from the LAPD about the risk of prone restraint and

22  the risk of putting someone chest down and putting weight on

23  their back?  Did you read those portions of their depositions?

24    A.    I read the depositions.  I don't remember those

10:42AM  25  words as we speak now.

1    Q.    Well, do you -- do you remember words to that

2    effect?

3    A.    I remember that they said that they didn't receive

4    that specific type of training other than the hobble memo that

10:42AM  5    we talked about, which implies to put the person on their side.

6    Q.    Well, if the hobble memo implies putting them on

7    their side -- and you agree with me, they didn't put him on his

8    side the first time after -- immediately after he was hobbled;

9    correct?

10:43AM 10    A.    Again, it's my understanding that the training is

11    when it's safe and feasible to do so after --

12    Q.    Well, you're familiar that Officer Mena -- and I'm

13    shortening his name, as we have here -- assisted in applying

14    the hobble; correct?

10:43AM 15    A.    That is my understanding.

16    Q.    And I'll proffer to you that he testified before

17    this jury -- and I'm assuming you read his statement and

18    deposition; correct?  Or at least his statement.

19    A.    I believe there was a statement taken, yes.

10:43AM 20    Q.    And you're aware from reviewing this case as an

21    expert that Officer Mena says at the time he applied the hobble

22    and after, he didn't see any movement by Mr. Cedillo.  Do you

23    recall that?

24    A.    I don't recall him saying that specifically, no.

10:43AM 25    Q.    Well, if there was no movement at all by him, the

| | |
|---|---|
| 1 | time he applied the hobble, don't you think that would be a |
| 2 | good time to put him on his side? |
| 3 | A.   Well, I don't know that he would be able to perceive |
| 4 | and feel what the officers felt and perceived while in contact |
| 10:44AM 5 | with Mr. Cedillo. |
| 6 | Q.   And then doesn't the hobble policy also have a |
| 7 | section that says, even if the person's still resisting |
| 8 | violently, assuming they are, you need to put them seated up or |
| 9 | on their side, one officer control him, the other one hold the |
| 10:44AM 10 | hobble strap?  Remember that? |
| 11 | A.   Again, I don't remember the memo to that |
| 12 | specificity. |
| 13 | Q.   And so given this hobble policy that you think is |
| 14 | sufficient for training purposes, these officers not only did |
| 10:44AM 15 | not put him on his side immediately after he was hobbled but, |
| 16 | after he laid there for 11-and-a-half minutes and awoken, they |
| 17 | put him back chest down.  Is that your understanding of the |
| 18 | facts? |
| 19 | A.   They did once they perceived that Mr. Cedillo was |
| 10:45AM 20 | becoming a potential threat again. |
| 21 | Q.   And where does it say in the hobble policy that |
| 22 | that's okay to do? |
| 23 | A.   I think we talked about that.  I don't think -- I |
| 24 | wrote policy for years, and I don't think I could think of any |
| 10:45AM 25 | policy that would have that level of specificity. |

```
 1            MR. GALIPO:  May I have a moment to look at my
 2   notes, Your Honor?
 3            THE COURT:  Sure.
 4            (Pause in the proceedings.)
 5       Q.   (BY MR. GALIPO:)  You would agree, Mr. Flosi, that
 6   putting someone in a recovery position on their side or seated
 7   up allows the person to breathe easier.  You would agree with
 8   that; correct?
 9       A.   It is easier to breathe if you're on your side or in
10   a seated position versus chest down on the ground, yes.
11       Q.   And I think you told me this in your deposition but
12   just to make sure I'm understanding, you agree that the LAPD
13   had no training materials or policies that you're aware of at
14   the time of this incident dealing with positional asphyxia,
15   restraint asphyxia, or the dangers of prone restraint; true?
16       A.   I don't recall any written policy that specifically
17   called out those issues.
18            MR. GALIPO:  Thank you.  That's all I have,
19   Your Honor.
20            MR. HURRELL:  Nothing further, Your Honor.
21            THE COURTROOM DEPUTY:  Mr. Flosi, when I swore you
22   in, I forgot to ask you to state your name -- to state your
23   name for the record.
24            THE WITNESS:  I was waiting for that, actually.
25            My name -- full name is Edward Thomas Flosi.  Edward
```

10:45AM (line 5)
10:45AM (line 10)
10:46AM (line 15)
10:46AM (line 20)
10:47AM (line 25)

|   | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:47AM | 5 |

```
  1  is common spelling.  Thomas has an "h."  And Flosi is spelled

  2  F, as in Frank, l-o-s-i.

  3            THE COURTROOM DEPUTY:  Thank you so much.

  4            THE COURT:  All right.  Mr. Flosi, you consider

  5  yourself an independent -- basically an independent observer

  6  as -- as you function as an expert in this case.  Right?

  7            THE WITNESS:  I do.

  8            THE COURT:  All right.  You do an investigation and

  9  you come to a conclusion.  And you pretty much let the facts

 10  speak for themselves.  You don't consider yourself a party to

 11  these cases, do you?

 12            THE WITNESS:  No.  The -- reviewing the evidence and

 13  letting the evidence lead you to your opinions.

 14            THE COURT:  All right.  Because I was wondering,

 15  Mr. Galipo had asked you about de-escalation being part of the

 16  training of police officers.  But I guess once you see a case

 17  beginning to spiral out of control, that one of the things they

 18  teach policemen is to settle things down, to de-escalate.  Is

 19  that right?

 20            Do you remember -- do you even remember that

 21  question and the fact that you actually did provide an answer

 22  to that?  If you don't, let me read it to you.

 23            THE WITNESS:  I don't remember.

 24            THE COURT:  All right.

 25            "QUESTION:  And also part of the training is to
```

10:47AM    10
10:47AM    15
10:48AM    20
10:48AM    25

1    de-escalate the situation rather than escalate it?"

2         Your answer:  "We try to de-escalate when we can.

3    It takes both sides of the equation for a proper de-escalation

4    to occur."

10:49AM    5         So do you put yourself in that equation?  "We try to

6    de-escalate when we can."

7         THE WITNESS:  Meaning the training that I provide

8    for law enforcement and when I was still on the job, that we

9    try to de-escalate to the best of our ability.

10:49AM   10         THE COURT:  Well, that's -- that's a long time ago.

11   That was when you were a young man.

12         He was asking about -- about training.  In an answer

13   to the question about de-escalation, you didn't talk about you

14   teaching or what is being taught or what other people know or

10:49AM   15   try or do.  You said "we" try to de-escalate.  And I'm

16   wondering, How did you get into this situation?  Or do you

17   consider yourself -- do you really consider yourself that

18   closely aligned with law enforcement now that you can no longer

19   be objective?

10:50AM   20         THE WITNESS:  I do not.

21         THE COURT:  Okay.  Thank you.

22         THE WITNESS:  I -- I testify against police officers

23   in criminal cases.

24         THE COURT:  Pardon me?

10:50AM   25         THE WITNESS:  I've taken cases -- I've been retained

1    by district attorney offices in the prosecution of officers in

2    cases where, if they were convicted, they would maybe go to

3    prison or jail.

4           THE COURT:  Okay.  I -- I understand that.  You said

10:50AM  5    that.  But then listening to other parts of your testimony, I

6    began to -- to wonder just how independent you are.

7           You saw things that I didn't see.  I didn't see

8    fights, I didn't see spitting, I didn't see any kind of a

9    confrontation or combativeness.  I certainly did not see any

10:51AM  10   kicking.

11          And even so, one of the things that we all saw was

12   the gentleman's shoes are still sitting out in the street.

13   He's barefoot, he's in his stockings.  And I couldn't

14   understand the constant references to kicking.

10:51AM  15          But in any event, I was beginning to wonder whether

16   or not -- or just -- I was asking:  How independent are you?

