# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

4

5   NICOLE JUAREZ ZELAYA, individually and )
    as Successor-in-Interest to Decedent   )
6   JACOBO JUAREZ CEDILLO,                 )
                                           )
7                        Plaintiff,        )
                                           )
8       v.                                 )            Case No.
                                           )   CV 20-8382 ODW (MAAx)
9   CITY OF LOS ANGELES, DUSTIN RICHMOND,  )
    and JOSEPH HUNT,                       )        Volume 3
10                                         )     (Pages 177 - 375)
                         Defendants.       )
11  _____)

12

13             REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                            TRIAL DAY TWO
14                 WEDNESDAY, OCTOBER 11, 2023
                            8:03 A.M.
15                   LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23        MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305

1    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        LAW OFFICES OF DALE K. GALIPO
         BY:  DALE K. GALIPO
5        BY:  RENEE V. MASONGSONG
             Attorneys at Law
6        21800 Burbank Boulevard, Suite 310
         Woodland Hills, California  91367
7        (818) 347-3333

8        CARRILLO LAW FIRM, LLP
         BY:  MICHAEL S. CARRILLO
9            Attorney at Law
         1499 Huntington Drive, Suite 402
10       South Pasadena, California  91030
         (626) 799-9375

11

12   **FOR THE DEFENDANTS:**

13
         HURRELL CANTRALL, LLP
14       BY:  THOMAS C. HURRELL
         BY:  DIANE MARTINEZ
15           Attorneys at Law
         725 South Figueroa Street, Suite 3800
16       Los Angeles, California  90017
         (213) 426-2000

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                            **INDEX OF WITNESSES**

2

3    **PLAINTIFF'S WITNESSES**                                          **PAGE**

4    RICHMOND, Dustin

5        Cross-examination by Mr. Hurrell                         183
         Redirect Examination by Mr. Galipo                      198
6        Recross-examination by Mr. Hurrell                      210

7

8    HUNT, Joseph

9        Direct Examination by Mr. Galipo                        213
         Cross-examination by Mr. Hurrell                        230
10       Redirect Examination by Mr. Galipo                      237

11

12   MENASAKANIAN, Tadeh

13       Direct Examination by Mr. Carrillo                      249
         Cross-examination by Ms. Martinez                       255
14       Redirect Examination by Mr. Carrillo                    257

15

16   NUÑEZ, Scott

17       Direct Examination by Mr. Galipo                        259
         Cross-examination by Ms. Martinez                       275
18       Redirect Examination by Mr. Galipo                      279

19

20   RIVERA, Javier

21       Direct Examination by Mr. Galipo                        286
         Cross-examination by Mr. Hurrell                        291
22       Redirect Examination by Mr. Galipo                      294

23

24

25   ///

**UNITED STATES DISTRICT COURT**

1    **INDEX OF WITNESSES, CONTINUED:**

2

3    **<u>PLAINTIFF'S WITNESSES</u>**                                    **<u>PAGE</u>**

4    NOBLE, Jeff

5        Direct Examination by Mr. Galipo                   296
         Cross-examination by Mr. Hurrell                   331
6        Redirect Examination by Mr. Galipo                 344

7

8    JUAREZ ZELAYA, Nicole

9        Direct Examination by Mr. Carrillo                 348
         Cross-examination by Mr. Hurrell                   363
10       Redirect Examination by Mr. Carrillo               366

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 11A  - | Video recording | | 183 |
| 20A  - | 76 Gas Station surveillance video | | 183 |
| 20C  - | 76 Gas Station surveillance video | | 183 |
| 21A  - | Dash cam video | | 183 |
| 21B  - | Dash cam video | | 183 |
| 23   - | Synchronized video compilation | | 183 |
| 29   - | Photographs | 350 | 350 |
| 33   - | LAFD Pre-hospital Care Report | 286 | |
| 34   - | LAPD Use of Force - Tactics Directive 2.2, hobble restraint device | | 183 |
| 158-1 - | Officer Cuba's body-worn video | 196 | 373 |
| 164  - | Officer Nuñez's body-worn video | 235 | 373 |

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | WEDNESDAY, OCTOBER 11, 2023; 8:03 A.M. |
| 2 | LOS ANGELES, CALIFORNIA |
| 3 | -oOo- |
| 4 | (In the presence of the jury:) |
| 5 | THE COURTROOM DEPUTY:  Calling Item 1, CV 20-8382, |
| 6 | Nicole Juarez Zelaya versus City of Los Angeles. |
| 7 | Counsel, may I have your appearances, please. |
| 8 | MR. GALIPO:  Yes.  Good morning.  Dale Galipo with |
| 9 | Michael Carrillo and Renee Masongsong on behalf of the |
| 10 | plaintiff who is present. |
| 11 | THE COURT:  Good morning to you all. |
| 12 | MR. HURRELL:  And good morning, Your Honor. |
| 13 | Tom Hurrell and Diane Martinez for the defendants. |
| 14 | MS. MARTINEZ:  Good morning, Your Honor. |
| 15 | THE COURT:  Counsel, good morning. |
| 16 | MR. GALIPO:  Just as a housekeeping matter, |
| 17 | Your Honor. |
| 18 | THE COURT:  Yes. |
| 19 | MR. GALIPO:  We played numerous video clips |
| 20 | yesterday.  The parties have agreed to their authenticity and |
| 21 | admissibility.  And we are moving them into evidence.  The |
| 22 | clips include Exhibit 20A, 11A, 20C, 21A, 21B, and 23. |
| 23 | We additionally referenced Exhibit 34, which was the |
| 24 | hobble restraint policy in effect at the time, and we would |
| 25 | move that into evidence as well. |

01:35PM (line 5)
08:03AM (line 10)
08:03AM (line 15)
08:03AM (line 20)
08:04AM (line 25)

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | THE COURT:  Excellent.  All right.  Thank you. |
| 2 | (Exhibits 20A, 11A, 20C, 21A, 21B, |
| 3 | 23, and 34 received into evidence.) |
| 4 | THE COURT:  And had you concluded your examination |
| 5 | of Officer Richmond? |
| 6 | MR. GALIPO:  Yes.  My initial examination is |
| 7 | concluded. |
| 8 | THE COURT:  All right.  Any cross?  Sir?  Oh, I'm |
| 9 | sorry.  Go ahead.  No, just do you intend? |
| 10 | MR. HURRELL:  Yes, Your Honor.  I was going to do my |
| 11 | direct as well. |
| 12 | THE COURT:  All right.  You can resume your place on |
| 13 | the witness stand, please, sir. |
| 14 | THE WITNESS:  Yes, sir. |
| 15 | THE COURT:  Remember, sir, you are still under oath. |
| 16 | THE WITNESS:  Yes, Your Honor. |

08:04AM lines: 5, 10, 15
08:05AM lines: 20, 25

**DUSTIN RICHMOND**,

**A DEFENDANT HEREIN, PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:**

**CROSS-EXAMINATION**

BY MR. HURRELL:

Q.   Good morning.

A.   Good morning.

Q.   Officer, a little bit about your background.  Again, you started with the LAPD when?

A.   I started the academy in December of 2014.

```
         1              MR. HURRELL:  Thank you.

         2              THE WITNESS:  Yes, sir.

         3              MR. GALIPO:  No further questions, Your Honor.

         4              THE COURT:  You may step down, sir.

08:47AM  5              THE WITNESS:  Thank you.

         6              THE COURT:  Next witness.

         7              MR. GALIPO:  Yes.  Thank you, Your Honor.

         8              We'd like to call Joseph Hunt, please.

         9              THE COURTROOM DEPUTY:  Do you solemnly swear that

08:47AM 10     the testimony you shall give in the cause now before this Court

        11     shall be the truth, the whole truth, and nothing but the truth,

        12     so help you God?

        13              THE WITNESS:  I do.

        14              THE COURTROOM DEPUTY:  Please be seated.

08:47AM 15              Please state your first and last name and spell it

        16     for the record.

        17              THE WITNESS:  Joseph Hunt, J-o-s-e-p-h, H-u-n-t.

        18              THE COURTROOM DEPUTY:  Thank you.

        19              MR. GALIPO:  Thank you, Your Honor.

08:48AM 20                        **JOSEPH HUNT**,

        21         **A DEFENDANT HEREIN, WAS SWORN AND TESTIFIED AS FOLLOWS:**

        22                    **DIRECT EXAMINATION**

        23     BY MR. GALIPO:

        24         Q.   Good morning, Officer Hunt.

08:48AM 25         A.   Good morning.
```

1    Q.   How tall are you?

2    A.   6'3".

3    Q.   How much do you currently weigh?

4    A.   About 235.

08:48AM  5    Q.   You played football in high school; is that correct?

6    A.   Yes.

7    Q.   Offensive and defensive line?

8    A.   Yes.

9    Q.   Now, you were the partner officer with

08:48AM  10   Officer Richmond; correct?

11   A.   Yes.

12   Q.   And just to remind us, who was driving the car?

13   A.   I was.

14   Q.   At some point you observed who we now know to be

08:48AM  15   Mr. Cedillo sitting in the driveway area of the gas station?

16   A.   Yes.

17   Q.   And you were en route to another call?

18   A.   Correct.

19   Q.   But you had a quick discussion with your partner and

08:49AM  20   decided to make contact with Mr. Cedillo?

21   A.   Correct.

22   Q.   Had anyone provided you with previous information

23   that Mr. Cedillo had committed a crime?

24   A.   No.

08:49AM  25   Q.   Had threatened anyone?

1          A.    No.

2          Q.    Robbed anyone?

3          A.    No.

4          Q.    Tried to harm anyone?

08:49AM    5          A.    No.

6          Q.    Had a weapon?

7          A.    No.

8          Q.    And when you approached Mr. Cedillo, did it appear

9    to you that he might have a mental illness or be in a mental

08:49AM    10   health crisis and/or be under the influence of drugs?

11         A.    Yes.

12         Q.    You -- and I think we talked about this in your

13   deposition, you acknowledge that you thought that he might have

14   some type of a mental illness.  You weren't sure?

08:49AM    15         A.    Correct.

16         Q.    Now, he was handcuffed; correct?

17         A.    Yes.

18         Q.    And he was compliant and cooperative at that time?

19         A.    Yes.

08:50AM    20         Q.    And then there was a decision to walk him over to

21   the front of the car?

22         A.    Yes.

23         Q.    He was compliant and cooperative at that time?

24         A.    Yes.

08:50AM    25         Q.    And then at some point he's facing the front of your

```
  1    patrol car; correct?

  2         A.   Correct.

  3         Q.   Now, were you aware at some point that your partner,

  4    Officer Richmond, was applying a wrist lock?

  5         A.   Yes.

  6         Q.   And how did you become aware of that?

  7         A.   He was standing right next to me, so I could see it

  8    being done.

  9         Q.   And do I have it correctly that, as Mr. Cedillo was

 10    facing the front of the car, Officer Richmond would be more on

 11    his back left side and you would be more on the back right

 12    side?

 13         A.   That is correct.

 14         Q.   And you understood that wrist locks can cause pain;

 15    correct?

 16         A.   Correct.

 17         Q.   And, in fact, when the wrist lock -- or after the

 18    wrist lock was applied, did it appear to you that Mr. Cedillo

 19    was becoming more agitated?

 20         A.   Yes.

 21         Q.   Did you ever in your mind think that there might be

 22    a correlation or a connection between the wrist lock causing

 23    him pain and him becoming more agitated?

 24         A.   He was already becoming more agitated at that point,

 25    which was why the wrist lock was applied.  So --
```

08:50AM (line 5)
08:50AM (line 10)
08:51AM (line 15)
08:51AM (line 20)
08:51AM (line 25)

1    Q.    Were you trained that in situations where someone

2    might be experiencing a mental health crisis or have a

3    potential mental illness, that you should de-escalate the

4    situation?

08:51AM   5    A.    Yes.

6    Q.    Now, you took the primary role in writing the report

7    in this case; is that correct?

8    A.    Yes.

9    Q.    But you did have input from Officer Richmond?

08:52AM   10    A.    Correct.

11    Q.    And have you had a chance to review the report

12    recently?

13    A.    Yes.

14    Q.    Now, you yourself, did you apply a firm grip or a

08:52AM   15    C grip?

16    A.    Yes.

17    Q.    And what parts of Mr. Cedillo's body did you apply

18    those to?

19    A.    His right bicep and right forearm.

08:52AM   20    Q.    Now, you would agree that there were no physical

21    contacts in terms of kicks between Mr. Cedillo and yourself?

22    A.    Correct.

23    Q.    Did Mr. Cedillo ever verbally threaten to harm you

24    or Officer Richmond?

08:53AM   25    A.    Not that I'm aware.

1      Q.   You recall and we've listened to the video several

2  times him saying "Cedillo" over and over again?

3      A.   I do recall hearing that.

4      Q.   And do you recall him being asked his name on

08:53AM  5  multiple occasions?

6      A.   Yes.

7      Q.   And at least now you know Cedillo is his name;

8  correct?

9      A.   I do know that now.

08:53AM 10     Q.   Now, was there any verbal warning that you were

11  aware of that Mr. Cedillo was going to be taken down to the

12  ground?

13     A.   No.

14     Q.   And were you aware, when he was taken down to the

08:53AM 15  ground that he was handcuffed, you were holding his right arm

16  and your partner was applying a wrist lock to his left arm?

17     A.   I'm sorry.  Can you repeat the question?

18     Q.   Sure.

19          Were you aware at the time he was taken down to the

08:54AM 20  ground he was handcuffed behind his back, you had control of

21  his right arm and your partner had control of his left arm?

22     A.   Yes.

23     Q.   And obviously you were aware that there was a hard

24  surface or cement there at the base of the driveway?

08:54AM 25     A.   Correct.

UNITED STATES DISTRICT COURT

1    Q.   So you were aware, when he was taken down to the

2    ground, that he might hit his head or face on the cement?

3    A.   Yes.

4    Q.   And you later, I think, saw a bleeding or a

08:54AM  5    laceration to the forehead?

6    A.   Correct.

7    Q.   And in your mind, that probably happened when he was

8    taken down to the ground.  Is that fair?

