# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

4

5    NICOLE JUAREZ ZELAYA, individually and )
     as Successor-in-Interest to Decedent   )
6    JACOBO JUAREZ CEDILLO,                  )
                                             )
7                        Plaintiff,          )
                                             )
8        v.                                  )            Case No.
                                             )    CV 20-8382 ODW (MAAx)
9    CITY OF LOS ANGELES, DUSTIN RICHMOND,   )
     and JOSEPH HUNT,                        )         Volume 4
10                                           )     (Pages 376 - 488)
                         Defendants.         )
11   _____)

12

13            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                          TRIAL DAY THREE
14              THURSDAY, OCTOBER 12, 2023
                          9:07 A.M.
15                 LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23       MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, ROOM 4455
                LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305


                    UNITED STATES DISTRICT COURT

```
 1              APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4       LAW OFFICES OF DALE K. GALIPO
         BY:  DALE K. GALIPO
 5       BY:  RENEE V. MASONGSONG
              Attorneys at Law
 6       21800 Burbank Boulevard, Suite 310
         Woodland Hills, California  91367
 7       (818) 347-3333

 8       CARRILLO LAW FIRM, LLP
         BY:  MICHAEL S. CARRILLO
 9            Attorney at Law
         1499 Huntington Drive, Suite 402
10       South Pasadena, California  91030
         (626) 799-9375
11

12   FOR THE DEFENDANTS:

13
         HURRELL CANTRALL, LLP
14       BY:  THOMAS C. HURRELL
         BY:  DIANE MARTINEZ
15            Attorneys at Law
         725 South Figueroa Street, Suite 3800
16       Los Angeles, California  90017
         (213) 426-2000
17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1                    **INDEX OF WITNESSES**

2

3    **PLAINTIFF'S WITNESSES**                                **PAGE**

4    OMALU, M.D., Bennet

5        Direct Examination by Mr. Galipo              384
         Cross-examination by Mr. Hurrell             420
6        Redirect Examination by Mr. Galipo           431
         Recross-examination by Mr. Hurrell           436

7

8    **DEFENDANTS' WITNESSES**                               **PAGE**

9    CHAIKIN, M.D., Michael

10       Direct Examination by Mr. Hurrell            438
11       Cross-examination by Mr. Galipo              453
         Redirect Examination by Mr. Hurrell          471
12       Recross-examination by Mr. Galipo            471

13

14   BRISCOE, Jeff

15       Direct Examination by Ms. Martinez           474
         Cross-examination by Mr. Galipo              477
16

17

     CUBA, Brian
18
         Direct Examination by Ms. Martinez           480
19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 148-1 - | Officer Menasakian's body-worn video | 481 | |
| 164-2 - | Officer Nuñez's body-worn video | 476 | |
| 164-3 - | Officer Nuñez's body-worn video | 477 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT**

1              **BENNET OMALU, M.D.**,

2        **PLAINTIFF'S WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:**

3                          **DIRECT EXAMINATION**

4    BY MR. GALIPO:

09:18AM  5        Q.    Good morning, Dr. Omalu.

6        A.    Good morning, sir.

7        Q.    Are you a medical doctor?

8        A.    Yes, sir.

9        Q.    What is your area or areas of specialty?

09:18AM 10        A.    Anatomic pathology, clinical pathology, forensic

11   pathology, neuropathology, and epidemiology,

12   e-p-i-d-e-m-i-o-l-o-g-y, epidemiology.

13        Q.    Are you board certified in any areas of medicine?

14        A.    Yes, I'm board certified in the four specialties of

09:18AM 15   forensic pathology -- clinical pathology, anatomic pathology,

16   neuropathology.  I'm also board certified in medical management

17   by the American Association of Physician Leadership.

18        Q.    So how many board certifications do you have all

19   together?

09:19AM 20        A.    Five.

21        Q.    Without going into details, was there a movie made

22   called "Concussion" about some of your work as a -- and your

23   life as a forensic pathologist?

24        A.    Yes, sir.

09:19AM 25        Q.    What other education do you have besides a medical

1   death of people who consume methamphetamine in the

2   United States every year, about 13 million people above the age

3   of 12, agree to have used methamphetamine.  Less than 3,000 die

4   from it, which is 0.02 percent.

09:35AM  5       And a paper recently published by Strommer,

6   S-t-r-o-m-m-e-r, Strommer & Powell published in 2022, shows

7   that people -- 1 out of 350,000 doses of methamphetamine may

8   result in death.  1 out of 350,000 doses.

9       So death from methamphetamine is not something very

09:35AM  10  prevalent.  The majority of people who consume methamphetamine

11  do not die from it.  So the presence of methamphetamine in your

12  blood does not mean it was what killed you.

13  Q.    And if you know, Dr. Omalu, are stimulants like

14  amphetamine also prescribed by doctors to some patients?

09:35AM  15  A.    Yes, sir.  Amphetamine is prescribed by doctors

16  sometimes to treat diseases like narcolepsy, like ADHD.  So

17  it's actually a prescription medicine, yes, sir.

18  Q.    Now I'd like to move on in the chronology of what

19  happened to Mr. Cedillo.

09:36AM  20      So after he was sitting in the driveway and

21  handcuffed in the driveway, he was walked over to the front of

22  the patrol vehicle.  And you saw this in reviewing the videos?

23  A.    Yes, sir.

24  Q.    Thank you.  I'll stay by the microphone.  Sorry.

09:36AM  25      And one of the things you were asked to opine on in

**UNITED STATES DISTRICT COURT**

