# EXHIBIT 4

1            UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

4

5   NICOLE JUAREZ ZELAYA, individually and )
    as Successor-in-Interest to Decedent   )
6   JACOBO JUAREZ CEDILLO,                  )
                                            )
7                        Plaintiff,         )
                                            )
8       v.                                  )          Case No.
                                            )   CV 20-8382 ODW (MAAx)
9   CITY OF LOS ANGELES, DUSTIN RICHMOND,   )
    and JOSEPH HUNT,                        )       Volume 2
10                                          )    (Pages 86 - 176)
                         Defendants.        )
11  _____)

12

13        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
             TRIAL DAY ONE:  AFTERNOON SESSION
14              TUESDAY, OCTOBER 10, 2023
                        1:36 P.M.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23      MYRA L. PONCE, CSR 11544, CRR, RPR, RMR, RDR
           FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2305

UNITED STATES DISTRICT COURT

1                          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        LAW OFFICES OF DALE K. GALIPO
         BY:   DALE K. GALIPO
5        BY:   RENEE V. MASONGSONG
              Attorneys at Law
6        21800 Burbank Boulevard, Suite 310
         Woodland Hills, California  91367
7        (818) 347-3333

8        CARRILLO LAW FIRM, LLP
         BY:   MICHAEL S. CARRILLO
9              Attorney at Law
         1499 Huntington Drive, Suite 402
10       South Pasadena, California  91030
         (626) 799-9375

11

12   **FOR THE DEFENDANTS:**

13
         HURRELL CANTRALL, LLP
14       BY:   THOMAS C. HURRELL
         BY:   DIANE MARTINEZ
15             Attorneys at Law
         725 South Figueroa Street, Suite 3800
16       Los Angeles, California  90017
         (213) 426-2000

