1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**O**

# United States District Court
# Central District of California

NICOLE JUAREZ ZELAYA,

　　　　　Plaintiff,

　v.

CITY OF LOS ANGELES et al.,

　　　　　Defendants.

Case № 2:20-cv-08382-ODW (MAAx)

**ORDER DENYING MOTION FOR NEW TRIAL AND/OR MOTION TO ALTER OR AMEND THE JUDGMENT [133]**

## I.　　INTRODUCTION

After a four-day trial, a jury returned a verdict in favor of Plaintiff Nicole Juarez Zelaya, individually and as successor in interest to her father Decedent Jacob Juarez Cedillo, and against Defendants City of Los Angeles, Officer Dustin Richmond, and Officer Joseph Hunt, on Zelaya's claims for excessive force, interference with familial relations (wrongful death), and municipal liability for failure to train.  (*See* Verdict, ECF No. 121.)  Pursuant to Federal Rules of Civil Procedure ("Rule") 59(a) and (e), Defendants move for a new trial or to alter or amend the judgment on the basis of prejudicial judicial misconduct ("Motion").  (Mot., ECF No. 133.)  For the reasons discussed below, the Court **DENIES** Defendants' Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II.    BACKGROUND

Over four days in October 2023, the Court held a jury trial in this matter, during which testimony and video evidence established the following objective facts.

On April 8, 2019, Los Angeles Police Department ("LAPD") Officers Richmond and Hunt observed Cedillo sitting in the driveway of a 76-gas station while they were on patrol.  Officer Richmond testified they thought Cedillo may be under the influence or in need of medical assistance.  Officers Richmond and Hunt, both more than six feet tall and over 200 pounds, pulled over and approached Cedillo, who was approximately five foot three inches tall and under 150 pounds.  Cedillo put his hands together behind his head and then behind his back, in what Officers Richmond and Hunt recognized as a handcuffing posture.  Officers Richmond and Hunt had difficulty understanding Cedillo's verbal responses to their inquiries.  Cedillo permitted Officer Richmond to handcuff him.  Cedillo stood when the Officers asked that he stand.  Cedillo voluntarily walked with them to the front of their patrol car, leaving his shoes behind.  Officers Richmond and Hunt began to conduct a search of Cedillo's pockets and applied "wrist lock" and "C-grip" pain compliance techniques to Cedillo's handcuffed wrists and arms.

Officers Richmond and Hunt then conducted a "take down" of Cedillo to the ground, where Cedillo landed chest down and hit his head on the curb, causing a laceration and bleeding.  Officer Richmond landed with his chest on Cedillo's back and then at times lifted up on his toes to apply more weight downward.  Officer Hunt landed with his body on Cedillo's legs and wrapped his arms around Cedillo's legs to restrain them.  They called for backup.  When it arrived, they had another LAPD officer apply a "hobble restraint" to Cedillo's ankles.  Officers Richmond and Hunt remained on top of Cedillo in this prone restraint for approximately four and a half minutes.  When Cedillo "stopped making sounds" and "stopped resisting," they rolled him to his side, into what is called a "recovery position."  An LAPD supervisor arrived and called for paramedics when he saw the laceration on Cedillo's head.

Cedillo remained unconscious on his side for approximately eleven minutes.  Officer Richmond testified he thought that Cedillo was asleep during this time.

The paramedics arrived.  One paramedic approached Cedillo, who was still being held on his side, and shook his shoulder to check for consciousness.  Cedillo, still handcuffed and hobbled, startled, and began moving and making noise.  Officers Richmond and Hunt immediately put Cedillo back into a prone restraint, with Officer Richmond on Cedillo's back and Officer Hunt on Cedillo's legs.  They kept Cedillo in this second prone restraint for more than three minutes, again waiting until Cedillo "stopped making sounds."

The paramedics then placed an unconscious Cedillo on a gurney, to which he was handcuffed.  The paramedics observed Cedillo was not breathing and had no pulse, so they administered CPR and transported him to the hospital.  He never regained consciousness.  Cedillo was taken off of life support five days later.