17   Because you -- you found nothing inappropriate about the

18   takedown, you found nothing inappropriate about the -- using

19   these pain methods to control this individual.

10:51AM  20          And I don't understand -- would you tell me what it

21   was that you were trying to control?  Because he seemed to be

22   compliant up until -- certainly he was compliant at the time

23   they walked him over to the police car, which they tried to

24   wrench his arm back halfway up his back.  And I'm wondering,

10:52AM  25   What is the purpose for this that you found to be appropriate?

1    Why inflict pain on someone who's not fighting you?

2            THE WITNESS:  Well, that was a good long question,

3    sir.  I'll try to answer to the best of my ability.

4            THE COURT:  All right.  Let me just ask you this.

10:52AM 5    What was the purpose of that application of pain when they

6    first walked him over to the -- the car?

7            THE WITNESS:  The -- the two-handed wrist lock was

8    applied when the officers -- and this is on the body worn as

9    well -- when Mr. Cedillo was moving his body back and forth and

10:52AM 10   was in a jerking kind of movement.

11           So the control hold -- and that's what they're

12   called, control holds -- is applied to help control the

13   subject's movements so that the officer can do whatever task it

14   is that they need to do next.

10:52AM 15           THE COURT:  Number one -- I've forgotten which

16   officer it was, it may have been Richmond, indicated when he

17   first put the cuffs on, he just did it because the guy

18   basically volunteered his wrist.  He put his hands behind his

19   back.  So he said, what the hell, I may as well put the cuffs

10:53AM 20   on.  But the officer admits, he had no probable cause at that

21   time to arrest the man.  All right?

22           So here we are now, seconds later, you walk him over

23   to the car.  And what we see on the video is his arm being

24   wrenched up between his shoulder blades and he's crying out in

10:53AM 25   pain.  And it's your -- your position now is that, by him

```
 1  moving back and forth, apparently in response to pain, that
 2  invites the infliction of more pain and that's justified?
 3              THE WITNESS:  Well, if I can address certain things.
 4  The handcuffing was done to maintain the status quo of the
 5  detention.  There was no probable cause --
 6              THE COURT:  What detention?  There was no probable
 7  cause for a detention.
 8              THE WITNESS:  Well, sir, respectfully, the standard
 9  is not probable cause for detention.  It is reasonable
10  suspicion.
11              THE COURT:  Of what?
12              THE WITNESS:  They had reason to -- that he was
13  under the influence of a stimulant --
14              THE COURT:  Or?
15              THE WITNESS:  -- methamphetamine.
16              THE COURT:  Or?
17              THE WITNESS:  Or what?
18              THE COURT:  Is that the only -- the only conclusion,
19  that he could not have been having a psychotic episode of some
20  kind?
21              THE WITNESS:  Could have, but no officer is trying
22  to jump to any conclusions until they can do an evaluation.
23              THE COURT:  But they're trained to do an evaluation?
24              THE WITNESS:  When they can.  Mr. Cedillo had not
25  been searched yet.  And the officers believed, based on their
```

10:53AM (line 5)
10:54AM (line 10)
10:54AM (line 15)
10:54AM (line 20)
10:54AM (line 25)

600

```
 1    observations, that he may have been armed or at least in
 2    possession of --
 3                 THE COURT:  All right.  They thought he may have
 4    been armed.  And they walked him over to the patrol car to --
 5    what? -- conduct the search?
 6                 THE WITNESS:  Pat for a search, yes, sir.
 7                 THE COURT:  All right.  And he's handcuffed?  Why
 8    was it necessary to inflict any pain on him to pat him down?
 9                 THE WITNESS:  Well, he -- it started, the movements,
10    before he -- the wrist lock.  He started the movement.  And he
11    tried to use the vehicle -- my understanding, he tried to use
12    the vehicle --
13                 THE COURT:  Where are you getting this understanding
14    from?  Where are you getting this information from?
15                 THE WITNESS:  From the material I reviewed.
16                 THE COURT:  It's not on the video.
17                 THE WITNESS:  Unless the officers are narrating the
18    video, um, they wouldn't have -- it would have to be in a
19    statement.
20                 THE COURT:  By the way, you just said something
21    that's -- are officers taught anywhere, even when they first
22    get to patrol, do their training officers teach them how to now
23    navigate this new world where they're wearing body cams?  Are
24    you taught to say certain things while you're wearing a body
25    cam?
```

10:54AM (line 5)
10:55AM (line 10)
10:55AM (line 15)
10:55AM (line 20)
10:56AM (line 25)

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 10:56AM | 5 |

        For example, they kept telling him to relax.  I just found that curious.  Why were they telling him to relax when they were inflicting pain on him and he's understandably moving but they're saying "Relax"?  Is that for the benefit of the camera?

        THE WITNESS:  No.  It's for the benefit of the subject so that the subject understands what they need to do --

        THE COURT:  Oh.  The subject understands that if you stop hurting me, I'll stop moving.  And we all understood that.  But what we didn't understand is why they kept saying "Relax."

        THE WITNESS:  The first command of "relax" was well before any kind of pain compliance.  It's something that officers are trained to do when they feel that the subject may start to resist, to let the subject know that, hey, I'm feeling some resistance, you need to relax so that I can continue doing my job.

        THE COURT:  All right.  I'm just thinking that's an awful lot of pain inflicted just to pat him down quickly and get on with whatever the job was, but all right.

        Thank you.  You've answered my questions.

        THE WITNESS:  Thank you.

        THE COURT:  Next witness.

        MR. GALIPO:  Your Honor, I -- I'm not sure there are any more witnesses but Mr. Hurrell --

        THE COURT:  Oh, excellent.

```
       1              MR. HURRELL:  We're all done, Your Honor.  Defense
       2    rests.
       3              THE COURT:  Defense rests?  Okay.
       4              You know what?
10:57AM 5              THE WITNESS:  Am I excused, sir?
       6              THE COURT:  Oh, yeah.
       7              MR. GALIPO:  Can we excuse the witness?
       8              THE COURT:  Yes, please.
       9              Can we talk for a minute?  I'd like to let the jury
10:57AM 10   go to lunch and then I want to talk to you all.
       11             MR. GALIPO:  Can we have a quick sidebar,
       12   Your Honor?
       13             THE COURT:  Okay.  Yeah.
       14             (At sidebar:)
10:58AM 15             THE COURT:  This is actually turning out better than
       16   I had hoped.  Okay?  What I would like is for you guys to go to
       17   lunch, change gears, come back and make your closings.
       18             MR. GALIPO:  Yeah.  And we still have a few things
       19   we're working out.
10:58AM 20             MS. MARTINEZ:  Yes.  I already have everything ready
       21   to go.  I'm going to have Tom take a quick look.  I was doing
       22   that right now.  Once he gives me the okay, I'll send it to
       23   your team.  And then we can agree to merge it to the -- to the
       24   best we can.  And then whatever is, like, the tiniest language
10:58AM 25   that's not in agreement, then we'll highlight it for you.
```

```
 1   would be that constitutional violation?
 2            THE COURT:  Well, it comes under the -- it comes
 3   under the Fourteenth Amendment.  Right?  Now, what does that
 4   have to do with training?
 5            MS. MARTINEZ:  Our position is it doesn't.  So then
 6   it wouldn't -- then they wouldn't go to the failure to train
 7   Monell claim.
 8            THE COURT:  I'm inclined to agree with you, but I
 9   have to admit that that isn't something I gave a whole lot of
10   thought to and we probably need to.
11            MS. MARTINEZ:  Yes.
12            MR. GALIPO:  Well, again, one of the reasons they
13   could have been deliberately indifferent is because of the lack
14   of training.  So it's kind of intermingled, and that's why I
15   think we should have the jury answer the questions if they can
16   and then deal with some of these complicated issues later.
17            THE COURT:  So we are going to have a Phase 2.
18            MR. GALIPO:  No.  There --
19            THE COURT:  They'll answer the questions, and then
20   we'll decide whether or not to go to Monell?
21            MR. GALIPO:  No.  No, Monell -- the Monell claim is
22   in this phase the inadequate training, is here.  What --
23            THE COURT:  Yeah, but if -- if -- like Ms. Martinez
24   says, what if they come back with -- the only thing they're
25   going to come back with is the Fourteenth Amendment violation?
```

01:35PM (line 5)
01:35PM (line 10)
01:35PM (line 15)
01:36PM (line 20)
01:36PM (line 25)

**UNITED STATES DISTRICT COURT**

1               MR. GALIPO:  Right.  Then --

2               THE COURT:  That doesn't get us to *Monell*.

3               MR. GALIPO:  I think it does, but I'm hoping we

4       don't have to cross that bridge.  If the verdict form comes

01:36PM 5       back that way, then we can have a discussion at sidebar before

6       releasing the jury.