9    A.   Yes.

08:54AM  10   Q.   Now, with the initial prone restraint -- and I think

11   you indicated this in your report -- your impression was that

12   Officer Richmond landed on his back, Mr. Cedillo's back;

13   correct?

14   A.   Yes.

08:55AM  15   Q.   And you went to the legs?

16   A.   Yes.

17   Q.   And you wrapped your arms around both of his legs

18   and pulled them into your chest?

19   A.   Yes.

08:55AM  20   Q.   And you and your partner were trying to hold

21   Mr. Cedillo down at that point?

22   A.   Yes.

23   Q.   And there were times when you felt he was trying to

24   lift up or roll?

08:55AM  25   A.   From -- I was holding his legs, like, from when he

1   was -- he was kicking upward and trying to kick me off of him.

2   As far as, like, rolling from what I was doing, I could -- I

3   was holding his legs, and it felt like he was trying to kick me

4   off of him.

08:55AM   5       Q.    Well, he never landed a kick on you; true?

6       A.    No.

7       Q.    Is that correct?

8       A.    Correct.

9       Q.    Okay.  In any event, you're controlling his legs

08:56AM   10  with -- you actually pulled his legs into your chest, so you

11  were applying the weight of your chest on his legs during the

12  initial prone restraint?

13      A.    Right.

14      Q.    And this went on up until the time where

08:56AM   15  Officer Mena came to apply a hobble?

16      A.    Correct.

17      Q.    And you slightly lifted or repositioned the legs to

18  allow the hobble to be applied?

19      A.    Correct.

08:56AM   20      Q.    And you were aware when the hobble was finally

21  applied?

22      A.    Yes.

23      Q.    And we saw this hobble policy.  Maybe we can put it

24  up again briefly, Exhibit 34, page 4.

08:56AM   25           I'm assuming you were familiar with the hobble

**UNITED STATES DISTRICT COURT**

1   policy before this incident; correct?

2       A.    Correct.

3       Q.    And are you -- is it your understanding that, as an

4   LAPD officer, you're supposed to attempt to follow directives?

08:56AM  5       A.    Yes.

6       Q.    And this was a directive; correct?

7       A.    Yes.

8             MR. GALIPO:  And if we can go to page 4, please.

9       Q.    (BY MR. GALIPO:)  And I'm not going to read all the

08:57AM 10   language again because it's been referenced more than once.

11   But did you understand that, once the hobble was secured and

12   the person was immediately searched, they should be sat up or

13   put on their side?

14       A.    Yes.

08:57AM 15       Q.    And after he was hobbled, were you aware that

16   Officer Sampson searched him?

17       A.    Yes.

18       Q.    And would you agree, sir, that, after he was hobbled

19   and after he was searched, he was not immediately sat up or put

08:57AM 20   on his side?  Would you agree with that?

21       A.    Yes.

22       Q.    In fact, he was -- continued to be held down for

23   some period of time by yourself and Officer Richmond after he

24   was hobbled and searched; correct?

08:57AM 25       A.    Yes.

```
 1        Q.    And you continued to apply your body weight to his

 2   legs; true?

 3        A.    True.

 4        Q.    And as you indicated in the report, Officer Richmond

08:58AM  5   was applying body weight and downward pressure on his back --

 6        A.    Yes.

 7        Q.    -- correct?  Is that correct?

 8        A.    Yes.

 9        Q.    Okay.  And then at some point you realized or

08:58AM 10   noticed that he's not resisting anymore?

11        A.    Correct.

12        Q.    And you put him on his right side?

13        A.    Correct.

14              MR. GALIPO:  Now, if we could scroll up a little bit

08:58AM 15   on page 4 of Exhibit 34.

16        Q.    (BY MR. GALIPO:)  You were familiar with the section

17   under the photographs; correct?

18        A.    Correct.

19        Q.    And, by the way, is it your understanding that these

08:59AM 20   photographs are depicting the position you should put the

21   individual in?

22        A.    Yes.

23        Q.    And were you familiar with this language, "If the

24   individual continues to act violently or aggressively towards

08:59AM 25   the officers, one officer should use physical force to hold the
```

```
 1  person in the approved positions, described above, while the
 2  partner maintains control of the" hobble restraint device's
 3  strap, "HRD strap"?  Do you see that?
 4       A.   Yes.
 5       Q.   So -- thank you for that.
 6            He was out for a period of time; correct?
 7  11-and-a-half minutes, let's say he was not resisting.  Is that
 8  fair?
 9       A.   Yes.
10       Q.   Did you see him moving around during that time?
11       A.   I could see his fingers moving.  And as far as --
12  yeah, his fingers were moving.  That's what I saw moving.
13       Q.   You describe his fingers as twitching; correct?
14       A.   Correct.
15       Q.   You didn't know if it was voluntary or involuntary;
16  correct?
17       A.   Correct.  I just saw them twitching and moving.
18       Q.   And you were aware prior to that that you and your
19  partner had held him chest down with weight applied for over
20  four minutes; correct?
21       A.   Correct.
22       Q.   And you knew an ambulance was on the way?
23       A.   Yes.
24       Q.   You heard some reference to him being unconscious.
25  Remember that?
```

08:59AM  5
09:00AM  10
09:00AM  15
09:00AM  20
09:00AM  25

|       |                                                                   |
|-------|-------------------------------------------------------------------|
| 1     | MR. HURRELL:  Objection.  That assumes facts.                     |
| 2     | Q.    (BY MR. GALIPO:)  Do you -- did you hear a reference        |
| 3     | to him being unconscious?                                         |
| 4     | A.    We're talking about the -- we're talking about the          |
| 5     | RA request; right?  Yes.                                          |
| 6     | Q.    Now, were you there when the RA got there?                  |
| 7     | A.    Yes.                                                        |
| 8     | Q.    And did you see him at some point, the RA approach          |
| 9     | Mr. Cedillo?                                                      |
| 10    | A.    Yes.                                                        |
| 11    | Q.    Tried to say something to him?                             |
| 12    | A.    Yes.                                                        |
| 13    | Q.    And when they initially said something to                   |
| 14    | Mr. Cedillo, did Mr. Cedillo appear to respond?                   |
| 15    | A.    No.                                                         |
| 16    | Q.    And then you saw the RA shake his shoulder area?            |
| 17    | A.    Yes.                                                        |
| 18    | Q.    And that's when he came to?                                |
| 19    | A.    Yes.                                                        |
| 20    | Q.    And your recollection is, when he woke up, he was           |
| 21    | immediately put back chest down; correct?                        |
| 22    | A.    Yes.                                                        |
| 23    | Q.    And this time, obviously he was handcuffed and              |
| 24    | hobbled?                                                          |
| 25    | A.    Yes.                                                        |

Timestamps: 09:00AM (line 5), 09:01AM (line 10), 09:01AM (line 15), 09:01AM (line 20), 09:02AM (line 25)

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Q.   And remember that part of the policy we just looked           |
|       | 2  | at where, even if the person's still resisting, you should put     |
|       | 3  | him sitting up or on his side, one officer controlling him, the    |
|       | 4  | other officer holding the hobble strap?                            |
| 09:02AM | 5  | A.   Yes.                                                         |
|       | 6  | Q.   You would agree, sir, you didn't do that in this             |
|       | 7  | case; correct?                                                      |
|       | 8  | A.   Yes.                                                          |
|       | 9  | Q.   Now, medical attention was called for Mr. Cedillo at         |
| 09:02AM | 10 | some point; correct?                                             |
|       | 11 | A.   Correct.                                                     |
|       | 12 | Q.   And would it be at least fair to say that you               |
|       | 13 | believed he needed medical attention prior to them being          |
|       | 14 | called?                                                           |
| 09:02AM | 15 | A.   Yes.                                                        |
|       | 16 | Q.   So you knew he needed medical attention.  You              |
|       | 17 | thought he might have a mental illness or be in a mental health    |
|       | 18 | crisis and possibly be under the influence of drugs; correct?     |
|       | 19 | A.   Correct.                                                    |
| 09:03AM | 20 | Q.   And you knew that he had hit his head when he was          |
|       | 21 | taken down; correct?                                              |
|       | 22 | A.   Immediately when he was taken down, I didn't know.        |
|       | 23 | But at some point I became aware.                                 |
|       | 24 | Q.   You became aware --                                        |
| 09:03AM | 25 | A.   Yes.                                                        |

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | Q.    -- before the second prone restraint?              |
|       | 2  | A.    Yes.                                                |
|       | 3  | Q.    And you were aware of this hobble policy?           |
|       | 4  | A.    Yes.                                                |
| 09:03AM | 5 | Q.    And there were other officers present at that time; |
|       | 6  | true?                                                     |
|       | 7  | A.    True.                                               |
|       | 8  | Q.    And after he came to, you and your partner          |
|       | 9  | immediately put him back chest down; correct?            |
| 09:03AM | 10 | A.    Correct.                                           |
|       | 11 | Q.    For almost three minutes; correct?                 |
|       | 12 | A.    Correct.                                            |
|       | 13 | Q.    And your partner -- and I think you document this in |
|       | 14 | your report -- had both of his knees on his back during that |
| 09:03AM | 15 | time frame; true?                                      |
|       | 16 | A.    True.                                               |
|       | 17 | Q.    And you had both of your knees on the back of      |
|       | 18 | Mr. Cedillo's legs?                                       |
|       | 19 | A.    Yes.                                                |
| 09:04AM | 20 | Q.    And I think you also had your hands holding a      |
|       | 21 | portion of his legs as well?                             |
|       | 22 | A.    Yes.                                                |
|       | 23 | Q.    And you and your partner maintained those positions |
|       | 24 | until, in your words, Mr. Cedillo stopped resisting?     |
| 09:04AM | 25 | A.    Yes.                                               |

UNITED STATES DISTRICT COURT

|    |    |
|----|----|
| 1 | Q.    In fact, your recollection -- strike that. |
| 2 | You heard him -- and I think we all heard it |
| 3 | yesterday.  But you heard him making noises during the second |
| 4 | prone restraint; true? |
| 5 | A.    True. |
| 6 | Q.    You describe the noises as yelling and grunting; |
| 7 | correct? |
| 8 | A.    Correct. |
| 9 | Q.    And your impression was he stopped making noises at |
| 10 | about the same time he stopped resisting? |
| 11 | A.    Correct. |
| 12 | Q.    And just so we're clear, when you say "resisting" |
| 13 | because he was handcuffed and hobbled, you mean trying to lift |
| 14 | up? |
| 15 | A.    Yes.  Trying to -- yes, his legs were lifting me up. |
| 16 | Q.    And when you say "stop resisting," just so I |
| 17 | understand what you're trying to say, you're saying that he -- |
| 18 | his body was no longer trying to lift up? |
| 19 | A.    Yes. |
| 20 | Q.    And you're saying that that stopped at about the |
| 21 | same time he stopped making noises? |
| 22 | A.    Yes. |
| 23 | Q.    But you would agree -- and you watched the video |
| 24 | with us yesterday -- that after he stopped making noises, he |
| 25 | was continued to be held down with weight applied for some |

09:04AM (line 5)
09:04AM (line 10)
09:05AM (line 15)
09:05AM (line 20)
09:05AM (line 25)

```
 1   period of time?
 2        A.   I'm sorry.  Can you say the question one more time?
 3        Q.   Sure.
 4             You would agree that, after he stopped making
 5   noises, that he was continued to be held down for some period
 6   of time.  He was not immediately sat up or put on his side?
 7        A.   I suppose for some period of time, yes.
 8        Q.   Now, after he stopped making noises, did you ever
 9   hear him talk again?
10        A.   No.
11        Q.   Did you ever see him voluntarily move again?
12        A.   Not that I recall.
13        Q.   Did you assist with putting him on the gurney?
14        A.   I did.
15        Q.   He was even handcuffed to the gurney at some point?
16        A.   Yes.
17             MR. GALIPO:  May I have a moment to look at my
18   notes, Your Honor?
19             (Pause in the proceedings.)
20        Q.   (BY MR. GALIPO:)  When you indicated in your report
21   that you were -- and your partner were applying weight and
22   downward pressure, was that generally from your observations at
23   the scene or did you also have discussions with your partner
24   before finalizing the report?
25        A.   We spoke together as I was writing it.
```

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | Q.    Prior to this incident, did you have any training |
| | 2 | with the LAPD on positional asphyxia? |
| | 3 | A.    Not that I recall. |
| | 4 | Q.    Any training prior to this incident on restraint |
| 09:08AM | 5 | asphyxia? |
| | 6 | A.    No. |
| | 7 | Q.    Any training prior to this incident on the risk of |
| | 8 | prone restraint? |
| | 9 | A.    No. |
| 09:08AM | 10 | Q.    Any training from the LAPD prior to this incident on |
| | 11 | risk factors to look at that you should consider before |
| | 12 | deciding whether to keep someone in a prone position? |
| | 13 | A.    Not that I recall. |
| | 14 | Q.    Did you have an understanding from any source prior |
| 09:08AM | 15 | to this incident that holding someone chest down with weight |
| | 16 | applied for a prolonged period could interfere with their |
| | 17 | ability to breathe? |
| | 18 | A.    Not that I recall. |
| | 19 | Q.    Do you have that understanding now? |
| 09:09AM | 20 | A.    Yes. |
| | 21 | Q.    Knowing what you know now, if you had known that at |
| | 22 | the time of this incident, would you have done anything |
| | 23 | differently? |
| | 24 | A.    No. |
| 09:09AM | 25 | MR. GALIPO:  That's all I have, Your Honor.  Thank |

**UNITED STATES DISTRICT COURT**

1    restraint?

2         A.    Yes.

3         Q.    That was the main question/issue they had?

4         A.    Correct.

09:31AM  5    Q.    And I'm assuming that at the time, at least of your

6    second statement, you were aware that Mr. Cedillo had died?

7         A.    Yes.

8         Q.    And I'm also assuming, before you left the scene,

9    you were aware that the paramedics were giving him CPR?

09:31AM  10   A.    Correct.

11        Q.    And your understanding is you give CPR to someone

12   who's not breathing; correct?

13        A.    Correct.

14             MR. GALIPO:  Thank you.  That's all I have,

09:31AM  15   Your Honor.