```
 1    this case was his pre-death pain and suffering.  Is that

 2    correct?

 3         A.   Yes, sir.

 4         Q.   And did you note, when he was in front of the

 5    vehicle at some point, the officers were applying a wrist lock

 6    to him, lifting his arm or hand up behind his back?

 7         A.   Yes, sir.

 8         Q.   And based on your viewing the video, your knowledge

 9    as a medical doctor, did that cause him pain?

10         A.   Yes, sir.  That caused him severe pain.  There are

11    four modalities of pain that the human brain can appreciate.

12    There is the mental pain, there is the somatic or physical

13    pain, and there is the chemical pain.  And then, there is the

14    fourth one, the thermal, thermal heat pain.

15              A human brain is one of the most efficient

16    mechanisms you can see in life.  It functions at a level of one

17    of ten-thousandth of a second.  If I hit my hand on the table,

18    even before it touches the table, I feel the pain.

19              And when his hand was twisted, that is an abnormal

20    human position.  The human body cannot tolerate such

21    positioning.  So it puts strain and stress on the fibers, the

22    nerves, the blood vessels, the muscles, and the joint.

23              So thousands, if not hundreds of thousands of nerve

24    endings were activated within one of a ten-thousandth of a

25    second and within 100 milliseconds, the signal goes to the
```

09:36AM (line 5)
09:37AM (line 10)
09:37AM (line 15)
09:38AM (line 20)
09:38AM (line 25)

1    spinal cord -- it doesn't have to go to the brain -- and comes

2    back.  And the person appreciates -- that was why he screamed

3    out.

4            Pain is a primitive reflex.  It's one of the

09:38AM  5    functions of the human body that protects you, that keeps you

6    alive, it's as basic as thirst.  So you don't have to think to

7    feel pain.

8            So when he cried out, it wasn't a conscious effort

9    because that's his primitive nature well evolved in response to

09:39AM  10   the pain.  And the physical pain sent signals to a part of the

11   brain called the limbic, l-i-m-b-i-c, the limbic system which

12   drives your emotions.

13           So with the physical pain, the mental pain

14   accompanies it.  Your heart begins to beat faster.  Your -- you

09:39AM  15   start breathing quicker.  Your muscles start tensing up because

16   your body, especially specific part of your brain called the

17   locus coeruleus -- l-o-c-u-s, coeruleus, c-o-e-r-u-l-e-u-s --

18   secretes enzymes, proteins accentuate the pain.

19           And as you continue inflicting whatever mechanism

09:40AM  20   that is causing the pain, the amount of chemicals your body is

21   eliciting will increase and the intensity of the pain will

22   increase.

23           So, yes, in my calculation, he felt some of the

24   highest levels of pain a human being could experience for about

09:40AM  25   20 to 30 minutes.

**UNITED STATES DISTRICT COURT**

|     |     |
| --- | --- |
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:40AM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:40AM | 10 |

1    Q.    Okay.  I'm going to go through it.

2         Then we have the takedown.  And you're aware, when

3    he was taken down to the ground, his hands were behind his

4    back?

5    A.    Yes.

6    Q.    And that at some -- during the takedown, you're

7    aware he hit his head on the hard surface?

8    A.    Yes, sir.

9    Q.    Now, you mentioned in the beginning that you're

10   board certified in neuropathology?

11   A.    Yes, sir.

12   Q.    Can you describe to the jury what that is,

13   neuropathology?

14   A.    Neuropathology is the part of medicine that deals

15   with the brain and the nervous system.  So we spent two years

16   just studying the brain and the spinal cord to find out how the

17   brain functions, to study diseases of the brain and how the

18   brain sustains and manifests trauma and how the brain

19   experiences pain.

20        So a good example of what we do in the hospital --

21   if you remember Senator John McCain, he had some symptoms.  CT

22   scan showed he had a tumor.  So the surgeons took out a biopsy

23   of the tumor.  They sent it to a neuropathologist who

24   determined that he was suffering from cancer and specified the

25   type of cancer.

**UNITED STATES DISTRICT COURT**

1      When you suffer brain trauma, your clinician may not

2  tell you but they're consulting a neuropathologist behind the