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**



**INDEX OF WITNESSES**

**PLAINTIFF'S WITNESSES**                                              **PAGE**

RICHMOND, Dustin

    Direct Examination by Mr. Galipo                          125

**UNITED STATES DISTRICT COURT**

```
 1                        INDEX OF EXHIBITS

 2                                            FOR              FOR
                                       IDENTIFICATION       EVIDENCE
 3     NUMBER   DESCRIPTION                  PG.               PG.

 4     11A  -   Video recording              162

 5     20A  -   76 Gas Station surveillance video    161

 6     20C  -   76 Gas Station surveillance video    165

 7     21A  -   Dash cam video               166

 8     21B  -   Dash cam video               170

 9     23   -   Synchronized video compilation       174

10     34   -   LAPD Use of Force - Tactics  140
               Directive 2.2, hobble restraint
11             device

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

a limited purpose.

"When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that purpose and not for any other purpose.

02:35PM "Now, evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider 02:36PM both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

"By way of example, if you wake up in the morning 02:36PM and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial 02:36PM evidence, you must consider all the evidence in the light of reason, experience, and common sense.

"There are Federal Rules of Evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the 02:37PM other side thinks that that is not permitted by the Federal

Rules of Evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

"Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means that, when you are deciding the case, you must not consider the stricken evidence for any purpose.

"In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

"In considering the testimony of any witness, you may take into account:

"1.  The opportunity and ability of the witness to see or hear or know the things testified to;

"2.  The witness's memory;

"3.  The witness's manner while testifying;

"4.  The witness's interest in the outcome of the case, if any;

"5.  The witness's bias or prejudice, if any;

"6.  Whether other evidence contradicted the witness's testimony;

1    "7.  The reasonableness of the witness's testimony

2    in light of all the evidence; and

3    "8.  Any other factors that bear on believability.

4    "Sometimes a witness may say something that is not

02:39PM  5    consistent with something else he or she may have said.

6    Sometimes different witnesses will give different versions of

7    what happened.  People often forget things or make mistakes in

8    what they remember.  Also, two people may see the same event

9    but remember it differently.  You may consider these

02:39PM  10   differences, but do not decide that testimony is untrue just

11   because it differs from other testimony.

12   "However, if you decide that a witness has

13   deliberately testified untruthfully about something important,

14   you may choose not to believe anything that witness said.  On

02:39PM  15   the other hand, if you think the witness testified untruthfully

16   about some things but told the truth about others, you may

17   accept the part you think is true and ignore the rest.

18   "The weight of the evidence as to a fact does not

19   necessarily depend on the number of witnesses who testify.

02:40PM  20   What is important is how believable the witnesses were and how

21   much weight you think their testimony deserves.

22   "If there is any news media account or commentary

23   about the case or anything to do with it, you must ignore it.

24   You must not read, watch, or listen to any news media account

02:40PM  25   or commentary about the case or anything to do with it.  The

**UNITED STATES DISTRICT COURT**

case must be decided by you solely and exclusively on the evidence that will be presented in the case and on my instructions as to the law that applies.  If any juror is exposed to any outside information, please notify me immediately.

"I urge you to pay close attention to the trial testimony as it is given.  During deliberations, you will not have a transcript of the trial testimony.

"If you wish, you may take notes to help you remember the evidence.  If you do take notes, please keep them to yourself until you go to the jury room to decide the case. Do not let note-taking distract you.  When you leave for the evening, your notes should be left in the courtroom.  No one will read your notes.

"Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of other jurors.

"Only the lawyers and I are allowed to ask questions of witnesses.  A juror is not permitted to ask questions of witnesses.  If, however, you are unable to hear a witness or a lawyer, please raise your hand and I will correct the situation.

"From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing

|  | 1 | of the jury, either by having a conference at the bench when |
|  | 2 | the jury is present in the courtroom or by calling a recess. |
|  | 3 | Please understand that, while you are waiting, we are working. |
|  | 4 | The purpose of these conferences is not to keep relevant |
| 02:42PM | 5 | information from you but to decide how certain evidence is to |

        of the jury, either by having a conference at the bench when

        the jury is present in the courtroom or by calling a recess.

        Please understand that, while you are waiting, we are working.

        The purpose of these conferences is not to keep relevant

02:42PM  information from you but to decide how certain evidence is to

        be treated under the Federal Rules of Evidence and to avoid

        confusion and error.

                "Of course, we will do what we can to keep the

        number and length of these conferences to a minimum.  I may not

02:43PM  always grant an attorney's request for a conference.  Do not

        consider my granting or denying a request for a conference as

        any indication of my opinion of the case or what your verdict

        should be."

                I think we're going to take our afternoon break a

02:43PM  little early, if you all don't mind.  And when we come back,

        we're going to start with the presentation of evidence by the

        plaintiff's first witness.  Okay?

                Remember the admonition now.

                THE COURTROOM DEPUTY:  All rise.

02:44PM          (Break taken.)

                (In the presence of the jury:)

                THE COURT:  All right.  We've been rejoined by the

        jury, all counsel, and the parties are present.

                Mr. Galipo.

03:05PM          MR. GALIPO:  Yes, thank you.

UNITED STATES DISTRICT COURT

|   |   |
|---|---|
| 1 | THE COURT:  Your first witness, sir. |
| 2 | MR. GALIPO:  Yes.  Thank you, Your Honor. |
| 3 | We'd like to call Dustin Richmond, please. |
| 4 | THE COURT:  You've been in enough courtrooms. |

03:05PM
5      THE COURTROOM DEPUTY:  Do you solemnly swear that
6   the testimony you shall give in the cause now before this Court
7   shall be the truth, the whole truth, and nothing but the truth,
8   so help you God?
9      THE WITNESS:  I do.

03:06PM
10      THE COURTROOM DEPUTY:  Thank you.  Please be seated.
11      Please state your first and last name and spell it
12   for the record.
13      THE WITNESS:  My name is Dustin Richmond, first name
14   Dustin, D-u-s-t-i-n, last name Richmond, R-i-c-h-m-o-n-d.

03:06PM
15      THE COURTROOM DEPUTY:  Thank you.
16      THE WITNESS:  Yes, ma'am.
17      MR. GALIPO:  Thank you, Your Honor.
18                  **DUSTIN RICHMOND**,
19      **A DEFENDANT HEREIN, WAS SWORN AND TESTIFIED AS FOLLOWS:**

03:06PM
20                  **DIRECT EXAMINATION**
21   BY MR. GALIPO:
22      Q.   Good afternoon, Officer Richmond.
23      A.   Good afternoon, sir.
24      Q.   How long have you been a police officer?

03:06PM
25      A.   Approximately nine years.

**UNITED STATES DISTRICT COURT**

1        Q.    And this incident that we're here to talk about

2    happened how many years ago, approximately?

3        A.    Four years ago.

4        Q.    And so you had been a police officer about five --

03:06PM    5    for about five years at that time?

6        A.    That's correct.

7        Q.    And when did you go to the academy?

8        A.    I started the academy in December of 2014.

9        Q.    How old were you at the time of this incident?  So

03:07PM   10    just subtract four years, approximately.

11        A.    I believe I was 30, maybe 31.

12        Q.    Okay.  How tall are you?

13        A.    Approximately 6'4" inches.

14        Q.    And how much did you weigh at the time of this

03:07PM   15    incident?

16        A.    Approximately 250 pounds.

17        Q.    And you played sports in high school; correct?

18        A.    Yes, sir.

19        Q.    And I take it that you wear equipment when you work

03:07PM   20    that adds additional weight?

21        A.    That's correct.

22        Q.    Now, the incident happened on April 8th, 2019;

23    correct?

24        A.    That's correct.

03:08PM   25        Q.    And the 76 Station in question, was that at the

1    corner of Woodman and Sherman Way?

2         A.    Yes.  Woodman Avenue and Sherman Way.

3         Q.    And your partner that night was Officer Hunt?

4         A.    Yes, sir.

03:08PM   5         Q.    And you first observed Mr. Cedillo about 4:10 in the

6    morning?

7         A.    Approximately.

8         Q.    Who was driving the car?

9         A.    My partner, Officer Hunt.

03:08PM   10        Q.    You were on your way at that point to another call?

11        A.    That is correct.

12        Q.    And you observed Mr. Cedillo at some point sitting

13   in the driveway area of the gas station?

14        A.    Correct.

03:08PM   15        Q.    And there was some discussion between you and your

16   partner, and you decided to make contact with Mr. Cedillo?

17        A.    Correct.

18        Q.    And where did you pull your patrol vehicle?

19        A.    We pulled our patrol vehicle to the north curb of

03:08PM   20   Sherman Way, just east of Woodman Avenue.

21        Q.    And you had a body-worn camera on your person?

22        A.    I did.

23        Q.    And it was activated during your contact with

24   Mr. Cedillo?

03:09PM   25        A.    It was.