Zelaya argued to the jury that Cedillo was compliant and that there was no need to use pain compliance techniques, take downs, or prone restraints.  She argued Cedillo died due to restraint asphyxia caused by Officers Richmond and Hunt's excessive prone restraint.  (*See* Tr. 624:1–652:18, 661:2–668:10 (Pl.'s Closing Arg.), ECF No. 149.)[2]  Defendants argued to the jury that, although initially compliant, Cedillo resisted them when they began to search him and their use of force was appropriate to restrain Cedillo from kicking them, trying to run away and escape, and being combative.  They argued Cedillo died from a cardiac arrest suffered during the second prone restraint, due to his history of drug use and bad heart.  (*See* Tr. 653:5–660:25 (Defs.' Closing Arg.).)

The jury returned a verdict for Zelaya on all counts.  (*See* Verdict.)  They awarded $6,000,000 for Cedillo's pre-death pain and suffering, $6,000,000 for Cedillo's loss of life, and $1,500,000 for Zelaya's past and future wrongful death for the loss of her father.  (*Id.* at 4.)

---

[2] The entire trial transcript may be found in the case docket at ECF Nos. 145 through 149.

Defendants now move pursuant to Rule 59(a) and (e) for a new trial or to alter or amend the judgment.  (*See* Mot. 1.)  The Motion is fully briefed.  (*See* Opp'n, ECF No. 144; Reply, ECF No. 151.)

### III.        LEGAL STANDARD

A court may grant a motion for new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Thus, Rule 59(a) permits a court to grant a new trial where the moving party demonstrates the jury's "verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)).  Similarly, Rule 59(e) permits a court to alter or amend a judgment where the moving party demonstrates "that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based."  *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999).  The authority to grant a new trial or alter or amend a judgment under Rule 59 "is confided almost entirely to the exercise of discretion on the part of the trial court."  *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (discussing a Rule 59(a) motion); *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) (discussing a Rule 59(e) motion).

### IV.        DISCUSSION

Defendants move for a new trial pursuant to Rule 59(a) on the grounds that the Court's comments and questions during trial amounted to prejudicial judicial misconduct, which denied them a fair trial and provoked the jury to award excessive damages.  (*See* Mot. 1, 12, 21.)  Defendants alternatively move to vacate, amend, or alter the judgment pursuant to Rule 59(e) "[f]or the same reasons."  (Mot. 1, 22.)  The Court has carefully reviewed the parties' briefing and the trial transcript in its entirety.  Finding the Court's comments and questions did not "project[] to the jury an appearance of advocacy or partiality" or demonstrate "actual bias," *United States v.*

*Mostella*, 802 F.2d 358, 361 (9th Cir. 1986), and finding the evidence supports the jury award, the Court denies Defendants' Motion.

**A.     No Prejudicial Judicial Misconduct**

Defendants contend the Court's comments and questioning of several witnesses constituted prejudicial judicial misconduct, individually and cumulatively.  (Mot. 1.)

"The law grants district judges wide discretion to participate in the questioning of witnesses," as it "is well established that a trial judge is more than a moderator or umpire."  *Swinton v. Potomac Corp.*, 270 F.3d 794, 808 (9th Cir. 2001) (quoting *Mostella*, 802 F.2d at 361).  Indeed, it is the court's "responsibility to make sure that evidence is understood, questions are clear and that words used are understood by the jury."  *J.R. v. City of San Bernardino*, No. 5:05-cv-1045-JWJ, 2007 WL 5030309, at *3 (C.D. Cal. Aug. 6, 2007), *aff'd sub nom. J.R. ex rel. Dickson v. City of San Bernardino*, 374 F. App'x 755 (9th Cir. 2010).  Thus, "[i]t is entirely proper for him to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony."  *Mostella*, 802 F.2d at 361; *see United States v. Poland*, 659 F.2d 884, 893 (9th Cir. 1981) (finding questions "calculated to make the testimony clearer to the jury" not improper).

A court's statements or intervention during trial require a new trial "only if the record 'discloses actual bias on the part of the trial judge or leaves . . . an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.'"  *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 531 (9th Cir. 1986) (alterations omitted).  Judicial remarks during a trial that are critical, disapproving, or even hostile to counsel, the parties, or their cases, "ordinarily do not support a bias or partiality challenge."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  This includes "expressions of impatience, dissatisfaction, annoyance, and even anger."  *Id.* at 555–56.