7               THE COURT:  Okay.

8               MR. GALIPO:  But I -- I don't think that's going to

9       happen.

01:36PM 10              THE COURT:  All right.  Then -- what -- hang on a

11      second.  One second.

12              Okay.

13              MS. MARTINEZ:  The only reason it will matter we

14      decide this now is because the direction that they're going on

01:37PM 15      the verdict form.  So if the *Monell* failure to train is based

16      on the Fourth Amendment, the excessive force, then it's

17      separate and apart from the familial relationship.

18              The only reason I'm bringing it up is because it

19      will dictate how they will come across the questions and direct

01:37PM 20      them to get to the questions.

21              THE COURT:  You think so?

22              MS. MARTINEZ:  I think so.

23              THE COURT:  You're concerned about all that.

24      They're just going to answer the questions, and then it's going

01:37PM 25      to be up to us what do we do with these answers.

|       |                                                                                  |
|-------|----------------------------------------------------------------------------------|
| 1     | And if there is no excessive force, which is going                               |
| 2     | to be interesting since they're, like, joined with restraint --                  |
| 3     | but if they basically say no liability with respect to the                       |
| 4     | Fourth Amendment, I think it would be strange for them to find                   |

01:37PM 5    a Fourteenth Amendment violation.  But if they do that, it

6    looks like a strain to get to *Monell*.

7            MR. GALIPO:  I'm not so sure because you just need

8    an underlying constitutional violation, but I don't think we

9    need to discuss it right now.

01:38PM 10           THE COURT:  You're probably right.  And I think it

11   probably needs a full decent discussion.

12           MR. GALIPO:  Yes.

13           THE COURT:  Okay.  Yes, go ahead.

14           (In the presence of the jury:)

01:38PM 15           THE COURT:  All right.  We've been joined by the

16   jury, all counsel and the parties are present.

17           (Reading:)

18           "Members of the jury, now that you have heard all of

19   the evidence and will hear the arguments of the attorneys, it

01:39PM 20   is my duty to instruct you on the law that applies to this

21   case.

22           "A copy of these instructions will be sent to the

23   jury deliberation room for you to consult during your

24   deliberations.

01:39PM 25           "It is your duty to find the facts from all the

```
01:39PM
01:40PM
01:40PM
01:41PM
01:41PM
```

 1   evidence in the case.  To those facts, you will apply the law

 2   as I give it to you.  You must follow the law as I give it to

 3   you, whether you agree with it or not.  And you must not be

 4   influenced by any personal likes or dislikes, opinions,

 5   prejudices, or sympathy.  That means that you must decide the

 6   case solely on the evidence before you.  You will recall that

 7   you took an oath to do so.

 8            "Please do not read into these instructions or

 9   anything that I may have said or done that I have an opinion

10   regarding the evidence or what your verdict should be.

11            "You have heard testimony from expert witnesses who

12   testified about their opinions and the reasons for those

13   opinions.  This opinion testimony is allowed because of

14   specialized knowledge, skill, experience, training, or

15   education of this witness.

16            "Such opinion testimony should be judged like any

17   other testimony.  You may accept it or reject it and give it as

18   much weight as you think it deserves, considering the witness's

19   specialized knowledge, skill, experience, training, or

20   education, the reasons given for the opinion, and all of the

21   other evidence in the case.

22            "Certain charts and summaries not admitted into

23   evidence have been shown to you in order to help explain the

24   contents of books, records, documents, or other evidence in the

25   case.  Charts and summaries are only as good as the underlying

evidence that supports them.  You should, therefore, give them
only such weight as you think the underlying evidence deserves.

"A governmental entity, City of Los Angeles, is a
party to this lawsuit.  The City of Los Angeles is entitled to
the same fair and impartial treatment that you would give an
individual.  You must decide the case with the same fairness
that you would use if you were deciding the case between
individuals.

"When I use words like 'person' or 'he' or 'she' in
these instructions to refer to a party, those instructions also
apply to the City of Los Angeles.

"Plaintiff brings claims under the federal statute
42, United States Code, Section 1983, which provides that any
person or persons who, under color of law, deprives another of
any rights, privileges, or immunities secured by the
Constitution or laws of the United States shall be liable to
the injured party.

"In order to prevail on her 1983 claims against
defendants Officer Dustin Richmond and Officer Joseph Hunt,
plaintiff must prove each of the following elements against
each officer by a preponderance of the evidence:

"1.  Dustin Richmond and Joseph Hunt acted under
color of state; and

"2.  The acts or failure to act of Dustin Richmond
and Joseph Hunt deprived Jacobo Cedillo of his rights under the

Fourth Amendment of the United States Constitution as explained in later instructions.

"A person acts 'under color of state law' when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that Dustin Richmond and Joseph Hunt acted under color of state law.

"If you find the plaintiff has proved each of these elements and if you find that plaintiff has proved all the elements she is required to prove, your verdict should be for the plaintiff on this claim.  If, on the other hand, you found that the plaintiff has failed to prove any one or more of these elements, your verdict should be for Dustin Richmond and Joseph Hunt on this claim.

"In order to prevail on their 1983 claim against defendant City of Los Angeles alleging liability based on a policy of a failure to train its officers, the plaintiff must prove each of the following elements by a preponderance of the evidence:

"1.  The acts or failure to act of Dustin Richmond or Joseph Hunt deprived Jacobo Cedillo of his particular rights under the Fourth Amendment to the United States Constitution as explained in later instructions;

"2.  Dustin Richmond and Joseph Hunt acted under color of state law;

1          "3.   The training of the City of Los Angeles with

2     respect to the risks of prone restraint and/or the risk of

3     positional and restraint asphyxia were not adequate to train

4     its police officers to handle the usual and recurring

01:46PM  5     situations with which they must deal;

6          "4.   The City of Los Angeles was deliberately

7     indifferent to the known or obvious consequences of its failure

8     to train its police officers adequately; and

9          "5.   The failure of the City of Los Angeles to

01:46PM  10    provide adequate training with respect to the risks of prone

11    restraint and/or the risk of positional and restraint asphyxia

12    caused the deprivation of Mr. Cedillo's rights by

13    Dustin Richmond and/or Joseph Hunt, that is, the City of

14    Los Angeles's failure to train played a substantial part in

01:46PM  15    bringing about or actually causing the injury or damage to

16    Mr. Cedillo.

17         "A person acts 'under color of state law' when the

18    person acts or purports to act in the performance of official

19    duties under any state, county, or municipal law, ordinance, or

01:47PM  20    regulation.  The parties have stipulated that Dustin Richmond

21    and Joseph Hunt acted under color of state law.