16             MR. HURRELL:  Nothing further, Your Honor.

17             THE COURT:  We saw a fair amount of video of this --

18   this incident, beginning from the time that you -- you

19   approached him as he was sitting in the driveway or lying down

09:32AM  20   in the driveway until the time you and your partner walked up

21   to him and he placed his hands behind his back without being

22   instructed to do so.

23             We saw the exchange of dialogue.  Obviously there

24   was a language barrier there, and I don't believe very much was

09:32AM  25   being communicated.

```
 1              We also saw the part where you and your partner were
 2    inflicting pain on him, digging into his bicep and bending his
 3    wrist back a direction it was not intended to go.  And he's
 4    crying out in pain, and you're saying, "Relax, relax."  And I
 5    would imagine he's trying to pull away from you.
 6              Is that the part where he was being noncompliant?
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  So when he was recoiling from your
 9    infliction of pain, that was being noncompliant; is that right?
10              THE WITNESS:  Yes.
11              THE COURT:  Because you were instructing him to
12    relax; correct?
13              THE WITNESS:  Correct.
14              THE COURT:  And he would not relax.
15              THE WITNESS:  No.
16              THE COURT:  Because you continued to inflict pain;
17    correct?
18              What was the purpose for the infliction of the pain?
19              THE WITNESS:  The purpose of a pain compliance
20    technique is the person does not want to have that pain
21    compliance done on them and for it -- to be relaxed and it will
22    stop.
23              THE COURT:  But why was it done to begin with?
24    Where was the noncompliance?
25              He walked with you voluntarily and peacefully over
```

**UNITED STATES DISTRICT COURT**

```
  1    to your vehicle, yet you're employing these pain compliance
  2    techniques.  For what reason?
  3              THE WITNESS:  He's -- at that point, he was moving
  4    back toward us.  He's no longer -- he's not calm anymore, and
  5    he's steadily becoming more and more agitated.
  6              THE COURT:  That's what you're saying, but that
  7    isn't what we saw.  We keep hearing you say "Relax, relax," and
  8    he is crying out in pain.  It's often difficult to watch.  And
  9    I'm wondering, Why are you doing this to this man?  So I
 10    haven't been able to wait to ask you.  Why were you doing this
 11    to this man who your partner's indicated, when you encountered
 12    him, you had no reason to even arrest him, yet you put him in
 13    cuffs, okay, and that should have given you some feeling of
 14    security.  He is cuffed behind his back.
 15              You have nothing to fear from this man; correct?
 16              THE WITNESS:  I don't know if I have nothing --
 17              THE COURT:  This little guy.  You had nothing to
 18    fear from this man, did you?  Or you're in the wrong line of
 19    work.  You feared this man who is handcuffed behind his back.
 20    Is that -- is that what you're saying?  The two of you, over
 21    6 feet tall, you were fearful of this man at that time?
 22              THE WITNESS:  I didn't know what he could -- he
 23    appeared to be under the influence to me of likely meth.  I
 24    didn't know what he could --
 25              THE COURT:  Let's say he was.  Let's just say he was
```

**UNITED STATES DISTRICT COURT**

```
 1   under the influence of meth.  Handcuffed behind his back, two

 2   young, healthy police officers well over 6 feet tall.  What

 3   were you worried about?

 4              THE WITNESS:  Him beginning to resist or try --

 5              THE COURT:  And then what?  What were you worried

 6   about?

 7              THE WITNESS:  That he would try to -- try to flee,

 8   he may try to kick us.  He still had the ability to do those

 9   things.

10              THE COURT:  That's what you were worried about?

11         We never saw any signs of either of those things

12   happening, so I don't know why it was that you thought that

13   they might happen.  Or is that something that's convenient for

14   the purpose of the trial?

15         That's fine.  I understand that.

16         Step down.

17         Your next witness.

18         Oh, never mind.  No, no, no.  Thank you.  I'm sorry.

19   Let's take a break.

20              THE COURTROOM DEPUTY:  All rise.

21         (Break taken.)

22         (In the presence of the jury:)

23              THE COURT:  We are rejoined by the jury, all

24   counsel, and the parties are present.

25         Mr. Galipo, your next witness.
```

| | | |
|---|---|---|
| | 1 | MR. GALIPO:  Thank you, Your Honor. |
| | 2 | Mr. Michael Carrillo will take the next witness, |
| | 3 | Your Honor. |
| | 4 | MR. CARRILLO:  Your Honor, plaintiff calls |
| 09:50AM | 5 | Officer Menasakanian. |
| | 6 | THE COURT:  Is he in the courtroom, by any chance? |
| | 7 | MR. CARRILLO:  My understanding is Ms. Martinez went |
| | 8 | to -- |
| | 9 | THE COURT:  Okay.  Excellent. |
| 09:51AM | 10 | THE COURTROOM DEPUTY:  Do you solemnly swear that |
| | 11 | the testimony you shall give in the cause now before this Court |
| | 12 | shall be the truth, the whole truth, and nothing but the truth, |
| | 13 | so help you God? |
| | 14 | THE WITNESS:  I do. |
| 09:51AM | 15 | THE COURTROOM DEPUTY:  Please be seated. |
| | 16 | THE WITNESS:  Thank you. |
| | 17 | THE COURTROOM DEPUTY:  Please state your first and |
| | 18 | last name and spell it for the record and speak slowly. |
| | 19 | THE WITNESS:  First name is Tadeh, T-a-d-e-h, last |
| 09:51AM | 20 | name is Menasakanian, M-e-n-a-s-a-k-a-n-i-a-n. |
| | 21 | THE COURTROOM DEPUTY:  Thank you. |
| | 22 | THE COURT:  Common spelling. |
| | 23 | MR. CARRILLO:  May I inquire, Your Honor? |
| | 24 | THE COURT:  Yes. |
| | 25 | /// |

| | |
|---|---|
| 1 | **TADEH MENASAKANIAN,** |
| 2 | **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:** |
| 3 | **DIRECT EXAMINATION** |
| 4 | BY MR. CARRILLO: |
| 09:52AM 5 | Q.   Officer Menasakanian -- am I pronouncing that |
| 6 | correctly? |
| 7 | A.   Yes, sir. |
| 8 | Q.   Okay.  Do you sometimes go by Officer Mena or |
| 9 | Officer Mena? |
| 09:52AM 10 | A.   Mena, sir. |
| 11 | Q.   That's what some of the other officers of the LAPD |
| 12 | refer to you, as Officer Mena? |
| 13 | A.   Correct, sir. |
| 14 | Q.   Officer, at the time of April 8th, 2019, you had |
| 09:52AM 15 | been with the LAPD for about two years and three months; |
| 16 | correct? |
| 17 | A.   Yes. |
| 18 | Q.   And you were working which division, which shift? |
| 19 | A.   Van Nuys Division, patrol, Watch 3. |
| 09:52AM 20 | Q.   Now, at some point around 4:00 in the morning, you |
| 21 | were called as a backup officer to assist Officers Richmond and |
| 22 | Hunt; correct? |
| 23 | A.   Yes. |
| 24 | Q.   And when you heard the call for backup, you weren't |
| 09:53AM 25 | given any information about a suspect being violent, anything |

1    like that; correct?

2         A.    It was a backup for a 415 man.

3         Q.    Okay.  And a 415, can you just educate us what that

4    means?

09:53AM  5    A.    Generally means somebody causing a disturbance or

6    resisting.

7         Q.    So you responded to the area where the incident took

8    place that we're here to talk about today on April 8th;

9    correct?

09:53AM  10   A.    Yes.

11        Q.    And when you responded to the scene, you encountered

12   Officers Richmond and Hunt on top of the body of a man you

13   later came to find out to be Mr. Cedillo; correct?

14        A.    Yes.

09:53AM  15   Q.    Okay.  Now, when you came onto the scene, it was

16   both -- or one of the officers instructed you to put a hobble

17   on Mr. Cedillo; correct?

18        A.    Yes.

19        Q.    And when you arrived and you were instructed to

09:53AM  20   place a hobble on Mr. Cedillo, you didn't see any movement from

21   Mr. Cedillo; correct?

22        A.    Correct.

23        Q.    Regardless, you still placed the hobble at their

24   direction; correct?

09:54AM  25   A.    Yes.

1      Q.     Now, you're trained through the LAPD directive on

2   hobble restraints that, when you place someone in a hobble and

3   they're handcuffed, that they're immediately supposed to be

4   placed in a recovery position; correct?

09:54AM   5      A.     Yes.

6      Q.     Now, a recovery position -- we've heard a lot about

7   this already.  But a recovery position can refer to someone

8   sitting up; correct?

9      A.     Yes.

09:54AM  10      Q.     Or someone on their right or left side; correct?

11      A.     Yes.

12      Q.     Now, in this case, after you placed the hobble on

13   Mr. Cedillo, at some point you saw Officer Sampson search

14   Mr. Cedillo; correct?

09:54AM  15      A.     Yes.

16      Q.     And when you -- after you saw Officer Sampson search

17   Mr. Cedillo, Officers Richmond and Hunt did not instruct you to

18   roll Mr. Cedillo into a recovery position; correct?

19      A.     Correct.

09:55AM  20      Q.     They never told you let's get him somewhere safe,

21   let's get him medical treatment, for example, anything like

22   that; correct?

23      A.     I don't recall that they said that.

24      Q.     Did they ever tell you that they're -- that they

09:55AM  25   were trying to get him medical attention, that that was their

**UNITED STATES DISTRICT COURT**

```
 1   goal?
 2        A.   I don't recall them saying that.
 3        Q.   Now, after you placed the hobble, from the first
 4   time of the prone restraint of Mr. Cedillo, after you placed
 5   the hobble, would you estimate that he was in that hobble,
 6   prone with the officers on his back, for over one minute and
 7   54 seconds?
 8        A.   Approximately.
 9        Q.   And during that time, did you ever tell the officers
10   Richmond and Hunt, hey, maybe we should put him in a recovery
11   position?
12        A.   No.
13        Q.   And during that one minute, 54 seconds, after you
14   placed the hobble, am I correct that, during that time period,
15   you also did not see Mr. Cedillo make any further movement?
16        A.   Correct.
17        Q.   Now, you voiced certain things to him; correct?
18        A.   Yes.
19        Q.   And when you voiced certain things to him, he didn't
20   respond to you in any way verbally; correct?
21        A.   Correct.
22        Q.   And when you had him with the hobble, with the
23   handcuffs for about a minute, 54 seconds, did you ever see
24   Officers Richmond and Hunt check his pulse?
25        A.   I don't think that I did.
```

1       Q.    At some point Mr. Cedillo is -- is awakened; is that
2    correct?
3       A.    Correct.
4       Q.    And that's when the firefighter EMTs had arrived
09:57AM  5    onto the scene?
6       A.    Correct.
7       Q.    And you saw them shake his -- one of his shoulders
8    to startle him?
9       A.    I don't remember seeing somebody shaking a shoulder.
09:57AM  10      Q.    But at some point you became aware that Mr. Cedillo
11   became verbal again?
12      A.    Yes.
13      Q.    And within a couple seconds after that, you saw
14   Officers Richmond and Hunt place Mr. Cedillo back in the prone
09:57AM  15   position?
16      A.    Yes.
17      Q.    And you also saw Officer Richmond put both of his
18   knees into the back of Mr. Cedillo?
19      A.    I don't remember the specifics of where he placed
09:57AM  20   his body parts on Mr. Cedillo.
21      Q.    But at least for Officer Hunt, you saw him place his
22   body weight on the legs of Mr. Cedillo?
23      A.    Correct.
24      Q.    And during that second period of prone restraint,
09:57AM  25   did they ever say to you, hey, let's put him in the recovery

1   position?

2        A.   I don't recall that they did.

3        Q.   And when supervisors arrived, they're in that second

4   prone restraint, am I correct that the supervisors also did not

09:58AM   5   instruct Officers Richmond and Hunt to get off Mr. Cedillo's

6   back?

7        A.   Correct.

8        Q.   Now, before this April 8th, 2019, incident, had you

9   had occasions where you yourself had applied the hobble to an

09:58AM   10   individual?

11       A.   I don't recall.

12       Q.   Okay.  Had you ever seen the hobble being applied

13   out in your work for the LAPD before April 8th of 2019?

14       A.   Yes.

09:58AM   15       Q.   And on those occasions, had you seen the officers,

16   maybe even yourself, put that individual into a recovery

17   position?

18       A.   Yes.

19       Q.   Had you ever seen before April 8th, 2019, an

09:58AM   20   occasion in which officers placed a hobble and handcuffs on an

21   individual and not immediately placed him in the recovery

22   position?

23       A.   I don't recall specific timing in those other

24   instances.

09:59AM   25       Q.   In other words, you don't know if they were before

1    or after?

2         A.    I don't remember if they immediately did it or if

3    they waited a certain amount of time when it was safe to do so.

4         Q.    Well, had you ever seen an occasion in which someone

09:59AM  5    was placed in a hobble and handcuffs close to two minutes when

6    they weren't turned over and put in a recovery position?

7         A.    I don't remember that I have.

8         Q.    Did you ever see Mr. Cedillo try to run away at any

9    point?

09:59AM 10         A.    I did not.

11         Q.    Did he ever utter the words, "I'm going to cause

12    great harm or" -- "or kill any one of you officers"?

13         A.    I do not.

14              MR. CARRILLO:  Just a moment, Your Honor.

10:00AM 15              Thank you, Your Honor.  No further questions at this

16    time.

17                           **CROSS-EXAMINATION**

18    BY MS. MARTINEZ:

19         Q.    Hello, Officer Mena.

10:00AM 20         A.    Hello.