3  scene to help explain the mechanisms and the types of traumas

4  you sustained and sometimes what the treatment should be.

09:42AM  5      So whenever there is any form of trauma to the

6  brain, the neuropathologist have some function or duty.

7      Q.    Now, was the fact that he was taken down and hit his

8  head on the hard surface immediately before the prone restraint

9  important to you in your analysis of the case?

09:42AM  10      A.    Yes, sir.

11      Q.    And why so?

12      A.    The -- the human brain is the most sensitive organ

13  in the body.  It's got about 200 billion brain cells.

14  Unfortunately, the human brain does not have any reasonable

09:43AM  15  capacity to regenerate itself.  Whenever injury occurs, it's

16  permanent.

17      And because it's such a sensitive organ, most

18  modalities of injury and trauma have the same mechanism of

19  injury.  And that mechanism of injury we'll call -- I'll spell

09:43AM  20  it -- excitotoxic injury.  Excitotoxic, e-x-c-i-t-o-t-o-x-i-c,

21  excitotoxic injury.

22      Another characteristic of the brain is that it takes

23  what we call cumulative injury.  If you suffer an injury, the

24  brain cells remember that injury, whether it's over a long

09:44AM  25  period of time or a short period of time.  The shorter the

1          period of time, the more likelihood of adverse outcomes.

2                    So when he was slammed down or when he fell head-on,

3          the human brain, 3 percent of the body weight, floats freely in

4          the human skull.  It's not attached to the human skull.   In

09:44AM   5          fact, there are spaces inside the brain that keeps it buoyant,

6          like balloon.

7                    So when he slammed his head on the ground, the brain

8          inside was bouncing like a balloon bouncing inside a ball.

9          When that happens, it's 60 to 80 percent water.  So when that

09:44AM  10          happens, there is a shearing injury.  The net fibers move

11          around in the water and suffer what we call axonal injuries.

12          This is why sometimes if you fall and hit your head, you may

13          pass out for a while.  It's because you suffered a shearing

14          injury.

09:45AM  15                    So when that happens, you suffer a laceration of --

16          abrasion or contusion of your head confirms that kinetic energy

17          was transferred to the skull and to the brain.  And when

18          that -- the kinetic energy goes to the brain, the brain cells

19          begins to suffer excitotoxic injury.

09:45AM  20                    Then for a short time you also suffer another

21          modality of injury, like asphyxia, it accentuates the

22          preexisting trauma you've already suffered.

23                    So though he may have died of asphyxia, the blunt

24          force trauma while he was sustaining the asphyxia was also a

09:45AM  25          contributing factor to the eventual death.

1          So there is the natural whereby you die from natural

2     diseases, like, I don't know, lung cancer.

3          Then there is accidental whereby death is an

4     unexpected outcome, not involving any individual, like a car

10:06AM   5     crash.  You're driving and you have a car crash on accident and

6     you die.

7          Then there's suicide whereby somebody dies because

8     of a premeditated self-inflicted injury.  That is a suicide.

9          Then there is the homicide whereby somebody dies by

10:06AM   10    the hands of another, where an individual or individuals,

11    directly or indirectly, contributed to your death, death in the

12    hands of another.

13          And then there's the fifth one, undetermined,

14    meaning we have done all we could do, but we cannot reasonably

10:06AM   15    classify the death.  A good example is when you find skeletal

16    remains out in the bush.  All you have is the skeleton.  You

17    look at the skeleton, you don't see any evidence of trauma, you

18    don't know why this individual died.  You do toxicology of the

19    bone, it's negative.  So such a case you cannot determine the

10:07AM   20    cause of death with a reasonable degree of certainty, so you

21    classify it as undetermined.

22          Q.   In your opinion, Dr. Omalu, what do you believe the

23    manner of death is in this case?

24          A.   So in this case, having reviewed it, Mr. Cedillo

10:07AM   25    died in the hands of other people.  So it's a homicide.  It's a

**UNITED STATES DISTRICT COURT**