```
         1        Q.    Now, had you received any call for service regarding

         2   Mr. Cedillo, in other words, someone complaining that he was

         3   bothering someone, had committed some crime, something like

         4   that?

03:09PM  5        A.    No.

         6        Q.    When you saw him initially sitting there in the

         7   driveway, did it look to you as if he was involved in a fight

         8   or a disturbance with another person at that time?

         9        A.    No.

03:09PM 10        Q.    Did it look to you like he was committing a crime

        11   when you first saw him sitting there?

        12        A.    No.

        13        Q.    And when you went up to contact him, you initially

        14   handcuffed him; is that correct?

03:09PM 15        A.    That's correct.

        16        Q.    And would you agree, at the time you handcuffed him,

        17   you had no probable cause to arrest him at that point?

        18        A.    That's correct.

        19        Q.    And would you at least agree that he initially

03:10PM 20   appeared compliant?

        21        A.    Correct.

        22        Q.    And your assessment of him was that he may have been

        23   under the influence of drugs or have a mental illness or both;

        24   is that fair?

03:10PM 25        A.    Fair.
```

**UNITED STATES DISTRICT COURT**

1      Q.    And you being 30 or 31 years old at the time, did
2  you recognize that he was older than you?
3      A.    I did.
4      Q.    Did you recognize that he was shorter than you?
03:10PM   5      A.    I did.
6      Q.    And did you recognize that he weighed less than you?
7      A.    I did.
8      Q.    So now there's a period of time where he's sitting
9  down and handcuffed behind his back.  Is that correct?
03:10PM  10      A.    That's correct.
11      Q.    Now, you were in court when your attorney gave his
12  opening statement?
13      A.    I was.
14      Q.    And there was a reference to your goal being to get
03:10PM  15  Mr. Cedillo medical care.  Did you hear that during the
16  statement?
17      A.    I did.
18      Q.    So I'd like to ask you about that.
19          When you first approached him and you saw him
03:11PM  20  sitting down and he was handcuffed, did you call for medical
21  care for him at that time?
22      A.    No.
23      Q.    Did it appear to you that he was in medical distress
24  and needed medical care when you first saw him sitting down?
03:11PM  25      A.    No.  It's possible.  I -- I -- no.

UNITED STATES DISTRICT COURT

|            |     |                                                            |
|------------|-----|------------------------------------------------------------|
|            | 1   | Q.    Okay.  Now, at some point, he stood up; is that      |
|            | 2   | correct?  Or you helped him stand up?                       |
|            | 3   | A.    I -- yes.                                             |
|            | 4   | Q.    And you walked him over to the front of your          |
| 03:11PM    | 5   | vehicle?                                                    |
|            | 6   | A.    Correct.                                              |
|            | 7   | Q.    And he, again, was compliant generally up to that     |
|            | 8   | point in time; is that true?                               |
|            | 9   | A.    True.                                                 |
| 03:11PM    | 10  | Q.    And he's handcuffed behind his back as you're        |
|            | 11  | walking him to the front of the vehicle?                    |
|            | 12  | A.    He is.                                                |
|            | 13  | Q.    And when you get to the front of the vehicle, at      |
|            | 14  | some point do you put him in a wrist lock?                  |
| 03:12PM    | 15  | A.    I do.                                                 |
|            | 16  | Q.    And what is a wrist lock?                             |
|            | 17  | A.    Can I ask for clarification on the question, like     |
|            | 18  | what is the -- like, you want me to demonstrate it?         |
|            | 19  | Q.    Well, you don't have to demonstrate it yet.          |
| 03:12PM    | 20  | But a wrist lock is a pain compliance technique;           |
|            | 21  | true?                                                       |
|            | 22  | A.    True.                                                 |
|            | 23  | Q.    And it's done in such a way as to cause pain to the   |
|            | 24  | person who you're doing the wrist lock on?                 |
| 03:12PM    | 25  | A.    Correct.                                              |

1    Q.    And you were doing this wrist lock to cause pain to
2  Mr. Cedillo while Mr. Cedillo was handcuffed behind his back;
3  is that right?

4    A.    That's correct.

03:12PM  5    Q.    And this is while he was at or near the front of
6  your vehicle?

7    A.    Correct.

8    Q.    Did you call for medical care for him at that time?

9    A.    No.

03:13PM  10    Q.    Did you think he needed medical care at that time?

11    A.    I think it depends on what type of medical care
12  you're referring to.

13    Q.    Did you think he needed any type of medical care at
14  that time?

03:13PM  15    A.    I initially -- my initial impressions of him was
16  that he was possibly trying to kill himself and harm himself
17  and so that would be the initial medical care that we would be
18  referring to.

19    Q.    Well, let me ask you this.  Up to the point in time
03:13PM  20  where you're with him in front of your car and you're doing the
21  wrist lock, did you have any information that he had weapons on
22  him?

23    A.    No.

24    Q.    Did you see any weapon in his hands --

03:13PM  25    A.    No.