"The standard for reversal on the basis of judicial misconduct in a civil trial is . . . quite high." *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 779–80 (9th Cir. 1990); *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1989), *overruled on other grounds by Act Up!/Portland v. Bagley*, 988 F.2d 868, 872–73 (9th Cir. 1993). "Very few cases outside of the criminal law area support [a] . . . finding of general judicial misconduct during trial." *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1289 (9th Cir. 1984).

### 1.   Court Participation—Individual Incidents

Defendants identify five instances of judicial participation in the trial that they contend were improper and require a new trial.[3]   (*See* Mot. 5–11.)   As discussed further below, each incident is soundly within the Court's discretion to ensure the orderly presentation of evidence and to clarify questions and testimony.   Even if some instances could be deemed misconduct, they do not warrant a new trial.

### a.   Incident videos

Defendants first object to the Court directing Zelaya's Counsel to stop the replay of the incident videos.   (*Id.* at 6 (citing Tr. 174:7–9).)   The "trial judge has a wide discretion in his management of the trial," *Robinson v. United States*, 401 F.2d 248, 252 (9th Cir. 1968), which includes properly "controlling the orderly presentation of the evidence," *Mostella*, 802 F.2d at 361.

Over approximately thirty minutes, Zelaya's Counsel questioned Officer Richmond about the incident using video from multiple body worn cameras, surveillance videos, and patrol car dashboard cameras.   Counsel then played a video of the incident portraying four synchronized video sources.   When the replay became cumulative, the Court directed Counsel to stop the video.   (Tr. 174:7–9.)   Although Defendants accurately note that the videos are difficult to watch, (*see* Mot. 21), the

---

[3] During trial, Defendants objected only to the Court's questioning of defense police practice expert Edward Flossi.   (*See* Tr. 603:22–25 (defense mistrial motion).)   Nevertheless, the Court considers all identified instances of alleged judicial misconduct and finds Defendants fail to establish that a new trial is necessary.

Court's intervention clearly reflects only the Court's obligation to ensure "the orderly presentation of the evidence." *Kennedy*, 901 F.2d at 709 (quoting *United States v. Malcolm*, 475 F.2d 420, 427 (9th Cir. 1973)).

    b. <u>Questioning Officer Hunt</u>

  Defendants next object to the Court's questioning of Officer Hunt.  (Mot. 6.) Specifically, Defendants contend the Court's "skepticism" of Officer Hunt's testimony prejudicially undermined his credibility.  (*Id.* at 6–7, 16–17 (citing Tr. 245:1–247:16).) However, a district judge has the right to examine witnesses and call the jury's attention to important evidence.  *Kennedy*, 901 F.2d at 709; *Kern*, 899 F.2d at 780. "Questions by a court indicating skepticism are not improper when the witnesses are permitted to respond 'to the district court's expressed concerns to the test of their ability.'"  *Shad*, 799 F.2d at 531.

  After Counsel for both sides completed questioning Officer Hunt, the Court inquired to clarify his testimony regarding why Officers Richmond and Hunt used pain compliance techniques on Cedillo, and at what point Officer Hunt found Cedillo to be noncompliant.  (*See, e.g.*, Tr. 245:18 ("What was the purpose for the infliction of the pain?"), 245:23–24 ("But why was it done to begin with? Where was the noncompliance?").)  Officer Hunt testified that he was afraid of what Cedillo could do to the Officers, like "beginning to resist or try . . . to flee" or kick them.  (Tr. 247:4–9.) Finding Officer Hunt's responses unsupported by the video evidence, the Court continued: "We never saw any signs of either of those things happening [in the videos], so I don't know why it was that you thought that they might happen.  Or is that something that's convenient for the purpose of the trial?"  (Tr. 247:11–14.) Officer Hunt did not answer the Court's question.