22         "A policy is a deliberate choice to follow a course

23    of action made from, among various alternatives, by the

24    official or officials responsible for establishing final policy

01:47PM  25    with respect to the subject matter in question.  A policy of

inaction or omission may be based on a failure to implement

procedural safeguards to prevent constitutional violations.

01:48PM

          To establish that there is a policy based on a

failure to preserve constitutional rights, the plaintiff must

show, in addition to a constitutional violation, that this

policy amounts to deliberate indifference to the plaintiff's

constitutional rights and that the policy caused the violation

in the sense that the municipality could have prevented the

violation with an appropriate policy.

01:48PM

          "The phrase 'deliberate indifference' is the

conscious choice to disregard the consequences of one's acts or

omissions.  The plaintiff may prove deliberate indifference in

this case by showing that the facts available to defendant City

of Los Angeles put it on actual or constructive notice that its

01:49PM

failure to train adequately was substantially certain to result

in the violation of the constitutional rights of persons such

as the decedent, Jacobo Cedillo, due to the police officers'

conduct.

          "If you find that the plaintiff has proved each of

01:49PM

these elements and if you find that the plaintiff has proved

all the elements they are required to prove, your verdict

should be for the plaintiff on this claim.  If, on the other

hand, the plaintiff has failed to prove any one or more of

these elements, your verdict should be for the defendant, City

01:50PM

of Los Angeles, on this claim.

1        "In general," a person is unreasonable --

2    correction -- "In general, a seizure of a person is

3    unreasonable under the Fourth Amendment if a police officer

4    uses excessive force and/or restraint in making a lawful arrest

01:50PM    5    or in defending himself.  Therefore, to establish an

6    unreasonable seizure by excessive force and/or restraint in

7    this case, the plaintiff must prove by a preponderance of the

8    evidence that Dustin Richmond and/or Joseph Hunt used excessive

9    force and/or restraint against Jacobo Cedillo.

01:51PM   10        "Under the Fourth Amendment, a police officer may

11    use only such force and restraint as is 'objectively

12    reasonable' under all of the circumstances.  You must judge the

13    reasonableness of a particular use of force from the

14    perspective of a reasonable officer on the scene and not with

01:51PM   15    the 20/20 vision of hindsight.  Although the facts known to

16    Dustin Richmond and/or Joseph Hunt are relevant to your

17    inquiry, the officers' subjective intent or motive is not

18    relevant to your inquiry.

19        "In determining whether each individual defendant

01:51PM   20    officer used excessive force in this case, consider all of the

21    circumstances known to Dustin Richmond and/or Joseph Hunt on

22    the scene, including:

23        "1.  The nature of the crime or other circumstances

24    known to Dustin Richmond and/or Joseph Hunt at the time force

01:52PM   25    was applied;

1       "2.   Whether Jacobo Cedillo posed an immediate

2   threat to the safety of Dustin Richmond, Joseph Hunt, or to

3   others;

4       "3.   Whether Jacobo Cedillo was actively resisting

01:52PM   5   arrest or attempting to evade arrest by flight;

6       "4.   The amount of time Dustin Richmond and

7   Joseph Hunt had to determine the type and the amount of force

8   that reasonably appeared necessary and any changing

9   circumstances during that period;

01:53PM   10       "5.   The type and amount of force used;

11       "6.   The availability of alternative methods to

12   subdue Jacobo Cedillo;

13       "7.   The number of lives at risk (motorists,

14   pedestrians, police officers) and the parties' relative

01:53PM   15   culpability, that is, which party created the dangerous

16   situation and which party is more innocent;

17       "8.   Whether it was practical for Dustin Richmond

18   and/or Joseph Hunt to give warning of the imminent use of force

19   and whether such warning was given;

01:53PM   20       "9.   Whether it should have been apparent to

21   Dustin Richmond and/or Joseph Hunt that the person they used

22   force against was emotionally disturbed;

23       "10.   Whether a reasonable officer would have or

24   should have accurately perceived a mistaken fact; and

01:54PM   25       "11.   Whether there was probable cause for a

 1   reasonable officer to believe that the suspect had committed a

 2   crime involving the infliction or threatened infliction of

 3   serious physical harm.

 4        "Plaintiff claims that Dustin Richmond and

01:54PM  5   Joseph Hunt deprived her of her right under the

 6   Fourteenth Amendment to be free from unlawful state

 7   interference with her familial relationship with

 8   Jacobo Cedillo.

 9        "In order to prove that Dustin Richmond and/or

01:55PM 10   Joseph Hunt deprived plaintiff of her Fourteenth Amendment

11   right to be free from unreasonable state interference with

12   their relationship with the decedent, plaintiff must prove that

13   Dustin Richmond and/or Joseph Hunt acted with deliberate

14   indifference when they used force and/or restraint against

01:55PM 15   Mr. Cedillo.

16        "Deliberate indifference is reflected by a conscious

17   disregard of a risk to the decedent's health or safety.

18   However, if you find it was impracticable for Dustin Richmond

19   and/or Joseph Hunt to deliberate before they used force against

01:55PM 20   Mr. Cedillo, then plaintiff must instead prove that

21   Dustin Richmond and/or Joseph Hunt acted with a purpose to harm

22   Mr. Cedillo that was unrelated to a legitimate law enforcement

23   objective.

24        "It is the duty of the Court to instruct you about

01:56PM 25   the measure of damages.  By instructing you on damages, the

1   Court does not mean to suggest for which party your verdict

2   should be rendered.

3         "If you find for the plaintiff on any of her claims,

4   you must determine the plaintiff's respective damages.

5   Plaintiff has the burden of proving her respective damages by a

6   preponderance of the evidence.  Damages means the amount of

7   money that will reasonably and fairly compensate the plaintiff

8   or Mr. Cedillo for any injury you find was caused by the

9   defendants.

10        "You should consider the following as to

11  Mr. Cedillo's damages:

12        "1.  The nature and extent of his injuries;

13        "2.  The loss of life and loss of enjoyment of life;

14  and

15        "3.  The mental, physical, and emotional pain and

16  suffering experienced prior to death.

17        "You should consider the following as to the damages

18  for plaintiff:

19        "1.  The loss of Mr. Cedillo's love, companionship,

20  comfort, care, assistance, protection, affection, society, and

21  moral support; and

22        "2.  Funeral and burial expenses.

23        "It is for you to determine what damages, if any,

24  have been proved.  Your award must be based upon evidence and

25  not upon speculation, guesswork, or conjecture."

```
 1              All right, ladies and gentlemen.  We will now hear

 2    the closing arguments of counsel.  Again, these arguments are

 3    not evidence.  They are the attorneys' recollection of what

 4    the -- they believe that the evidence has established.

 5              You will hear twice from the plaintiff because the

 6    plaintiff bears the burden of proof.  The plaintiff will start

 7    and be followed by the closing arguments of the defendants, and

 8    then the plaintiff will give his final rebuttal.

 9              (Pause in the proceedings.)

10              MR. GALIPO:  I'm good, Your Honor.  I'll just refer

11    to it --

12              THE COURT:  Because I can give her time to do this.

13    You want to take a couple minutes?  That's fine.

14              MR. GALIPO:  Okay.  Maybe five minutes and then

15    we'll start, if that's okay with everybody.

16              THE COURT:  Yeah.  Because they've been sitting on

17    the edge of their seats.

18              MR. GALIPO:  Oh, yes.  I can see.

19              THE COURTROOM DEPUTY:  All rise.

20              (Break taken.)

21              (In the presence of the jury:)

22              THE COURT:  All right.  We've been rejoined by the

23    jury, all counsel and the parties are present.

24              Mr. Galipo, your closing, sir.

25              MR. GALIPO:  Yes.  Thank you, Your Honor.
```

01:58PM (line 5)
01:59PM (line 10)
01:59PM (line 15)
02:07PM (line 20)
02:11PM (line 25)

**UNITED STATES DISTRICT COURT**

1    Well, clearly here, I think it's pretty obvious, the

2  officers had time to deliberate.  They weren't in a situation

3  where they had to make a split-second decision in a dark alley.