21         Q.    Now, would you agree that it would have been a

22    little bit difficult to see Mr. Cedillo run when you observed

23    Officers Hunt and Richmond on top of him?

24         A.    Yes.

10:00AM 25         Q.    And I wanted to just walk you briefly -- after you

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | placed the hobble, do you remember what actions you took while          |
| 2    | you were there on the scene?                                            |
| 3    |      A.    Yes, I do.                                                   |
| 4    |      Q.    And at what point did you stand up and walk away             |
| 5    | from Mr. Cedillo?                                                       |
| 6    |      A.    Immediately upon applying the hobble.                        |
| 7    |      Q.    Was there a point in time where you were holding --          |
| 8    | holding any part of the hobble restraints?                             |
| 9    |      A.    Yes.                                                         |
| 10   |      Q.    And for approximately how long do you remember               |
| 11   | holding onto the hobble restraint?                                     |
| 12   |      A.    Um, not very long.  I'd say anywhere between -- up           |
| 13   | to two minutes.                                                        |
| 14   |      Q.    And was there a reason why at some point you let go          |
| 15   | of the hobble restraint?                                               |
| 16   |      A.    Yes.                                                         |
| 17   |      Q.    And what was the reason?                                     |
| 18   |      A.    I felt like there wasn't a need for me to hold onto          |
| 19   | it and that the two officers had control over him.                     |
| 20   |      Q.    I'm going to show you just a short clip and then ask         |
| 21   | you some follow-up questions.  And this is Exhibit No. 158-1.          |
| 22   | And it's just a short clip.                                            |
| 23   |           (Videotape played, not reported.)                            |
| 24   |      Q.    (BY MS. MARTINEZ:)  Okay.  Officer Mena, the                 |
| 25   | individual that approaches there, Mr. Cedillo and with the             |

The 10:01AM / 10:02AM timestamps appear at lines 5, 10, 15, 20, 25.

1    flashlight, is that you?

2         A.    Yes.

3         Q.    And did anybody on scene ask you to approach

4    Mr. Cedillo?

5         A.    No.

6         Q.    And why did you approach Mr. Cedillo in that manner?

7         A.    To go see what he was looking like he was in, what

8    type of state he was in.

9         Q.    And what was the purpose for you looking to see what

10   state Mr. Cedillo was in?

11        A.    To see if there was anything that would alarm me to

12   believe that he might need any specific medical treatment or if

13   anything stuck out to me.

14        Q.    Okay.  Did it appear to you, when you observed him

15   up-close with your flashlight, whether he was in any visible

16   medical distress?

17        A.    Nothing specific, no.

18        Q.    And at the point that you approached Mr. Cedillo

19   with a flashlight, do you remember if the RA had already been

20   requested?

21        A.    It had.

22        MS. MARTINEZ:  That's all I have.  Thank you.

23                   **REDIRECT EXAMINATION**

24   BY MR. CARRILLO:

25        Q.    Officer Menasakanian, during the second period of

|     |                                                                                    |
|-----|------------------------------------------------------------------------------------|
| 1   | prone restraint, was there a reason why you didn't hold the                        |
| 2   | hobble at that time?                                                               |
| 3   | A.   I felt like I didn't need to.                                                  |
| 4   | Q.   Okay.  And what does your training tell you with how                           |
| 5   | you're supposed to hold the hobble on an individual once                           |
| 6   | they're hobbled?                                                                    |
| 7   | A.   You're supposed to hold it by the tether or the                               |
| 8   | extended portion.                                                                  |
| 9   | Q.   While that individual is in recovery position;                                |
| 10  | correct?                                                                            |
| 11  | A.   Correct.                                                                       |
| 12  | Q.   Had you ever seen an individual that's handcuffed or                           |
| 13  | hobbled run or get away from police officers?                                       |
| 14  | A.   I've -- no, not successfully.                                                  |
| 15  | MR. CARRILLO:  Thank you, Your Honor.                                               |
| 16  | MS. MARTINEZ:  Nothing further.                                                     |
| 17  | THE COURT:  You may step down, sir.                                                 |
| 18  | THE WITNESS:  Thank you.                                                            |
| 19  | MR. GALIPO:  May I confer with counsel for a moment?                                |
| 20  | (Off-the-record discussion between counsel.)                                        |
| 21  | MR. GALIPO:  The -- the plaintiff calls Scott Nuñez.                                |
| 22  | THE WITNESS:  Sir.                                                                  |
| 23  | MR. GALIPO:  Just one moment, Officer Nuñez.                                        |
| 24  | THE COURTROOM DEPUTY:  Raise your right hand.                                       |
| 25  | Do you solemnly swear that the testimony you shall                                  |

Timestamps in left margin: 10:03AM (line 5), 10:04AM (line 10), 10:04AM (line 15), 10:04AM (line 20), 10:06AM (line 25).

|   |   |
|---|---|
|   | 1 |

give in the cause now before this Court shall be the truth, the
2  whole truth, and nothing but the truth, so help you God?

3           THE WITNESS:  I do.

4           THE COURTROOM DEPUTY:  Please be seated.

10:06AM  5           THE WITNESS:  Thank you.

6           THE COURTROOM DEPUTY:  Please state your first and
7  last name and spell it for the record.

8           THE WITNESS:  My name is Scott Nuñez, S-c-o-t-t,
9  N-u-ñ-e-z.

10:06AM 10           THE COURTROOM DEPUTY:  Thank you.

11           MR. GALIPO:  Thank you, Your Honor.

12                    **SCOTT NUÑEZ,**

13      **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

14                  **DIRECT EXAMINATION**

10:06AM 15  BY MR. GALIPO:

16      Q.    Good afternoon, Officer -- good morning,
17  Officer Nuñez.  Sorry.  Getting ahead of myself.  Good morning.

18      A.    Good morning.

19      Q.    Who do you currently work for?

10:07AM 20      A.    I work for the City of Los Angeles.

21      Q.    And with the LAPD?

22      A.    Yes, sir.

23      Q.    How long have you been with the LAPD?

24      A.    Over 23 years.

10:07AM 25      Q.    So when did you start with them, approximately?

1      A.      1999.

2      Q.      And when did you go to the academy?

3      A.      In June of '99.

4      Q.      And this incident happened on April 8th, 2019;

10:08AM   5   correct?

6      A.      Yes, sir.

7              MR. GALIPO:  Your Honor, an issue has come up.  May

8      we approach just for a moment?

9              THE COURT:  Sure.

10:08AM  10          (At sidebar:)

11             MR. GALIPO:  Okay.  So one of the questions that I

12     intended to ask --

13             THE COURT:  Come here.

14             MR. GALIPO:  Oh.  Thank you.  Thank you, Your Honor.

10:08AM  15          THE COURT:  Go ahead.

16             MR. GALIPO:  One of the questions that I intended to

17     ask the officer is about whether he had training in the field

18     prior to this incident with respect to positional asphyxia,

19     restraint asphyxia.  But it just dawned on me that he started

10:08AM  20     in 1999.  And those two training bulletins that we've spoken of

21     are 1997 and 1999.

22             So I don't want to necessarily go there, I don't

23     plan on it.  But I just wanted to make sure that you are okay

24     with me asking him -- because these other officers said they

10:09AM  25     had no training on it at all.  And I was going to ask him the

UNITED STATES DISTRICT COURT

|  | 1 | same question, but I wanted to get your thoughts. |

        1    same question, but I wanted to get your thoughts.

        2         THE COURT:  I don't know how it matters one way or

        3    another.  He wasn't involved in that aspect of it.  So it's

        4    like what difference does it make?

10:09AM  5         MR. GALIPO:  The only difference it may make is

        6    whether it confirms that the LAPD didn't have to train them at

        7    the time.  Maybe I just leave it alone.

        8         THE COURT:  Aren't you supposed to leave that alone

        9    anyways?

10:09AM  10        MS. MARTINEZ:  Yes.

       11         MR. GALIPO:  The training bulletins, yes.  I think

       12    it's safest for me to leave it alone, to be honest.  I'm going

       13    to leave it alone.

       14         THE COURT:  Is it your understanding that they just

10:09AM  15   said they weren't going to go there?

       16         MR. HURRELL:  Yes.

       17         MR. GALIPO:  I don't want to ask him about the

       18    training bulletins.  I was going to ask him about the training.

       19         THE COURT:  What about training on this particular

10:10AM  20   aspect?  Isn't that what's really important?

       21         MR. GALIPO:  Yes.

       22         THE COURT:  Okay.  Well, if the defense has a

       23    reasonable understanding that that was going to be off the

       24    table as part of the package deal --

10:10AM  25        MR. GALIPO:  Correct.  I'll ask him a different way.

```
 1   How about if I ask it this way, did you have an understanding
 2   there was any policy in effect at the time of this incident?
 3              THE COURT:  Okay.  That's fair.
 4              MR. GALIPO:  Okay.  Thank you.
 5              (In the presence of the jury:)
 6              MR. GALIPO:  Thank you, Your Honor.
 7        Q.   (BY MR. GALIPO:)  Officer Nuñez, I take it this
 8   incident happened about four years ago, approximately?
 9        A.   Yes, sir.
10        Q.   And so you would have been with the LAPD at that
11   time for, give or take, 19 years?
12        A.   Yes, sir.
13        Q.   Now, at the time of the incident, so I'm talking
14   about April 2019 -- are you with me on the time period?
15        A.   Yes, sir.
16        Q.   Did the LAPD have any specific policy or training
17   materials in place with respect to positional or restraint
18   asphyxia?
19        A.   At that specific date, I don't recall.
20        Q.   Okay.  You at some point responded to the scene;
21   correct?
22        A.   Yes, sir.
23        Q.   And who was your partner officer?
24        A.   It was Officer -- I believe his name is
25   Walter Sampson.
```

10:10AM  (line 5)
10:10AM  (line 10)
10:11AM  (line 15)
10:11AM  (line 20)
10:11AM  (line 25)

1    Q.    Okay.  And it's my understanding, Officer Sampson is

2  no longer with the department?

3    A.    Correct.

4    Q.    Okay.  But he was at the time and he was your

10:12AM  5  partner at least on that shift?

6    A.    Yes, sir.

7    Q.    And at some point you responded to the area of the

8  incident somewhere around Woodman and Sherman Way?

9    A.    Yes.

10:12AM 10    Q.    And when you got there, at some point did you see

11  other officers already on scene?

12    A.    Yes.

13    Q.    And who was on scene when you got there?

14    A.    It was Officer Hunt, Officer Richmond, Officer Cuba,

10:12AM 15  and Officer Menasak- -- I don't know how to pronounce his last

16  name.

17    Q.    We're going with Mena.

18    A.    Mena.  All right.

19    Q.    Okay.  Okay.  So the -- were -- did you see Mr. --

10:12AM 20  who we now know to be Mr. Cedillo at some point?

21    A.    Yes.

22    Q.    Okay.  Where was Mr. Cedillo when you first saw him?

23    A.    He was on the street on the southeast corner of the

24  corner of -- sorry.  The northeast corner of the corner of

10:13AM 25  Sherman Way and Woodman.

```
 1        Q.    Okay.  And was he generally on his stomach at that

 2   point?

 3        A.    When I first arrived, yes, sir.

 4        Q.    And did you observe at that point Officer Hunt on

 5   the bottom portion of his body?

 6        A.    Yes.

 7        Q.    And Officer Richmond on the upper portion of his

 8   body?

 9        A.    Yes.

10        Q.    And do you know whether he had been hobbled already

11   when you got there?

12        A.    I don't recall if -- when I first got there, I don't

13   recall.  But it was pretty quickly after.

14        Q.    At some point did you see Officer Mena holding the

15   hobble strap?

16        A.    Yes, sir.

17        Q.    Okay.  And that indicated to you that Mr. Cedillo

18   was hobbled?

19        A.    Correct.

20        Q.    Okay.  And do you recall your partner searching

21   Mr. Cedillo at some point?

22        A.    Yes, sir.

23        Q.    Okay.  And so he's stomach down, hobbled at that

24   point.  And then your partner searches him, and he's still at

25   least at that point stomach down.  Is that correct?
```

10:13AM  5

10:13AM  10

10:14AM  15

10:14AM  20

10:14AM  25

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | A.    I don't recall his exact position when my partner              |
|       | 2  | started searching him.                                               |
|       | 3  | Q.    Okay.  Well, do you recall, after he was searched,             |
|       | 4  | that he remained stomach down for some period of time?               |
| 10:14AM | 5 | A.    Some period of time, yes.                                       |
|       | 6  | Q.    Okay.  Have you looked at any of the video footage             |
|       | 7  | in preparation for the testimony?                                    |
|       | 8  | A.    I have.                                                         |
|       | 9  | Q.    Okay.  Um, I take it you don't know how long he               |
| 10:15AM | 10 | was -- remained chest down after he was hobbled and searched;       |
|       | 11 | is that fair?                                                        |
|       | 12 | A.    Correct, sir.                                                   |
|       | 13 | Q.    And at some point did you see him put on his side?            |
|       | 14 | A.    Yes.                                                            |
| 10:15AM | 15 | Q.    And would that be his right side?                              |
|       | 16 | A.    I thought it was his left side.                                |
|       | 17 | Q.    Okay.  One of the sides?                                        |
|       | 18 | A.    Yes, sir.                                                       |
|       | 19 | Q.    And did you notice a laceration to his forehead?              |
| 10:15AM | 20 | A.    I did not.                                                      |
|       | 21 | Q.    Okay.  Were you requested to call medical at some             |
|       | 22 | point?                                                                |
|       | 23 | A.    Yes, sir.                                                       |
|       | 24 | Q.    And it took them some time to get there?                      |
| 10:15AM | 25 | A.    It took some time, yes.                                        |

**UNITED STATES DISTRICT COURT**

```
 1        Q.   Do you have any estimate as to how long it took them

 2   to get there after you called them?

 3        A.   I do not.

 4        Q.   I want to ask you just a few questions,

 5   Officer Nuñez, about the time period before the paramedics got

 6   there when Mr. Cedillo's on his side.  Do you know the time

 7   period I'm talking about?

 8        A.   Yes.

 9        Q.   Okay.  And this would be after the hobble, after the

10   search, at some point he's put on his side and you're waiting

11   for the paramedics.  Are you with me?

12        A.   Yes, sir.

13        Q.   Okay.  During the time he was on his side, did you

14   see him moving at all?

15        A.   Yes.

16        Q.   What movements did you see?

17        A.   Just his -- his body moving and him breathing.

18        Q.   Okay.  Be more specific as to the type of movements

19   that you saw, if you recall.

20        A.   I don't recall.

21        Q.   Okay.  And you're saying you -- you never -- it

22   sounds like -- did you ever see the bleeding on his head?

23        A.   I did not, no.

24        Q.   So did you not get a good look at his face?

25        A.   I did not, no.
```

**UNITED STATES DISTRICT COURT**

```
 1        A.    I don't recall.  But, I mean, if it was cardiac
 2   arrest, he would probably be -- he would have no pulse.
 3              MR. GALIPO:  Can I have one moment, Your Honor?
 4              (Pause in the proceedings.)
 5        Q.    (BY MR. GALIPO:)  Did you have a chance to review
 6   your statement before you testified?
 7        A.    Briefly.
 8              MR. GALIPO:  Okay.  Thank you.  That's all I have,
 9   Your Honor.
10                         CROSS-EXAMINATION
11   BY MR. HURRELL:
12        Q.    Good morning, sir.
13              If you can look at page 2 of the report that you
14   have in front of you.
15        A.    Okay.
16        Q.    And it says "Vitals."  Do you see that?
17        A.    Yes.
18        Q.    And at a time of 4:48 and 47 seconds, there's a
19   summary and it says "RESP."  What's that?
20        A.    It says respirations.
21        Q.    And how many were there?
22        A.    None.
23        Q.    And then -- by the way, were these readings taken
24   inside the ambulance?
25        A.    I don't recall.
```

10:52AM (lines 5, 10, 15)
10:53AM (lines 20, 25)

**UNITED STATES DISTRICT COURT**

1    Q.    And then there's a reading for CO2.  Do you see

2    that?