```
 1   homicide, meaning -- this is a medical homicide, not legal
 2   medical homicide, that he died in the hands of other people.
 3   Other people directly or indirectly contributed to his death.
 4        Q.    Now, your understanding is Mr. Cedillo was
 5   pronounced dead -- technically pronounced dead five days later
 6   on April 13th, 2019?
 7        A.    Yes, five days later, there are different types of
 8   death.  There is the brain death.
 9        Q.    Yes, that is --
10        A.    And then the somatic -- so five days later, he was
11   determined to be brain dead, yes.
12        Q.    That's what I wanted to ask.  If you can explain
13   that to the jury, what generally his hospital course was and
14   whether or not the event that caused his death had already
15   happened before he even got on the gurney.
16        A.    So by the time he got to the hospital, he had
17   suffered anoxic brain damage.  He was dead.
18             Um, when the science of organ transplantation began
19   in Pittsburgh in the United States, they discovered that when
20   you keep an individual who is brain dead alive with no chance
21   and then you recover the organs, the people who receive the
22   organs do better.  The organs are more likely to survive.
23             So many years ago, most Governments in the world
24   came up with this new classification of death, which is brain
25   death.  There are criteria, and it has to be done by two
```

10:07AM (line 5)
10:08AM (line 10)
10:08AM (line 15)
10:08AM (line 20)
10:09AM (line 25)

|   | |
|---|---|
| 1 | for the record and speak slowly. |
| 2 | THE WITNESS:  Brian Cuba.  B-r-i-a-n, Cuba, C-u-b-a. |
| 3 | THE COURTROOM DEPUTY:  Thank you. |
| 4 | MS. MARTINEZ:  If I could just have one moment, |
| 01:47PM   5 | Your Honor. |
| 6 | **BRIAN CUBA,** |
| 7 | **DEFENSE WITNESS, WAS SWORN AND TESTIFIED AS FOLLOWS:** |
| 8 | **DIRECT EXAMINATION** |
| 9 | BY MS. MARTINEZ: |
| 01:47PM  10 | Q.    Good afternoon, Officer Cuba. |
| 11 | A.    Good afternoon. |
| 12 | Q.    Just one quick second. |
| 13 | Officer Cuba, how long have you been with the |
| 14 | department? |
| 01:48PM  15 | A.    Approximately seven years. |
| 16 | Q.    And we're here today on an incident that occurred on |
| 17 | April 8th, 2019.  Do you recall how long you had been with the |
| 18 | department at that time? |
| 19 | A.    Approximately two-and-a-half years. |
| 01:48PM  20 | Q.    And what was your position at that time? |
| 21 | A.    I was a patrol officer. |
| 22 | Q.    And do you remember responding to a call involving |
| 23 | Officer Richmond and Officer Hunt on that date? |
| 24 | A.    Yes. |
| 01:48PM  25 | Q.    And what kind of call were you responding to, if you |