```
 1        Q.    -- at any time?

 2        A.    No.

 3        Q.    Did you see a bulge or a weapon sticking out of his

 4   clothing somewhere?

 5        A.    I don't recall as to bulges, but I didn't see a

 6   weapon sticking out of his clothing.

 7        Q.    Did you have any information at any point in time

 8   that he had ever tried to harm anyone?

 9        A.    Say the last part.  I didn't hear you.

10        Q.    Did you have any information at any time that he

11   tried to harm anyone?

12        A.    No.

13        Q.    So -- and in addition to the wrist lock, were you

14   doing something else called a C grip?

15        A.    Correct.

16        Q.    And so which hand or which arm of Mr. Cedillo were

17   you doing the wrist lock on?

18        A.    The left.

19        Q.    And -- and the C grip, what were you applying that

20   to?

21        A.    Left bicep.

22        Q.    And did you have an understanding whether your

23   partner, Officer Hunt, was doing something similar on the right

24   back side of Mr. Cedillo?

25        A.    I don't recall what Officer Hunt was doing.
```

03:13PM (line 5)
03:14PM (line 10)
03:14PM (line 15)
03:14PM (line 20)
03:14PM (line 25)

**UNITED STATES DISTRICT COURT**

1      Q.    Okay.  You were focused on what you were doing?

2      A.    That's correct.

3      Q.    And so at some point do you decide to take

4    Mr. Cedillo down to the ground?

03:14PM  5      A.    I think that question calls for clarification.  I

6    didn't initially decide to take him to the ground.  That

7    wasn't -- that wasn't what I was trying to do, no.

8      Q.    Well, let me ask it this way.  Did you take him to

9    the ground at some point?

03:15PM  10      A.    Yes.

11      Q.    And when you took him to the ground, you were aware

12    he was handcuffed behind his back; true?

13      A.    Absolutely.

14      Q.    And you were applying this wrist lock to him;

03:15PM  15    correct?

16      A.    Correct.

17      Q.    And also a C grip?

18      A.    Correct.

19      Q.    And you don't know what Hunt was doing on your right

03:15PM  20    side, but you assumed he was doing something similar?

21      A.    I didn't assume anything.  I'm not sure what he was

22    doing.

23      Q.    Okay.  And so you knew, when you took Mr. Cedillo

24    down to the ground, he would not be able to brace his fall;

03:15PM  25    true?

1       A.      That's correct.

2       Q.      So you knew, when you took him down to the ground,

3   he may hit his face or head on the cement?

4       A.      Correct.

03:15PM   5     Q.      And you were aware, based on your training, that

6   taking someone down to the ground is a reportable use of force;

7   true?

8       A.      Correct.

9       Q.      You were also aware from your training that taking

03:15PM   10  someone down to the ground who's handcuffed who may hit his

11  head or face on the cement could potentially cause serious

12  injury; isn't that correct?

13      A.      Correct.

14      Q.      Okay.  So after you took him down to the ground, did

03:16PM   15  you call for medical care for him then?

16      A.      No.

17      Q.      Did you have your police radio on you?

18      A.      I did.

19      Q.      Did you make any communication over your police

03:16PM   20  radio at that time?

21      A.      Broadcast for backup.

22      Q.      Okay.  So you broadcast for backup; correct?

23      A.      Yes.

24      Q.      But no request for medical?

03:16PM   25      A.      No, sir.

**UNITED STATES DISTRICT COURT**

1        Q.    Okay.  Because regarding your goal to get him

2   medical care, I'm going to ask you when that goal kicked in.

3   But we'll get there.

4            So now, you take him down to the ground and you

03:16PM  5   pretty much land on his back; correct?

6        A.    Correct.

7        Q.    And he went down facedown or chest down; true?

8        A.    Correct.

9        Q.    And you and your partner at some point worked

03:17PM 10   together to generate a police report following this incident;

11   true?

12       A.    Correct.

13       Q.    I mean, Officer Hunt kind of took the primary role

14   in putting it together, but you gave your input and assisted.

03:17PM 15   Is that a fair statement?

16       A.    Correct.

17       Q.    And then at some point after you wrote that report,

18   you gave an interview to FID; correct?

19       A.    Correct.

03:17PM 20   Q.    Do you know what FID stands for?

21       A.    Force Investigative Division.

22       Q.    Okay.  And then you gave a second interview to them.

23   Is that also correct?

24       A.    That's correct.

03:17PM 25   Q.    And then at some point in the litigation, you gave a

| | | |
|---|---|---|
| | 1 | deposition? |
| | 2 | A.    Correct. |
| | 3 | Q.    And in the deposition, just like we have here, there |
| | 4 | was a court reporter -- |
| 03:17PM | 5 | A.    Correct. |
| | 6 | Q.    -- right? |
| | 7 | And you understood in your deposition you had a duty |
| | 8 | to tell the truth? |
| | 9 | A.    Correct. |
| 03:18PM | 10 | Q.    Now, in preparation for this trial, have you |
| | 11 | reviewed your report recently? |
| | 12 | A.    Yes. |
| | 13 | Q.    Have you reviewed your statements that you gave, the |
| | 14 | transcriptions recently? |
| 03:18PM | 15 | A.    Yes. |
| | 16 | Q.    And have you reviewed your deposition testimony |
| | 17 | recently? |
| | 18 | A.    Yes. |
| | 19 | Q.    So would you agree that, when you took Mr. Cedillo |
| 03:18PM | 20 | down to the ground, you landed on his back? |
| | 21 | A.    Yes. |
| | 22 | Q.    And would you agree that your partner, Officer Hunt, |
| | 23 | immediately went to Mr. Cedillo's legs? |
| | 24 | A.    That was my understanding. |
| 03:18PM | 25 | Q.    And was it your understanding that Officer Hunt |

1   wrapped his arms around Mr. Cedillo's legs?

2       A.   Not exactly sure how -- I know now because I've seen

3   video and things.  At the time, I just knew he was controlling

4   the legs.

03:18PM  5       Q.   And you maintained your C grip and wrist lock even

6   as you were on Mr. Cedillo's back when he was on the ground;

7   true?

8       A.   Correct.

9       Q.   Is that correct?

03:19PM  10      A.   Correct.

11      Q.   Because you were still trying to inflict some pain

12  on him with the wrist lock?

13      A.   In order to gain compliance.

14      Q.   And you were having essentially your chest to

03:19PM  15  Mr. Cedillo's back.  Is that correct?

16      A.   Correct.

17      Q.   And you were applying weight and downward pressure

18  to Mr. Cedillo?

19      A.   Correct.

03:19PM  20      Q.   And that's indicated in your report, your statement,

21  and your deposition; true?

22      A.   Correct.

23      Q.   And there were times, while you were on

24  Mr. Cedillo's back, while he was chest down, that you felt him

03:19PM  25  trying to lift up or roll; is that correct?

| | |
|---|---|
| 1 | A.     Correct. |
| 2 | Q.     And when he did that, tried to lift up or roll, you |
| 3 | responded by putting more pressure and weight on his back to |
| 4 | keep him flat on the ground; correct? |
| 03:19PM 5 | A.     Correct. |
| 6 | Q.     In fact, at some point you even got up on your toes |
| 7 | while your chest was on his back so you can get more downward |
| 8 | pressure and weight on him.  Is that true? |
| 9 | A.     True. |
| 03:20PM 10 | Q.     And during this time, you understood your partner |
| 11 | was on the legs? |
| 12 | A.     Correct. |
| 13 | Q.     And you described your position at some point as |
| 14 | having to sprawl.  Do you remember that? |
| 03:20PM 15 | A.     I did. |
| 16 | Q.     You said, "I sprawled."  And you could see that in |
| 17 | watching some of the body-worn camera footage; correct? |
| 18 | A.     Correct. |
| 19 | Q.     And you were sprawling, again, so that you can get |
| 03:20PM 20 | on your toes and place more weight on his back with your chest; |
| 21 | correct? |
| 22 | A.     Correct. |
| 23 | Q.     Now, you're on his back for some period of time |
| 24 | before the next unit gets there; true? |
| 03:21PM 25 | A.     True. |