  Although the Court "expressed concerns" and "skepticism," *Shad*, 799 F.2d at 531, the Court acted within its discretion in questioning Officer Hunt to clarify his testimony and appropriately provided him an opportunity to respond.  That Officer Hunt did not take the opportunity does not make the Court's question prejudicial.

c.  Questioning Noble and Officer Cuba

Defendants also point to the Court's interruption of Defendants' Counsel's questioning of Zelaya's police practices expert, Jeff Noble, and to the Court's questioning of LAPD Officer Brian Cuba.  (Mot. 7–8 (citing Tr. 337–38 (Noble), 482–86 (Cuba)); *see id.* at 17–18, 20.)  Each of the Court's interventions in the questioning of these witnesses was appropriately designed to clarify questions or testimony.

With respect to Noble, the Court properly required Counsel to rephrase a question that assumed facts not in evidence, specifically assuming the incident videos displayed Cedillo "becoming combative."  (Tr. 337:12–19 (Counsel: "Wouldn't you agree that the best way to gain control of somebody who's becoming combative is to get them into a prone position on the ground?"; Court: "Wait, wait, wait. Is there evidence of him being combative? I have a problem with your question, the hypothetical. Where is the combative part?").)  Counsel rephrased the question—"do you see any indication that Mr. Cedillo is resisting"—and Noble continued his testimony.  (*Id.* at 337:20–338:5.)  When Noble's response began to stray toward the original improper question, the Court appropriately redirected the witness to answer the rephrased question, confining the witness to the Court's evidentiary ruling.  (*Id.* at 338:7–10.)

Defendants object to the Court's sarcasm: "His question was whether or not Mr. Cedillo is resisting the efforts of the officers . . . to break his freakin' arm. Was he resisting that?"  (Mot. 20.)  But the use of sarcasm, and even isolated displays of irritation or annoyance, do not amount to prejudicial misconduct.  *See Mostella*, 802 F.2d at 361–62 (finding judge's "sarcastic comments" did not overstep proper judicial role); *Poland*, 659 F.2d at 894 (finding trial judge's displays of irritation and use of sarcasm were not prejudicial).  Counsel completed his examination of Noble without further interruption.  (*See* Tr. 338–47.)

With respect to Officer Cuba, the Court questioned him only after Counsel for both sides concluded their questioning.  (*See* Tr. 482:10–483:25 (prompting Officer

Cuba to clarify his initial testimony—that a code "415" means "a man that's acting -- poses a threat to himself or others"—and instead testify that a code "415" means merely "a disturbance"). However, when the Court asked why Cedillo was crying out in pain on the videos, why Officer Cuba was telling Cedillo to "relax," and why Officer Cuba thought the pain compliance techniques were used in this case to "de-escalate" the situation, Officer Cuba's answers became nonresponsive. (*See* Tr. 484:20–486:23.) Expressing understandable exasperation in the face of persistent nonresponsive answers, the Court thanked and excused Officer Cuba. (*Id.* at 486:24–25 ("Get out of here. Go. Thank you. Goodbye.").)[4]

Although Defendants may not have preferred the Court to ask its questions, even "quite pointed and intemperate" questioning does not necessitate a new trial when it is for the purpose of "clarifying the evidence." *See United States v. Scott*, 642 F.3d 791, 799–800 (9th Cir. 2011) (finding that judge's "pointed" questioning was not prejudicial where it was generally for the proper purpose of "clarifying the evidence"); *see also United States v. Laurins*, 857 F.2d 529, 537–38 (9th Cir. 1988) (finding judge's expressed exasperation did not amount to judicial misconduct).

> ### d.   Questioning Flosi

Finally, Defendants cite the Court's questioning of defense police practices expert Edward Flosi. (Mot. 9–11, 15–16.) A court may question an expert just as it may question any witness, to "clarify[] the evidence, confin[e] counsel to evidentiary rulings, control[] the orderly presentation of the evidence, and prevent[] undue repetition of testimony." *Mostella*, 802 F.2d at 361–62.