4    So we believe the evidence supports that the

02:17PM  5  restraint and force was excessive.  And why was it excessive?

6  Because it was more than was necessary.  It wasn't necessary

7  under the circumstances.  And that the officers were

8  deliberately indifferent, certainly to Mr. Cedillo's health and

9  well-being, which I'll get into.

02:17PM  10    And then we have a training claim because I told you

11  in opening statement, you know, there's a real issue in this

12  case, how strong was these officers' training at the time of

13  this incident?  How clearly were they trained by the LAPD that

14  holding someone down with weight applied to their back for an

02:18PM  15  extended period of time could cause positional asphyxia or

16  restraint asphyxia?

17    The testimony has been there was no training

18  materials and no written policy at the time of this incident on

19  restraint asphyxia or positional asphyxia or the risk of prone

02:18PM  20  restraint or the risk factors to look for, like someone under

21  the influence or someone possibly mentally ill.  That's very

22  troublesome.

23    Now, there was a hobble policy, which I'll talk

24  about, but I would submit that doesn't go far enough because,

02:18PM  25  if you think about it, the hobble policy only applies if

```
          1  someone's hobbled.  What if someone's not hobbled and they're
          2  handcuffed and held down for three or four minutes or whatever
          3  it is and dies?  Well, they'll say the hobble policy didn't
          4  apply because he wasn't hobbled.  But that's not the point.
02:19PM   5          So there are questions on the verdict form that go
          6  to the Fourth Amendment claim.  There's a question that goes to
          7  the Fourteenth Amendment claim, the interference of familial
          8  relationship.  There's questions on the training, and then
          9  there's the damage questions.  And I'll go through it with you
02:19PM  10  in a little bit.
         11          But before we do that, just -- let's take a step
         12  back for a moment and think about this case.  Mr. Cedillo's
         13  50 years old, 5'3", 146 pounds, sitting in the driveway of a
         14  gas station.
02:19PM  15          Now, no one called the police and said this guy
         16  committed a crime, this guy is harassing us, robbing us,
         17  attacking us, has a weapon, no call about him at all.  No
         18  evidence that Mr. Cedillo ever committed a violent act in his
         19  life.
02:20PM  20          And admittedly, this is not his best moment.  We
         21  don't know exactly what's going on with him.  He may have been
         22  under the influence, may have had a mental health episode or --
         23  or both.  But I think one thing we can all agree on, he needed
         24  help.
02:20PM  25          And for him within minutes to end up dead, something
```

1    is really bad.  And initially he was totally cooperative.  Put

2    his hands behind his head -- behind his back, he's handcuffed,

3    there's dialogue going on.  Admittedly, he's somewhat difficult

4    to understand at times.  The officers admitted, we had no

02:21PM    5    probable cause to arrest him.  He hadn't committed a crime.

6            So this isn't a case where they're responding to

7    someone who just robbed someone, assaulted someone, attacked

8    someone, has a weapon.  No.  No crime.  And cooperative.

9            I'm homeless, I want to go to work.  And then they

02:21PM    10    stand him up and he agrees to stand up.  They walk him over to

11    the front of the car -- I'm telling you everything you already

12    know -- and his shoes are left there.  And then they go to the

13    front of the car.

14            And there's no evidence at all that he was trying to

02:21PM    15    fight with or attack these officers.  He's 5'3", 50 years old.

16    6'4", 250, 30 years old.  6'3", 210, 220, defensive and

17    offensive line on the football team.  And little Mr. Cedillo

18    who's now handcuffed in front of the car.

19            And was he getting a little agitated?  Maybe.  But

02:22PM    20    maybe that's understandable, especially if someone starts doing

21    wrist locks to you and causing you pain while you're already

22    handcuffed.

23            And one could imagine someone thinking, you know,

24    why are you doing that?  That's not necessary.  You're causing

02:22PM    25    me pain.  I'm trying to cooperate.  I didn't do anything.  I

```
 1    don't have anything on me.  And that wasn't enough.  As you saw
 2    in the video, they're lifting his hands up, handcuffed high.
 3    And you hear him yelling or screaming out in pain.
 4           That was the first excessive force used.  It wasn't
 5    necessary.  The man is already handcuffed.
 6           Now, remember, officers, especially when someone's
 7    in custody or handcuffed, they have a duty to provide for the
 8    person's safety, avoid injury to the person, a minimal amount
 9    of force.  What do they do?  They forcefully take him to the
10    ground, knowing he's handcuffed behind his back.  They both
11    have control of his arms with wrist locks and C grips.  And
12    what do they know is going to happen?  The inevitable, he's
13    going to hit his head on the cement.
14           Now, think about that for a second.  Head injuries
15    can be very serious.  Hitting someone's head against the
16    cement, do you think that might have stunned him, disoriented
17    him, caused him pain?
18           So now he's handcuffed, he -- and here's another
19    important point.  They brought him down to the ground, he
20    landed -- hit his head.  Richmond is on top of his back, all
21    250 pounds of him.  Hunt goes to the legs, and they're still
22    applying the wrist locks.  So he not only has the compressive
23    force on him, he's got the pain from the wrist locks.
24           Now, here is where the training issue and
25    Jeff Noble's testimony becomes very important.  Jeff Noble, the
```

02:23PM (5)
02:23PM (10)
02:24PM (15)
02:24PM (20)
02:24PM (25)

police practice expert the plaintiffs called does 50 percent of his work for plaintiffs, 50 percent of his work for law enforcement.  One could argue he's more objective and unbiased, perhaps, than Mr. Flosi who's done a hundred cases for the

02:25PM  LAPD.  And every single case he does with the LAPD, including shooting cases and death cases and unarmed people shot in the back, he comes into court and says everything that the officers did is -- is okay, it's fine.  Even when the Board of Police Commission says that was out of policy, Mr. Flosi disagrees.

02:25PM          So I would submit you can find that Mr. Flosi was not very credible because he seemed extremely biased in favor of the LAPD.  Mr. Noble, on the other hand, does half his work for the plaintiffs, half his work for the defense.

          What did he have to say?  He educated all of us

02:26PM  about the risk of prone restraint.  And in the law enforcement community, it's been around since the '80s and '90s.  This is nothing new.

          He talked about the Department of Justice, he talked about the International Association of Chiefs of Police, he

02:26PM  talked about all the agencies having written policies and training to prevent positional and restraint asphyxia; LAPD didn't have it.  Policies about risk factors; LAPD didn't have it.  That's not good.  It's not good for the LAPD, it's not good obviously for Mr. Cedillo and his family, it's not good

02:26PM  for these officers either not to have the right training.  I

          1    think we could all agree, training in any type of work is very

          2    important, especially in police work.

          3            This case is not about anyone being against the

          4    police at all.  I have close friends who are police officers.

02:27PM   5    That's not what this is about.  It's about whether this was

          6    excessive and unreasonable what happened to Mr. Cedillo.  It's

          7    about whether there needs to be better training, hopefully so

          8    that this doesn't happen to others.

          9            So if the national standards and training and the

02:27PM  10    International Association of Chiefs of Police put out suggested

         11    policy language to basically talk about positional and

         12    restraint asphyxia and don't put weight on someone's back for a

         13    prolonged period of time because it could interfere with their

         14    ability to breathe and kill them, then that is what the LAPD

02:28PM  15    should have had.

         16            Because if you think about it, doing that to

         17    someone, especially them being handcuffed, especially with some

         18    risk factors already included -- under the influence, maybe

         19    mental illness, small in stature -- you're literally applying

02:28PM  20    potentially deadly force to someone.  Deadly force.