3    A.    Yes.

4    Q.    What is CO2?

10:53AM  5    A.    How much carbon dioxide a patient is breathing out.

6    Q.    And the level says "44."  Is that normal, to your

7    knowledge?

8    A.    Um, that -- I mean, that number can vary.  Once

9    we're assisting ventilation, that number will change.  So as

10:54AM  10   far as saying normal, I'm unable to say at this time.

11   Q.    I'm sorry?

12   A.    I'm not able to say at this time if it's normal.

13   Q.    If someone hasn't been breathing for a period of

14   time, what happens to their CO2 levels?

10:54AM  15           MR. GALIPO:  I'm going to object as lacks

16   foundation.

17           THE COURT:  Sustained.

18   Q.    (BY MR. HURRELL:)  Can you tell us about your

19   medical training, sir?

10:54AM  20   A.    Um, I was an EMT before I went to medic school.  I

21   got hired in '07.  But since '16, I've been a paramedic with

22   the City of Los Angeles.

23   Q.    And as part of your paramedic training, have you

24   been given training on the effects of the ven- -- ventilatory

10:54AM  25   system on patients?

1    A.    Yes.

2    Q.    In other words, how we all breathe?

3    A.    Yes.

4    Q.    And in terms of CO2 levels, have you been given

10:55AM    5    training on what a high CO2 level might mean and what a low

6    level CO2 level might mean?

7    A.    I have.

8    Q.    As part of your training, did you come to understand

9    what happens to a CO2 level in an individual who has not been

10:55AM    10    breathing for a period of time?

11    A.    Yes.

12    Q.    What is that?

13    A.    I'm assuming it rises.

14    Q.    Okay.  And it would rise to a level certainly above

10:55AM    15    44; correct?

16    MR. GALIPO:  I'm going to object as it lacks

17    foundation and note for the record his last response was he

18    assumed that it would rise.

19    THE COURT:  That's sustained.

10:55AM    20    Can we -- can we do anything more rudimentary than,

21    I think, what you're trying to get?  Would a body expel CO2 at

22    all unless it was alive?

23    MR. HURRELL:  Certainly, that's a good question.

24    THE COURT:  I don't know.  Does that require a great

10:55AM    25    deal of medical education to offer an opinion on that, whether

1    or not we --

2              MR. GALIPO:  I think the way the question is

3    phrased --

4              THE COURT:  No, not the prior question.  Forget

10:56AM   5    that.

6              MR. GALIPO:  Yeah.

7              THE COURT:  Okay.  I'm worried about going forward.

8    I think we may be on to something here with a scientific basis.

9    Whether or not this is the gentleman -- the witness, I don't

10:56AM  10    know.  But maybe it's rudimentary enough that even I could

11    answer it.  So --

12              MR. HURRELL:  I'll ask you the judge's question.

13        Q.    (BY MR. HURRELL:)  When a person is not breathing,

14    do they expel CO2?

10:56AM  15        A.    No.

16        Q.    And does the CO2 level, because it's not being

17    expelled, build up in the body?

18        A.    Yes.

19        Q.    All right.

10:56AM  20              MR. HURRELL:  That's all I have.  Thank you.

21                        **REDIRECT EXAMINATION**

22    BY MR. GALIPO:

23        Q.    Well, now that we're talking about CO2 -- and I

24    think other experts will address this issue -- I'm going to ask

10:56AM  25    you a few questions about it.

1          You don't hold yourself out to be an expert in CO2,

2    do you?

3          A.    No.

4          Q.    By the time Mr. Cedillo was in your ambulance, I'm

10:57AM    5    assuming that his breathing was being assisted?

6          A.    Yes.

7          Q.    He wasn't breathing on his own?

8          A.    No.

9          Q.    Is that correct?

10:57AM   10          A.    Correct.

11          Q.    Okay.  And it looks like his CO2 readings, just from

12    this page, are kind of all over the map, aren't they?  They go

13    from 44 to 11, from 60?  See those?

14          A.    Yes.

10:57AM   15          Q.    And he remained unresponsive and unconscious during

16    the transport; true?

17          A.    True.

18          Q.    Not breathing on his own and no pulse?

19          A.    Correct.

10:57AM   20          Q.    And if he's flatline, I take it that's not a good

21    sign?

22          A.    Correct.

23          MR. GALIPO:  Thank you.

24          MR. HURRELL:  Nothing further, Your Honor.

10:58AM   25          THE COURT:  You may step down, sir.  Thank you.

**UNITED STATES DISTRICT COURT**

```
 1                    THE WITNESS:  Thank you.

 2                    MR. GALIPO:  Yes.  We'd like to call Jeff Noble,

 3       please.

 4                    THE COURTROOM DEPUTY:  Do you solemnly swear that

10:58AM  5       the testimony you shall give in the cause now before this Court

 6       shall be the truth, the whole truth, and nothing but the truth,

 7       so help you God?

 8                    THE WITNESS:  I do.

 9                    THE COURTROOM DEPUTY:  Thank you.  Please be seated.

10:58AM 10                    Please state your first and last name and spell your

11       last name for the record.

12                    THE WITNESS:  Jeff Noble, N-o-b-l-e.

13                    THE COURTROOM DEPUTY:  Thank you.

14                    MR. GALIPO:  Thank you.

10:59AM 15                    Thank you, Your Honor.

16                               JEFF NOBLE,

17            PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:

18                            DIRECT EXAMINATION

19       BY MR. GALIPO:

10:59AM 20           Q.   Good morning, Mr. Noble.

21           A.   Good morning.

22           Q.   I'd like to ask you a few questions about your

23       background.

24                    Do you have a background in law enforcement?

10:59AM 25           A.   I do.
```

UNITED STATES DISTRICT COURT

1      Q.    How many years were you a law enforcement officer

2   for?

3      A.    About 28 and a half.

4      Q.    And what rank were you at the time of your

10:59AM  5   retirement?

6      A.    I was the Deputy Chief of Police.

7      Q.    And for what department?

8      A.    The City of Irvine.

9      Q.    And can you just give the jury an idea as Deputy

11:00AM 10   Chief for Irvine what you oversaw and what you were responsible

11   for?

12      A.    Sure.  So as a Deputy Chief, I was the No. 2 person

13   in command.  I reported directly to the Chief of Police.

14           My responsibilities were all operational units of

11:00AM 15   the department.  So patrol, traffic, detectives, generally

16   anybody that would have contact with a member of the public to

17   conduct an investigation, pretty much the entire department,

18   with the exception of our property room, our dispatchers and

19   records.

11:00AM 20      Q.    Okay.  I'm going to slow you down just a little bit

21   for our court reporter.

22           And did you also serve as the Interim Deputy Chief

23   of Police for another agency?

24      A.    I did.  I did that after I retired.

11:00AM 25      Q.    And when did you retire?

|   |   |
|---|---|
| 1 | A.    2012. |
| 2 | Q.    Were you part of a Carnegie Institute of Peace think |
| 3 | tank? |
| 4 | A.    I was. |
| 11:01AM  5 | Q.    What was that about? |
| 6 | A.    So that was a group that was put together by the |
| 7 | Carnegie Institute in Washington, DC, that studied policing |
| 8 | internationally that met in order to address corruption issues |
| 9 | specifically in other countries. |
| 11:01AM  10 | Q.    And have you consulted with police organizations as |
| 11 | a consultant? |
| 12 | A.    I have. |
| 13 | Q.    Can you tell us about that? |
| 14 | A.    So I've done some consulting work for the City of |
| 11:01AM  15 | Seattle.  Primarily most of my work is expert witness work, but |
| 16 | I've done some limited consulting work where I give input on |
| 17 | policies. |
| 18 | Q.    And you've been retained as an expert on behalf of |
| 19 | the -- by the plaintiff's counsel in this case; is that |
| 11:01AM  20 | correct? |
| 21 | A.    Yes. |
| 22 | Q.    And you were initially retained by The Carrillo Law |
| 23 | Firm? |
| 24 | A.    Yes. |
| 11:02AM  25 | Q.    And do you only work on behalf of plaintiffs as an |

|     |     |
| --- | --- |
| 1 | expert, or what is your division between working on behalf of |
| 2 | plaintiffs versus working on behalf of defense? |
| 3 | A.   So about half my cases are for plaintiffs for people |
| 4 | who are suing the police.  The other half is for agencies, that |
| 11:02AM  5 | I'm defending agencies against claims. |
| 6 | Q.   Okay.  So it's about 50/50? |
| 7 | A.   Yes. |
| 8 | Q.   And have you testified as an expert witness before |
| 9 | in federal and state court? |
| 11:02AM  10 | A.   Many times. |
| 11 | Q.   In states other than California as well? |
| 12 | A.   Oh, yes. |
| 13 | Q.   How many other states, approximately? |
| 14 | A.   Oh, my gosh.  Um, 12 to 15. |
| 11:02AM  15 | Q.   A few other things in your background. |
| 16 | Have you given presentations to the International |
| 17 | Association of Chiefs of Police? |
| 18 | A.   I have. |
| 19 | Q.   Can you tell the jury about that? |
| 11:03AM  20 | A.   So I've given presentations on police officer |
| 21 | truthfulness, on issues like -- what we call state-created |
| 22 | danger issues where officers create situations where they have |
| 23 | to use force to get themselves out of a position that they |
| 24 | created, um, and some driving issues among police officers. |
| 11:03AM  25 | Q.   Have you published articles? |

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | A.    I've published about 30 articles.                             |
|       | 2  | Q.    And how about textbooks?                                      |
|       | 3  | A.    I've published two textbooks.                                 |
|       | 4  | Q.    And what are those textbooks about?                           |
| 11:03AM | 5 | A.    So the first textbook I published back in 2009 was          |
|       | 6  | accountability systems for police conduct.  And it was             |
|       | 7  | essentially a textbook on how to conduct an Internal Affairs        |
|       | 8  | investigation, how to investigate officers who have been aware      |
|       | 9  | there have been allegations of misconduct.                         |
| 11:03AM | 10 | Q.    And have you co-authored other textbooks?                  |
|       | 11 | A.    I -- I have.  So a couple of years ago I published a         |
|       | 12 | textbook that was -- I wrote a textbook that was published by      |
|       | 13 | New York University Press regarding uses of force, when police     |
|       | 14 | can use force.                                                     |
| 11:04AM | 15 | Q.    And would it be fair to say that in your career, you       |
|       | 16 | have supervised and trained many officers with respect to         |
|       | 17 | tactics in the use of force?                                       |
|       | 18 | A.    Oh, yes.                                                     |
|       | 19 | Q.    And do you also have a law degree?                           |
| 11:04AM | 20 | A.    I do.                                                      |
|       | 21 | Q.    Now, this particular case, you reviewed various             |
|       | 22 | materials?                                                         |
|       | 23 | A.    Yes.                                                         |
|       | 24 | Q.    Did those materials include the initial statements          |
| 11:04AM | 25 | of the officers?                                                 |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       |  1 | A.    Yes.                                                  |
|       |  2 | Q.    Did they include the initial report generated by     |
|       |  3 | Officer -- Officers Hunt and Richmond?                      |
|       |  4 | A.    Yes.                                                  |
| 11:04AM |  5 | Q.    Did they include their deposition transcripts?     |
|       |  6 | A.    Yes.                                                  |
|       |  7 | Q.    Did you also review video footage, including the     |
|       |  8 | surveillance video from the 76 Station, body-worn camera   |
|       |  9 | footage, and dash cam footage?                             |
| 11:05AM | 10 | A.    I did.                                              |
|       | 11 | Q.    Did you look at the hobble policy of 2017 that        |
|       | 12 | related to the hobble?                                      |
|       | 13 | A.    Yes.                                                  |

1     A.    Yes.

2     Q.    Did they include the initial report generated by

3  Officer -- Officers Hunt and Richmond?

4     A.    Yes.

11:04AM  5     Q.    Did they include their deposition transcripts?

6     A.    Yes.

7     Q.    Did you also review video footage, including the

8  surveillance video from the 76 Station, body-worn camera

9  footage, and dash cam footage?

11:05AM 10     A.    I did.

11     Q.    Did you look at the hobble policy of 2017 that

12  related to the hobble?

13     A.    Yes.

14           MR. GALIPO:  May I approach counsel for one moment?

11:05AM 15           (Off-the-record discussion between counsel.)

16     Q.    (BY MR. GALIPO:)  Okay.  And you formed some

17  opinions in this case; is that correct?

18     A.    Yes.

19     Q.    You've written a report talking about your opinions?

11:06AM 20     A.    Yes.

21     Q.    You've given a deposition where you were asked about

22  your opinions and some of the reasons for them?