```
 1   remember?
 2        A.    It was a backup for a 415 male.
 3        Q.    And can you remind us, what's a 415?  What does that
 4   stand for?
01:48PM  5        A.    415 is a man that's posing a threat to himself or
 6   others, acting erratic in a way.
 7        Q.    And, Officer Cuba, do you speak Spanish?
 8        A.    Yes.
 9        Q.    And do you recall if you were perhaps the only
01:49PM 10   officer who spoke Spanish on the scene that night?
11        A.    I'm the only one that spoke Spanish, yes.
12        Q.    And I will play for you just -- do you remember
13   speaking to Mr. Cedillo in Spanish?
14        A.    Yes.
01:49PM 15        Q.    I'm going to show you a clip.  We're going to mark
16   this as Exhibit -- it's 148-1.
17              (Exhibit 148-1 for identification.)
18              (Videotape played, not reported.)
19        Q.    (BY MS. MARTINEZ:)  And what are you telling
01:50PM 20   Mr. Cedillo at that moment?
21        A.    I'm advising him to calm down.
22              (Videotape played, not reported.)
23        Q.    (BY MS. MARTINEZ:)  And what -- you're speaking to
24   him in Spanish there as well; correct?
01:50PM 25        A.    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1          Q.   And what are you telling him?

 2          A.   We're all here to help him.

 3               MS. MARTINEZ:  I don't have anything further for

 4     this witness.  Thank you.

 5               MR. GALIPO:  May we have one moment, Your Honor?

 6               THE COURT:  Sure.

 7               (Off-the-record discussion between counsel.)

 8               MR. CARRILLO:  Thank you, Your Honor.  We have no

 9     questions of this witness.

10               THE COURT:  I have one.

11     What's a 415?

12               THE WITNESS:  You're asking what's a 415?

13               THE COURT:  Yeah.

14               THE WITNESS:  It's a man that's acting -- poses a

15     threat to himself or others.  It could be just his actions.

16     He's irate or abnormal to officers or the public.

17               I wasn't there when they put it out, so all I know

18     is there's a male acting 415 and they asked for backup.

19               THE COURT:  Well, what's a disturbance?

20               THE WITNESS:  A disturbance is, like, for --

21               THE COURT:  What's the code for just a disturbance?

22               THE WITNESS:  You're talking about -- disturbance as

23     in what type of disturbance, sir?

24               THE COURT:  I don't know.  If I want to report a

25     disturbance, I pick up the phone, I call LAPD.  Would they put
```

01:50PM (line 5)
01:50PM (line 10)
01:51PM (line 15)
01:51PM (line 20)
01:51PM (line 25)

1    me out as a 211 or 187?  What would it be?

2                THE WITNESS:  Depends on the crime.  If it's a

3    disturbance at the home --

4                THE COURT:  415?

01:51PM    5                THE WITNESS:  Not if it's at the home.  Not if it's

6    a robbery, no.  That's a 211.

7                THE COURT:  That's a robbery.

8                THE WITNESS:  Yes.

9                THE COURT:  I said a disturbance.  You don't know?

01:52PM    10                THE WITNESS:  It depends on the totality of the

11    circumstances.  I can't exact tell you every type of

12    disturbance.

13                415 can be --

14                THE COURT:  If you're responding to a call, do you

01:52PM    15    really need to know every kind of detail regarding this call or

16    just need to know in general?  Do you prepare for armed robbery

17    in progress, or do you prepare to take a stolen bicycle report?

18                THE WITNESS:  Depending on the call, yes.  If it's

19    just a disturbance, we respond as just a disturbance.

01:52PM    20                THE COURT:  Just a disturbance.

21                THE WITNESS:  Yes.

22                THE COURT:  And that would go out over the air as

23    a --

24                THE WITNESS:  415.

01:52PM    25                THE COURT:  -- 415?

THE WITNESS:  Yes.

THE COURT:  So this other stuff about a man acting erratically, et cetera, that's something that you supplied.

THE WITNESS:  Well, because it's a backup.  If someone thinks there's a basic disturbance, you usually ask for an additional unit, means you just need extra resources.  A backup elevates it.  That's why we respond Code 3, lights and sirens.

THE COURT:  Did you respond to this?

THE WITNESS:  Yes.

THE COURT:  415, Code 3.

THE WITNESS:  Yes, it was a backup.

THE COURT:  It wasn't an officer needs assistance. It was just a man acting erratically.

THE WITNESS:  No.  It came out as a backup, not a radio call.

THE COURT:  Backup on a call that went out originally as a 415.

THE WITNESS:  Yes.

THE COURT:  So why is he apparently -- it sounds like he's in pain, crying out in pain.  And you're going, "Relax."

What are you doing to him?

THE WITNESS:  I'm just verbalizing, de-escalating it.