```
 1        Q.    And the next unit, was one of the officers
 2   Menasakanian?
 3        A.    I believe that's how you say his name.
 4        Q.    We can call him Officer M. if you're comfortable.
 5        A.    We call him Officer Mena.
 6        Q.    I'm fine with that.
 7              He arrived at some point; correct?
 8        A.    Correct.
 9        Q.    Did he have a partner with him?
10        A.    He did.
11        Q.    Who was that?
12        A.    I believe it was Officer Cuba.
13        Q.    And to your knowledge, were those the next two
14   officers on scene?
15        A.    To my knowledge, yes.
16        Q.    Okay.  And at some point did either you or your
17   partner, Officer Hunt, or both direct Officer Mena to hobble
18   Mr. Cedillo?
19        A.    We did.
20        Q.    And was he hobbled at some point?
21        A.    He was.
22        Q.    And were you aware that he was being hobbled at that
23   time?
24        A.    Yes.
25        Q.    Okay.  So now, we're up to a point in time when
```

03:21PM (lines 5, 10, 15, 20, 25)

**UNITED STATES DISTRICT COURT**

Mr. Cedillo's chest down, you're still on his back with your
chest; correct?

A.    I am.

Q.    To your knowledge, your partner is still controlling
the legs; correct?

A.    Correct.

Q.    And now he's hobbled; correct?

A.    Correct.

Q.    Okay.  Now, you were aware, based on your training,
that you had a hobble policy in effect at the time of this
incident; correct?

A.    Correct.

Q.    And have you looked at that hobble policy recently
in preparation for the trial?

A.    I have.

Q.    Okay.  And I think it might be Exhibit 34.  I don't
know if we have an exhibit book up there or not.  But if we
don't, we could try to get you one.

        (Exhibit 34 for identification.)

        MR. GALIPO:  Oh, yeah.  It's 34.  Yeah.  Thank you.
We have the packets.  That's -- thank you.

Q.    (BY MR. GALIPO:)  All right.  Just take a look at
that just for a moment to yourself and see if that appears to
be at least one of the hobble restraint device policies in
effect at the time of this incident with Mr. Cedillo.

**UNITED STATES DISTRICT COURT**

```
 1              A.    I believe this is.