The Court initially intervened during Defendants' Counsel's direct examination of Flosi because Flosi's answer had "gotten way away from [counsel's] question," which was whether the Officers' use of prone restraints on Cedillo, as seen in the incident videos, was appropriate. (Tr. 576:4–24.) The Court restated Counsel's

---

[4] Defendants also object to the Court's aside to Counsel after Officer Cuba was excused. (Mot. 18 (citing Tr. 487:3 ("Pathetic.")).) But "cutting comments to counsel" will not generally mandate a new trial. *Kern*, 899 F.2d at 780.

question and Flosi answered that what he saw was appropriate.  (*Id.* at 576:21–577:5.)  The Court then sought to clarify what Flosi saw in the videos that made prone restraints appropriate, but Flosi did not answer.  (Tr. 577:14 ("I'm sorry. What's the question, sir?").)  The Court did not repeat the question.  (*See id.*)

Defendants next contend the Court improperly commented on Flosi's credibility.  (*See* Mot. 15 (citing Tr. 577:15–17 ("You're so in the bag. Why am I bothering? All right. I have nothing."))).)  However, as noted, the Court's expression of exasperation does not warrant a new trial.  *See United States v. McDonald*, 576 F.2d 1350, 1358 (9th Cir. 1978) (finding judge's remarks that "were sharp, even sarcastic, [did] not represent an abuse of discretion that warrants a new trial").  To the extent the Court's comment may have reflected skepticism or an appraisal of Flosi's credibility, Flosi was given ample opportunity to respond when Defendants' Counsel resumed and completed his inquiries uninterrupted.  *See Shad*, 799 F.2d at 531 (noting that court comments indicating skepticism are not improper when witness has opportunity to respond).  Moreover, the Court properly instructed the jury that they were the finders of fact and should not read into any of the Court's comments.  *See Robinson*, 401 F.2d at 252 (quoting *Smith v. United States*, 305 F.2d 197, 205 (9th Cir. 1962) (noting that a court may comment on the credibility of a witness provided it clearly instructed the jury that they determine the facts and may disregard the court's comments)).

Defendants' final objection is to the Court's further questioning of Flosi after Counsel completed their inquiries.  (Mot. 9–11, 15–16, 19 (citing Tr. 596–601).)  Once again, the Court's further questioning was appropriately designed to highlight and clarify portions of Flosi's testimony.  *See United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001) (stating that trial judge may "participate in the examination of witnesses to clarify issues and call the jury's attention to important evidence").  For instance, Flosi testified: "*We* try to de-escalate when *we* can." (Tr. 586:19 (emphasis added).)  The Court inquired further to highlight this testimony and clarify Flosi's independence as an expert, as his testimony suggested alignment with Defendants.

(*See* Tr. 596:2–21 ("So do you put yourself in that equation?"; "You said 'we' try to de-escalate. And I'm wondering, [h]ow did you get into this situation?").)  When the Court asked whether Flosi considered himself so "closely aligned with law enforcement" that he "can no longer be objective," Flosi answered that he did not, which the Court accepted.  (Tr. 596:16–21.)

Flosi also testified that the Officers' use of the pain compliance techniques, the take-down, and the two prone restraints were appropriate when Cedillo was resisting the Officers, attacking and kicking at them, and potentially trying to escape.  (*See, e.g.*, Tr. 576:4–10; 577:21–578:15, 590:7–11, 593:19–20.)  The Court inquired to clarify the basis for this opinion because the Court did not see Cedillo resisting, attacking, kicking, or trying to escape in the incident videos presented at trial.  (*See* Tr. 597:4–601:21; *id.* at 600:13–19 (Court: "Where are you getting this understanding from? Where are you getting this information from?" Witness: "From the material I reviewed." Court: "It's not on the video." Witness: "Unless the officers are narrating the video, um, they wouldn't have -- it would have to be in a statement.").)

The Court was within its discretion in questioning Flosi to clarify and highlight the evidence for the jury.  *See Parker*, 241 F.3d at 1119.  To warrant a new trial, the judicial participation would need to be far more frequent and extreme than these instances.  *See, e.g.*, *Mostella*, 802 F.2d at 361–62 (finding trial judge's numerous interruptions through a trial, including "extensive questioning" of expert witnesses and "sarcastic comments," did not merit a new trial); *Handgards*, 743 F.2d at 1289 (finding hostile comments and repeated interruptions did not rise to the level of "unfairness" required to warrant a new trial).

### 2.   *Court Participation—Cumulative Effect*

Having determined that none of the identified judicial interactions individually rise to the level warranting a new trial, the Court also considers them together and in light of the transcript as a whole.