         21            And deadly force, you can imagine, should only be

         22    used in an immediate threat of death situation or serious

         23    bodily injury.  You're putting someone's life in jeopardy, as

         24    Mr. Noble and the doctors explained to you.

02:28PM  25            And let me tell you, this isn't just like a hand on

the back.  This wasn't just -- we just kept him chest down
and -- and lightly held him there.  Officer Richmond has his
full chest on him, 250 pounds.  Vilke wanted to say, oh, maybe
half his weight.  You're going to decide.  He said my full body
weight on him and I'm going up on my toes to exert downward
pressure to keep him flat on the ground.

        And what's the physiology of a struggle, which makes
sense; right?  If you can't breathe because you can't expand
your diaphragm and chest cavity, as explained by the doctors,
what are you going to do?  Your natural instinct is going to
try to lift up slightly to take a breath or maybe roll
slightly.

        But these officers somehow think, oh, he's trying to
move.  I've got to put more weight on him.  I've got to keep
him flat on the ground.  And now the person is desperate.
Imagine someone in the water and their -- their head is under
the water and they're coming up for air and they're pushed back
down.  Imagine what was going through Mr. Cedillo's mind.

        First the wrist lock, then his head is slammed into
the cement, now he's got 4-, 500 pounds on top of him,
struggling to breathe.

        And then Officer Mena comes and puts the hobble on
him.  Now, think about it.  The one policy that they showed
you -- because they didn't show you any other policies because
they don't have any.  I think a fair presumption, if they had

 1    other good policies or training materials, they would have

 2    showed them to you.  They showed this policy.

 3              Can we put that up, please?

 4              And this was Exhibit 34, page 4, and you remember,

02:30PM    5    we saw it several times.  Well, the problem is they violated

 6    their own policy.

 7              So the one policy they showed you, they violated.

 8    But they want to stand up here and say we didn't do anything

 9    wrong.  They're denying all responsibility.  And they're

02:31PM   10    telling you you should find no excessive force or restraint at

11    all.  You should ignore this, basically, is what they're

12    saying.

13              So what does it say?  "If body weight is used to

14    gain control of an individual, officers should only apply

02:31PM   15    direct weight to the suspect's back for as long as reasonable

16    to control and secure the individual."

17              Now, "control and secure" has to be either

18    handcuffed and/or hobbled.

19              "Once the hobble is secured, officers shall

02:31PM   20    immediately search the waistband area and then immediately

21    place the individual in an upright seated position or on his or

22    her left side."  And if that's not possible, the right side

23    because you want to minimize the time the suspect spends on his

24    or her stomach after being restrained.

02:32PM   25              Here's the problem.  They hobble him.  And you know

**UNITED STATES DISTRICT COURT**

```
 1    what's really interesting?  You may remember this.
 2    Officer Mena said I got the hobble because they requested that
 3    they wanted to hobble him.  So I assisted them in hobbling him,
 4    putting it around his ankles.  And I'm looking at the guy and
 5    the guy's not moving.
 6            So the same person that they want you to believe is
 7    violently resisting the whole time and has got superhuman
 8    strength, their own officer's telling you he's not moving.  I'm
 9    watching the guy for like a minute and a half, two minutes, I
10    didn't even see him move.  And he's right there.
11            They should have, in accordance with their own
12    policy, sat him up, rolled him on his side.  The doctors you
13    heard say it's an easier position to breathe.  But they didn't
14    do that.
15            They want to talk about excessive force?  There you
16    have it.  Excessive restraint?  There you have it.  Deliberate
17    indifference to someone's health and safety?  There you have
18    it.
19            And they kept him chest down with weight applied,
20    full weight to back and legs, almost two minutes after the
21    hobble, over four minutes in total in the first prone
22    restraint.  And what happens?  He goes out.
23            Now, we had all this discussion about whether he's
24    sleeping, taking a nap, or unconscious.  But hopefully, again,
25    if you have to decide more likely true than not true, their own
```

02:32PM (line 5)
02:32PM (line 10)
02:33PM (line 15)
02:33PM (line 20)
02:33PM (line 25)

**UNITED STATES DISTRICT COURT**

expert, their own cardiologist, Dr. Chaikin, said I think it's kind of absurd to think he was sleeping or decided to take a nap.  He was unconscious.

Now, think about that for a moment.  He's unconscious.  That's serious in and of itself, someone going unconscious.

Can you put that back up just for one moment?  Because I wanted to say one more thing about it.

If we can just scroll -- and you all remember this because this was important too because they tried to suggest that, well, if he's moving at all, we have to keep him in that position, even though he's handcuffed and hobbled.

"If the individual continues to act violently or aggressively towards the officers" -- I would submit Mr. Cedillo never, never acted violently or -- or aggressively towards them at any time.  At a minimum, he was responding to everything they were doing to him -- wrist locks, lifting arms up, slamming him down on the ground head first, and then getting on top of him and he's struggling to breathe.

But even if he was acting violently, "one officer should use physical force to hold the person in the approved position described above while the partner maintains control of the hobble strap."

Why didn't they do that?  That's their training.  That's their policy that they violated.  And what happens --

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | Thank you.                                              |
|       | 2  | -- he goes unconscious.                                 |
|       | 3  | Now, what is a reasonable inference as to why he        |
|       | 4  | went unconscious?  Because he wasn't getting enough oxygen to |
| 02:35PM | 5 | his brain.  And why wasn't he getting enough oxygen to his |
|       | 6  | brain?  Because of the over four minutes of prone restraint, he |
|       | 7  | wasn't able to adequately breathe, as explained to you by the |
|       | 8  | doctors.                                                |
|       | 9  | So what happens?  That goes on for 11-and-a-half        |
| 02:35PM | 10 | minutes.  It's kind of crazy if you think about it.    |
|       | 11 | 11-and-a-half minutes, someone's laying on their side,  |
|       | 12 | unconscious, and the paramedics finally show up.        |
|       | 13 | And I'm not blaming the paramedics directly because     |
|       | 14 | I think an inference is the paramedics -- you know, the police |
| 02:36PM | 15 | are there.  The police are kind of telling the paramedics when |
|       | 16 | you can go to the patient.  What are the paramedics supposed to |
|       | 17 | do?  Grab the police officers and pull them off him?     |
|       | 18 | So the paramedic shakes his shoulder.  Now, imagine     |
|       | 19 | someone coming out of a state of unconsciousness, after having |
| 02:36PM | 20 | hit his head, after being handcuffed and hobbled and restrained |
|       | 21 | for over four minutes.  You think he might be a little bit off? |
|       | 22 | Confused?  Disoriented?                                  |
|       | 23 | And this is the most painful, difficult part of the     |
|       | 24 | case from the plaintiff's perspective because, arguably, |
| 02:37PM | 25 | everything they did to him up to that point, he had a chance to |

survive.  He might have had some damage, maybe, brain damage, some damage, but he had a chance to survive.

But that was taken away from him and his daughter when they say he started -- I don't know doing what.  You watched the video.  He basically becomes alert.  And with one second, maybe two at most, handcuffed and hobbled, boom, put him right back down into the same position that he lost consciousness.

And when you're thinking about whether or not there's excessive force or restraint or whether they were deliberately indifferent, start thinking about the wrist lock, the raising the arms up, the takedown with the head hitting the ground, the first prone restraint, the hobble, not putting him immediately sitting up or on his side.  And then think about the second prone restraint because we all know the second prone restraint killed him.

And as the doctors explained to you, he was in a more vulnerable state now.  And are you really telling me -- you saw the video -- with six or eight officers there and this little man, handcuffed and hobbled, they couldn't control him?  They couldn't sit him up?  What did he do to anyone that was so terrible that they had to do that to him?