23     A.    Yes.

24     Q.    I want to talk to you a little bit about your

11:06AM 25  understanding of the facts.

1        And the nature of the call or the nature of the

2   approach and initial information that the officers had, was

3   that important to you in your analysis of this case?

4        A.   It was part of it, yes.

5        Q.   And why was that important?

6        A.   Well, when you're conducting an analysis of a use of

7   force, you begin with what the crime is or why -- why the

8   officers are engaged in the conduct because that helps officers

9   to determine what a proportional level of force may be

10  depending on the circumstances.

11       Q.   Okay.  And in this case, what was important to you

12  based on the evidence you reviewed?

13       A.   Well, it was important to me that they didn't

14  suspect Mr. Cedillo of committing a crime, maybe being under

15  the influence, which could be a crime, but that he was just

16  simply, you know, seated in the driveway to a gas station and,

17  you know -- and acting in a manner that would cause a

18  reasonable officer to believe that he was impaired in some way,

19  whether he was suffering a mental health crisis or under the

20  influence of a drug or narcotic.

21       Q.   Okay.  And do you look to see, when you're reviewing

22  a case, whether the individual is initially cooperative or

23  uncooperative?

24       A.   Yes.  You look to that.

25       Q.   Is that important?

```
 1        A.    Yeah.  It's -- again, it's all part of the analysis.

 2        Q.    And what was your view in this case from reviewing

 3   the facts?

 4        A.    As the officers approached, Mr. Cedillo immediately

 5   put his hands over his head and then he put his hands behind

 6   his back.  And he followed the officers' commands.

 7        Q.    Okay.  At some point, based on your review, was he

 8   walked over to the front of the police vehicle?

 9        A.    Yeah.  He was handcuffed while he was still seated

10   and then he was walked to the front of the police car.

11        Q.    Okay.  And based on your review, did he appear

12   cooperative with that?

13        A.    He did.

14        Q.    And were those acts of compliance in viewing this

15   case and the subsequent force important to you?

16        A.    Yes.

17        Q.    And can you explain to the jury why the acts of

18   compliance were important?

19        A.    So, again, you're looking at a case in its totality.

20   So while, you know, events could change that you could justify

21   a level of force, up until that point you have somebody

22   who's -- who's, at most, suspected of possibly being under the

23   influence of a drug and the person's being compliant with

24   everything you're asking of him.

25        Q.    The relative sizes of the officers versus
```

**UNITED STATES DISTRICT COURT**

1   Mr. Cedillo, was that a fact you considered?

2       A.   Yes.  Absolutely.

3       Q.   And what was your understanding in that regard?

4       A.   So Mr. Cedillo is about 5'5", 145.  Officer Richmond

11:09AM  5   was 6'4", about 250.  And Officer Hunt was 6'3", over

6   200 pounds.

7       Q.   Okay.  Now, up until the point that they're in front

8   of the vehicle, is it your understanding that one or both

9   officers applied a wrist lock?

11:09AM 10      A.   Yeah.  It appeared that both officers were -- were

11  holding his arm and potentially had him in a wrist lock.

12      Q.   And that is pain producing?

13      A.   It can be.  So you can hold somebody in a wrist lock

14  without causing pain.  But if you -- you know, if a person

11:09AM 15  moves and you need compliance, you can just simply twist your

16  hand a little bit and cause pain.

17      Q.   Okay.  Now, I want to talk to you about the

18  takedown.

19           At the -- you were aware that Officer Richmond took

11:10AM 20  him down to the ground?

21      A.   Yes.

22      Q.   And Mr. Cedillo was handcuffed at that point?

23      A.   Yes.

24      Q.   And they had been applying wrist locks to him

11:10AM 25  immediately prior and during the takedown?

1     A.     Yes.

2     Q.     Do you have an opinion, given that he was handcuffed

3  behind his back, given that they had been applying wrist locks,

4  and given that he had generally been compliant and cooperative

11:10AM  5  up to that point and hadn't committed any crime or serious

6  crime, whether the takedown was appropriate or not?

7     A.     I do.

8     Q.     What is your opinion?

9     A.     It was not appropriate.

11:10AM  10     Q.     Can you tell the jury why, in your opinion, the

11  takedown was not appropriate?

12     A.     So we train police officers to use force based on a

13  threat and that they can only use force that's proportional to

14  the threat.

11:10AM  15         So in this case, you have two officers who are

16  physically much larger than Mr. Cedillo.  Mr. Cedillo has been

17  handcuffed, his hands are behind his back.  He's been

18  compliant.  While the officers claim that Mr. Cedillo began

19  kicking at them and that they feared that he may attempt to

11:11AM  20  flee, again, it had two much -- physically much larger officers

21  holding him in a wrist lock, he's handcuffed.  A reasonable

22  officer would not believe he's going to flee.

23         I didn't see any evidence on the video consistent

24  with him fleeing or kicking.  Even if he did kick, he would be

11:11AM  25  kicking backwards where an officer would understand that you

```
 1  can't apply very much force in kicking backwards.  And they
 2  were to his sides, so they were -- they weren't directly behind
 3  him where he could -- they could easily be kicked.
 4           And police officers know that when somebody is
11:11AM  5  handcuffed behind their back and you do a takedown, they have
 6  no ability to break their fall.  Their hands are behind their
 7  back, so they're going to -- what's likely going to happen,
 8  unless you take somebody down very slowly and cradle their
 9  head, is that they're going to strike their head on the
11:12AM 10  pavement.
11       Q.   And, in fact, based on your review of the materials
12  in this case, did Mr. Cedillo strike his head on the pavement?
13       A.   Yes.
14       Q.   Now, I want to ask you next about the initial prone
11:12AM 15  restraint.  And by way of background, I want to ask you a
16  series of questions about the standards and policies and
17  training, both in California and throughout the country, on
18  positional asphyxia.
19           Do you understand the topic?
11:12AM 20       A.   I do.
21       Q.   And I do -- I don't specifically want to talk about
22  any policies that the City of Los Angeles had or didn't have at
23  this point.  Do you understand that?
24       A.   Yes.
11:12AM 25       Q.   Okay.  First of all, is this a new concept in law
```

```
 1   enforcement, positional asphyxia?

 2       A.   No.  It started -- discussions of it started in the

 3   '90s.

 4       Q.   Okay.  How long around -- has this discussion been

 5   going on among law enforcement officers?

 6       A.   Um, you know, I think the first medical study was,

 7   like, in '92.  The International Association of Chiefs of

 8   Police, you know, weighed in on the subject in 1992.

 9       Q.   Okay.  And tell us about this organization, the

10   International Association of Chiefs of Police.

11       A.   So we call it the IACP.  It's been in existence --

12   it's the oldest organization, policing organization in the

13   country.

14           And what they do is they produce -- they bring

15   police officers from not only the United States but

16   internationally together.  And they do a lot of publications,

17   they do a lot of studies.  They publish model policies and

18   training bulletins to assist agencies across the country

19   regarding their policies and training.

20       Q.   Now, does the International Association of Chiefs of

21   Police provide model policies or training materials on

22   positional asphyxia?

23       A.   They do.

24       Q.   Can you explain that to the jury, please?

25       A.   So as early as 1992, they provided training
```

11:13AM (line 5)
11:13AM (line 10)
11:13AM (line 15)
11:14AM (line 20)
11:14AM (line 25)

**UNITED STATES DISTRICT COURT**

1    bulletins on positional asphyxia that instructed officers that,

2    you know, of the -- of the possible issues of people dying due

3    to being in a prone position and put out a training bulletin

4    training officers as soon as -- that you may have to put

11:14AM    5    somebody in a prone position if they're struggling with you and

6    you don't have them handcuffed.  But once you get them

7    handcuffed, then you roll them on their side or sit them up in

8    order to facilitate their breathing.

9    They've published a couple -- they -- you know,

11:15AM    10   later in -- I think in 1998, they did a policy review where

11   there began to be some dispute of whether or not positional

12   asphyxia was truly causing these deaths.  And the IACP

13   basically came out and said, you know, until there's clear

14   evidence that it's not producing deaths, that this is an easy

11:15AM    15   thing for us to do.  Continue to roll them on their side.

16   And as recent as 2017, they published a model

17   policy, again directing officers to place -- once they're

18   secured, once they're handcuffed -- again, you know, if you're

19   struggling with somebody, you can put them in a prone position

11:15AM    20   and often that's the best position to put them in.  But once

21   they're handcuffed and secured, to roll them on their side.

22   Q.    Okay.  And is it generally understood that putting

23   them on their side is sometimes referred to as a recovery

24   position?

11:15AM    25   A.    Yes.

**UNITED STATES DISTRICT COURT**

1    Q.    And is that a position that's understood that will

2    help facilitate breathing?

3    A.    Right.  That's exactly what it's for.

4    Q.    Now, in addition just to the position itself,

11:15AM  5    putting someone on their side or sitting them up rather than

6    having them chest down, is there something in the standards and

7    training about not applying weight to a person's back while

8    they're chest down for a prolonged period of time?

9    A.    Yes.

11:16AM  10   Q.    Can you explain that to the jury?

11   A.    Sure.  So, you know, first we want them off that

12   prone position.  But if they're left in that prone position,

13   you don't want to put weight on their back because, again,

14   you're -- by putting your weight on their back, it compresses

11:16AM  15   the person's chest and their lungs and it makes -- it makes it

16   more difficult to have that exchange of oxygen.

17         So we train police officers that, even though maybe

18   somebody may be talking to you so they're obviously breathing,

19   they may not be breathing, you know -- their breathing still

11:16AM  20   may be compromised.  So we don't want to put any weight on

21   their back.

22   Q.    Now, someone who's in an agitated or excited state,

23   are there -- is there training regarding certain risk factors

24   that police officers should consider before putting someone in

11:17AM  25   a prone restraint position for an extended period?

|  | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    Can you explain that to the jury? |
| 3 | A.    So, you know, when somebody's in an excited state or |
| 4 | they've been in an extensive struggle, it just tends to |
| 11:17AM 5 | exacerbate the problem.  So you want to get them in that |
| 6 | recovery position to -- you know, because if you recognize that |
| 7 | they are in this excited state, that they've -- they may have |
| 8 | fought with the officers, they may have struggled, they're |
| 9 | already exhausted, that that tends to compound the problem. |
| 11:17AM 10 | So, again, that's another reason why you need to |
| 11 | give them that recovery position so they can breathe more |
| 12 | effectively as soon as possible. |
| 13 | Q.    Now, has the International Association of Chiefs of |
| 14 | Police and other organizations taught about the concept of |
| 11:17AM 15 | physiology of a struggle? |
| 16 | A.    Yes. |
| 17 | Q.    Can you explain that to the jury, please? |
| 18 | MR. HURRELL:  Well, Your Honor, that would be |
| 19 | hearsay. |
| 11:18AM 20 | MR. GALIPO:  I can phrase it in a different way if |
| 21 | you want me to. |
| 22 | THE COURT:  Let's -- he's here as a police |
| 23 | procedures expert? |
| 24 | MR. GALIPO:  Correct, Your Honor. |
| 11:18AM 25 | THE COURT:  And in that capacity has relied upon |

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | writings and other materials from other organizations, such as         |
| 2    | IACP?                                                                   |
| 3    | MR. GALIPO:  Correct, Your Honor.                                       |
| 4    | THE COURT:  Yeah.  Go ahead.                                            |
| 5    | MR. GALIPO:  Thank you.                                                 |

11:18AM

6    Q.    (BY MR. GALIPO:)  Can you -- what's your
7    understanding of the standards and training that relate to the
8    concept of physiology of a struggle?

9    A.    So, again, what police officers are trained is that,
10   when you engage in a struggle, that people can become very
11   quickly exhausted, that their breathing may become compromised.
12   And that once you secure that individual, you have a
13   responsibility to take -- take care of that individual to
14   ensure they're breathing properly.

11:18AM (line 10)
11:19AM (line 15)

15   Q.    And what if you have a scenario where someone is
16   chest down, weight's applied to their back, the person feels
17   that they're having difficulty breathing so they try to lift up
18   and the officer perceives that as resistance so the officer
19   then puts more weight on their back to hold them down?

11:19AM (line 20)

20   A.    Yeah.  So, again, that's the thing we train on
21   because, you know, you don't know whether the person is
22   resisting, trying to somehow get away or whether they are
23   engaging in his movements to get on their side.  Because if
24   you're having difficulty breathing, you know, it's a natural
25   reaction to want to just get up and roll on your side.

11:19AM (line 25)

1          So we train them that, you know, be aware that it's

2     possible that the reason why they're -- they're trying to get

3     up is because they're having difficulty breathing.

4          Q.   And you talk in your report about this being a

11:19AM   5     vicious cycle.  How so?

6          A.   Well, you know, so you'll -- you'll -- officers will

7     get somebody handcuffed, get them in a prone position.  And

8     they may try and roll them over.  And the person may start to

9     struggle, so then they get them back in the prone position.

11:20AM  10    And every time you move somebody back in the prone position,

11    then you have the difficulty breathing which leads back to

12    the -- you know, the person struggling, you know, to get out of

13    that position.  And it just keeps going back and forth.

14         Q.   Are there articles in the police literature about

11:20AM  15    how to prevent positional asphyxia?

16         A.   Yes.

17         Q.   And does POST reference positional asphyxia?

18         A.   Yes.

19         Q.   Can you tell the ladies and gentlemen of the jury

11:20AM  20    what POST is?

21         A.   So POST stands for Peace Officer's Standards and

22    Training.  It's the state organization that oversees peace --

23    police officer training in the state of California.