```
 1                THE COURT:  You're verbalizing it and doing what?
 2                THE WITNESS:  Trying to de-escalate by verbalizing
 3      him to relax.
 4                THE COURT:  Why was he not relaxed?  What was going
 5      on with him?
 6                THE WITNESS:  I can't answer for him.
 7                THE COURT:  You can't answer because you weren't
 8      there or you weren't paying attention or you don't want to
 9      answer now in open court under oath?
10                THE WITNESS:  No, he was erratic by moving.  They
11      were trying to de-escalate, keep him in control --
12                THE COURT:  De-escalate what?
13                THE WITNESS:  From him getting up, trying to resist,
14      trying to fight.
15                THE COURT:  Trying to fight?
16                THE WITNESS:  They were just controlling him.
17                THE COURT:  Wait a minute.  He was trying to fight?
18      He's handcuffed.  He's hobbled.  He's trying to fight?
19                How many of you were there?
20                THE WITNESS:  Approximately six.
21                THE COURT:  And he's what?  5 foot nothing or what?
22      143 pounds?  He was trying to fight?
23                THE WITNESS:  I never said he was trying to fight.
24      I said they're de-escalating it.  That's why I'm verbalizing to
25      him to just relax, the ambulance is here.
```

01:53PM (line 5)
01:53PM (line 10)
01:54PM (line 15)
01:54PM (line 20)
01:54PM (line 25)

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Why is he crying out?

 2              THE WITNESS:  I couldn't understand him.

 3              THE COURT:  You couldn't understand him.  It sounds

 4    like he's in pain.  I don't understand squat.  I barely

 5    understand English.  But that man sounds like he's in pain.

 6    What was that about?

 7              What were you guys doing to him?

 8              THE WITNESS:  I wasn't doing anything.  I was just

 9    verbalizing.

10              THE COURT:  Of course, you didn't observe anything;

11    right?

12              THE WITNESS:  I was the cover officer.  So, yes, I

13    was observing pedestrians --

14              THE COURT:  What were you doing to him?  Why was he

15    crying out in pain?

16              THE WITNESS:  I wasn't doing anything to him.  I

17    didn't touch him.

18              THE COURT:  I said what were you guys doing?  You

19    don't have to give up any names.  What are you guys doing to

20    the man that's causing him to cry out in pain?

21              THE WITNESS:  Police officers were controlling him.

22              THE COURT:  From what?

23              THE WITNESS:  I can't explain that, sir.

24              THE COURT:  Get out of here.  Go.  Thank you.

25    Goodbye.
```

**UNITED STATES DISTRICT COURT**

1           Got any more of these?

2           MS. MARTINEZ:  No, Your Honor.  All done.

3           THE COURT:  Pathetic.

4           Are these the witnesses for the day?

01:55PM  5           MS. MARTINEZ:  Yes.

6           THE COURT:  All right.  Ladies and gentlemen, we've

7    got things to do, not the least of which is try to finalize our

8    jury instructions, et cetera.  Okay?

9           So we're going to shut it down early and -- what

01:55PM  10   time tomorrow?  9:00 o'clock?  8:00 o'clock?  Let's get the day

11   going; right?  8:00 o'clock?  8:00 o'clock.

12          Okay.  Remember the admonition.

13          THE COURTROOM DEPUTY:  All rise.

14          (Proceedings adjourned at 1:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1     **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES )
           )
4 STATE OF CALIFORNIA  )

5

6     I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7 REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8 CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9 TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10 IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11 REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12 THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17     DATED THIS 29TH DAY OF NOVEMBER, 2023.

18

19

20     /S/ MYRA L. PONCE

      _____
21    MYRA L. PONCE, CSR NO. 11544, CRR, RDR
      FEDERAL OFFICIAL COURT REPORTER
22

23

24

25