 2              Q.    Okay.  Can you please turn to page 4?  You see a

 3      section at the top that says "Violent Suspects"?

 4              A.    Yes, sir.

 5              Q.    Okay.  Had you been trained on this policy at least

 6      before the date of this incident?

 7              A.    Yes.

 8              Q.    Had you reviewed this policy before the date of the

 9      incident?

10              A.    At some point, yes.

11              Q.    Okay.  And was part of your training, um, that body

12      weight used to gain control of an individual should only -- you

13      should only apply direct weight to the suspect's back for as

14      long as reasonable to control and secure the individual?  Was

15      that part of your training?

16              A.    Yes.

17              Q.    And part of the policy?

18              A.    Yes.

19              Q.    And was it your training that, once the hobble is

20      secure, you should place the individual in an upright, seated

21      position or on his or her left side, left lateral recumbent

22      position?

23              A.    Yes.

24              Q.    That was part of your training and also part of the

25      policy?
```

|  |  |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    And that -- putting someone seated up or on their |
| 3 | side, is that referred to as a recovery position? |
| 4 | A.    It does -- or it is, excuse me. |

03:24PM 5    Q.    And then does your training go on to say that if for

6    some reason you can't put him on the left side, you should put

7    him on the right side?

8    A.    Yes.

9    Q.    And emphasized that this minimizes the time the

03:24PM 10   suspect spends on his or her stomach after being restrained?

11   A.    Correct.

12   Q.    Okay.  That's at least in the hobble policy;

13   correct?

14   A.    Correct.

03:25PM 15   Q.    Okay.  So now, we're up to the time where

16   Mr. Cedillo's chest down, he's handcuffed behind his back, he's

17   hobbled, you're on his back still, your partner's on his legs.

18   Do you sit him up immediately after he's hobbled?

19   A.    Not immediately.

03:25PM 20   Q.    Well, do you sit him up within five seconds?

21   A.    No.  I don't recall exactly how long it was.

22   Q.    Do you know if it was within ten seconds?

23   A.    I don't recall exactly how long it was.

24   Q.    Do you have any estimate?  Do you know if it was

03:25PM 25   more than 30 seconds?

|       |     |                                                              |
|-------|-----|--------------------------------------------------------------|
| 1     | A.  | It was probably more than 30 seconds.                        |
| 2     | Q.  | Do you know if it was more than a minute?                    |
| 3     | A.  | I don't recall.                                              |
| 4     | Q.  | Well, you've looked at the body-worn camera footage          |

03:25PM 5  in anticipation of this trial, haven't you?

| 6     | A.  | I have.                                                      |
| 7     | Q.  | And you've also looked at dash cam footage; correct?        |
| 8     | A.  | I have.                                                      |
| 9     | Q.  | And surveillance video?                                     |

03:25PM 10 | A. | Correct.

11     Q.   And you have no estimate as to how much time passed

12 from him being hobbled to you putting him in a recovery

13 position?

14     A.   I don't recall the amount of time that that was, no.

03:26PM 15     Q.   Okay.  Would you be surprised if it was more than a

16 minute?

17     A.   No.

18     Q.   Now, at some point after this prone restraint was

19 taking place and after he was hobbled and after you kept him

03:26PM 20 chest down for some period of time after he was hobbled, your

21 observations were he stopped resisting; correct?

22     A.   Correct.

23     Q.   He stopped moving; correct?

24     A.   He stopped resisting.

03:26PM 25     Q.   And he stopped moving?

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | A.    He stopped resisting.  He stopped actively kicking,           |
|       | 2  | jerking, trying to roll.                                            |
|       | 3  | Q.    I'm asking you a different question, sir.  I get              |
|       | 4  | that he stopped resisting.  I'm asking you now:  Did he stop        |
| 03:26PM | 5 | moving?                                                             |
|       | 6  | A.    I don't recall him stopping completely moving.               |
|       | 7  | Q.    You don't recall that?                                        |
|       | 8  | A.    No.                                                           |
|       | 9  | Q.    Do you recall that he stopped talking?                        |
| 03:26PM | 10 | A.   Yes.                                                          |
|       | 11 | Q.    Okay.  So you at least recall that he stopped                |
|       | 12 | resisting and stopped talking or making auditory noises.  Is       |
|       | 13 | that fair?                                                          |
|       | 14 | A.    Fair.                                                        |
| 03:27PM | 15 | Q.    Okay.  And he stopped lifting up or trying to roll;         |
|       | 16 | true?                                                              |
|       | 17 | A.    True.                                                        |
|       | 18 | Q.    And so you and your partner finally put him on his          |
|       | 19 | side, his right side; correct?                                     |
| 03:27PM | 20 | A.   Correct.                                                      |