Judicial words or actions in a trial, even when seemingly inappropriate, will not warrant a new trial unless they "so persistently pervade the trial or, considered individually or together, are of such magnitude that a courtroom climate unfair to the defendant is disc[er]nible from the cold record." *See Robinson*, 401 F.2d at 252 (quoting *Smith*, 305 F.2d at 205). This requires "an 'extremely high level of interference' by the trial judge," *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995), such as where a court "dominate[s] questioning of the witnesses so as to preempt counsel's function," *Kennedy*, 901 F.2d at 709 (citing *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 926 (4th Cir. 1984)); *see United States v. Pena-Garcia*, 505 F.2d 964, 966–67 (9th Cir. 1974) (finding judge "went too far" where he continually interrupted counsel, threatened and intimidated witness and counsel, and usurped prosecutor's role).

Very few cases have found judicial misconduct reversible in the civil law area. *See Handgards*, 743 F.2d at 1289. Indeed, the vast majority of cases conclude that the judicial conduct at issue was not prejudicial, nor did it rise to the level requiring a new trial. For instance, in *Kennedy*, the Ninth Circuit held that even though the district judge's "questioning was not marked by complete indifference" and instead was sometimes "quite pointed and intemperate," a new trial was not required. 901 F.2d at 709. The court noted that the trial judge's questioning filled only eight pages of a 400-page trial transcript and the "court [did not] dominate questioning of the witnesses so as to preempt counsel's function." *Id.* In *Ward v. Westland Plastics, Inc.*, the Ninth Circuit found that although the judge' conduct "borderline," it did not ultimately prejudice the plaintiff's case in light of (1) the judge's proper caution to the jury not to take his questions or remarks as evidence, and (2) the plaintiff's lack of persuasive evidence on the ultimate issues. 651 F.2d 1266, 1271–72 (9th Cir. 1980). And in *Poland*, even though it was a criminal case, the Ninth Circuit still held that the trial judge's impatience, irritation, and sarcasm were not prejudicial given that the instances were relatively few when "[v]iewed against the very long record of

1  testimony," and in light of the overwhelming evidence against defendants.  659 F.2d
2  at 892, 894.

3      This case fits easily within the above examples.  While the Court's questioning
4  was not at all times "marked by complete indifference" and may even have been
5  "quite pointed and intemperate," the cumulative effect of the Court's participation
6  cannot be said to be prejudicial when viewed against the transcript as a whole and the
7  abundant video evidence.  As cited by Defendants, the Court's comments and
8  questioning comprises only seventeen pages of a total 680 pages of trial transcript.
9  The Court questioned or engaged only four witnesses out of thirteen.  These relatively
10  few interactions cannot be found to dominate the questioning or preempt Counsel's
11  role.  Rather, the Court's questions appropriately sought to clarify questions or
12  responses, the Court afforded witnesses an opportunity to respond to the Court's
13  questions, and the Court did not state an opinion on the ultimate issues.  *See Shad*,
14  799 F.2d at 531 (finding no abuse of discretion based on similar findings).

15      Additionally, the Court twice instructed the jury not to read into anything the
16  Court said or did that it had any opinion on the evidence or the verdict.  (*See*
17  Tr. 117:14–16, 614:8–10 ("Please do not read into these instructions or anything that I
18  may have said or done that I have an opinion regarding the evidence or what your
19  verdict should be.").)  These instructions helped alleviate "any appearance of
20  impartiality the [Court's] questioning may have conveyed."  *Kennedy*, 901 F.2d
21  at 709; *see United States v. Morgan*, 376 F.3d 1002, 1008–09 (9th Cir. 2004) (finding
22  questioning that was "inappropriately extensive and suggestive" did not warrant
23  reversal in light of the court's curative instructions given both before and after
24  questioning).