And it's particularly difficult to listen to.  I might play it one more time in my rebuttal argument, but I got to tell you, it's difficult to listen to because it's so tragic

1    and sad when you literally hear someone trying to survive and

2    yelling out for their life but no one to help them.  And you

3    hear the volume of his voice going down in time until you don't

4    hear anything.  And they're still on top of him.

02:39PM   5         And then they want you to believe he's still

6    breathing.  It doesn't even make a difference because the

7    restraint killed him.  And I don't care if you want to call it

8    restraint asphyxia, positional asphyxia, if you want to say the

9    increase in the acidosis and the potassium and the

02:39PM  10   catecholamines that their experts say rose and killed him, any

11   way you look at it, the restraint killed him.

12        Dr. Dan told you this morning, there is no doubt he

13   died because of the restraint.  Are we just supposed to assume

14   that it was a coincidence?  Or how about Dr. Vilke?  Imagine

02:40PM  15   this, 100 cases, a hundred where the police officers have

16   restrained someone in a prone position and the person died, a

17   hundred cases.

18        Now, what did he say he got paid in this case?  Came

19   out between 20- and $30,000.  Let's call it 25,000.  Let's

02:40PM  20   multiply that by a hundred.  $2.5 million that this man is

21   being paid.  In every single case, even when the medical

22   examiner says the restraint caused the death, the restraint was

23   a contributing cause of death, he disagreed with all the

24   medical examiners, plaintiff's experts, doctors like Dr. Omalu

02:41PM  25   and Dr. Dan, disagrees with everyone in every case.  And he

1   gets his 25-, 30,000, and he'll go on to the next case and the

2   next case and the next case.

3          And a reasonable inference is -- we're all here

4   today, had the pleasure of meeting you nice people.  Next

02:41PM   5   month, the month after that, guess what, Dr. Vilke will be

6   testifying somewhere before another jury and so will Mr. Flosi

7   in another death case.

8          And Briscoe said, "Is he breathing?" as he's looking

9   right at him.  Why do you think Briscoe asked that?  Because he

02:41PM   10   couldn't tell if he was breathing.  Do you think someone's

11   going to say "Is he breathing?" if he looked like he was

12   breathing with lights shining on him?

13          And who is the reliable source they want you to rely

14   on to say he was breathing off?  Officer Richmond, the guy that

02:42PM   15   was on his back for seven minutes.

16          The paramedics never said he was breathing.  One

17   reference to it, he had an agonal breath maybe, which is post

18   cardiac arrest.  The paramedics have him not breathing, no

19   pulse, and asystole.

02:42PM   20          So let's talk about that for a moment because, if

21   their theory is -- although they have no blood exemplar, they

22   have no quantity of methamphetamine, they have a urine test

23   where it could stay in your body for three to seven days, even

24   if he had a little meth in his system, if you are going to die

02:42PM   25   by a heart attack, an overdose, which the medical examiner did

UNITED STATES DISTRICT COURT

```
       1   not find, your heart rhythm is going to be that ventricular
       2   fibrillation or ventricular tachycardia.  That would be the
       3   heart rhythm on the monitor.  He didn't have that.  He had
       4   asystole.
02:43PM 5          And he gets to the hospital, severe metabolic
       6   acidosis, something called rhabdomyolysis, which essentially
       7   all his cells are dying and breaking open and the potassium is
       8   leaking into his blood, which, according to their experts, was
       9   happening during the restraints.  And they want to tell you,
02:43PM 10  well, he died because he was resisting during the restraints.
       11  Well, what the heck are you on top of him for so he can't
       12  breathe?  Any person's going to try to breathe.
       13         He shouldn't have been in that position in the first
       14  place.
02:43PM 15         He's there five days, multi-organ failure, kidneys,
       16  liver, it's horrible, five days, and they finally pronounced
       17  him dead.  And Dr. Omalu described some of that to you.
       18         And they decided to have it so he can have his
       19  organs donated to save other lives.
02:44PM 20         And then we have the autopsy report.  Well, they had
       21  promised you in opening statement, you're going to hear from
       22  the medical examiner.  The medical examiner wasn't called.
       23  References were made to her report.  Well, she said
       24  "Undetermined."
02:44PM 25         Well, I think it's pretty clear that Dr. Omalu,
```

```
        1    who's a forensic pathologist, is more experienced and highly

        2    acclaimed than she is.  And I don't mean to put her down.  But

        3    she didn't even do some basic things like take microscopic

        4    slides of the brain and the heart.

02:45PM  5           Dr. Omalu had to do that.  He is the only expert in

        6    this case that went to the medical examiner's office, got

        7    slides from the tissues of the heart and brain.  He took them

        8    himself and examined them.  And they told him two very

        9    important undisputed facts in this case.

02:45PM 10           Fact No. 1, in looking at the heart slides -- heart

       11    slides, he did not have scarring and damage to his heart, as

       12    they're trying to claim he had such a bad heart.

       13           The other thing he told you, from looking at the

       14    heart slides, I can see this wasn't a methamphetamine caused

02:45PM 15    cardiac arrest.

       16           And then he looked at the brain slides.  And the

       17    brain slides confirmed what he already thought, it was an

       18    asphyxial death.

       19           But I guess they want you to believe that, even

02:46PM 20    though Vilke's done a hundred similar cases, there's training

       21    across the country on this, all the doctors understand and know

       22    this, they want you to believe that the restraint had nothing

       23    to do with his death, even though the initial restraint caused

       24    him to go unconscious.

02:46PM 25           And then in the autopsy report, the reference by the
```

UNITED STATES DISTRICT COURT

|       |                                                                              |
|-------|------------------------------------------------------------------------------|
| 1     | We know he was injured in his head when he went to the ground.               |
| 2     | We know the initial prone restraint, in addition to causing him              |
| 3     | pain and suffering, caused him to go unconscious.  And we know               |
| 4     | the second prone restraint killed him, not to mention the five               |
| 5     | days he's in the hospital with pneumonia, multi-organ failure,               |
| 6     | everything going until they finally pronounce him dead five                  |
| 7     | days later.                                                                  |
| 8     | So that, we would submit, is clearly a "yes" to both                         |
| 9     | officers.                                                                    |
| 10    | Those are the Fourth Amendment questions.  And                               |
| 11    | Question 3 is the Fourteenth Amendment questions.                            |
| 12    | Did they interfere with the familial relationship?                           |
| 13    | And that, you'll have an instruction on it.  You can look at it              |
| 14    | again.  But, quite basically, if they had time to deliberate,               |
| 15    | which they did, the question is whether they were deliberately               |
| 16    | indifferent to his health and safety by doing what they did to               |
| 17    | him.  And we believe the answer for both officers, certainly                 |
| 18    | more likely true than not, is "yes."                                         |
| 19    | Now, the next group of questions deal with the                               |
| 20    | training.  And you'll notice in Question 4, they talk about the              |
| 21    | risk of prone restraint, the risk of positional and/or                       |
| 22    | restraint asphyxia.  And I would submit, since they had no                   |
| 23    | written training materials, no written training policies, not                |
| 24    | one person came up here from the LAPD and told you we did train             |
| 25    | our officers on this as of April 8th, 2019, not one person said              |

02:56PM (lines 5)
02:56PM (line 10)
02:56PM (line 15)
02:56PM (line 20)
02:57PM (line 25)

1    that.

2          In fact, they conceded practically they had no

3    training on it.  Both officers said they had no training on it.

4    There's no written materials saying they had any training on

02:57PM    5    it.  And they're trying to tell you that this hobble restraint

6    suffices.  And I would respectfully say they violated it, but

7    it doesn't suffice because it doesn't even mention positional

8    or restraint asphyxia or things of that nature.