24         One of the things that they do is they publish what

11:20AM  25    are called learning domains.  And the learning domains are

| | |
|---|---|
| 1 | outlines of the basic minimum training for every police academy |
| 2 | in the state of California. |
| 3 | So among those learning domains, in Learning Domain |
| 4 | 34, is a reference to positional asphyxia. |
| 11:21AM 5 | Q.   Okay.  So just to -- I know you told us that you |
| 6 | thought the takedown was inappropriate for the reasons you |
| 7 | said. |
| 8 | In terms of the prone restraint, the standards are |
| 9 | to do what once you have a person handcuffed? |
| 11:21AM 10 | A.   Once the person is handcuffed, then you move them |
| 11 | into what we call the recovery position, get them on their |
| 12 | side. |
| 13 | Q.   For what purpose? |
| 14 | A.   To facilitate -- to facilitate their breathing. |
| 11:21AM 15 | Q.   Now, what if -- what's the training and standards |
| 16 | about putting weight on someone's back while they're prone? |
| 17 | A.   Yeah.  You don't want to put weight on their back |
| 18 | because it tends to exacerbate the problem. |
| 19 | Q.   Is there training in the standards that that could |
| 11:21AM 20 | lead to positional or restraint asphyxia? |
| 21 | A.   Yes.  So you don't want to put weight on their back |
| 22 | and you want to get them in that recovery position as soon as |
| 23 | they're handcuffed. |
| 24 | Q.   Now, what if they're handcuffed and hobbled? |
| 11:22AM 25 | A.   Well, once you hobble somebody, that's just an |

**UNITED STATES DISTRICT COURT**

1    increased level of control.  Their ankles are hobbled together.

2    So now you have control of their legs so they can't kick,

3    they're handcuffed, they can't fight, they can't run away.  It

4    just makes it easier to hold somebody in a recovery position.

5        Q.    And you said you reviewed their hobble policy?

6        A.    I did.

7        Q.    And did that talk about how to maintain control of

8    an individual in a seated or on their side position?

9        A.    Yes, it did.

10        Q.    Okay.  Now, I'd like to talk to you about this case

11   after the takedown, the initial prone restraint.  Is it your

12   understanding that the officers were using weight and downward

13   pressure on Mr. Cedillo during that time frame?

14        A.    Yes.

15        Q.    And where did you get that understanding from?

16        A.    Well, from watching videos because you can see the

17   officers laying across his back and over his legs and from the

18   officers' statements in their depositions.

19        Q.    And at some point during that prone restraint, is it

20   your understanding that Mr. Cedillo was hobbled?

21        A.    Yes.

22        Q.    But as you already stated, he was handcuffed even

23   before it started?

24        A.    Yes.

25        Q.    So let's take the time frame of the prone restraint,

1    the initial prone restraint before he was hobbled.  Are you

2    with me --

3         A.    Yes.

4         Q.    -- in that time frame?

11:23AM  5         Do you have an opinion as to whether or not that

6    time frame, that restraint, that weight, that force was

7    reasonable or not?

8         A.    Yes.

9         Q.    What's your opinion?

11:23AM 10         A.    It was not reasonable.

11         Q.    Why not?

12         A.    Because he had already been handcuffed, he was on

13    the ground.  You had two officers who were physically much

14    larger than him.  And they could have simply rolled him on his

11:23AM 15    side and maintained control of him.

16         Q.    What if the officers say, well, we felt him trying

17    to lift up or roll so we felt we had to put more weight on him

18    and more downward pressure?  What would be your response to

19    that?

11:23AM 20         A.    So police officers are trained that, you know, it's

21    certainly possible that somebody could be trying to resist

22    while they're handcuffed with their hands behind their back,

23    but they also may be trying to breathe.

24         And it's a fairly simple process, particularly when

11:24AM 25    you have multiple officers, to put somebody on their side, put

```
  1    them in a wrist lock, have the other officer take his upper leg
  2    and pull his leg behind so he can't kick and you can hold it by
  3    the ankle.  And you just -- you know, it's very difficult to
  4    move in that position.
  5        Q.   Okay.  Now, he's hobbled at some point.  And is it
  6    your understanding that, after he's hobbled, he's immediately
  7    sat up?
  8        A.   Yes -- or he's not sat up.  He's rolled on his side.
  9        Q.   Okay.  But how much -- do you know if there was a
 10    period of time that passed between him being hobbled and being
 11    rolled on his side?
 12        A.   Yeah.  I don't recall exactly how long it was, but
 13    there was a period of time.
 14        Q.   Okay.  Do you have any criticism of the officers if
 15    they continued to apply weight and hold Mr. Cedillo down while
 16    he was chest down after he was hobbled?
 17        A.   So once you -- once he's hobbled, that gives them an
 18    additional level of restraint.  And they have additional
 19    officers there at that point.  So it's very simple to hold on
 20    to the end of the hobble to control his legs.  And, again, they
 21    had multiple officers who could have rolled him on his side and
 22    held him in a safe position.
 23        Q.   Now, in your opinion, in reviewing their hobble
 24    policy in effect at the time of this incident, do you have an
 25    opinion as to whether they violated that policy?
```

11:24AM (5)
11:24AM (10)
11:24AM (15)
11:25AM (20)
11:25AM (25)

**UNITED STATES DISTRICT COURT**

1       A.   Yes.

2       Q.   What's your opinion?

3       A.   That they did violate it.  The policy requires that,

4  once he's hobbled, to put him on his side or sit him up.

11:25AM   5       Q.   Okay.  Now, moving forward, is it your understanding

6  that, after this first prone restraint, eventually Mr. --

7  according to the officers, Mr. Cedillo stopped resisting?

8       A.   Yes.

9       Q.   And was put on his right side?

11:25AM   10       A.   Yes.

11       Q.   And remained on his right side for a period of

12  almost 11-and-a-half minutes?

13       A.   Yes.

14       Q.   And several of the officers describe him as sleeping

11:26AM   15  during that time.  Did you see that reference?

16       A.   Yes.

17       Q.   Okay.  Now, for someone to go into a sleeping phase

18  following a prone restraint, the first prone restraint with the

19  weight applied, the handcuff, the hobbles, based on what you

11:26AM   20  would expect officers to be trained on, should that cause a

21  reasonable officer some concern?

22            MR. HURRELL:  Objection.  No foundation.  Calls for

23  medical testimony.

24            THE COURT:  Given all the variables in that

11:26AM   25  hypothetical, I'm going to go ahead and sustain that objection.

|  |  |  |
|---|---|---|
| | 1 | MR. GALIPO:  Okay.  I'll rephrase.  Thank you. |
| | 2 | Q.    (BY MR. GALIPO:)  Was that an important factor to |
| | 3 | you in your review of the case, the fact that they described |
| | 4 | him as sleeping for 11-and-a-half minutes? |
| 11:26AM | 5 | A.    Yeah.  I think -- it was a factor I considered, yes. |
| | 6 | Q.    Was -- was that important to you in some respects? |
| | 7 | A.    Yes. |
| | 8 | Q.    Why? |
| | 9 | A.    Well, it's very unusual to have someone who has just |
| 11:27AM | 10 | been in a struggle with you start sleeping.  I mean, that -- |
| | 11 | that is unusual.  And they already had called for the rescue |
| | 12 | ambulance, they called for paramedics, which was the |
| | 13 | appropriate thing to do.  But I think a reasonable officer |
| | 14 | would believe that that person is in the midst of a medical |
| 11:27AM | 15 | crisis and needed the paramedics. |
| | 16 | Q.    Okay.  And at some point, is it your understanding |
| | 17 | that they saw the laceration to his head? |
| | 18 | A.    Yes. |
| | 19 | Q.    So when deciding whether to apply prone restraint |
| 11:27AM | 20 | and how much to apply, if any, it sounds like you take into |
| | 21 | consideration a variety of factors, including the nature of the |
| | 22 | call and whether any crime was committed? |
| | 23 | A.    Yes. |
| | 24 | Q.    Whether the person's handcuffed already? |
| 11:27AM | 25 | A.    Yes. |

**UNITED STATES DISTRICT COURT**

```
 1        Q.    Whether they're hobbled?

 2        A.    Yes.

 3        Q.    And whether they're in medical distress?

 4        A.    Yes.

 5        Q.    Now, your understanding is the paramedics got there,

 6   at some point shook his shoulder, Mr. Cedillo came to, and

 7   within a matter of a couple seconds -- I'm estimating -- he was

 8   put back down in a prone position?

 9        A.    Yes.

10        Q.    And Officer Richmond had both of his knees on

11   Mr. Cedillo's back?

12        A.    Yes.

13        Q.    And Officer Hunt was -- had both knees and hands on

14   the back of his legs?

15        A.    Yeah, he was on his legs.

16        Q.    For a little under three minutes?

17        A.    Yes.

18        Q.    Okay.  What is your opinion, given the totality of

19   the circumstances in this case, as to whether that was

20   appropriate or not, to put him back down when he was awoken by

21   the paramedics, chest down, handcuffed, hobbled, with all that

22   weight and pressure on him?

23        A.    It was inappropriate.

24        Q.    And why?

25        A.    Well -- so you look at it -- you look at the
```

11:27AM (line 5)
11:28AM (line 10)
11:28AM (line 15)
11:28AM (line 20)
11:28AM (line 25)

|        |     |                                                                      |
|--------|-----|----------------------------------------------------------------------|
|        | 1   | totality.  So, you know, why are they there?  You know, they         |
|        | 2   | have an individual who's probably in the midst of a mental           |
|        | 3   | health crisis or under the influence of a drug or narcotic.          |
|        | 4   | That's -- you know, that's the only possible crime.                  |
| 11:29AM| 5   | You know, he's physically much smaller.  You know he                 |
|        | 6   | has, you know, a laceration to his head so he has a head             |
|        | 7   | injury.  He fell asleep unusually.  You have multiple officers       |
|        | 8   | there.  He's handcuffed.  He's been searched at that point.          |
|        | 9   | After the hobble was put on, they did a more thorough search of      |
| 11:29AM| 10  | him.  So they know he doesn't have any weapons.  He's got a          |
|        | 11  | hobble on his legs.  The paramedics are now there.                   |
|        | 12  | So -- and you have -- I believe there were at least                  |
|        | 13  | six to eight officers present, including two supervisors.  So        |
|        | 14  | there's just no reason to put him into, you know, a prone            |
| 11:29AM| 15  | position and again put weight on his back when you know that,        |
|        | 16  | you know, he's been compromised, he's -- you know, he's              |
|        | 17  | sleeping in an unusual way, he's got a head injury, he's             |
|        | 18  | handcuffed, he's been searched, he's got a hobble on.  There's       |
|        | 19  | just no reason for it.                                               |
| 11:29AM| 20  | Q.    And based on the training and standards that you               |
|        | 21  | would expect, what risk, if any, based on law enforcement           |
|        | 22  | training and standards does it put Mr. Cedillo in this case in       |
|        | 23  | to be put back down, chest down, with weight applied to his          |
|        | 24  | back?                                                                |
| 11:30AM| 25  | MR. HURRELL:  Objection.  No foundation.                             |

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  So as police officers, we're not
 3     medical experts.  I'm not a doctor, you know, I don't have that
 4     ability.  So -- but, you know, nobody -- you know, as police
 5     officers, that's just not what we do.  So we rely on the
 6     training that that position may cause death.  I mean, so it's a
 7     serious injury.  I mean, it's incredibly serious.
 8              And what we're being asked to do doesn't require any
 9     special tools, any special training, you know, any special
10     equipment or anything like.  Simply put them on their side and
11     avoid putting weight on their back.
12              So it's a very simple remedy to a very serious
13     problem.  And the training has been in policing for many, many
14     years.
15              MR. GALIPO:  May I approach just for one moment,
16     Your Honor?
17              (At sidebar:)
18              THE COURT:  We're going to break for lunch so go
19     ahead.
20              MR. GALIPO:  Okay.  Good.  Here's my thing.  The
21     only other area of questioning I have for Mr. Noble is
22     regarding the status of the training or lack thereof of LAPD at
23     the time.  But nobody told him, I don't think, about your
24     ruling and our stipulation.
25              So I want to make sure he knows not to mention the
```

11:30AM (line 5)
11:30AM (line 10)
11:30AM (line 15)
11:31AM (line 20)
11:31AM (line 25)

**UNITED STATES DISTRICT COURT**

|  | 1 | Please state your name, first and last name for the |
|---|---|---|
|  | 2 | record, please, and speak slowly. |
|  | 3 | THE WITNESS:  Nicole Juarez Zelaya, N-i-c-o-l-e, |
|  | 4 | J-u-a-r-e-z, Z-e-l-a-y-a. |

01:03PM      5        THE COURTROOM DEPUTY:  Thank you.

6                        **NICOLE JUAREZ ZELAYA,**

7        **THE PLAINTIFF HEREIN, WAS SWORN AND TESTIFIED AS FOLLOWS:**

8                        **DIRECT EXAMINATION**

9        BY MR. CARRILLO:

01:03PM     10        Q.    Ms. Zelaya, good afternoon.

11        A.    Good afternoon.

12        Q.    First, I want to talk a little bit about you, since

13        you are the one that's filed this lawsuit.

14              Can you tell us where you live now?

01:03PM     15        A.    Yeah.  I'm currently in Durham, North Carolina.  I

16        moved there a little over a year ago.

17        Q.    How old are you now?

18        A.    I'm 23.

19        Q.    What do you do in Durham, North Carolina, for work?

01:04PM     20        A.    I work at a non-profit that serves people with and

21        without disabilities.  So the center of my work is working with

22        people who have intellectual and developmental disabilities and

23        kind of making sure that they are in spaces where they can form

24        friendships with other people in a healthy way.

01:04PM     25        Q.    How long have you been in Durham?

|  | 1 | A.   A little over a year. |
| | 2 | Q.   Before living in Durham, were you living in |
| | 3 | Washington? |
| | 4 | A.   Yes. |
| 01:04PM | 5 | Q.   What were you doing when you lived in Washington? |
| | 6 | A.   Most currently, I was living in Spokane, Washington, |
| | 7 | and I was getting my bachelor's in psychology there. |
| | 8 | Q.   Did you end up getting your bachelor's? |
| | 9 | A.   Yes. |
| 01:04PM | 10 | Q.   What was your purpose upon graduating from college? |
| | 11 | What were you trying to do after college? |
| | 12 | A.   My hope was that I would find a job that -- one that |
| | 13 | would be life-giving and that would be able to help support me |
| | 14 | and the people that I loved and people closest to me.  And so I |
| 01:05PM | 15 | was hoping to, um -- yeah, just be in a spot where I could have |
| | 16 | a career and support my family. |
| | 17 | Q.   Okay.  Do you have any kids? |
| | 18 | A.   No. |
| | 19 | Q.   Do you have any siblings from your dad, Mr. Cedillo? |
| 01:05PM | 20 | A.   No. |
| | 21 | Q.   So you're his only child? |
| | 22 | A.   Yes. |
| | 23 | Q.   Now, I want to go back a little bit in time to when |
| | 24 | you grew up with your father and your mother. |
| 01:05PM | 25 | Now, what part of the country did you grow up in? |

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | A.    Washington state. |
| | 2 | Q.    Okay.  Any particular city or region that L.A. |
| | 3 | people here might know about? |
| | 4 | A.    Tonasket, Washington, so north-central Washington. |
| 01:05PM | 5 | Q.    Okay.  And when you were growing up, did you live |
| | 6 | with your mother and father? |
| | 7 | A.    Um, I lived not with both of them together.  Um, I |
| | 8 | lived with my mom or my dad, um, and kind of go back and forth. |
| | 9 | Q.    At some point did your father move to the L.A. area? |
| 01:06PM | 10 | A.    Yes. |
| | 11 | Q.    And how old, approximately, were you then? |
| | 12 | A.    I believe I was about 8 years old. |
| | 13 | Q.    Okay.  So this would be about first, second grade? |
| | 14 | A.    I believe so. |
| 01:06PM | 15 | Q.    What I'd like to do is publish -- well, let me ask |
| | 16 | you, first, about these photos.  This would be Exhibit 29. |
| | 17 | MR. CARRILLO:  By agreement, Your Honor, to the |
| | 18 | admittance of Exhibit 29.  If I may publish? |
| | 19 | THE COURT:  Sure. |
| 01:06PM | 20 | (Exhibit 29 for identification |
| | 21 | and received into evidence.) |
| | 22 | MR. CARRILLO:  Thank you. |
| | 23 | Q.    (BY MR. CARRILLO:)  Now, is this a photo, |
| | 24 | Exhibit 29, of you and your father? |
| 01:06PM | 25 | A.    Yes. |

**UNITED STATES DISTRICT COURT**

|   | | |
|---|---|---|
| | 1 | Q.   And which one are you in this photo? |
| | 2 | A.   I'm the one on the left side. |
| | 3 | Q.   The one with the blue pigtails? |
| | 4 | A.   Yes. |
| 01:06PM | 5 | Q.   Okay.  And who is the girl to your left? |
| | 6 | A.   That's my older sister, Rosemary. |
| | 7 | Q.   I'm sorry? |
| | 8 | A.   Rosemary. |
| | 9 | Q.   Is that your father's child? |
| 01:07PM | 10 | A.   No. |
| | 11 | Q.   Can you tell us a little bit about this |
| | 12 | relationship, who was your older sister to your father at that |
| | 13 | time? |
| | 14 | A.   Yeah.  Um, my older sister is a little over three |
| 01:07PM | 15 | years older than me.  And her dad passed shortly after she was |
| | 16 | born.  Um, and so anytime that I was -- all those times that I |
| | 17 | was hanging out with my dad -- she's obviously really young |
| | 18 | too -- she would come and hang out with the both of us. |
| | 19 | Q.   And do you remember how old, approximately, you are |
| 01:07PM | 20 | in this photo? |
| | 21 | A.   I believe I was about 4 or 5 years old. |
| | 22 | Q.   And what was the occasion or why did you take this |
| | 23 | photo? |
| | 24 | A.   Um, I believe we just didn't have a lot of photos |
| 01:08PM | 25 | growing up.  We didn't have a lot of great technology.  And so |