|       | 21 | Q.    Now, when he's on his right side, he's still                 |
|       | 22 | handcuffed behind his back; true?                                  |
|       | 23 | A.    True.                                                        |
|       | 24 | Q.    And he's still hobbled?                                      |
| 03:27PM | 25 | A.   Correct.                                                      |

**UNITED STATES DISTRICT COURT**

|  | 1 | Q. And you're still in close proximity to him; correct? |
|---|---|---|
|  | 2 | A. I am. |
|  | 3 | Q. Do you have any conversation with him? |
|  | 4 | A. No. |
| 03:27PM | 5 | Q. Does he say anything after he's on his side? |
|  | 6 | A. Not that I recall. |
|  | 7 | Q. Did you say anything to him when he was on his side? |
|  | 8 | A. Not that I recall. |

1    Q.   And you're still in close proximity to him; correct?

2    A.   I am.

3    Q.   Do you have any conversation with him?

4    A.   No.

5    Q.   Does he say anything after he's on his side?

6    A.   Not that I recall.

7    Q.   Did you say anything to him when he was on his side?

8    A.   Not that I recall.

9    Q.   Did you try to check his pulse or anything like

10   that?

11   A.   No.

12   Q.   Your -- you said, I believe, in one of your

13   statements -- but correct me if I'm wrong -- you thought he

14   might be sleeping?

15   A.   I did say that, yes.

16   Q.   Okay.  And this potential sleeping you're talking

17   about, according to you, went on for about 11-and-a-half

18   minutes.  Is that correct?

19   A.   That's correct.

20   Q.   Now, is the reason you thought he was sleeping

21   because you didn't hear him making any noises and he wasn't

22   moving?

23   A.   No.  I believed he was sleeping because he still had

24   muscle tone and he was supporting his head.

25   Q.   Um, did you have any training on the lateral

1    vascular neck restraint?

2        A.    Not that I'm aware of.

3        Q.    Were you aware that -- based on your training, that

4    compressing someone's carotid arteries could cause them to lose

03:28PM  5    consciousness?

6        A.    Yes.

7        Q.    Okay.  Did you ever consider that Mr. Cedillo, after

8    the over four minutes of prone restraint, up to that point in

9    time, might have lost consciousness?

03:29PM  10        A.    It didn't appear that he lost consciousness to me.

11        Q.    Well, what's the difference, in your mind, between

12    someone losing consciousness and appear to be sleeping for

13    11 minutes?

14        A.    I would again say that he was supporting his head

03:29PM  15    and he appeared to have muscle tone.  It didn't appear that he

16    was just -- for lack of a better term, just, like, limp.

17        Q.    Did anybody give him any medical attention during

18    this 11-and-a-half minutes before the paramedics got to him?

19        A.    No.

03:29PM  20        Q.    Because if the goal was to get him medical care, I'm

21    just wondering if you did anything yourself medically for him.

22        A.    No.

23        Q.    And there were other officers now on scene; correct?

24        A.    Correct.

03:29PM  25        Q.    And do you have an estimate as to how many officers

1    were on scene by the time the paramedics got there?

2        A.    I believe there was at least six officers and two

3    sergeants.

4        Q.    Was this in addition to you and Officer Hunt or

03:30PM  5   including you and Officer Hunt?

6        A.    That's including me and Officer Hunt.

7        Q.    So eight officers all together?

8        A.    Probably.

9        Q.    Now, at some point you notice a bleeding or

03:30PM  10  laceration to his forehead; correct?

11       A.    Correct.

12       Q.    And somebody requested Office Nuñez -- he arrived at

13   some point; true?

14       A.    True.

03:30PM  15      Q.    And Nuñez's partner, was that Sampson?

16       A.    I believe it was.

17       Q.    And, in fact, after Mr. Cedillo was hobbled in the

18   first prone restraint, somebody asked Sampson to search him;

19   true?

03:30PM  20      A.    True.

21       Q.    And you were aware that Sampson had searched him?

22       A.    Yes.

23       Q.    Okay.  So you were aware before the time frame where

24   you thought he went to sleep that he was handcuffed, hobbled,

03:31PM  25  and had been searched; correct?

|   |   |
|---|---|
| | 1 |

         1    A.    That was my understanding.

         2    Q.    And, in fact, Nuñez at some point requested for

         3    medical to come; correct?

         4    A.    Yes.

03:31PM   5    Q.    And do you recall -- and I know you've listened to

         6    the tapes recently.  Do you recall Nuñez when he requested

         7    medical, indicating they had one unconscious, using the word

         8    "unconscious"?

         9    A.    I don't recall that, no.

03:31PM  10    Q.    So -- and it was about 11-and-a-half minutes.  Do I

        11    have that time frame correct?

        12    A.    Eleven --

        13    Q.    From -- from him stopping resisting and you putting

        14    him on his side to the paramedics actually getting to him.

03:32PM  15    A.    Yes.

        16    Q.    And the paramedics you saw at some point initially

        17    talking to him with no response; correct?

        18    A.    Yes.

        19    Q.    And then one of the paramedics started to shake his

03:32PM  20    shoulder?

        21    A.    Yes.

        22    Q.    And when the paramedic started to shake his

        23    shoulder, Mr. Cedillo's still handcuffed and hobbled; true?

        24    A.    True.