25      Defendants rely on *Maheu v. Hughes Tool Co.*, 569 F.2d 459 (9th Cir. 1977), to
26  argue the Court's conduct was so prejudicial it could not be cured by appropriate jury

27
28

instructions.[5]  (*See* Mot. 13, 19; Reply 3–4.)  But Defendants do not benefit from this plainly distinguishable case.  In *Maheu*, a defamation case, the central issue was the plaintiff's credibility.  Despite voluminous conflicting evidence on the plaintiff's credibility and the plaintiff having been "thoroughly and convincingly impeached," the trial judge gave what amounted to a personal glowing character reference for the plaintiff immediately before the jury retired to deliberate.  569 F.2d at 471–72.  The judge additionally had his glowing character reference transcribed and included with the jury's written instructions for their reference during deliberations.  *Id.* at 472.

This case is nothing like *Maheu*.  Here, Defendants' credibility was not the controlling issue; it was but one factor among many.  Also, the jury in this case was not limited in their deliberations to the parties' testimony; rather, they had the benefit of extensive video evidence of the incident from multiple cameras and angles.  Moreover, the Court seldom, if ever, spoke directly to the ultimate issues, and clearly instructed the jury, not once but twice, not to read into anything the Court said or did that it had any opinion on the evidence or outcome.  "Juries are presumed to follow jury instructions." *Scott*, 642 F.3d at 800.

In sum, Defendants fail to establish that the Court's comments and questions, considered individually or together, rise to the level of prejudicial judicial misconduct that warrants a new trial.

---

[5] Defendants also rely extensively on *Rivas v. Brattesani*, 94 F.3d 802 (2d Cir. 1996).  (*See* Mot. 14, 17, 18, 21.)  However, *Rivas* is a case out of the Second Circuit, and is therefore not binding on this Court.  *See generally Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) (discussing that precedent in a Circuit Court of Appeals binds all courts within that particular circuit).  Nevertheless, *Rivas* is inapposite here.  The court in *Rivas* found the trial judge's statements carried more than the usual import because the parties told "sharply divergent stories about their encounter."  *Id.* at 805 (describing plaintiff's account that the officer came into a restaurant and began beating plaintiff without provocation, in contrast with defendant's account that he conducted a routine stop and frisk of plaintiff on a street corner).  Here, in contrast, the parties agree on the majority of facts and the jury could rely on extensive video evidence of the incident.  Thus, the Court's comments and questioning in this case did not carry the outsized weight present in *Rivas*.

**B.     Damages Award Not Excessive**

A court may also grant a new trial where the jury awards excessive damages. *Banks-Reed v. Mateu*, Nos. 19-17444, 20-17085, 2022 WL 486607, at *2 (9th Cir. Feb. 17, 2022).   However, in the Ninth Circuit, the court affords "substantial deference" to a jury's findings as to the appropriate amount of damages, *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996), unless it is "clearly not supported by the evidence," *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).  Thus, in evaluating a verdict for excessiveness, a court reviews the evidence in a light most favorable to the prevailing party, disturbing only those awards that it concludes are "grossly excessive or monstrous" or "based on passion or prejudice."  *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (en banc).

Defendants argue the Court's prejudicial misconduct influenced the jury to award excessive damages based on inflamed passions.  (Mot. 21–22.)  In light of the conclusion that the Court's appropriate participation in the trial was not prejudicial, the Court's conduct correspondingly did not inflame the jury's damages award.  The Court finds the jury award is supported by the evidence and is not "grossly excessive or monstrous."  *Lambert*, 180 F.3d at 1011.  Notably, it falls far short of the figure Zelaya suggested in closing arguments.  (*See* Tr. 650:24 (suggesting $20 million).) As nothing justifies disturbing the substantial deference due to the jury's findings as to the appropriate amount of damages, the Court declines to overturn the jury's verdict.

**C.     Defendants' Rule 59(e) Motion**

Defendants also move to "vacate/amend/alter the judgment" under Rule 59(e), "[f]or the same reasons" as in its Motion for a New Trial.  (Mot. 22.)  As such, "[f]or the same reasons" discussed above, the Court declines to grant the "extraordinary remedy" of Rule 59(e).  *See Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) ("[A] Rule 59(e) motion is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." (internal quotation marks omitted)).

## V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' Motion for a New Trial and/or Motion to Alter or Amend the Judgment.  (ECF No. 133.)

**IT IS SO ORDERED.**

May 24, 2024

_____

**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**