9          Question 5, were they deliberately indifferent to

02:57PM    10    the known or obvious consequences?  Well, obviously, if you're

11    not training your officers on something that can kill people

12    and something that happens a lot, like holding people down in a

13    prone position like this, that is deliberate indifference.

14          Next question, whether or not it was a moving force

02:58PM    15    behind the injury or harm or death.  And obviously, when these

16    officers -- and this was shocking, really.  I don't know if you

17    remember this testimony.  They said, I kind of know it now, I

18    understand now that that interferes with ability to breathe,

19    but I didn't know it at the time.  And the implication is, if

02:58PM    20    they had better training, this wouldn't have happened.

21          So from the plaintiff's perspective, clearly it was

22    a moving force behind what happened.

23          Next question.  Now the damages.  Okay.

24          So this is a little complicated, but I'll try to

02:58PM    25    make it simple.  There's two types of damages in a case like

1    this that are allowed under federal law.  One type is called

2    survival damages.  Survival damages.  So those are damages that

3    kind of belong, if you will, to the decedent even though

4    they'll be -- obviously the daughter is the plaintiff and

5    successor-in-interest.

6         So the two elements of survival damages that you can

7    award are pre-death pain and suffering and loss of life.  Those

8    are the two areas of survival damages.  And I will tell you --

9    of course, some people will say, you know, nothing's more

10   valuable than human life, which I tend to agree with.  But the

11   pain and suffering in this case was horrific.  Not only at the

12   scene but in the five days at the hospital, it really was

13   horrific.

14        And I'm going to tell you, I believe that this

15   Question No. 7, based on the evidence and the law, should be a

16   big number.  And I'm not afraid to say it.

17        Now, ultimately, it's totally up to you.  You may

18   think I'm too low, too high.  Up to you.  And I can't even

19   decide, I started thinking about how much of it should be

20   pre-death pain and suffering and how much loss of life, and

21   they're so both significant in this case.  I'm going to leave

22   it up to you.  But I would suggest the total number for

23   Question 7 in this case, how horrific it is, should be

24   $20 million.  $20 million.  And you, as the jury, should decide

25   how you're going to divide it up.

          1         You may think I'm too high, you may think I'm just

          2    about right, it's up to you to decide based on everything

          3    you've heard in this case.

          4         And then Question 8 -- now, this is the other

03:00PM   5    element of damages.  This is her damages under the law for the

          6    loss of her father.

          7         Now, you'll notice for this one, you only get there

          8    if you answered "yes" to 3 or 6.  So go back to 3 for just a

          9    moment.  3 was the familial relationship claim, the deliberate

03:01PM  10    indifference claim is 3.  And then 6 is whether the inadequate

         11    training was a moving force behind what happened here.

         12         So if you answer "yes" to 3 or 6, you get to her

         13    damages.  If you don't, you don't get there.  But we're hoping,

         14    based on the evidence and the law -- go back to the last

03:01PM  15    question -- we're hoping you will get to her damages for the

         16    loss of her father.

         17         And, again, it's difficult to break up the past and

         18    the future.  It's been about, I guess, four-and-a-half years.

         19    She's going to live without her father at least -- obviously

03:02PM  20    for the rest of her life.

         21         And, you know, there are certain things we do in

         22    life where we would like to include our parents, maybe

         23    marriage, maybe who's going to walk her down the aisle, maybe

         24    just sharing things, having children one day, sharing things.

03:02PM  25    I think all of us intrinsically, whether we have issues with

```
  1   our parents or not -- I know we all love our parents -- we want
  2   them to be proud of us.  It just feels good if we think our
  3   parents are proud of us.
  4          And that's how she was.  She felt like her dad was
03:02PM   5   proud of her and it made her feel special and good.  She ain't
  6   gonna have that anymore.  It's done.
  7          So I would submit wrongful death damages in this
  8   case, between 8 and 10 million.  And you could break it down
  9   how you want, you could tell me I'm too low, you could tell me
03:03PM  10   I'm too high.  It's up to you to decide the damages.
 11          But I will say this, this is a very serious, tragic
 12   case that someone was killed and they should not have been
 13   killed.  And as a result, people have suffered a tremendous
 14   loss.
03:03PM  15          So I thank you for listening to me, all of you very
 16   much.  And counsel's going to have a chance to address you.
 17   I'll have one last chance to talk to you, but I thank you very
 18   much.
 19          THE COURT:  All right, ladies and gentlemen.  Let's
03:04PM  20   take a bit of a break and give our reporter a break, give
 21   Sheila a break, give me a break.  And -- ten minutes.  Ten
 22   minutes.
 23          Remember the admonition.  You almost have the case
 24   now.
03:04PM  25          THE COURTROOM DEPUTY:  All rise.
```

**UNITED STATES DISTRICT COURT**

1    credible is that?

2         The end-tidal $CO_2$, Omalu told you -- first of all,

3    it was elevated and it's completely consistent with death by

4    asphyxia.  And Dr. Dan told you the same thing.  Dr. Chaikin

03:42PM    5    tried to talk about it, but then admitted it's not even in his

6    report.  This is a made-up thing.  They're trying to mislead

7    and trick you.

8         And the autopsy report, they talk about the temporal

9    relationship and asphyxia due to compression of the body may be

03:42PM   10    contributory to the cardiopulmonary arrest.  And let me tell

11    you something else, he had a cardiac arrest during the second

12    prone restraint.  Their own experts admit that.

13         And then this is also misleading.  They don't call

14    the medical examiner, they don't call her.  They said they

03:43PM   15    would call her.  They don't call her, no.  They're now telling

16    you, well, there's a reference in a report that there's no

17    specific findings of asphyxia at autopsy.  Well, what did you

18    learn?  You're not going to see it.  You're not going to look

19    at the table, oh, there it is, it's asphyxia written down

03:43PM   20    across the chest.  You've got to learn what the history is.

21         Was he prone?  How long?  Was weight applied?  Did

22    he go unconscious at some point?  Did he have a cardiac arrest

23    during the prone restraint?  That's how you determined it.

24    Then you look at the other factors, which the doctors

03:43PM   25    explained.

```
 1              And you'll notice something else on the verdict
 2   form.  Questions 2 and 6 say a cause, a moving force.  Because
 3   under the law, you can have more than one cause of something.
 4   Can you have more than one cause.  You might think in your mind
 5   maybe the drugs did have a little something to do with it.
 6   It's okay.  But as long as you find that the restraint was also
 7   a cause or the main cause, that's enough under the law.
 8              And you might remember the end of Noble's testimony.
 9   You'll see a reference in the jury instructions to the totality
10   of the circumstances.  And I asked Noble, do you think this was
11   inappropriate?  Yes.  Why?  And this is what you do as a jury,
12   well, look at the totality of the circumstances.  This guy
13   didn't even commit a crime.  They had no probable cause to
14   arrest him.  He's 5'3", 146 pounds, 50 years old.  And they do
15   the wrist lock and they take him down and they do all this
16   prone restraint?
17              Then they say, oh, the videos don't show the whole
18   story.  Well, the videos don't show violent resistance, the
19   videos don't show him kicking, the videos just show him
20   responding to pain and trying to survive.  But don't pay
21   attention to the videos is what their suggestion is.  They
22   don't really tell you what happened.
23              The videos, I would submit, are the strongest
24   evidence in this case.
25              And when they say everything was going fine and
```

03:44PM (line 5)
03:44PM (line 10)
03:45PM (line 15)
03:45PM (line 20)
03:46PM (line 25)

**UNITED STATES DISTRICT COURT**

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES    )
                               )
4     STATE OF CALIFORNIA      )

5

6          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7     REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8     CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9     TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17          DATED THIS 29TH DAY OF NOVEMBER, 2023.

18

19

20          /S/ MYRA L. PONCE
       _____
21       MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**