```
 1   this photo was, like, a special day.  And we like went into the
 2   Walmart exhibit where they take photos, and we got a photo
 3   taken that day.
 4        Q.    Now, during the time that your father lived in
 5   Washington in the same area that you were living in, what sort
 6   of activities did you all do together?
 7        A.    We went to the -- there is one local park in my
 8   town, it was a really small town.  We often went to the park,
 9   often my sister would be with us too, just a lot of walking
10   around, a lot of swinging, playing a bunch of different games.
11            Um, and -- yeah, I just remember also just being at
12   his house a lot and running around back -- in the back and
13   hanging out.
14        Q.    And when you were younger up until the time that he
15   moved out of Washington to L.A., you know, did your father give
16   you any sort of life lessons or guidance that you can remember?
17        A.    Yeah.  We talked often, about once a week.  And he
18   often would -- well, he would pray for me.  Um, he always
19   wanted protection and peace and joy for me.  And he always
20   reminded me to just be a good person.  He always ended his
21   calls reminding me that he just wanted me to be a good person.
22            He would often tell me, um, to make sure I'm helping
23   my mom and being a good sibling and being, like, a good student
24   in school and to try my best and that all he wants is for me to
25   try my best.
```

     1          And he would -- even at a very young age would
     2   encourage me and, um, want and -- yeah, encourage me to go to
     3   college and to find a career that I enjoyed.
     4       Q.   Well, after your father moved out of Washington, how
01:10PM  5   often would you two speak?
     6       A.   About once a week, um, on the phone usually.
     7            I, growing up, played a lot of sports every
     8   season -- volleyball, basketball, track.  I'm student council.
     9   And so there are extracurriculars and he always was up-to-date
01:10PM 10   on what was my next big thing that I was going to do and
    11   excited about and would often ask me updates on the phone about
    12   how those things were going and how I was feeling about them.
    13            And so we talked often because I just, yeah, always
    14   had things going on that I wanted to update him on.
01:10PM 15       Q.   And what sort of things would you share with him or
    16   update him about?
    17       A.   So if I had a sporting event, I would tell him about
    18   my sporting event.  As I was applying for college, I'd tell
    19   him, like, about what colleges I was interested in, um, what,
01:11PM 20   like, fields I was interested in.  Um, we would talk about what
    21   I wanted to do after college.  Um, yeah, just a bunch of stuff
    22   like that.
    23       Q.   Did you feel loved by your father?
    24       A.   Most definitely.
01:11PM 25       Q.   Can you tell the jury how -- how it is you felt

1    loved by your father?

2         A.    Yeah.  I just was, first of all, always super

3    encouraged by my father.  Um, he was always very proud of me,

4    and he always let me know that he was proud of me.

01:11PM   5         Um, I'd tell him about all these things that I had

6    going on, and they were just opportunities he didn't have and

7    people in our family didn't really have.  And so he was always

8    excited to know about them and would always verbalize how much

9    he cared for me, how much he encouraged me.  Um, yeah, how much

01:12PM   10   he loved me and how much he was praying for me, even if he

11   wasn't praying for me on the phone.

12        Q.    Were you able to see him from the time that you --

13   he moved from Washington, were you able to see him in person

14   very often?

01:12PM   15        A.    No.  From when he moved, I wasn't able to.  Um, the

16   hope was when I had graduated high school, I would be able to,

17   but that just wasn't an option, like, financially.  And so we

18   had talked about too that, when I graduated college, that I'd

19   get to see him then.  But, no, it wasn't able to happen.

01:13PM   20        Q.    Besides these phone calls with the updates, are

21   there other ways that you and your father communicated?

22        A.    Yeah.  We would often send letters to each other.  I

23   would, yeah, write him letters and tell him what I was up to

24   and he would write back.

01:13PM   25        Q.    These are handwritten letters?

**UNITED STATES DISTRICT COURT**

```
 1          A.     Yeah, handwritten letters.

 2          Q.     What sort of things would he write back to you?

 3          A.     Lots of encouragements, lots of just reminding me

 4     that I'm loved, that I'm -- that he's proud of me, um,

 5     excited -- he was excited to hear about what was next, asking

 6     me if I needed anything, if there was ways that he could help

 7     me.  If he was going to help me, like, he -- he would let me

 8     know in the letters what -- like, what might be sent.

 9          Q.     Were there times where he sent you photos or you

10     sent photos to him?

11          A.     Yeah.  I often sent photos.  He always asked for

12     photos of the different things that I was doing and the

13     different things that I was in.  And so quite frequently I'd

14     send him photos.

15          Q.     Were there occasions where he sent you photos?

16          A.     Yeah.  There is -- sometimes, not as often, but he

17     did send me photos too.

18                 MR. CARRILLO:  And, Your Honor, permission to

19     publish by stipulation Exhibit 29-2 and -3?

20                 THE COURT:  Go ahead.

21          Q.     (BY MR. CARRILLO:)  These photos that we're looking

22     at, the top one and, I guess, the bottom one of this page, can

23     you tell us what these photos depict?

24          A.     Yeah.  That's my dad.  And I believe it was

25     celebrating his birthday that day.
```

```
 1          Q.    And how is it that you came to receive these photos?

 2          A.    He had sent them to me.

 3          Q.    And this was part of your letter exchange that you

 4    had with him?

 5          A.    Yes.

 6          Q.    Did he also help you financially, supporting you

 7    with high school expenses, things like that?

 8          A.    Yeah.  He -- he helped me always as much as he

 9    could.  I did a lot of things growing up.  So sports fees,

10    extracurricular fees, um, anything from, like, you know,

11    volleyball and basketball shoes to supporting different trips I

12    had.

13          I went to nationals a couple of times and

14    extracurricular and helped me get to there and Washington, DC,

15    trip in eighth grade.  So whenever I had those kinds of

16    expenses, he was always quick to help me out.

17          Q.    Would the same apply for your college experience?

18          A.    Yeah.  My dad passed the -- the spring of my

19    freshman year.  But that year he had helped me, um, the

20    beginning of the school year when -- buying textbooks and have

21    moving fees to move to a different city and, yeah, did a lot to

22    help me get to where I was and feel stable at the beginning of

23    my college journey.

24          Q.    And so how old were you when you found out something

25    had happened to your father?
```

01:14PM (line 5)
01:15PM (line 10)
01:15PM (line 15)
01:15PM (line 20)
01:16PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1        A.    I was 19.
 2        Q.    And how is it that you came to find out what
 3   happened to your father?
 4        A.    My mom told me.
 5        Q.    And what is it that you were told at that time, at
 6   least?
 7        A.    Um, I remember not -- she didn't give me a lot of
 8   details, specific details the first day she mentioned it, but
 9   she told me that my dad had passed away, um, a very unexpected
10   passing, a very tragic passing.  And I don't -- I wasn't in a
11   state of being able to hear more at that time.
12        Q.    How did that affect you to hear that your father had
13   passed?
14        A.    Um, it affected me a lot and in a lot of different
15   ways.  I was in the spring of my freshman year, my first year
16   of college at the time.  And I didn't finish the year the way I
17   was expecting to finish the year.  I took incompletes that
18   whole second semester, even though I was still trying to show
19   up because I knew that that's what my dad would have wanted.
20             Um, so I came back the next year and finished those
21   incompletes, but my grades were never the same after that.  I
22   was just trying to push through because I had a lot, um, of
23   just, yeah, different emotions.
24             And, um, I -- my second year of college, I started
25   counseling, I started going to therapy, I was able to talk
```

01:16PM (line 5)
01:16PM (line 10)
01:17PM (line 15)
01:17PM (line 20)
01:18PM (line 25)

**UNITED STATES DISTRICT COURT**

1    about it more.  Um, I -- my counselor kind of recognized lots

2    of signs of depression and anxiety which I didn't have before.

3    So she, um, asked me to -- you know, if I would want to take

4    some medication for that.

01:18PM    5    Um, I -- my body started to do this thing where I --

6    I throw up a lot because of a lot of stress and trauma that

7    I -- that started after my dad passed.  I -- I throw up even

8    when there's not food in my system, and that happened for

9    several months after my dad passed.

01:18PM    10    And anytime that a time is coming up, like a

11    holiday, Father's Day, his birthday, the anniversary of his

12    passing, um, I -- that pattern starts to happen again.  It's

13    not one I can control, but my body is so anxious and just --

14    that it wants to throw up.  So I threw up even when I don't

01:19PM    15    have anything in my stomach.

16    And, um, when my dad passed, too, I lost my

17    menstrual cycle, which I didn't know but -- at the time but

18    when something really tragic or hard or stressful was happening

19    in your life, that can happen.  And so a few months after that,

01:19PM    20    I lost it and I went to be checked.  I was told that that is

21    the reason.

22    And, um, that -- it's been four years and I still

23    haven't gotten my menstrual cycle back, um, because my body is

24    still very much affected by this incident, which I've been

01:20PM    25    going to doctors and talking to them.  They have let me know,

**UNITED STATES DISTRICT COURT**

```
  1   you know, if -- I hope to have a family one day, like, this
  2   kind of affects, like, this -- like the way that my body is
  3   reacting right now.
  4          Um, yeah, I, um -- I lost my dad when I had no --
01:20PM  5   this idea that I would, very unexpected.  Um, and so I also
  6   have had a lot of anxiety over possibly just losing my mom
  7   unexpectedly because that's what happened the first time and
  8   you don't expect it.
  9          And so I just have, yeah, a lot of -- yeah, um, I
01:21PM 10   guess really unhealthy mental patterns, um, when thinking about
 11   loss and, um, unexpected loss.  And so I -- I see that affect
 12   the relationship I have with my mom a lot today.
 13      Q.   Did you have any dreams of things that you might do
 14   with your father before you knew he had passed?
01:21PM 15      A.   Yes, definitely.  Um, you know, this big dream to
 16   get to see him after my college graduation.  Um, I -- like,
 17   I've always wanted to get married and have a family.  And so
 18   I've been invited to so many weddings in the last few years and
 19   always think about how, like, I don't get to have my dad there
01:22PM 20   for my wedding, which was a huge dream.
 21          I've -- since I, yeah, been in my early years of
 22   high school, I've always had this dream of, like, being able to
 23   financially provide for my family because I know my family
 24   is -- yeah, has never been wealthy.  And so I've always had a
01:22PM 25   deep desire to help my family out in that way of just having
```

**UNITED STATES DISTRICT COURT**

1           **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES   )
                            )
4   STATE OF CALIFORNIA     )

5

6           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17           DATED THIS 29TH DAY OF NOVEMBER, 2023.

18

19

20           /S/ MYRA L. PONCE
      _____
21      MYRA L. PONCE, CSR NO. 11544, CRR, RDR
             FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**