03:32PM  25    Q.    And according to you, he had been sleeping for about

|     | 11-and-a-half minutes? |
| --- | --- |
| 1 | 11-and-a-half minutes? |
| 2 | A.    Yes. |
| 3 | Q.    And then he came to; correct?  Started yelling, |
| 4 | moving? |
| 5 | A.    Yes. |
| 6 | Q.    And is it true, sir, within about one or two seconds |
| 7 | after he came to, after being shaken by the paramedic, you put |
| 8 | him back chest down? |
| 9 | A.    It was quick.  I don't remember if it was one, two |
| 10 | seconds, five seconds.  It was quick. |
| 11 | Q.    Would you agree, sir, it was less than five seconds? |
| 12 | A.    Probably. |
| 13 | Q.    And you didn't have any physical injury in this |
| 14 | incident, did you? |
| 15 | A.    No. |
| 16 | Q.    So now I want to talk to you about the second prone |
| 17 | restraint.  So this would be after he was, according to you, |
| 18 | sleeping for 11-and-a-half minutes and awoken and within less |
| 19 | than five seconds you put him chest down again.  I want to talk |
| 20 | about that time period.  Okay? |
| 21 | A.    Yes, sir. |
| 22 | Q.    You got on his back again; correct? |
| 23 | A.    Can you clarify what you mean by "got on his back"? |
| 24 | Q.    You had this time -- instead of your chest on his |
| 25 | back for about four minutes or so in the first restraint, in |

03:32PM — line 5
03:33PM — line 10
03:33PM — line 15
03:33PM — line 20
03:33PM — line 25

1   the second restraint you put both of your knees on his back;

2   true?

3          A.   That's correct.

4          Q.   And in the second prone restraint, you were applying

03:34PM   5   weight and downward pressure; is that correct?

6          A.   Correct.

7          Q.   And while you were doing that, did you have a firm

8   grip on him somewhere?

9          A.   Not that I recall.

03:34PM   10         Q.   And you would agree, with your knees on his back,

11   you were applying body weight?

12         A.   Yes.

13         Q.   And, in fact -- and he was still facedown; correct?

14         A.   Correct.

03:34PM   15         Q.   Still on his stomach; correct?

16         A.   Correct.

17         Q.   And you were on the upper portion of his back; is

18   that also correct?

19         A.   I had one knee on the upper portion of his back.

03:35PM   20         Q.   In fact, which knee did you have on his upper back?

21         A.   I believe it was my right knee.

22         Q.   And which knee did you have on his lower back?

23         A.   That would be my left knee.

24         Q.   So both knees on his back, one on the upper back,

03:35PM   25   one on the lower back?

1       A.      That's my recollection, yes.

2       Q.      And it's still your understanding that your partner

3   was controlling his legs?

4       A.      Yes.

03:35PM  5      Q.      And you're still applying downward pressure;

6   correct?

7       A.      I am.

8       Q.      And I think we talked about this in your deposition,

9   that you would agree that the majority of your weight was

03:35PM 10  distributed on his back?

11      A.      At times.

12      Q.      And at times, you placed the majority of your weight

13  on his back; true?

14      A.      At times, yes.

03:35PM 15      Q.      And in that -- during that second prone restraint,

16  were there time frames when you felt he was trying to lift up?

17      A.      Lift up and roll, yes.

18      Q.      And you, once again, were trying to prevent him from

19  doing that; correct?

03:36PM 20      A.      Correct.

21      Q.      And to prevent him from doing that, you would apply

22  more weight and more downward pressure; true?

23      A.      True.

24      Q.      And that cycle went on for some time, him trying to

03:36PM 25  lift up, you applying more weight and downward pressure, until

UNITED STATES DISTRICT COURT

1    eventually he stopped trying to lift up.  Is that fair?

2         A.    Fair.

3         Q.    Now, he also stopped, once again, making noises or

4    sounds; true?

03:36PM  5         A.    True.

6         Q.    And he stopped, meaning Mr. Cedillo, making noises

7    and sounds while he was chest down during that second prone

8    restraint?

9         A.    Sorry.  Say the first part again.

03:37PM 10         Q.    Sure.

11              You already told us that he started making -- he

12   stopped making sounds and stopped resisting at the end of the

13   first prone restraint; correct?

14         A.    Correct.

03:37PM 15         Q.    Now I'm talking about the second prone restraint.

16   At some point did he stop resisting?

17         A.    Yes.

18         Q.    At some point did he stop making sounds?

19         A.    Yes.

03:37PM 20         Q.    And your recollection is that he stopped making

21   sounds at about the time he stopped moving?

22         A.    At the time he stopped resisting.

23         Q.    Well, you recall indicating that he also stopped

24   moving at about that time?

03:37PM 25         A.    I don't recall him completely ever stop moving.

1 **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES )
           )
4 STATE OF CALIFORNIA  )

5

6    I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7 REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8 CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9 TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10 IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11 REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12 THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17    DATED THIS 29TH DAY OF NOVEMBER, 2023.

18

19

20      /S/ MYRA L. PONCE
      _____
21    MYRA L. PONCE, CSR NO. 11544, CRR, RDR
      FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**